IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| DAVID LYNN CARPENTER, | § | |
| Petitioner, | § | |
| | § | Civil Action No. 3:02-CV-1145-H |
| v. | § | "ECF" |
| | § | Referred to the U.S. Magistrate |
| NATHANIEL QUARTERMAN, Director, | § | |
| Texas Department of Criminal Justice | § | |
| Justice, Correctional Institutions Division, | § | |
| Respondent. | § | |

**RESPONDENT QUARTERMAN'S SUPPLEMENTAL ANSWER
WITH BRIEF IN SUPPORT**

Petitioner, David Lynn Carpenter ("Carpenter"), was properly convicted and sentenced to die in a Texas state court for the murder of Nelda Henin ("Henin"). He now challenges his presumptively valid conviction and sentence in federal court pursuant to 28 U.S.C. §§ 2241 & 2254. Carpenter filed his original petition for a writ of habeas corpus on March 13, 2003. In his petition, Carpenter alleged that the state court denied him due process by not conducting a hearing to explore newly discovered evidence that Carpenter's co-defendant allegedly confessed to the murder and exculpated Carpenter. The Respondent, Nathaniel Quarterman ("the Director"), responded to Carpenter's petition on January 12, 2004, contending that this claim was unexhausted and procedurally defaulted. On April 15, 2004, the Court stayed the case to allow Carpenter to exhaust this claim in his state court. Carpenter returned to state court, and the Texas Court of Criminal Appeals ultimately denied relief on March 7, 2007. On April 7, 2007, the Court reinstated the case and ordered supplemental briefing from the parties. Carpenter filed an amended petition on June 4, 2007. Yet Carpenter's amended brief fails to demonstrate that he is entitled to federal habeas relief, and therefore the Director respectfully requests that the Court grant summary judgment in

his favor.

## PETITIONER'S ALLEGATION

The Director understands Carpenter to allege that the state court denied him due process by not conducting a hearing to explore newly discovered evidence that his co-defendant allegedly confessed to Henin's murder and exculpated him.

## STATE COURT RECORDS

The Director has transmitted copies of Carpenter's most recent state writ proceedings to the Court under separate cover.

## STATEMENT OF CASE

Carpenter was convicted and sentenced to death for murdering Henin in 1991. The Texas Court of Criminal Appeals affirmed Carpenter's conviction and sentence on October 24, 2001. *Carpenter v. State*, No. 73,442 (Tex. Crim. App. 2001). Carpenter did not petition the Supreme Court for a writ of certiorari.

Concurrent with his direct appeal, Carpenter filed an application for habeas relief in the trial court on August 30, 2000. *Ex parte Carpenter,* Application No. 46,656-01, at 4. On May 1, 2001, the trial court entered an order adopting the State's proposed findings and recommending that relief on Carpenter's application be denied. *Ex parte Carpenter*, Application No. 46,656-01 at 626-27. The Court of Criminal Appeals adopted the trial judge's recommendation and denied habeas relief on December 19, 2001. *Ex Parte Carpenter*, Application No. 49,656-01 (Tex. Crim. App. 2001), Order.

Carpenter filed his original federal petition for a writ of habeas corpus on March 13, 2003. The Director answered Carpenter's petition and moved for summary judgment on January 12, 2004. On April 15, 2004, the Court stayed the case to allow Carpenter to exhaust this claim in his state court.

2

On April 19, 2004, Carpenter filed his third state habeas application.[1] On September 22, 2004, the Court of Criminal Appeals held that Carpenter's allegations satisfied the requirements of a subsequent writ application and remanded the case to the trial court for consideration of Carpenter's claim. Based on the trial court's findings of fact and conclusions of law, the Court of Criminal Appeals of Texas ultimately denied relief on March 7, 2007. *Ex Parte Carpenter*, No. 49,656-03 (Tex. Crim. App. 2007), Order.

On April 7, 2007, this Court reinstated the case and ordered supplemental briefing. Carpenter filed his amended petition on June 4, 2007.

## STATEMENT OF FACTS

### I. Facts of the Crime

The Court of Criminal Appeals summarized the facts on direct appeal as follows:

[I]n August of 1991, Evrin Smith hired [Carpenter] to murder Nelda Henin, the former girlfriend of Smith's lover, Gary Hall. At approximately 8:30 a.m. on August 28, 1991, [Carpenter] broke into Henin's home and cut her throat.

As [Carpenter] was breaking into Henin's home, Henin was talking to her friend Ricky Jackson on the phone. She told Jackson to call the police because someone was breaking in her front door. After a few seconds of silence, Jackson hung up the phone and called the police, then drove to Henin's house. When he arrived, he found the police already there and told them about his conversation with Henin on the phone.

Tessica Rainey saw [Carpenter] fleeing Henin's house that morning while driving herself and her younger brother to school. Rainey first noted Henin's alarm sounding, then saw [Carpenter] run from Henin's front porch. [Carpenter] jumped into his car and sped away, nearly sideswiping Rainey's car as he fled. He looked directly at Rainey as he drove past her.

---

[1] In July 2003, Carpenter filed a second state application. The Court of Criminal Appeals dismissed that application as an abuse of the writ on October 1, 2003. *Ex parte Carpenter*, No. 49,656-02 (Tex. Crim. App. 2003).

Bernard White, also on his way to school that morning, encountered Henin in her front yard a few minutes after the attack. He heard Henin's alarm sounding and saw her standing in her front yard, holding her neck, and waving him towards her. Realizing that Henin was bleeding profusely, White ran inside Henin's house to call for help. When he discovered the phone was dead, he ran to a neighbor's house and called 911. He then returned to Henin's house and waited outside for help to arrive.

Dallas Police Officer Verle Trammel arrived at Henin's house moments after White called. The alarm was sounding, the front door was open, and the door frame was shattered. Officer Trammel found Henin inside alone, lying on her living room floor and clutching a Bible. Her eyes were open, but she did not respond to the officer's questions.

The paramedics arrived shortly thereafter and immediately transported Henin to the hospital. They attempted to revive her, but she was pronounced dead minutes after arriving at the hospital.

Henin's murder remained unsolved for more than six years. In September of 1997, the police department renewed its investigation after receiving a tip from a confidential informant. Dallas Police Detective Kenneth Penrod oversaw the renewed investigation and contacted [Carpenter]'s former live-in girlfriend, Mandee McBay, in response to the tip.

According to McBay, [Carpenter] told her that Smith had offered to pay him to kill Henin because she wanted Henin's boyfriend. On the morning of the murder, [Carpenter] returned to the mobile home that he shared with McBay, entered their bedroom, and told McBay that he had just cut Henin's throat. [Carpenter] drew his bloody buck knife from his pocket and opened it, then handed McBay the knife along with his tennis shoes, instructing her to clean them both. He also told McBay that he had kicked in Henin's door. Smith had shown [Carpenter] where Henin lived. Smith visited [Carpenter] a couple of times at the mobile home after the murder but never paid him in full.

Based on the information obtained from McBay, Detective Penrod assembled a photographic line-up containing [Carpenter]'s picture and presented it to Tessica Rainey. Rainey identified [Carpenter] by his photograph as the man she saw fleeing from Henin's house on the morning of the murder.

Detective Penrod then contacted [Carpenter]'s aunt and cousin, Judy Carter and Becky Crisler. Smith had lived with Carter and worked with Crisler. According to Crisler, Smith had a sexual relationship with Gary Hall, Smith's supervisor. Hall was also dating and sometimes living with Henin. Smith became obsessed with Hall and Henin, following both of them after work and spying on Henin's house several times a week. On one occasion, Smith asked Crisler if she thought [Carpenter] would kill Henin for her. After the murder, Smith asked Crisler not to report their conversation about hiring [Carpenter] to kill Henin. Crisler, nonetheless, did contact Crimestoppers shortly after the murder and made an anonymous report regarding Henin's "boyfriend's girlfriend."

When Detective Penrod interviewed Smith, she initially denied, then minimized her involvement in the murder. Eventually, she did admit her obsession will Hall and confessed to stalking Henin and hiring [Carpenter] to murder her. According to Smith, she agreed to pay [Carpenter] $1000 in installments of $100. She gave him a $100 advance payment. She also showed [Carpenter] where Henin lived and identified Henin's bedroom.

Smith professed that she telephoned [Carpenter] a couple of days after hiring him and called off the murder. [Carpenter] became angry and told her he needed the money. After he killed Henin, [Carpenter] called Smith, told her he had committed the murder, and demanded payment. Smith refused to pay [Carpenter], then went to his mobile home and demanded her $100 back. [Carpenter] became very angry, took another $20 from Smith, and threatened to harm her. Smith left but never made another payment. She was charged with criminal solicitation and testified against [Carpenter] at trial.

*Carpenter*, at 2-5.

## II.   Facts Regarding Punishment

In addition to the heinous nature of the evidence presented at trial, the State introduced evidence showing that Carpenter presented a future danger to society. As a juvenile, Carpenter nearly drowned an eight-year-old boy by holding his head under water in the schoolyard fountain. 29 RR 254; 30 RR 26-32.[2] In a two-year time period, Carpenter

---

[2]   "RR" refers to the reporter's record of transcribed trial proceedings. All references are

was convicted of four misdemeanors and three felonies, including two burglaries. 28 RR 11-23; 29 RR 18-20, 26-36, 38-46. With each conviction, Carpenter received longer sentences, but nevertheless continued his crime spree with not only this murder but also a felony conviction for endangering a child during a high-speed flight from police. 28 RR 12-13; 29 RR 72-78.

The State also presented ample evidence of Carpenter's violent personality. He sought out confrontations and in one incident was shot in a bar brawl. 28 RR 33, 47. In prison, Carpenter assaulted fellow prisoners. 29 RR 135-37, 148, 150-52, 183-84, 192-93, 200. Mandee McBay ("McBay") testified that Carpenter repeatedly physically and sexually assaulted her during their relationship. 28 RR 30-32; 40-42. He also stalked the fourteen-year-old daughter of his cousin, Becky Crisler ("Crisler"). Further, after Crisler confronted him about this, he tried to run her down with his truck and later called threatening to burn her house down. The second time Crisler confronted him, he threatened to kill her. 28 RR 47-49, 29 RR 94-100.

Even testimony from Carpenter's relatives supported the State's case. His father acknowledged that he was put on juvenile probation for the attempted drowning of the eight year-old. 29 RR 254. His mother admitted Carpenter had disciplinary problems and had to keep his father's guns locked away from him. 29 RR 268-70. Crisler also testified that Carpenter failed to reimburse his grandmother for a truck loan, and when family members attempted to reclaim the truck, he threatened to kill his grandmother. 28 RR 45-46.

---

preceded by volume number and followed by page numbers.

**ARGUMENT**

I.     **Standard Of Review**

Carpenter filed his supplemental federal petition for a writ of habeas corpus on June 4, 2007.  Supplemental Petition.  Consequently, his petition is subject to review under the amendments to the federal habeas corpus statutes embodied in the Antiterrorism and Effective Death Penalty Act of 1996 ("the AEDPA").  28 U.S.C.A. § 2254; *Lindh v. Murphy*, 521 U.S. 320, 336 (1997) (noting that the AEDPA applies to those habeas corpus cases filed after its effective date of April 24, 1996).

The provisions of Section 2254(d) set forth a "highly deferential standard for evaluating state-court rulings . . . which demands that state court decisions be given the benefit of the doubt."  *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (internal citation omitted).  Here, the petitioner may not obtain federal habeas corpus relief with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim:

> (1)     resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2)     resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d) (West 2007); *see Price v. Vincent*, 538 U.S. 634, 639 (2003); *see also Riddle v. Cockrell*, 288 F.3d 713, 716 (5th Cir. 2002) (quoting 28 U.S.C. § 2254(d)(1)-(2)).  Courts are to review pure questions of law and mixed questions of law and fact under subsection (d)(1), and pure questions of fact under subsection (d)(2).  *See Martin v. Cain*, 246 F.3d 471, 475 (5th Cir. 2001).  Under this standard, a federal court's review is restricted

7

to the reasonableness of the state court's "ultimate decision, not every jot of its reasoning." *Santellan v. Cockrell*, 271 F.3d 190, 193 (5th Cir. 2001) (citing *Cruz v. Miller*, 255 F.3d 77, 86 (2nd Cir. 2001) (noting that even where a state court makes a mistake in its analysis, "we are determining the reasonableness of the state court's 'decision' . . . not grading their papers."). Indeed, the AEDPA deferential standard of review applies even if the state court does not cite to applicable Supreme Court precedent or does not explain its decision. *Early v. Packer*, 537 U.S. 3, 7, 8 (2002); *Schaetzle v. Cockrell*, 343 F.3d 440, 443 (5th Cir. 2003); *Catalan v. Cockrell*, 315 F.3d 491, 493 (5th Cir. 2002).

A decision is contrary to clearly-established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." *(Terry) Williams v. Taylor*, 529 U.S. 362, 413 (2000). A decision is an unreasonable application of federal law "if the state court identifies the correct governing legal principle . . . but unreasonably applies that principle to the facts of the prisoner's case." *Id.* To be unreasonable, the state decision must be more than merely incorrect or erroneous. *See Lockyer v. Andrade*, 538 U.S. 63, 65 (2003). Rather, the state court's application of clearly-established law must be "objectively unreasonable." *Id.* Stated another way, a reversal is not required unless "the state court decision applies the correct legal rule to a given set of facts in a manner that is so patently incorrect as to be 'unreasonable.'" *See Gardner v. Johnson*, 247 F.3d 551, 560 (5th Cir. 2001); *see also Montoya v. Johnson*, 226 F.3d 399, 403-04 (5th Cir. 2000) (reiterating that the standard for federal habeas relief is one of objective reasonableness) and *Neal v. Puckett*, 286 F.3d 230, 246 (5th Cir. 2002) (*en banc*) (holding that a federal court's "focus on the 'unreasonable application' test under Section 2254(d) should be on the ultimate legal conclusion that the

8

state court reached and not on whether the state court considered and discussed every angle of the evidence").

Specifically, the AEDPA has "modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693 (2002); (citing *(Terry) Williams*, 529 U.S. at 403-404). A federal habeas court's inquiry into unreasonableness should be objective rather than subjective, and a court should not issue the writ simply because that court concludes in its independent judgment that the relevant state court decision applied clearly-established federal law erroneously or incorrectly. *(Terry) Williams*, 529 U.S. at 409-11; *Tucker v. Johnson*, 242 F.3d 617, 620-21 (5th Cir. 2001). Rather, federal habeas relief is only merited where the state court decision is both incorrect and objectively unreasonable. *(Terry) Williams*, 529 U.S. at 411; *Martin*, 246 F.3d at 476. In other words, habeas relief is inappropriate when a state court, at a minimum, reaches a "satisfactory conclusion." *(Terry) Williams,* 529 U.S. at 410-11 (citing *Wright v. West*, 505 U.S. 277, 287 (1992)).

In review of a state prisoner's federal habeas petition, "a determination of a factual issue made by a State court shall be presumed to be correct," and the petitioner "shall have the burden of rebutting the presumption by *clear and convincing evidence*." 28 U.S.C. §2254(e)(1) (emphasis added); *see Smith v. Cockrell*, 311 F.3d 661, 668 (5th Cir. 2002); *see also Sumner v. Mata*, 449 U.S. 539, 546-47 (1981) (holding that state appellate courts' findings are entitled to the same respect that trial judges' findings receive). "The presumption of correctness not only applies to explicit findings of fact, but it also applies to those unarticulated findings which are necessary to the state court's conclusions of mixed law and fact." *Valdez v. Cockrell,* 274 F.3d 941, 948 n.11 (5th Cir. 2001).

9

Moreover, where the petitioner has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that:

(A)    the claim relies on–

    (I)    a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or

    (ii)    a factual predicate that could not have been previously discovered through the exercise of due diligence; and

(B)    the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

28 U.S.C. § 2254(e)(2) (2007).

Thus, in the state courts, a petitioner "must be diligent in developing the record and presenting, if possible, all claims of constitutional error.  If the prisoner fails to do so, himself or herself contributing to the absence of a full and fair adjudication in state court, Section 2254(e) prohibits an evidentiary hearing to develop the relevant claims in federal court, unless the statute's other stringent requirements are met." *(Michael) Williams v. Taylor*, 529 U.S. 420, 437 (2000).

Finally, habeas relief is foreclosed if a claim (1) is procedurally barred as a consequence of a failure to comply with state procedural rules, *Coleman v. Thompson*, 501 U.S. 722 (1991); (2) seeks retroactive application of a new rule of law to a conviction that was final before the rule was announced, *Teague v. Lane*, 489 U.S. 288 (1989); or (3) asserts trial error that, although of constitutional magnitude, did not have a "substantial and injurious

10

effect or influence in determining the jury's verdict," *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993) (citation omitted).

### B.      Summary Judgment

A party seeking a summary judgment "bears the initial burden of 'informing the district court of the basis for the motion, and identifying those portions of the [record] which it believes demonstrate the absence of a genuine issue of material fact.'" *Taita Chem. Co. v. Westlake Styrene Corp.*, 246 F.3d 377, 385 (5th Cir. 2001) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the movant presents a properly supported motion for summary judgment, "the burden shifts to the nonmoving party to show with 'significant probative evidence' that there exists a genuine issue of material fact." *Hamilton v. Segue Software, Inc.*, 232 F.3d 473, 477 (5th Cir. 2000) (quoting *Conkling v. Turner*, 18 F3d 1285, 1295 (5th Cir. 1994)).

In federal habeas cases, however, the parties' summary judgment burdens must be viewed under the deferential scheme of the 1996 amendments to the federal habeas corpus statute embodied in the AEDPA. While "[a]s a general principle, Rule 56 of the Federal Rules of Civil Procedure, relating to summary judgment, applies with equal force in the context of habeas corpus cases," *Clark v. Johnson,* 202 F.3d 760, 764 (5th Cir. 2000), the rule applies only to the extent that it does not conflict with the habeas rules. Therefore, Section 2254(e)(1)—which mandates that findings of fact made by a state court are "presumed to be correct"—overrides the ordinary rule that, in a summary judgment proceeding, all disputed facts must be construed in the light most favorable to the nonmoving party. Unless a habeas petitioner can "rebut [ ] the presumption of correctness by clear and convincing evidence" as to the state court's findings of fact, they must be accepted as correct. *Smith v. Cockrell*, 311 F.3d 661, 668 (5th Cir. 2002).

11

## II.     Carpenter's Complaints Are Not Cognizable and Entirely Without Merit.

In his Supplemental Petition, Carpenter argues that he is actually innocent, that Smith has admitted sole responsibility for committing the murder, and that Smith committed perjury at trial by incriminating him.  Supp. Pet. at 2-3.  In support of his argument, Carpenter submits affidavits from prison inmates Debra Lebourney ("Lebourney"), Dana Chamberlain ("Chamberlain"), Deborah Curry, and Athena Burdick.  *Id*. at Exhibits 1-4.  These inmates claim that Smith admitted to them that she framed Carpenter and murdered Henin by herself. He asserts that the state court "denied [him] a hearing on his claim of newly discovered evidence based upon an unreasonable application of existing legal precedent."  *Id*. at 1.  He further claims that the state court "erred in denying [his] claim for relief . . . due to an unreasonable determination of objective facts."  *Id*. at 1.  This Court, however, should deny Carpenter's claim for relief because it is not cognizable on federal habeas corpus review.

### A.     Errors in state habeas proceedings are not cognizable on federal habeas review.

To the extent that Carpenter complains that he should be granted relief because the state court refused to conduct a hearing on his claim, this claim is foreclosed by years of precedent.  Infirmities in state habeas corpus proceedings do not state a claim for federal habeas corpus relief.  *Henderson v. Cockrell*, 333 F.3d 592, 606 (5th Cir. 2003); *Wheat v. Johnson*, 238 F.3d 357, 361 (5th Cir. 2001); *Beazley v. Johnson* , 242 F.3d 248, 271 (5th Cir. 2001);  *Hallmark v. Johnson*, 118 F.3d 1073, 1080 (5th Cir. 1997);  *Nichols v. Scott*, 69 F.3d 1255, 1275 (5th Cir. 1995);  *Duff-Smith v. Collins*, 973, F.2d 1175, 1182 (5th Cir. 1992); *Millard v. Lynaugh*, 810 F.2d 1403, 1410 (5th Cir. 1987);  *Vail v. Procunier,* 747 F.2d 277, 277 (5th Cir. 1984).

**B.**     **Furthermore, even though the state court did not conduct a live hearing, its findings are still entitled to deference under the AEDPA.**

Carpenter complains that the state court's decision to hold a 'paper hearing' was an objectively unreasonable application of prevailing Supreme Court precedent. Supp. Pet. at 10. Carpenter is mistaken. The AEDPA does not require state courts to adjudicate claims at trial-type hearings involving live testimony and cross-examination. The law in this circuit is clear that deference to a state habeas court's factual determinations is not dependent upon the form of the state court's evidentiary hearing. *Valdez*, 274 F.3d 941. The *Valdez* court held that "a full and fair hearing is not a precondition to according § 2254(e)(1)'s presumption of correctness to state habeas court findings of fact nor to applying § 2254(d)'s standards of review." *Id*. at 951. The Fifth Circuit concluded that deference was owed unless the findings were rebutted by clear and convincing evidence to the contrary.

This is so even if the hearing was a 'paper' hearing. *Morrow v. Dretke*, 367 F.3d 309, 315 (5th Cir. 2004) (citing *Valdez*, 274 F.3d at 950-51). It is also true, as here, even if the trial judge and state habeas judge are different. *Rudd v. Johnson*, 256 F.3d 317, 319 (5th Cir. 2001).

Carpenter's cited precedent to the contrary simply does not support his argument. Rather, it is a mélange of unpublished decisions, 28 U.S.C. § 2255 cases, and opinions from other circuits. Carpenter apparently fails to recognize that (1) he is proceeding under 28 U.S.C. §§ 2241 & 2254, not 28 U.S.C. § 2255; (2) he is under the ambit of the Fifth Circuit, not the Seventh or Eleventh; and (3) his unpublished cases—even if they stood for the proposition he asserts (which they do not)—lack weight. Carpenter's argument that the state court's findings are not entitled to deference is unfounded and should be summarily dismissed.

### C.  Claims of actual innocence based on newly discovered evidence do not state a ground for federal habeas relief.

Carpenter couches his claim as a due process violation stemming from the state court's decision not to conduct a hearing on his evidence.  Carpenter would have the Court apply a "three-step determination" to evaluate his claim.  But the precedent he cites to deals largely with claims of newly discovered evidence in the *direct appeal* context.  Carpenter is not on direct appeal.  Rather, he is challenging the denial of his state habeas application in federal district court.  As such, applying his "three-part determination" at this juncture would be completely inappropriate.

As recognized by the state court, Carpenter's claim is more accurately a claim of actual innocence based on newly discovered evidence.  Presumably, Carpenter phrases his claim as a due process violation to circumvent this circuit's firmly established law barring relief on stand-alone actual innocence claims.

"Claims of actual innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding."  *Herrera v. Collins,* 506 U.S. 390, 400 (1993).  "This rule is grounded in the principle that federal habeas courts sit to ensure that individuals are not imprisoned in violation of the Constitution—not to correct errors of fact." *Herrera*, 506 U.S. at 399.  Although in dicta the Supreme Court assumed "for the sake of argument that a *truly persuasive* showing of 'actual innocence' made after trial would render the execution of a defendant unconstitutional," the Court nevertheless reasoned that habeas relief would be warranted only "if there were no state avenue open to process such a claim. . . ." *Id.* at 417.  While some courts have adopted as a matter of law the *Herrera*

14

assumption,[3] the Fifth Circuit Court of Appeals has expressly and consistently declined to adopt that rule. *Graham v. Johnson*, 168 F.3d 762, 788 (5th Cir. 1999); *Dowthitt v. Johnson*, 230 F.3d 733, 741 (5th Circuit 2000) (expressly rejecting the assuming *arguendo* portion of *Herrera* ); *Lucas v. Johnson*, 132 F.3d 1069, 1074 (5th Cir. 1998) (reaffirming the long-standing principle that "the existence merely of newly discovered evidence relevant to the guilt of a state prisoner is not a ground for relief on federal habeas corpus");[4] *Jacobs v. Scott*, 31 F.3d 1319, 1324 (5th Cir. 1994) (declining to adopt the assuming *arguendo* portion of *Herrera* and adhering to law of circuit that the existence merely of newly discovered evidence relevant to the guilt of a state prisoner is not a ground for relief on federal habeas corpus).

Thus, under the law of this circuit, Carpenter fails to raise a constitutionally cognizable claim. To the extent Carpenter wants the Court to issue a new rule of law finding that claims of actual innocence provide a basis for federal relief, then he is foreclosed from relief based on the principles announced in *Teague*, 489 U.S. at 310. For these reasons, habeas relief is precluded as a matter of law.

### D.   Even if Carpenter's actual innocence claim was cognizable, it has no merit.

Carpenter takes issue with many of the state court's findings. He also makes the blanket assertion that all of the state court's determinations are suspect because the state habeas judge failed to read the record. Supp. Pet. at 12-13. Carpenter believes that by

---

[3]   *See, e.g., Griffin v. Delo*, 33 F.3d 895, 908 (8th Cir. 1994).

[4]   Certiorari was dismissed in *Lucas* because he presented his claims of actual innocence through the clemency process and the Governor commuted his death sentence to life imprisonment. Thus, the clemency process is an effective vehicle for presentation of actual innocence claims.

adopting Findings of Fact 104-110, the judge has implicitly accused herself of violating the code of judicial ethics. *Id*. Therefore, Carpenter reasons, the judge must not have read what she was signing and this Court should not assign any value to the state court's findings. *Id*.

But Carpenter's argument is based on a false premise. The findings in question simply do not yield the implication that Carpenter reads into them. They merely recite the procedural history of the case. *Ex Parte Carpenter*, No. 49,656-03 at 60-61. Moreover, as explained above, even if Carpenter were correct and the judge failed read the record, the findings would still be entitled to deference. *See* Section II(B), *supra*.

**1. Carpenter fails to rebut the findings regarding Smith's vehicle with clear and convincing evidence.**

Carpenter claims that the state court found "that Smith was not present based solely on her ownership of a dissimilar vehicle" to the one used in the offense. Yet, the Director asserts that this was not the state court's finding. Instead, the state court found that Lebourney's affidavit was not credible because it contained an assertion that Smith possessed a vehicle matching the one spotted at the crime scene. *Ex Parte Carpenter*, No. 49,656-03 at 237-38 (Findings of Fact 65-70). This finding was based largely on Smith's affidavit, which explains, "Debra also states that in 1991 I drove an Oldsmobile Delta 88, red-brown in color, 4-door. Again, this statement is false. In 1991 I drove a 1990 Chevy Cavalier, 2-door, charcoal gray. The title was in my name and the car paid for. I am in total disbelief of the information Debra has tried to pass as fact." *Id*. at 93-99. The State further provided proof of vehicle registration verifying that Evrin owned a two-door 1990 Chevrolet Cavalier in 1991. *Id*. at 99-101. And the State introduced evidence at trial that Carpenter drove a reddish-brown 4-door Oldsmobile Delta 88 at the time of the offense. 24 RR137-38; 25 RR 27-28. Thus, the state court's findings are supported by the record and Carpenter fails to

16

rebut them with clear and convincing evidence.

### 2.   The state court's determination of Investigator Espinoza's credibility is entitled to deference.

Carpenter complains that the state court improperly found Investigator Espinoza more credible than Chamberlain despite not conducting a hearing during which Investigator Espinoza could be cross-examined. Supp. Pet. at 14. He raises the same complaint regarding the state court's finding that Smith was credible. *Id.* at 17-18. However, as noted in Section II(B), *supra*, neither the AEDPA nor controlling caselaw imposes such a burden on the state court. And although Carpenter plainly takes issue with the state court's assessment of the Investigator Espinoza[5] and Smith's credibility, the governing statute requires this Court to presume that the state court's credibility determinations are correct. 28 U.S.C. §§ 2254(d)(2), 2254(e)(1); *Self v. Collins*, 973 F.2d 1198, 1214 (5th Cir. 1992). These claims are without merit and should be denied.

### 3.   The record clearly shows that Ervin had an alibi for the murder.

Carpenter contests state court's finding that Smith had an alibi for the murder. Supp. Pet. at 15; *Ex Parte Carpenter*, No. 49,656-03 at 191-92, 195-96 (Findings of Fact 8, 24-28). But these findings are clearly supported by the record. During state writ proceedings, the State submitted an affidavit from a coworker of Smith, Adrian Cook. Cook establishes that Smith was at work at ProSet Press by 7:00 a.m. on the day of the offense and that he remembers Smith leaving work that same day shortly after Gary Hall received an urgent call and left the office. *Id.* at 108-09. Moreover, Crisler testified at trial that she picked up Smith from work between 9:00 and 9:30 that morning at ProSet Press. 24 RR 130; 26 RR 102. The

---

[5]   The Director further observes Carpenter does not supply any evidence refuting the statements contained in Espinoza's affidavit.

17

offense is estimated to have occurred at approximately 8:20 that morning.  Carpenter has not rebutted the state court's findings regarding Smith's alibi with clear and convincing evidence.  This claim should be denied.

### 4.     The state court's finding that Smith was aware of the details of the crime through secondary sources is supported by the record.

Carpenter complains that state court's finding that Smith's knowledge of certain facts concerning Henin's murder does not corroborate her alleged confession is no more than "speculation and conjecture."  Supp. Pet. at 15.  But Smith clearly explains in her affidavit that she knew about the details of the murder from several different sources. *Ex Parte Carpenter*, No. 49,656-03 at 93-99.  Furthermore, since the crime went unsolved for six years, Smith had plenty of time to read the newspaper and watch the news accounts on television.  The state court's conclusion is amply supported by the record.

### 5.     The state court's finding that the murder weapon belonged to Carpenter is supported by the record.

Carpenter alleges that the state court erroneously found him in possession of the murder weapon.  Supp. Pet. at 15.  He speculates that "any" knife could have been the weapon.  *Id*.  The evidence, however, clearly shows that Carpenter's buck knife was the murder weapon.  Carpenter's former girlfriend, McBay, testified that Carpenter usually carried around some kind of a buck knife.  25 RR 38.  McBay testified that she went to a store with representatives from the State and showed them a knife that looked most similar to the one Carpenter asked her to wash on the morning of the offense.  Similarly, Carpenter's cousin, Crisler, testified at trial that she knew Carpenter to carry a buck knife.  24 RR 136; State's Trial Exhibit 143.  Moreover, the medical examiner testified that Henin died from "incised wounds to the neck" and that the buck knife introduced by the State (which

resembled the one Carpenter was known to carry) would be consistent with causing the fatal wounds to Henin's neck.  26 RR 58; State's Trial Exhibit 143.  Carpenter's claim is meritless and should be dismissed.

> **6.**     **The state court's finding that Carpenter, rather than Smith, broke down Henin's door is supported by the record.**

Carpenter claims that the state court's finding that Carpenter, not Smith, broke down Henin's door is not supported by any evidence.  Supplemental Petition at 16.  Yet Dallas Police Department Detective Daniel Cannon testified that he investigated the crime scene in this offense and that whoever broke into the victim's house did so by kicking open a large, heavy, solid wood door and shattering the door frame.  24 RR 95; 25 RR 103, 112, 117.  Detective Cannon testified that, in his opinion, "the door was forced open by a very probably large person" and would have taken a great amount of force.  25 RR 117-18.  Carpenter offered no extrinsic evidence to demonstrate that Smith would have had the physical prowess or know how to kick in a door and shatter the door frame.

Furthermore, the State offered evidence at the punishment phase of trial that this was not Carpenter's first time kicking in a door.  In 1988, Carpenter and another man burglarized a home in Kaufman County, Texas.  29 RR 26-41, 49-57; State's Trial Exhibit 194. Carpenter's codefendant testified that he and Carpenter gained entry into the home by kicking in a door. 29 RR 57.  The homeowner testified that his front door had been "kicked, beat open or kicked in," and "forced open in a manner that broke it from the front." 29 RR 40-41.  The homeowner further testified that the door was heavy and that the wooden support had been ripped out of the frame.  The record thus clearly shows that it is Carpenter, rather than Smith, who most likely broke down Henin's door.

**7.     Carpenter has not presented clear and convincing evidence that Tessica's identification was inaccurate.**

Carpenter claims that the state court erroneously found that Tessica's identification was accurate.  Supp. Pet. at 17-18.  Yet Tessica picked Carpenter out of a photo lineup, and, during trial, she unequivocally identified him as the person fleeing Henin's house on the morning of the offense.  25 RR 97.  Tessica testified that her identification of Carpenter was based primarily on seeing his face when he passed her in his car on the victim's street.  25 RR 91; 26 RR 80, 88.  She further testified that their cars were so close that she could have reached out and touched his car, that Carpenter looked straight at her as he past, and that he had a "really evil look in his eyes."  25 RR 89, 91.  Further, Tessica's description of a white male, between 6' and 6'2", with light brown, ratty hair, and skinny, and driving a long, square, brown four-door was consistent with Carpenter's appearance and the car he was driving at the time of the murder.  Tessica testified that, at the time of trial (as compared to what she observed in 1991), Carpenter's hair looked darker, he had a mustache, and he looked heavier.  25 RR 97.

Although Lebourney and Chamberlain include in their affidavits descriptions of Smith's physical features (presumably to support Carpenter's theory of misidentification), Tessica's testimony rebuts Carpenter's allegation that she was mistaken.  25 RR 91; 26 RR 88 (noting how she observed Carpenter's face and eyes as he nearly sideswiped her car).  In fact, Detective Penrod testified regarding Tessica's certainty of her identification of Carpenter:

> She told me – the way she described the suspect to me was that he just – he had an unusual look to him and she would be able to – and that's why it struck such an image in her mind that she thought she would be able to identify him again.

[I] don't recall the what the specifics were other than his face, it looked different from anything she had seen and it was striking – whatever to her is ordinary, it was something different.

23 RR 96-97.

Notably, neither Lebourney nor Chamberlain's affidavits state that Smith's and Carpenter's facial features are similar or that Smith and Carpenter look alike. In her statement, Chamberlain merely states that Smith has "facial features like a man." Chamberlain concentrates mostly on Smith's physical features and states, "If [Smith] were dressed in men's clothing, she most definitely could be mistaken for a man." In a very similar description of Smith, Lebourney states: "[Smith] could definitely be mistaken for a man," and "Even the way [Smith] walks is like a man." Carpenter fails to proffer any additional evidence that he and Smith have similar facial features or that they look alike. Tessica did not simply testify to seeing "a man" fleeing from Henin's home but rather picked Carpenter out of a photo lineup based on his facial features and identified him in court. Carpenter's habeas evidence does not directly rebut Tessica's testimony.

### 8. Even if these affidavits had been presented during trial, it would not have changed the verdict.

Carpenter claims that had the testimony of Lebourney, Chamberlain, Curry, and Burdick been introduced at trial it would have probably resulted in an acquittal. Supp. Pet. at 18-19, 22-23. But such an assertion is in error. Even assuming that his stand-alone actual innocence claim were cognizable, there was more than sufficient evidence to convict Carpenter. He possessed a buck knife consistent with the murder weapon. He admitted to McBay that he killed Henin. Tessica picked him out of a line-up and in the courtroom. His car matched the one spotted at the murder scene. Crisler acknowledged that Smith had approached her about having Carpenter kill Henin. Moreover, Smith had an alibi for the time

21

of the murder.  This claim is without merit and should be denied.

### 9.   Carpenter's complaints regarding the state court's analysis is meritless.

Carpenter complains that the State "nitpicks" by finding inconsistencies between his affidavits.  Supp. Pet. at 19.  He believes that his evidence should be analyzed under his erroneous newly-discovered-evidence test.  Nevertheless, as discussed earlier, this is an inappropriate analysis for Carpenter's actual innocence claim.  *See* Section II(C), *supra*.

### 10.   Chamberlain's affidavit has been undermined by her recantation.

Carpenter claims the state court unreasonably found that Chamberlain's recantation undermined her affidavit.  Supp. Pet. at 21.  The record shows that Investigator Espinoza spoke to Chamberlain on the telephone asking her to clarify some of her statements in her affidavit.  *Ex parte Carpenter,* Application No. 46,656-03 at 102-07.  As Investigator Espinoza statess in his affidavit:

> [Chamberlain] explained that she did not write the affidavit but that "a lady" came to her house to interview her and took notes as they sat at the table. When [the prosecutor and I] told [Chamberlain] that we had a copy of her signed, typed affidavit, she said she did not remember signing a typed affidavit.

*Id*.

In that same telephone conversation, Chamberlain admitted that her affidavit incorrectly states that Smith confessed to cutting Henin's throat.  Chamberlain explained that Smith merely gave her detailed information about the offense (such as telling her that the victim made gurgling noises when her throat was cut), and Chamberlain simply believed that Smith could not have known these details unless she had killed Henin herself.  Chamberlain admitted that she "didn't know the whole story" regarding Henin's murder.  *Id*.  Obviously,

the state court properly found that Chamberlain's verbal admissions to Investigator Espinoza completely discredit the allegations she makes in her affidavit inculpating Smith as the one who slit Henin's throat.  This claim is without merit and should be denied.

**11.   The state court's finding that Carpenter's affiants are discredited by their contact with Carpenter is supported by the record.**

Carpenter objects to Findings of Fact 61-67.  Supp. Pet. at 21.  In particular, he finds fault with number 61, which states that Chamberlain and Lebourney's affidavits are undermined by their contact with Carpenter corresponded with both women by mail.  *Id*. Carpenter complains that "the only way that the affiants would be deemed credible by the court is if they had told no one of Smith's statements."  *Id*.

Carpenter misstates both the findings and the evidence.  Chamberlain told Investigator Espinoza that she received a thank-you note from Carpenter for her statement and that Lebourney had told him to send it.  *Ex parte Carpenter,* Application No. 46,656-03 at 102-07.  Additionally, Smith told Investigator Espinoza that Lebourney and Carpenter had written letters to one another after Smith had discussed her case with Lebourney.  *Id*.

Carpenter has a documented history of attempting to influence witnesses.  At trial, McBay testified that Carpenter had a friend named Fate Warren and that Warren and Carpenter looked very similar to one another.  25 RR 48-49.  McBay then read to the jury the following letter from Carpenter to Warren:

> Say, they are saying that some girl seen me run from the front porch and get in a car and leave the scene.  I'm going to see if maybe my attorney will let you help me.
>
> They have showed her a picture of me but I think if like you were in the courtroom where I am supposed to be when they ask her, "Do you see that man in the courtroom," she'd point at you.

See that would show that she didn't see me and that would make her testimony no good.  Would you be willing to help me?

State's Trial Exhibit 152.

Given Carpenter's propensity in this regard, the state court's skepticism of Carpenter's affidavits is entirely justified.  This claim is without merit and should be denied.

### 12.    Carpenter's objection to Findings of Fact Nos. 89-91 is meritless.

Seeking to bolster his erroneous newly-discovered-evidence theory, Carpenter objects to Findings of Fact 89-91, which finds that certain affidavits do not constitute newly-discovered evidence.  Supp. Pet. at 21.  Yet Carpenter's brief indicates that he believes that these findings apply to the affidavits of Smith's cellmates.  *Id*.  In fact, these findings apply to potential affidavits that Carpenter might submit to show that he did not own the car used in the murder.  *Ex parte Carpenter,* Application No. 46,656-03 at 212.  As such, Carpenter's objection misses the mark entirely.

### 13.    Carpenter's objection to the state court's finding that Smith may have made up her alleged recantation to impress her cellmates is meritless.

Carpenter objects to Finding of Fact 60, which states that "[e]ven if [Smith] made those statements, the Court does not find that she committed the capital murder.  The Court finds that [Smith] simply could have been lying or puffing to acheive status."  Supplemental Petition at 22; *Ex parte Carpenter,* Application No. 46,656-03 at 204.  Carpenter argues this finding inconsistent with the court's prior finding that Smith was credible.

Yet "the ultimate irony," as Carpenter puts it, is not especially ironic.  The state court simply observed that, "even if" Carpenter's affiants were telling the truth, it is possible that Smith may have claimed responsibility the murder to impress her cellmates.  *Ex parte Carpenter,* Application No. 46,656-03 at 204.  This observation does not impugn the earlier

24

findings regarding Smith's credibility, and, moreover, is phrased entirely in the alternative. *Id.* The Director is not aware of any caselaw that forbids state courts from making findings in the alternative and Carpenter cites to none. Carpenter's claim that this finding is inconsistent with prior findings is meritless.

### 14.    Carpenter Has Not Met His Burden.

In conclusion, Carpenter cannot show the state court's adjudication of his claim resulted in a decision which was contrary to, or involved an unreasonable interpretation of, clearly-established federal law, as set out by the Supreme Court of the United States, or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. § 2254(d). Accordingly, even if the Court were to find Carpenter's actual innocence claim cognizable, it should be denied as meritless.

### CONCLUSION

For the foregoing reasons, the Director respectfully requests that Carpenter's federal petition for writ of habeas corpus be denied with prejudice, and that no certificate of appealability issue with regard to any of the claims raised in the instant federal habeas action. *See Alexander v. Johnson*, 211 F.3d 895, 898 (5th Cir. 2000) (explaining that the district court has the power to *sua sponte* deny a certificate of appealability without prior briefing and argument by counsel).

Respectfully submitted,

GREG ABBOTT
Attorney General of Texas

KENT C. SULLIVAN
First Assistant Attorney General

ERIC J.R. NICHOLS
Deputy Attorney General
for Criminal Justice

GENA BUNN
Assistant Attorney General
Chief, Postconviction Litigation Division

ELLEN STEWART-KLEIN*
Assistant Attorney General


   /s/ Stephen M. Hoffman

*Attorney-In-Charge                STEPHEN M. HOFFMAN
Assistant Attorney General
State Bar No. 24048978

P. O. Box 12548, Capitol Station
Austin, Texas   78711
(512) 936-1600
Facsimile No. (512) 320-8132

ATTORNEYS FOR RESPONDENT

## CERTIFICATE OF SERVICE

I, STEPHEN M. HOFFMAN, Assistant Attorney General of Texas, certify that a true and correct copy of the above and foregoing Respondent Quarterman's Supplemental Answer with Brief in Support was served by electronic mail, on this, the 4th day of September, 2007, addressed to:

Bruce Anton
Sorrels, Udashan, & Anton
2301 Cedar Springs Road
Suite 400
Dallas, Texas 75201
Email: ba@sorrelsudashan.com


  /s/ Stephen M. Hoffman
STEPHEN M. HOFFMAN
Assistant Attorney General

27