# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF TEXAS
# AT DALLAS

---

## 3:02-CV-1145-H

---

**DAVID LYNN CARPENTER,**

**Applicant,**

**VS.**

**STATE OF TEXAS,**

**Respondent.**

---

## APPLICATION FOR RELIEF
## PURSUANT TO 28 U.S.C. §2254

---

**MARY MARGARET PENROSE**
**State Bar No. 00788179**

**Texas Wesleyan University**
**School of Law**
**1515 Commerce Street**
**Fort Worth, TX 76102**
**(972) 310-8669**
**(972) 943 3578 (fax)**
**mpenrose@law.txwes.edu**

**BRUCE ANTON**
**State Bar No. 01274700**

**2311 Cedar Springs Rd.**
**Suite 250**
**Dallas, Texas 75201**
**(214) 468-8100**
**(214) 468-81004(fax)**
**ba@sualaw.com**

**ATTORNEYS FOR APPLICANT**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES   **XII**

**I.  INTRODUCTION** - The Emperor's New Clothes  **1**
**II.  PROCEDURAL HISTORY**  **4**
**III.  STATEMENT OF THE CASE**  **6**
 **A.  The Motive**  **6**
 **B.  The Scene of the Crime**  **6**
 **C.  The Physical Evidence**  **8**
 **D.  The investigation Stalls**  **8**
 **E.  Carpenter/McBay comes forward**  **9**
 **F.  Carpenter/McBay's Undisclosed Mental Illness**  **10**
  **1. Mandee's Relationship with Carpenter**  **10**
  **2. Post-Conviction Disclosures**  **11**
   **a. The Statements to Dr. Marshall**  **11**
   **b. McBay/Cloud's Deposition Testimony**  **12**
   **c. What the Prosecution Knew**  **14**
   **d. What She Disclosed to Carpenter and His Lawyers**  **14**
 **G. Bad Line-Up**  **16**
 **H. Ervin Smith, the co-conspirator**  **17**
  **1. Smith's Confession**  **17**
  **2. Evrin Smith's Post-Incarceration Admissions of Guilt 18**
 **I. Tailoring the Pieces to Fit**  **19**
 **J. Testimony Changes at Trial**  **19**
  **1. Rainey's Identifcation**  **20**
  **2. Crisler's Subsequent Inconsistent Statement**  **21**
  **3. Smith's Inconsistent Statements**  **21**
  **4. Carpenter/McBay's Inconsistent Statements**  **22**
 **K. Third Party Perpetrator**  **24**
 **L. Guilty Verdict**  **25**
 **M. Punishment Phase**  **26**
  **1. Prior Convictions**  **26**
  **2. Uncharged Offenses**  **27**
  **3. Prison Conduct**  **29**
  **4. Mitigation**  **30**

    N.     Death                                               30

**IV.  OVERVIEW - THE HEAVY RUBBER STAMP**        31

**CLAIM I.**

       **CARPENTER WAS DENIED DUE PROCESS OF LAW AND THE RIGHT TO PRESENT A DEFENSE WHEN THE TRIAL COURT REFUSED TO LET THE JURY HEAR TESTIMONY THAT A THIRD PARTY, MATTHEW TOLBERT, HAD PREVIOUSLY CONFESSED TO THE MURDER.**    36

    A.     **Relevant Facts**                36

    B.     **Evidence Not Heard By The Court**    37

    C.     **Post Conviction Rulings**         38

    D.     **Argument**                   40

         1.     **Third-Party Perpetrator**    40

         2.     **Standard of Admissibility**    40

         3.     **Low Bar for Relief**        42

         4.     **Prejudice to Carpenter**    42

    E.     **Unreasonable Determination of Claim by State Court**    43

**CLAIM II.**    45

       **CARPENTER WAS DENIED DUE PROCESS OF LAW BY THE USE OF AN IMPERMISSIBLY SUGGESTIVE PHOTO LINE-UP THAT TAINTED THE IDENTIFICATION OF THE ONLY EYEWITNESS WHO COULD MAKE AN IDENTIFICATION**

    A.     **Crime Scene Identification**    45

    B.     **The Flaws in the Photo Line-Up**    46

    C.     **Discrepancies in Identification at Trial**    46

         1.     **Assailant's Physical Appearance**    46

         2.     **The Car**    48

    D.     **Totality of Circumstances Indicates Mis-Identification**    48

    E.     **Post Conviction Rulings**    49

    F.     **Argument**    51

         1.     **The Criteria for Determining Reliability**    51

         2.     **Eyewitness Testimony Discredited**    56

         3.     **Application of the Criteria to the Initial Identification**  60

         4.     **Significance of Flawed Lineup**    62

         5.     **Prejudice to Carpenter**    62

    G.     **Unreasonable Determination of Claim by State Court**    63

**CLAIM III.**                                                    **66**
    **BY OMITTING THE AGGRAVATING ELEMENT OF THE OFFENSE THAT ELEVATED MURDER TO CAPITAL MURDER, THE TRIAL COURT'S CHARGE TO THE JURY CONSTITUTES AN *APPRENDI* VIOLATION AS WELL AS A VIOLATION OF THE EIGHTH AMENDMENT AND FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION.**
    **A.**    **Overview**                                         **66**
    **B.**    **Wording of Indictment**                         **67**
    **C.**    **Elements of Offense**                            **68**
    **D.**    **Variance in Charge**                             **69**
    **E.**    **Unreasonable Determination by Lower Court**     **69**
    **F.**    **Failure to Prove All the Necessary Elements**   **75**
    **G.**    **Lower Court's Incorrect Citation to Authority** **78**
    **H.**    **Prejudice to Carpenter**                        **79**

**CLAIM IV**                                                      **84**
**CLAIM IV(A).**                                                  **84**
    **THE DISTRICT COURT DENIED CARPENTER A HEARING ON HIS CLAIM OF NEWLY DISCOVERED EVIDENCE BASED UPON AN UNREASONABLE APPLICATION OF EXISTING LEGAL PRECEDENT.**

**CLAIM IV(B).**                                                  **84**
    **THE DISTRICT COURT ERRED IN DENYING CARPENTER'S CLAIM FOR RELIEF BASED UPON NEWLY DISCOVERED EVIDENCE DUE TO AN UNREASONABLE DETERMINATION OF OBJECTIVE FACTS.**

**OVERVIEW**                                                      84
    **A.**    **Introduction**                                  **85**
    **B.**    **Post Trial Proceedings**                        **88**
    **C.**    **Newly Discovered Evidence**                     **90**
    **D.**    **The Materiality of Recantations**               **92**
    **E.**    **Three-Step Determination of Materiality of Recantations**    **94**
    **F.**    **Smith's Recantations are Material**             **95**

  G.  Hearing Wrongfully Denied       97

  H.  Objectively unreasonable factual determinations   101

     1.  The Judge Did Not Read What She Signed  102

     2.  Finding that Smith Did Not Drive the Car Observed
        at the Scene           103

     3.  Finding that one affiant is inherently more credible
        than another          104

     4.  Finding that Smith had an unimpeachable alibi  104

     5.  Finding that Smith's knowledge of the crime, as
        relayed to the affiants, was based solely on media
        accounts and not personal knowledge   106

     6.  Finding that a knife owned by Carpenter was
        positively identified as the murder weapon  106

     7.  Finding that Smith lacked the physical strength to
        break into Henin's home.      107

     8.  Finding that Smith is credible     108

     9.  Finding that Rainey's identification was accurate 108

     10.  Finding that Smith's recantation is insignificant in
        light of other evidence of guilt.    109

     11.  Findings that Carpenter's affidavits are incredible
        because they are not consistent with every other
        piece of evidence submitted. ( The State court
        nitpicks the affidavits)       111

     12.  The findings that an amended affidavit is inherently
        incredible            113

     13.  The findings that the affiants have conspired with
        Carpenter to present false testimony   114

     14.  The findings that post-conviction confessions are not
        "newly discovered" evidence    114

I.  The Ultimate Irony          115

J.  Prejudice to Carpenter         116

CLAIM V.               117

    CARPENTER WAS DENIED DUE PROCESS OF LAW WHEN THE PROSECUTION FAILED TO DISCLOSE TO THE DEFENSE THAT MANDEE MCBAY/CLOUD SUFFERED FROM A MENTAL DISABILITY AND WAS TAKING MEDICATIONS

AT THE TIME SHE TESTIFIED THAT AFFECTED HER ABILITY TO RECALL EVENTS AND TESTIFY TRUTHFULLY.

A.  Overview                                                          117
B.  Relevant Facts                                                   117
    1.  Mandee's Relationship with Carpenter                          118
    2.  The Statements to Dr. Marshall                               118
    3.  McBay/Cloud's Deposition Testimony                           120
    4.  What the Prosecution Knew                                    122
    5.  What Carpenter and his Lawyers Knew of Her Condition   122
C.  Argument                                                         124
    1.  *Brady* Violation                                            124
    2.  Prejudicial Effect to Carpenter                              129
D.  Unreasonable Determination of Claim by Lower Court               130

CLAIM VI.                                                            134
    THE EXECUTION OF CARPENTER WITHOUT EXAMINATION OF NEWLY DISCOVERED EVIDENCE RELATING TO THE MENTAL CONDITION OF MANDEE MCBAY/CLOUD WOULD BE SO FUNDAMENTALLY UNFAIR AS TO VIOLATE CARPENTER'S DUE PROCESS RIGHTS UNDER THE FOURTEENTH AMENDMENT.

A.  Relevant Facts                                                   134
    1.  Psychological Evaluation of Mandee                           134
    2.  Relevant Medical History                                     135
    3.  Effect of Mandee's Medical Condition on Her Testimony   137
B.  Evaluating Materiality of New Evidence                           139
    1.  Mandee's Condition Was Unknown to the Defense at the
        Time of Trial                                               139
    2.  Failure to Discover Mandee's Condition Was Not Due to
        a Lack of Diligence                                         141
    3. New Evidence is Material                                      142
C.  Unreasonable Determination by Lower Court                       145

CLAIM VII.                                                          149
    CARPENTER IS ENTITLED TO A NEW TRIAL CONCERNING HIS GUILT AS WELL AS A REDETERMINATION OF THE APPROPRIATENESS OF THE DEATH SENTENCE IMPOSED

**UPON HIM BECAUSE HIS TRIAL COUNSEL FAILED TO PROPERLY INVESTIGATE HIS CASE, RESEARCH AND PRESENT PERTINENT LEGAL ARGUMENT, REVIEW EVIDENCE AND CONTACT PERTINENT WITNESSES AT BOTH THE GUILT/INNOCENCE AND PENALTY PHASES OF TRIAL, THUS DENYING CARPENTER THE EFFECTIVE ASSISTANCE OF COUNSEL GUARANTEED TO HIM BY THE SIXTH AND FOURTEENTH AMENDMENTS OF THE U.S. CONSTITUTION.**

| | | | |
|---|---|---|---|
| A. | **The Legal Standard** | | **149** |
| B. | **Carpenter Was Denied Effective Assistance of Counsel at All Stages of the Trial.** | | **152** |
| | 1. | **Pre-trial** | **152** |
| | | a. **Effective Preparation** | **152** |
| | | b. **Identification issues** | **155** |
| | |   1. **Preparation for Challenging Identification** | **156** |
| | |   2. **Deficient Performance** | **158** |
| | |   3. **Prejudicial Effect** | **160** |
| | |   4. **Unreasonable Determination** | **160** |
| | | c. **Common Law Marriage** | **161** |
| | |   1. **Who is a Spouse?** | **162** |
| | |   2. **Evidence at the Hearing** | **163** |
| | |   3. **Deficient Performance** | **165** |
| | |   4. **Prejudicial Effect** | **167** |
| | 2. | **Trial Performance** | **167** |
| | | a. **Identification** | **167** |
| | |   1. **Educating the Jury** | **168** |
| | |   2. **Deficient Performance** | **169** |
| | |   3. **Prejudicial Effect** | **170** |
| | | b. **Third Party Perpetrator** | **170** |
| | |   1. **Deficient Performance** | **170** |
| | |   2. **Prejudicial Effect** | **172** |
| | 3. | **Punishment Phase** | **172** |
| | | a. **Education on the Special Issues** | **173** |
| | |   1. **Future Dangerousness** | **174** |
| | |   2. **Mitigation** | **179** |
| | | b. **Punishment Evidence** | **182** |

|  |  | c. | Effect of Lack of Education | 18 5 |
|  |  | d. | Charge of the Court | 185 |
|  |  | e. | Definitions | 188 |
|  |  | f. | Lack of Expert Testimony | 189 |
|  |  | g. | Deficient Performance: | 190 |
|  |  |  | Duty to Obtain Expert Assistance | 189 |
|  |  | h. | Prejudicial Effect | 193 |
|  | 4. | Ineffective assistance of 11.071 Counsel | | 194 |
|  |  | a. | Pending Issue | 195 |
|  |  | b. | Alleged Deficiencies | 200 |

**CLAIM VIII.**    <span style="float:right">200</span>

**THE TRIAL COURT'S INSTRUCTIONS ON THE SPECIAL ISSUES AT THE PUNISHMENT PHASE OF CARPENTER'S TRIAL VIOLATED THE EIGHTH AND FOURTEENTH AMENDMENTS OF THE UNITED STATES CONSTITUTION.**

| A. | Overview | 200 |
| B. | Instructions Given to Jury | 200 |
| C. | Deficiencies in Instruction | 20 0 |

1. **The Instructions in the Charge at the Sentencing Phase Relating to the Mitigation Issue that Unanimity Was Required for a Answer That Would Result in Death and Ten Votes Were Necessary for an Answer that Would Result in Life Imprisonment Prevented the Jury from Giving Due Consideration to Mitigating Evidence in Violation of *Mills v. Maryland*.**   205

2. **The Instruction in the Charge at the Sentencing Phase that Unanimity was Required for a Negative Answer and Ten Votes Were Necessary for An Affirmative Answer Undermined the Jury's Sense of Responsibility for Imposing A Death Sentence, in Violation of the Eighth Amendment, and So Infected the Sentencing Proceeding with Unfairness As to Render the Jury's Imposition of the Death Penalty a Denial of Due Process.**   209

3. **Prejudice from Instruction**   216

4. **The Failure to Place Upon the State the Burden of Proving the Mitigation Issue Beyond a Reasonable Doubt Relieved**

the State from Proving Beyond a Reasonable Doubt that Carpenter Merited a Death Sentence, Denying Carpenter Due Process. **218**

5. The Instructions Relating to the Mitigation Issue Given to the Jury in the Charge at the Sentencing Phase of Carpenter's Trial Constituted Excessively Vague, Arbitrary, and Capricious Sentencing Patterns in Violation of the Eighth Amendment and the Due Process Clause of the Fourteenth Amendment. **225**

**CLAIM IX.** **228**
CARPENTER'S RIGHT TO DUE PROCESS OF LAW AND HIS EIGHTH AMENDMENT FREEDOM FROM CRUEL AND UNUSUAL PUNISHMENT WERE VIOLATED BY THE TRIAL JUDGE'S INSTRUCTIONS ON THE DEFINITION OF "PROBABILITY."

A. Overview **228**
B. Instructions Given **229**
C. Determination Below **230**
D. Need for Instructions **230**

**CLAIM X.** **233**
THE TRIAL COURT'S REFUSAL TO INFORM THE JURY OF THE CONSEQUENCES OF A LIFE SENTENCE FOR CAPITAL MURDER, TO WIT: THAT CARPENTER WOULD BE REQUIRED TO SERVE FIFTEEN CALENDAR YEARS BEFORE BEING ELIGIBLE FOR RELEASE, DENIED CARPENTER DUE PROCESS OF LAW UNDER THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION AND RESULTED IN CRUEL AND UNUSUAL PUNISHMENT UNDER THE EIGHTH AMENDMENT TO THE UNITED STATES CONSTITUTION.

A. Overview **233**
B. Instructions Given **233**
C. Harm from Instruction **235**

1. The Failure to Advise the Jury that Applicant, If Sentenced to Life Imprisonment, Would Have Been Ineligible for

Parole Under Any Circumstances for Fifteen Years
Deprived Applicant of His Right, Under the Due Process
Clause of the Fourteenth Amendment, to Rebut Any
Evidence of Future Dangerousness.                                  236
    a.   Factual Background:  Future Dangerousness      236
    b.   Need for Definition                           239
    c.   Prejudice                                     240
2.   The Failure to Advise the Jury that Carpenter, If
Sentenced         to Life Imprisonment, Would Have
Been Ineligible for Parole Under Any Circumstances
for Fifteen Years Constituted Cruel and Unusual
Punishment in Violation of the Eighth Amendment and
Violated Carpenter's Right to Due Process of Law
Under the Fourteenth Amendment In That It
Impermissibly Diminished the Reliability of the Jury's
Ultimate Determination that Death Was the
Appropriate Punishment by Failing to Fully Inform the
Jury on the Meaning of "Life," a Legal Term of Art.    247
    a.   Overview                                      247
    b.   Charge Given                                  250
    c.   Prejudice                                     251

CLAIM XI(A)                                                        253
CARPENTER WAS DENIED DUE PROCESS OF LAW WHEN
THE TRIAL COURT INTRODUCED LETTERS WRITTEN BY
APPLICANT WHICH CONTAINED RACIST COMMENTS
THAT WERE IRRELEVANT TO SENTENCING
CONSIDERATIONS
BEFORE THE JURY.

CLAIM XI(B)                                                        253
CARPENTER WAS DENIED DUE PROCESS OF LAW WHEN
THE TRIAL COURT INTRODUCED LEWD DRAWINGS
DRAFTED BY CARPENTER THAT WERE IRRELEVANT TO
SENTENCING CONSIDERATIONS BEFORE THE JURY.
A   Overview                                          253
B.   Relevant Facts                                    253

|  |  | 1. | Letters | 253 |
|  |  | 2. | Drawings | 256 |
| C. | Determination Below |  |  | 257 |
|  |  | 1. | Letters | 255 |
|  |  | 2. | Drawings | 254 |
| D. | Protection of First Amendment Interests |  |  | 255 |
| E. | Prejudice |  |  | 258 |
| F. | Unreasonable Determination Below |  |  | 259 |

**CLAIM XII**          262

NONE OF THE FOREGOING CLAIMS RAISED BY CARPENTER SHOULD BE CONSIDERED PROCEDURALLY BARRED AS CARPENTER HAS PROPERLY ESTABLISHED HIS CLAIM OF ACTUAL INNOCENCE PURSUANT TO *SCHLUP V. DELO* AND THE FAILURE TO REVIEW THESE CLAIMS WILL RESULT IN THE MISCARRIAGE OF JUSTICE.

| A. | Introduction | 262 |
| B. | Application of the Law | 262 |
| PRAYER FOR RELIEF | | 265 |
| CERTIFICATE OF SERVICE | | 267 |

# TABLE OF AUTHORITIES

**Cases**                                                    **Page**

*Adams v. Thaler,* 421 Fed. Appx. 322 (5th Cir. 2011).. . . . . . . . . . . . . . . . . . . . . 131

*Ake v. Oklahoma*, 470 U.S. 68 (1985).. . . . . . . . . . . . . . . . . . . . . 73, 210, 221, 247

*Alcock v. Small Bus. Admin.,* 50 F.3d 1456 (9th Cir. 1995). . . . . . . . . . . . . . . . 34

*Allendale-Torres v. United States*, 523 U.S. 224 (1998). . . . . . . . . . . . . . . . . . . 74

*Almendarez-Torres v. United States*, 523 U.S. 224 (1998). . . . . . . . . . . . . . . . 223

*Amstar Corp. v. Domino's Pizza, Inc.,* 615 F.2d 252 (5th Cir.) *cert. denied,* 449 U.S. 899 (1980). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33-34

*Anderson v. City of Bessemer, North Carolina*,  470 U.S. 564, 571 (1985). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32, 34

*Andres v. United States*, 333 U.S. 740 (1948). . . . . . . . . . . . . . . . . . . . . . . . . . 206

*Apprendi v. New Jersey,* 530 U.S. 466 (2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69, 70-71, 73, 75, 78, 83, 231, 234-236

*Atkins v. Virginia,* 536 U.S. 304 (2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 192

*Balentine v. Thaler* 629 F.3d 470 (5th Cir. 2010). . . . . . . . . . . . . . . . . 130-31, 146

*Banks v. Dretke*, 540 U.S. 668 (2004).. . . . . . . . . . . . . . . . . . . . . . . . . . . 125, 128

*Barclay v. Florida*, 463 U.S. 939 (1983). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 240

*Barefoot v. Estelle*, 463 U.S. 880 (1983). . . . . . . . . . . . . . . . . . . . . . 73, 210, 221

*Battenfield v. Gibson*, 236 F.2d 1215, 1228 (10th Cir. 2000). . . . . . . . 152, 164, 190

*Beck v. Alabama*, 447 U.S. 625, 642 (1980).. . . . . . . . . . . . . . . . . . 212-13, 240, 248

*Bell v. Cone*, 535 U.S. 685 (2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

*Berger v. United States*, 295 U.S. 78, 88 (1935).. . . . . . . . . . . . . . . . . . . . . . . . . . 87

*Blanco v. Singletary*, 943 F.2d 1477 (11th Cir. 1991), *cert. denied*, 504 U.S. 943 (1992).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 189

*Boyd v. Puckett*, 905 F.2d 895 (5th Cir. 1990), *cert. denied* 498 U.S. 988 (1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 90

*Brady v. Maryland,* 373 U.S. 83 (1963). . . .  123-24,127,130-33, 139, 145-46, 214

*Brecht v. Abrahamson*, 507 U.S. 619 (1993). . . . . . . . . .  43,64-65,80,214,250,257

*Brown v. Johnson*, 224 F.3d 461 (5th Cir. 2000). . . . . . . . . . . . . . . . . . . . . . . 97-98

*Brown v. Texas*, 522 U.S. 940 (1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 242

*Brown v. State*, 689 S.W.2d 219 (Tex. Crim. App. 1985). . . . . . . . . . . . . . . . . . . 57

*Bruton v. United States*, 391 U.S. 123 (1968).. . . . . . . . . . . . . . . . . . . . . . . . . . . 240

*Bullington v. Missouri*, 451 U.S. 430 (1981). . . . . . . . . . . . . . . . . 72, 209, 220, 246

*California v. Ramos*, 463 U.S. 992 (1983). . . . . . . . . . . . . . . . 35, 72, 210, 220, 247

*Chambers v. Mississippi,* 410 U.S. 284 (1973).. . . . . . . . 39, 91, 94, 96, 111-12, 230

*Chambers v. State*, 903 S.W.2d 21 (Tex. Crim. App. 1995). . . . . . . . . . . . . . . . 230

*Chatom v. White*, 858 F.2d 1479 (11th Cir. 1998). . . . . . . . . . . . . . . . . . . . . . . . 168

*Cheesman v. Teets*, 357 U.S. 156, 174 (1957). . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Chicopee Mnfg. Corp. v. Kendall Co.,*  288 F.2d 719,725 (4th Cir.) *cert. denied*, 368 U.S. 825 (1961). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Coffin v. United States*, 156 U.S. 432 (1895). . . . . . . . . . . . . . . . . . . . . . . . . 70, 218

*Collier v. Turpin*, 177 F.3d 1184 (11th Cir. 1999).. . . . . . . . . . . . . . . . . . . . . . . 190

*Combs v. Coyle* 205 F.3d 268 (6th Cir. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . 165

*Commonwealth v. O'Brien*, 736 N.E.2d 841 (Mass. 2000). . . . . . . . . . . . . . 41, 93

*Commonwealth v. Roberio*, 700 N.E.2d 830 (Mass. 1998). . . . . . . . . . . . . . . . 190

*Commonweath v. Jewett*, 467 N.E.2d 155 (Mass.1984). . . . . . . . . . . . . . . . . . . . . 42

*Cook v. Lynaugh*, 821 F.2d 1072 (5th Cir. 1987).. . . . . . . . . . . . . . . . 153, 159, 166

*Cox v. United States,* 447 U.S. 908 (1980). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

*Corwin v. State*, 870 S.W.2d 23 (Tex. Crim. App. 1993).. . . . . . . . . . . . . . . . . 255

*Crandell v. Bunnell*, 144 F.3d 1213 (9th Cir. 1998). . . . . . . . . . . . . . . . . . 152, 164

*Crane v. Kentucky*, 476 U.S. 683 (1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 238

*Crotts v. Smith*, 73 F.3d 861(9th Cir. 1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . 158

*Cuevas v. State*, 742 S.W.2d 331 (Tex. Crim. App. 1987). . . . . . . . . . . . . . . . . 230

*Cunningham v. Peters*, 941 F.2d 535 (7th Cir. 1991). . . . . . . . . . . . . . . . . . . 94, 96

*Cunningham v. Zant*, 928 F.2d 1006 (11th Cir. 1991).. . . . . . . . . . . . 153, 158, 165

*Cuthbertson v. Biggers Bros., Inc.,* 702 F.2d 454 (4th Cir. 1983). . . . . . . . . . 33-34

*Cuyler v. Sullivan*, 446 U.S. 335 (1980). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 148

*Davis v. State* 872 S.W.2d 743 (Tex. Crim. App. 1994).. . . . . . . . . . . . . . . . . . . 93

*Dawson v. Delaware*, 503 U.S. 159 (1992). . . . . . . . . . . . . . . . . . . 255-56, 258-59

*Dowling v. United States*, 493 U.S. 342 (1990). . . . . . . . . . . . . . . . . . . . . . . 256-57

*Donnelly v. United States*, 228 U.S. 243 (1912). . . . . . . . . . . . . . . . . . . . . . . . . . . 91

*Duncan v. Louisiana*, 391 U.S. 145 (1968). . . . . . . . . . . . . . . . . . . . . . . . . . 71, 219

*Eddings v. Oklahoma,* 455 U.S. 104 (1982). . . . . . . . . . . . . . . . . . . . 192, 205, 217

*Estelle v. Williams*, 425 U.S. 501 (1976). . . . . . . . . . . . . . . . . . . . . . . . . . . 70, 218

*Evitts v. Lucey*, 469 U.S. 387 (1985). . . . . . . . . . . . . . . . . . . . . . . . . . 194, 196-97

*Ex Parte Threet*, 333 S.W.2d 561 (Tex. 1960). . . . . . . . . . . . . . . . . . . . . . 161, 164

*Federal Deposit Insurance Corp. v. Texarkana Nat. Bank,* 874 F.2d 264, 267 (5th Cir. 1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Ford v. Wainwright*, 477 U.S. 399 (1986). . . . . . . . . . . . . . . . . . 72, 210, 221, 247

*Faglie v. Williams*, 569 S.W.2d 557 (Tex. Civ. App.-- Austin 1978). . . . . . . . . 162

*Feldman v. State*, 71 S.W.3d 738, 757 (Tex. Crim. App. 2002). . . . . . . . . . . . . . 231

*Furman v. Georgia*, 408 U.S. 238 (1972) (*per curiam*). . . . . . . . . . . . . . . . . . . . . . .

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72, 209, 220, 225-26, 230, 246, 251

*Gacy v. Welborn*, 994 F2d 305 (7th Cir. 1993)

cert. denied, 510 U.S. 889 (1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 91

*Ganesan v. Vallavhaneni*, 96 S.W.3d 345 (Tex. Civ. App. Austin 2002). . . . . . 162

*Garcia v. State*, 887 S.W.2d 846, 859 (Tex. Crim. App. 1994)*, cert. denied*, 514 U.S. 1005 (1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 230

*Gardner v. Florida*, 430 U.S. 349 (1977) 72-73, 209-10, 219-21, 238, 244, 246-47

*Gholson v. State*, 542 S.W.2d 395 (Tex. Crim. App. 1976). . . . . . . . . . . . . . 254-55

*Gideon v. Wainwright,* 372 U.S. 335 (1963). . . . . . . . . . . . . . . . 149, 196, 198, 214

*Gimbel v. Commodity Futures Trading Com'n.,* 872 F.2d 196 (7th Cir. 1989). . . 34

*Godfrey v. Georgia*, 446 U.S. 420 (1980). . . . . . . . . . . . . . . . . . . . 73, 210, 221, 226

*Giglio v. United States,* 405 U.S. 150 (1972). . . . . . . . . . . . . . . . . . . . . . . . 124, 133

*Graham v. Texas Board of Pardons & Paroles,* 913 S.W.2d 745 (Tex. Civ. App. Austin 1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 91

*Gregg v. Georgia*, 428 U.S. 153 (1976). . . . . . . . . . . . . . . . 72, 211, 220, 225, 248

*Guy v. Cockrell,* 343 F.3d 348 (5th Cir. 2003).. . . . . . . . . . . . . . . . . . . . . . 99, 100

*Hall v. Washington*,106 F.3d 742, (7th Cir.) *cert. denied*, 522 U.S. 907 (1997).. 152

*Harris v. Nelson*, 394 U.S. 286 (1969). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 194

*Henderson v. Sargent*, 976 F.2d 706 (5th Cir. 1991). . . . . . . . . . . . . . . . . . 152, 164

*Herrera v. Collins*, 506 U.S. 390 (1993).. . . . . . . . . . . . . . . . . . . . . . . . . . 137, 262

*Hoffa v. United States*, 385 U.S. 293 (1966).. . . . . . . . . . . . . . . . . . . . . . . . . . . 51

*Holt v. United States,* 342 F.2d 163 (5th Cir.1965). . . . . . . . . . . . . . . . . . . . 40, 92

*Homan v. State*, 19 S.W.3d 847 (Tex. Crim. App. 2000). . . . . . . . . . . . . . 69, 77-78

*Horton v. Zant*, 941 F.2d 1449 (11th Cir. 1991). . . . . . . . . . . . . . . . 153, 158, 165

*Hughes v. State*, 878 S.W.2d 142 (Tex. Crim. App. 1992).. . . . . . . . . . . . . . . . 230

*In re Estate of Giessel*, 734 S.W.2d 27 (Tex. Civ. App. Hous. [1ˢᵗ Dist.] 1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 162

*In Re Winship*, 397 U.S. 358 (1970). . . . . . . . . . . .  67, 70, 71, 78-79, 218-19, 223

*Jackson v. State*, 551 S.W.2d 351 (Tex. Crim. App. 1977). . . . . . . . . . . . . . . . . 42

*James v. Stockham Valves & Fittings Co.,* 559 F.2d 310 (5th Cir.1977). . . . . . . 33

*Jenkins v. Jenkins,* 16 S.W.3d, 473 (Tex. Civ. App.– El Paso 2000). . . . . . . . . 161

*Johnson v. United States*, 552 A.2d 513, 516 (D.C. 1988). . . . . . . . . . . . . . 41, 92

*Jones v. Jones*, 163 F.3d 285 (5ᵗʰ Cir. 1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . 149

*Jones v. Smith*, 772 F.2d 668 (11ᵗʰ Cir. 1978). . . . . . . . . . . . . . . . . . . . . . . . . . . 167

*Jones v. United States*, 526 U.S. 227 (1999). . . . . . . . . . . . . . . . . . . . . . . . . 71, 219

*Jordan v. State*, 928 S.W.2d 550 (Tex. Crim. App. 1996). . . . . . . . . . . . . . . . . 168

*Jurek v. Texas*, 428 U.S. 262 (1976). . . . . . . . . . . . . . . . . . . . . . . . . . 209, 226-27

*Kelly v. South Carolina*, 534 U.S. 246 (2002). . . . . . . . . . . . . . . . . . . . . . 230, 249

*Kenley v. Armontrout*, 937 F.2d 1128 (8ᵗʰ Cir. 1991) *cert. denied*, 502 U.S. 964 (1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 152-53, 164

*Kimmelman v. Morrison*, 477 U.S. 365 (1986). . . . . . . . . . . . . . . . . . . . . . . . . . 158

*Kotteakos v. United States*, 328 U.S. 750 (1946). . . . . . . . . 43, 64-65, 80, 250, 257

*Kubat v. Theiret*, 867 F.2d 351 (7ᵗʰ Cir.), *cert. denied sub nom Kubat v. Greer,* 493 U.S. 874 (1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 207

*Kucki v. State*, 483 N.E.2d 788 (Ind. 1985). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*Kyles v. Whitley,* 514 U.S. 419, 432-34 (1995)........................ 124, 150

*Ladd v. State*, 3 S.W.3d 547 (Tex.Crim.App. 1999)*, cert denied*, 529 U.S. 1070, (2000)........................................................ 231

*Lee v. Lee* 44 S.W.3d 151 (Tex. Civ. App.-- Hous. 1st 2001)............... 161

*Lee v. Lee*, 981 S.W.2d 903 (Tex.Civ. App. -Hou 1st 1998)................ 162

*Lockett v. Ohio*, 438 U.S. 586 (1978)...................... 205-06, 211, 213

*Lockhart v. Fretwell*, 506 U.S. 364, 369 (1993)........................... 150

*Lockyer v. Andrade*, 538 U.S. 635 (2003)................................. 43

*Loserth v. State*, 963 S.W.2d 770 (Tex. Crim. App. 1998)............... 64, 159

*Louis v. Blackburn*, 630 F.2d 1105 (C.A. La. 1980)...................... 99

*Loyd v. Whitley*, 977 F.2d 149 (5th Cir. 1992)........................... 190

*Lucas v. Johnson*, 132 F.3d 1069 (5th Cir. 1998)........................ 137

*Luhr Bros., Inc. v. Shepp*, 157 F.3d 333 (5th Cir1998) *cert. denied, sub nom. Jones v. Luhr Bros.*, Inc., 526 U.S. 1050 (1999)................................ 33

*Magill v. Dugger*, 824 F.2d 879 (11th Cir. 1987). ...................... 151

*Manson v. Braithwaite*, 432 U.S. 98 (1977)...................... 52, 54, 56

*Martinez v. Ryan*, 131 S.Ct. 2960 (2011). ............................ 194

*Mason v. Hawks*, 97 F.3d 887 (7th Cir. 1996). ......................... 158

*Mason v. Scully*, 16 F.3d 88 (2nd Cir. 2000). ......................... 166

*Mauldin v. Wainwright*, 723 F.2d 799 (11th Cir. 1984). ................. 190

*Mayfield v. Woodford*, 270 F.3d 915 (9th Cir. 2001).. . . . . . . . . . . . . . . . . . . . . . 191

*Maynard v. Cartwright*, 486 U.S. 356 (1988).. . . . . . . . . . . . . . . . . . . . . . . 226*,* 230

*McMillan v. Pennsylvania*, 477 U.S. 79 (1986). . . . . . . . . . . . . . . . . . . . . . . . . 223

*Michigan v. Long,* 463 U.S. 1032 (1983). . . . . . . . . . . . . . . . . . . . . . . 131-32, 146

*Miller-El v. Cockrell*, 537 U.S.322 (2003). . . . . . . . . . . . . . . . 43, 45, 64, 159, 197

*Miller-El v. Dretke*, 545 U.S. 231 (2005). . . . . . . . . . . . . . . . . . . . . . . . . . . 198-99

*Mills v. Maryland*, 486 U.S. 367 (1988). . . . . . . . . . . . . . . . . . . . . . . . . 204-09, 216

*Murphy v. State*,112 S.W.3d 192 (Tex. Crim. App. 2003). . . . . . . . . . . . . . . . . . 230

*Nealy v. Cabana,* 764 F.2d 1173 (5th Cir. 1985). . . . . . . . . . . . . . . . . . . . . . . . . . 149

*Neil v. Biggers*, 409 U.S 188 (1972). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

*Nix v. Whiteside*, 475 U.S. 157 (1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 150

*O'Leary v. Liggett Drug Co.*, 150 F.2d 656 (6th Cir.) *cert. denied, sub nom.*
*O'Leary v. Johnston-Shelton Co.*, 326 U.S. 773 (1945). . . . . . . . . . . . . . . . . . . . . 32

*O'Neal v. McAninch*, 513 U.S. 432 (1995). . . . . . . . . . . . . . . . . . . . . 80*,* 214, 250

*Panetti v. Quaterman*, 551 U.S.930 (2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 198

*Patterson v. New York*, 432 U.S. 197 (1977). . . . . . . . . . . . . . . . . . . . . . . . 71, 218

*Pemberton v. Collins*, 991 F.2d 1218 (5th Cir. 1993). . . . . . . . . . . . . . . . . . . . . 138

*Penry v. Lynaugh,* 492 U.S. 302 (1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 192

*People v. Hall,* 718 P.2d 99 (CA 1986). . . . . . . . . . . . . . . . . . . . . . . . . . 40, 41, 92

*People v. Kindle*, 2002 W.L. 1554118 (Cal. 2002).. . . . . . . . . . . . . . . . . . . 159, 168

*People v. Miller*, 65 N.Y.2d 502 (1985). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

*People v. Moore*, 2001 WL 1190796 [Cal. App. 1 Dist. 3]. . . . . . . . . . . . . . . 168

*People v. Perez*, 592 N.E.2d 984 (Ill. 1992). . . . . . . . . . . . . . . . . . . . . . . . . . . 189

*People v. Rodgers*, 279 N.E. 2d 72 (Ill. 1972). . . . . . . . . . . . . . . . . . . . . . . . . . 61

*Perillo v. Johnson*, 79 F.3d 441 (5th Cir. 1996). . . . . . . . . . . . . . . . . . . . . . . . . 97

*Pettijohn v. Hall,* 599 F.2d 476 (1st Cir. 1979). . . . . . . . . . . . . . . . . . . . . . . . . 40

*Pitts v. Anderson*, 122 F.3d 275 (5th Cir. 1997). . . . . . . . . . . . . . . . . . . . . . . . 149

*Profitt v. Waldron*, 831 F.2d 1245 (5th Cir. 1987). . . . . . . . . . . . . . . 153, 158, 165

*Pulley v. Harris*, 465 U.S. 37 (1984). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*Ramdass v. Angelone*, 530 U.S. 156 (2000). . . . . . . . . . . . . . . . . . . . . . . . . 245-46

*Ramey Constr. Co., Inc. v. Apache Tribe of Mescalero Reservation,* 616 F.2d 464 (10th Cir. 1980). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Ramseyer v. Wood*, 64 F.3d 1432, 1435 (9th Cir. 1995). . . . . . . . . . . . . . . 152, 164

*Revels v. Diguglielmo,* 2005 WL 1677951 (E. D. Pa. 2005). . . . . . . . . . . . . . . . 94

*Ring v. Arizona*, 536 U.S. 584 (2002). . . . . . . . . . . . . . . . . . . . . . . 71, 219, 223

*Roberson v. State,* 852 S.W.2d 508 (Tex. Crim. App.1993). . . . . . . . . . . . . . . 168

*Robertson v. Cain*, 324 F.3d 297 (5th Cir. 2003). . . . . . . . . . . . . . . . . . 80, 83, 250

*Robinson v. Texas,* 548 S.W.2d 63, 66 (Tex. Crim. App. 1977)(en banc). . . . . . 190

*Robinson v. United States,* 434 U.S. 1050 (1978). . . . . . . . . . . . . . . . . . . . . . . . . 40

*Rocha v. Thaler* 626 F.3d 815 (5th Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . 130, 145

*Rompilla v. Beard*, 545 U.S. 374 (2005).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 197

*Roper v. Simmons*, 543 U.S. 551 (2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 198

*Saco-Lowell Shops v. Reynolds*, 141 F.2d 587 (4th Cir. (1994). . . . . . . . . . . . . . 32

*Sanders v. Ratelle*, 21 F.3d 1446 (9th Cir. 1994). . . . . . . . . . . . . . . . . . . . . . . . 41

*Sandstrom v. Montana*, 442 U.S. 510 (1979). . . . . . . . . . . . . . . 67, 71, 73, 83, 219

*Sawyer v. Smith,* 497 U.S. 227(1990). . . . . . . . . . . . . . . . . . 72, 210, 213, 221, 247

*Schilling v. Schwitzer-Cummins Co.*, 142 F.2d 82 (D.C. App. 1944). . . . . . . . . . 32

*Schlup v. Delo*, 513 U.S. 298 (1995).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 260-64

*Shafer v. South Carolina*, 532 U.S. 36 (2001). . . . . . . . . . . . . . . . . . . . . . . . . . 246

*Sierra Club, Lone Star Chapter v. Cedar Point Oil Co., Inc.,* 73 F.3d 546, 574 (5th Cir. 1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Simons v. Davidson Brick Co.*, 106 F.2d 518 (9th Cir. 1939). . . . . . . . . . . . . . . 32

*Simmons v. South Carolina*, 512 U.S. 154 (1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 212, 229, 238-40, 242-45, 248-49

*Skipper v. South Carolina*, 467 U.S. 1 (1986). . . . . . . . . . . . . . . . . . . . . . . . . . 238

*Spence v. State*, 795 S.W.2d 743 (Tex. Crim. App. 1990). . . . . . . . . . . . 41, 93, 124

*State v. Cobb*, 920 S.W.2d 136 (Mo.1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*State v. Cotton,* 318 N.C. 663 (1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

*State v. Denny,* 357 N.W.2d 12 (Wis. 1984). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

*State v. Echols,* 524 A.2d 1143 (Conn. 1987). . . . . . . . . . . . . . . . . . . . . . . . . . 40-41

*State v. Koedatich,* 548 A.2d 939 (NJ 1988). . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

*State v. Leitner*, 34 P.3d 42 (Kansas 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 257

*State v. Long*, 721 P.2d 483 (Utah 1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

*State v. Maestas*, 63 P.3d 621 (Utah 2002). . . . . . . . . . . . . . . . . . . . 58, 158, 167

*State v. Oden*, 2002 WL 31082064 (2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 257

*State v. Sturdivant,* 155 A.2d 771 (N.J. 1959),
*cert. den.*, 362 U.S. 956 (1960). . . . . . . . . . . . . . . . . . . . . . . . . . . 40-41, 44, 92-93

*Stewart v. Duckworth*, 93 F.3d 262 (7th Cir. 1996). . . . . . . . . . . . . . . . . . . . . 164

*Stirone v. United States*, 361 U.S. 212 (1960). . . . . . . . . . . . . . . . . . . . . . . . . . 87

*Strickland v. Washington,* 466 U.S. 668 (1984). . . . . . . . . . . 148-50, 152, 154, 196

Stephenson v. State, 226 S.W.3d 622
(Tex. App.--Amarillo 2007, no pet.). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

*Sturgeon v. Quarterman*, 615 F. Supp. 2d 546 (S.D. Tex. 2009). . . . . . . . . . . . . 56

*Taylor v. United States*, 287 F.3d 658 (7th Cir. 2002). . . . . . . . . . . . . . . . . . 97-98

*Tillman v. State*, 2011 WL 4577675 (Tex. Crim. App. Oct. 5, 2011). . . . . . 58, 168

*The People of the Territory of Guam v. Shymanovitz,*
157 F.3d 1154 (9th Cir. 1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 257

*Turner v. Duncan*, 158 F.3d 449 (9th Cir. 1995). . . . . . . . . . . . . . . . . . . . 152, 164

*United States v. Acosta*, 357 F. Supp.2d 1228 (D. Nev. 2005).. . . . . . . . . . . . . 125

*United States v. Alanis*, 88 Fed. Appx. 15 (5th Cir. 2004). . . . . . . . . . . . . . . 97-98

*United States v. Agurs*, 427 U.S. 97 (1976). . . . . . . . . . . . . . . . 125, 132, 142, 148

*United States v. Armstrong,* 621 F.2d 951 (9th Cir.1980). . . . . . . . . . . . . . . . . . 39

*United States v. Bagley*, 473 U.S. 667 (1985).. . . . . . . . . . . . . . . . . . . 123-24, 150

*United States v. Beasley*, 582 F.2d 337 (5th Cir. 1978). . . . . . . . . . . . . . . . . . 140

*United States v. Brannon,* 616 F.2d 413 (9th Cir.). . . . . . . . . . . . . . . . . . . . . . . 40

*United States v. Carmichael,* 269 F. Supp.2d 588 (D.N.J. 2003).. . . . . . . . . . . . 91

*United States v. Castro*, 2003 WL 1922967 (5th Cir. 2003).. . . . . . . . . . . . 97-98

*United States v. Crenshaw,* 698 F.2d 1060 (9th Cir.1983). . . . . . . . . . . . . . . . . . 39

*United States v. Crescent Amusement Co.*, 323 U.S. 173 (1994). . . . . . . . . . . . . . 32

*United States v. DeNoyer,* 811 F.2d 436 (8th Cir.1987).. . . . . . . . . . . . . . . . . . . 39

*United States v. El Paso Natural Gas Co.,* 376 U.S. 651 (1964). . . . . . . . . . . . . . 33

*United States v. Erwin*, 277 F.3d 727 (5th Cir. 2001). . . . . . . . . . . . . . . . . . . . 138

*United States v. Freeman*, 77 F.3d 812 (5th Cir. 1996). . . . . . . . . . . . . . . . . . . 138

*United States v. Green,* 786 F.2d 247 (7th Cir.1986). . . . . . . . . . . . . . . . . . . . . . 39

*United States v. Hall*, 165 F.3d 1095 (7th Cir. 1999), *cert. denied,* 527 U.S. 1029 (1999).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 91

*U.S. v. Hill*, 967 F.2d 226 (C.A.6 (Ky.) 1992). . . . . . . . . . . . . . . . . . . . . . . . . . 167

*United States v. Hannigan*, 27 F.3d 890 (3d Cir.1994). . . . . . . . . . . . . . . . . . .  57

*United States v. Kahn*, 472 F.2d 272 (2d Cir. 1973).. . . . . . . . . . . . . . . . . 125, 142

*United States v. Kissick,* 69 F.3d 1048 (6th Cir. 1995). . . . . . . . . . . . . . . . . . . . 166

*United States v. Marine Bancorporation,* 418 U.S. 602 (1974). . . . . . . . . . . . . . 33

*United States v. Morgan,* 581 F.2d 933 (D.C. Cir.1978). . . . . . . . . . . . . . . . . . . 40

*United States v. Nixon*, 881 F.2d 1305 (5th Cir. 1989).. . . . . . . . . . . . . . . 125, 128

*United States v. Pena*, 949 F.2d 751 (5th Cir. 1991). . . . . . . . . . . . . . . . . . . . . 138

*United States v. Phillips*, 2006 WL 1117882 (11th Cir. 2006). . . . . . . . . . . . . . . 97

*United States v. Robinson,* 544 F.2d 110 (2d Cir.1976). . . . . . . . . . . . . . . . . . . . 40

*United States v. Snoddy*, 862 F.2d 1154 (5th Cir. 1989). . . . . . . . . . . . . . 125, 142

*United States v. Stevens*, 935 F.2d 1380 (3rd Cir. 1991). . . . . . . . . . . . . . . . . . 40, 92

*United States v. Sullivan*, 112 F.3d 180 (5th Cir. 1997). . . . . . . . . . . . . . . . . . . 138

*United States v. Wade*, 388 U.S. 218 (1967).. . . . . . . . . . . . 50, 52, 64, 155, 157-58

*United States v. Wall*, 398 F.3d 457 (5th Cir. 2004).. . . . . . . . . . 132, 138-39, 147

*United States v. Wallach*, 935 F.2d 445 (2nd Cir. 1991). . . . . . . . . . . . . . . . . . . 90

*United States v. Weintraub*, 871 F.2d 1257 (5th Cir. 1989). . . . . . . . . . . . 125, 128

*United States v. Williams,* 596 F.2d 44 (2nd Cir. 1979)(cert. denied 442 U.S. 946 (1979).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

*United States ex rel. Gilliard v. LaVallee,* 376 F. Supp. 205 (S.D. N.Y. 1974). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

*United States ex rel. Maxwell v. Gibson*,
37 F.Supp.2d 1078 (N.D. Ill 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 152

*Walton v. Arizona*, 497 U.S. 639 (1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 224

*Washington v. Thaler* 2012 WL 245236 (5th Cir. 2012). . . . . . . . . . . . . . . 131, 147

*Watkins v. Sowders*, 449 U.S. 341 (1981). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

*Welch v. State,* 908 S.W.2d 258 (Tex. Civ. App. El Paso 1995). . . . . . . . . . . . 161

*Whitaker v. State*, 977 S.W.2d 595 (Tex.Crim.App. 1998), *cert. denied*, 525 U.S.
1108 (1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75

*Wiggins v. Smith,* 539 U.S. 510 (2003). . . . 99, 153-54, 159, 166, 169, 192-93, 197

*Williams v. State,* 375 S.W.2d 449 (Tex. Crim. App. 1964). . . . . . . . . . . . . . . . . 90

*Williams v. State*, 643 S.W.2d 477 (Tex. Crim. App. 1982). . . . . . . . . . . . . . 40, 93

*Williams v. Taylor*, 529 U.S. 362 (2000). . . . 30, 43, 152, 160, 197, 204, 231, 244

*Winfield v. Renfro,* 821 S.W.2d 640 (Tex. Civ. App. Hou-[1st] 1991). . . . . . . . 162

*Wong Sun v. United States*, 371 U.S. 471 (1963). . . . . . . . . . . . . . . . . . . . . . . . . 51

*Woods v. Johnson*, 76 F.3d 1017 (5th Cir. 1996). . . . . . . . . . . . . . . . . . . . . 80, 250

*Woods v. State*, 152 S.W.3d 105 (Tex. Crim. App. 2004). . . . . . . . . . . . . . . . . . 94

*Woodson v. North Carolina*, 428 U.S. 280 (1976). . . . . . . . . . . . . . . . . . . . . . . . .
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72-73, 192, 210-11, 215, 221, 247

*Zebroski v. State*, 715 A.2d 75 (D.C. 1980). . . . . . . . . . . . . . . . . . . . . . . . . . . . 257

## Constitution

U.S. Const. amend. VI . . . . . . . . . . . . . . . . . . . . . . . . . .  67, 71, 75, 148, 194, 219

U.S. Const. amend. VIII. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
66, 67, 70, 72-73, 75, 79 , 200, 204, 206, 208, 211, 215, 217, 220-21, 224-25, 227,
229, 231-32, 235, 246, 248, 251

U.S. Const. amend. XIV. . . . 39, 66-67, 74-75, 132, 148, 200-01, 203-04, 206, 208
217-18, 222, 225, 227-28, 232, 235, 238, 246, 251

## Codes, Rules, Statutes

Tex. Fam. Code 2.401. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 160

Tex. Code Crim Proc. Art 1.071§5(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 128, 144

Tex. Code Crim. Proc. Ann. Art. 11.071 §5a(1). . . . . . . . . . . . . . . . . . . . . . . . . 91

Tex. R. Crim. Evid. 504(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  34

Tex. R. Crim. Evid. 504(b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

Tex. R. Crim. Evid. 803(5). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

## Other Resources

Charles A. Wright and Arthur Miller, Federal Prac. and Proc. § 485 at 375 (3d ed.
2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 230, 249

Eric M. Freedman, *Giarratano is a Scarecrow:  The Right to Counsel in State
Capital Post-conviction Proceedings,* 91 Cornell L. Rev. 1079 (2006). . . . . . . 195

Hon. Nathan R. Sobel; Second Edition by Dee Pridgen; Updates by Lawrence A.
Vogelman and David W. Ruoff, *Eyewitness Identification: Legal & Practical
Problems* 2d § 6:4. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

House Comm. on Criminal Jurisprudence, Bill Analysis, Tex. H.B. 215, 82nd
Leg., R.S. (2011); Senate Comm. on Criminal Justice, Bill Analysis, Tex. H.B.
215, 82nd Leg., R.S. (2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

Maguire, Evidence of Guilt, 221 (1959). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

PHOTOGRAPH AND LIVE LINEUP IDENTIFICATION
PROCEDURES IN CRIMINAL CASES, 2011 Tex. Sess.
Law Serv. Ch. 219 (H.B. 215) (VERNON'S). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

1A J.H. Wigmore, *Evidence* §§ 139-141 (1983). . . . . . . . . . . . . . . . . . . . . . . . . . 39

# APPLICATION FOR WRIT OF HABEAS CORPUS UNDER 28 U.S.C. §2254

## I. INTRODUCTION
## THE EMPEROR'S NEW CLOTHES

David Carpenter, the Applicant  is innocent. Period. There is no physical evidence linking him to the crime scene, no fingerprints, no DNA, no personal items, nothing. The available physical evidence excludes him. A shoe print found outside the house belongs to a smaller individual, fingerprints found at the scene do not match Carpenter, and hairs found on the deceased's body do not match Carpenter's DNA. Even the eyewitness testimony given at the time of the offense excludes Carpenter.

The "eyewitness" saw the suspect for five to ten seconds and then was not asked to make an identification for *six years*. Her description of the suspect does not match Carpenter's. The co-conspirator is an admitted liar who has recanted her statement implicating Carpenter. A third party perpetrator has been identified, but not pursued. Finally, the ex-wife did not implicate Carpenter until six years *after* the murder and then only because she was getting back at him for having her mother arrested. Unknown to defense counsel, but not the prosecution team, the ex-wife was suffering from mental illness so severe that it renders her recollection and testimony worthless. At the time of the offense, the ex-wife  was admittedly having

hallucinations, and hearing voices. By the time of trial, she was on medications that further impaired her memory. The ex-wife told the prosecution team she did not want to testify, but was forced to under threat that she would be arrested and her children removed from her home. The trial transcript is replete with indications that the prosecution manipulated the ex-wife's testimony to fill in gaps as they arose. Moreover, the testimonies of the ex-wife and the snitch were not admissible and should not have been considered because of defects in the legal predicates for the testimony. Nonetheless, through a combination of incorrect evidentiary rulings and inadequate lawyering, a guilty verdict was obtained.

The State then obtained a death sentence by purposefully exploiting irrelevant but inflammatory materials, aimed at casting Carpenter in a distorted negative light. Because trial counsel made no real effort to educate the jury on the concepts of "future dangerousness" and mitigation, the State was able to take a history of property crimes and petty assaults, precondition the venire to assess a death penalty for such conduct, and then unfairly characterize Carpenter as a violent irredeemable offender.

No one can read the record against the backdrop of the factual development of the case and have anything remotely approaching an assurance that Carpenter is the perpetrator of the offense, much less, that he merits a punishment of death. There is no worthy evidence. However, like the fable of "The Emperor's New Clothes," those

charged with reviewing this case have chosen to see a strong case instead of the naked truth.

The "ancient" writ of habeas corpus was designed to correct the gross injustices of the criminal justice system. *Cheesman v. Teets*, 357 U.S. 156, 174 (1957) (Douglas, J. dissenting). Carpenter is asking this Court for relief.

## II.  PROCEDURAL HISTORY

| | |
|---|---|
| CHARGE | CAPITAL MURDER |
| OFFENSE DATE | AUGUST 28, 1991 |
| ARREST DATE | DECEMBER 23, 1997 |
| EXAMINING TRIAL | MARCH 5, 1998 |
| INDICTMENT RETURNED | DECEMBER 2, 1997 |
| JURY SELECTION | JANUARY 4, 1999 |
| PRETRIAL MOTIONS HEARD | MARCH 5, 1999 |
| TESTIMONY | MARCH 15, 1999<br>MARCH 23, 1999 |
| VERDICT OF GUILTY | MARCH 19, 1999 |
| TESTIMONY ON GUILTY/INNOCENCE | MARCH 19, 1999 |
| VERDICT IMPOSING DEATH SENTENCE | MARCH 23, 1999 |
| JUDGMENT AND SENTENCE | MARCH 23, 1999 |
| MOTION FOR NEW TRIAL | FILED: APRIL 22, 1999<br>DENIED:   MAY   27,   1999 |
| NOTICE OF APPEAL | MARCH 24, 1999 |
| OPINION AFFIRMING CONVICTION | OCTOBER 24, 2001 |
| MANDATE ISSUED | NOVEMBER 19, 2001 |
| 11.071 WRIT FILED | AUGUST 20, 2000 |

| | |
|---|---|
| PARTIES' PROPOSED FINDINGS FILED | APRIL 5, 2001 |
| FINDINGS DENYING RELIEF ENTERED | APRIL 19, 2001 |
| 11.071 WRIT DENIED | DECEMBER 19, 2001 |
| CERT DENIED | APRIL 1, 2002 |
| ORIGINAL §2254 FILED | JULY 13, 2003 |
| FIRST 11.071§5 FILED | JUNE 4, 2004 |
| FIRST 11.071§5 DENIED | AUGUST 25, 2004 |
| SECOND 11.071§5 FILED | JULY 17, 2006 |
| SECOND 11.071§5 DENIED | MARCH 7, 2007 |
| THIRD 11.071§5 FILED | JANUARY 10, 2011 |
| THIRD 11.071§5 DENIED | MAY 11, 2011 |

## III.  STATEMENT OF THE CASE

### A.     The motive

In 1991, Evrin Smith worked with Gary Hall at ProSet Press in Dallas (R.24:120), Hall had recently moved out of Nelda Henin's domicile, but their relationship continued on and off.  (R.24:122; R.26:17) At the same time, Hall began a relationship with Smith.  (R.24:121; R.26:16-17) By her own admission, Smith was obsessed with Hall.   (R.24:124; R.26:14; R.27:12)  Smith thought that Henin mistreated Hall.  Her dislike grew into hatred. (R.26:15,17)  She desired to break up Hall's relationship with Henin  (R.24:122), and she even began to stalk  Henin and Hall (R.24:122; R.26:18), often driving by Henin's home with her co-worker, Rebecca Crisler.  One night, in mid August 1991, Smith asked Crisler if she knew a hitman.  (R.24:127, 129; R.26:19)[1]

### B.     The scene of the crime

On August 28, 1991, at about 8:30 in the morning, the deceased, Nelda Henin, was in her home talking on the telephone with Ricky Jackson, a friend.  (R.24:38) During the call, she told Jackson that someone was breaking into her home and to call the police.  (R.24:39) He immediately called 911 (R.24:39) and drove to Henin's

---

[1] At trial, Crisler further recalled that Smith asked if her cousin, Carpenter, would commit a murder.  However, this statement regarding Carpenter's involvement appears nowhere in her affidavit to police. (R26-106-111, 112).

house (R24-40) arriving about 12 minutes later.  (R24-40)

About that time, Tessica Rainey, and her brother Brandon Whittal, were driving to school.  (R.25:65, 83)    Both saw a white male run from the decedent's home (R.25:86), get into a brown car and drive off. (R.25:66-68, 86, 90)  That person drove past the witnesses' car nearly sideswiping them.  (R.25:66)    Rainey and Whittal heard a burglar alarm.  (R.25:86)    While Brandon Whittal did not get a good look at the suspect except to notice that he had dark hair, (R.25:78) the driver, Rainey, stated that she saw the man for five to ten seconds.  (R.25:90)    In driving by, he passed very close to her and she saw that he was 6'2" with long brown, ratty hair and skinny.[2]    (R.25:90-91)

In the meantime, Bernard White was jogging by Henin's home, (R.24:54-58)  He saw a woman dressed in a nightgown staggering in the street, bleeding profusely. (R.24:59)   White ran inside her home to call the police, but the phone line was cut. (R.24:63)   The woman's home alarm was going off. (R.24:72)   Eventually, he was able to have a neighbor call 911. (R.24:65)

---

[2] When contacted by the police, shortly after the murder, Rainey told the detectives the person was skinny and driving a dark brown car.  (R.26:78) At a subsequent pretrial hearing concerning identification, Rainey stated that she primarily recalled the evil look the suspect gave her.  (R.23:67-68)

-7-

When the police arrived, they found Ms. Henin, the deceased, in her living room.  (R.24:87-89)   A paramedic arrived on the scene just as she took her last breath. (R.24:106) The coroner determined the cause of death was a gaping stab wound to the neck.  (R.26:58)

Smith heard of the murder that day and became frantic. (R.24:130)   She told Crisler not to mention her conversation regarding a hit man.  (R.24:131-132) Suspecting that Smith was involved in the crime, Crisler reported her to Crimestoppers.  (R.24:133-134)

## C.   The Physical Evidence

The police took numerous crime scene photos.   (R.24:107) Numerous identifiable prints were found throughout the house  (R.25:163-174) as well as on Henin's car.  (R.25:163) The police collected hair samples found around Henin's body. (R.25:177-178) The police discovered and photographed footprints located in the dirt outside.  (R.25:145) Police determined that entry to the house was gained by breaking down a large, heavy front door.  (R.25:113)

## D.   The investigation stalls

Little progress was made on the case for approximately six years.  Police compared the prints to numerous suspects, (R.27:42-44)  including Matthew Tolbert. (R.27:47) Tolbert apparently came to light because in December, 1991, Karen

Kedroski called the police and reported that Tolbert confessed to her that he had broken into a woman's house, robbed her, and stabbed her.  (R.27:61, 62, 64)

## E.      Carpenter/McBay comes forward

In October, 1997, the police contacted Mandee Carpenter/McBay, who had lived with Carpenter for several years from 1991-1995 (R.25:22, 31), when he went to prison, and who was the mother of two of his children.(R.25:24) Carpenter/McBay apparently felt that Carpenter had caused her mother to be arrested.  (R.25:47)   At first, Carpenter/McBay did not provide information to the police.   Eventually, however, she provided police with a detailed statement.  (R.25:36) She told the police that Carpenter had told her that Smith wanted Henin dead.  One morning, he awoke Carpenter/McBay and said that he had cut Henin's throat. (R.25:37) He asked her to clean the blood off his knife and shoes.  (R.25:37) She noted that there was a small amount of blood of the hinge of the knife blade (R.25:39) and just a few drops on the top of his white tennis shoes.     (R.25:39-40)[3]    Shortly after the murder, Carpenter/McBay had gone with Carpenter to his aunt Judy Carter's home. (R.25:40) Carpenter/McBay saw Smith there.  (R.25:41) Later Carpenter/McBay claimed that

---

[3] Notwithstanding the considerable blood at the crime scene (R.24:59; R.25:107), and in the driveway, the crime scene detective opined that it would not be unusual for the perpetrator of such a murder to have no blood on him.  (R.27:72) Carpenter/McBay's original statement fails to even mention the blood. Exhibit 54 (R.26:165)

Smith came to her home and had a conversation with Carpenter.  (R.25:42) Carpenter/McBay stated that after the conversation, that Carpenter was upset about not getting fully paid.  (R.25:42)

## F.     Carpenter/McBay's Undisclosed Mental Illness

### 1.     Mandee's Relationship with Carpenter

Mandee Mcbay/Cloud ("Mandee") is the mother of three children, two of whom were fathered by David Lynn Carpenter ("Carpenter").  (R.25:24).  These children were the result of a romantic relationship that began when Mandee was only twelve years old, and she began communicating with Carpenter through letters for two years while he was incarcerated.  (R.25:25). After Carpenter's release in 1991, Mandee and Carpenter began living together when Mandee was fifteen.  A major factor motivating Mandee to move in with Carpenter at such a young age was her need to escape from a broken household where her mother was a drug addict and her father was constantly in trouble with either law enforcement or criminal elements. (R.25:26).

Following the birth of their two children and several years of cohabitation, Mandee's and Carpenter's relationship came to an end in early 1995.  (R.25:28-30, 32).  Despite their breakup, Mandee and Carpenter kept in contact by letter-writing through at least 1999.  (R.25:32, 46-49). When the police investigation concerning

the death of the victim first began, Mandee was reluctant to talk to law enforcement. It took several affidavits for her to reveal key bits of information to the police, including her claim that Carpenter asked her to wash off the alleged murder weapon and his shoes.  (R.25:48, 55-56).

### 2.   Post-Conviction Disclosures

#### a.   The Statements to Dr. Marshall

Attached hereto as Exhibit A is the affidavit of Dr. Rycke Marshall.  The affidavit was based upon interviews with McBay/Cloud.  The federal court requested that a deposition of McBay/Cloud be taken and testimony, as set out hereinafter, was adduced.  The transcript of the deposition is attached hereto as Exhibit B.

McBay/Cloud reviewed the affidavit she had given to Rycke Marshall line-by-line and affirmed everything in the affidavit was correct.  (Exhibit B p. 33-80).  She met with Rycke Marshall for three or four sessions before giving the affidavit.  (Exhibit B p. 42).  McBay/Cloud insisted she was truthful with Rycke Marshall.  (Exhibit B p. 44).  She affirmed that her parents divorced when she was age two (2), and she rarely saw her father.  (Exhibit B p. 44).  Her father was a drug addict, an alcoholic who physically abused his children, and sexually abused Mandee's sister.  (Exhibit B p. 45).  Her mother was an alcoholic, a junkie, and a prostitute.  (Exhibit B p. 46).  Her childhood was extremely unstable and rife with abuse.  (Exhibit B p.

46).  Often, there was no food or electricity.  (Exhibit B p. 46).  Her mother frequently abandoned her children for days.  (Exhibit B p. 47).  From an early age she was exposed to alcohol, drugs, sex, pornography, and violence.  (Exhibit B p. 47). McBay/Cloud began abusing alcohol and drugs at age five (5).  (Exhibit B p. 47). She was sexually abused by a stepfather.  (Exhibit B p. 48).  She was the victim of child pornography by her mother's boyfriend.  (Exhibit B p. 48).  She became sexually active at age 12.  The family moved frequently.  (Exhibit B p. 48).  She did not do well in school and dropped out in seventh grade.  (Exhibit B p. 49).  She had only two long-term relationships--Carpenter and McBay/Cloud. (Exhibit B p. 49-50).

### b.    McBay/Cloud's Deposition Testimony

McBay/Cloud testified that throughout her life she had suffered panic attacks, mood swings and depression (Exhibit B p. 8) as well as suicidal ideation, anxiety, and substance abuse.  (Exhibit B p. 51).  In retrospect, McBay/Cloud believes that she had been bipolar her whole life.  (Exhibit B p. 19).  Around the time of the murder, McBay/Cloud was having hallucinations, like hearing people call her name while she was in the shower.  (Exhibit B p. 68).  She had these hallucinations whenever she was not taking drugs.  (Exhibit B p. 68).  McBay/Cloud also stated that certain noises, like scratching a nail on a chalkboard, would "set her off."  (Exhibit B p. 100-101).

Prior to trial, McBay/Cloud was diagnosed with depression and was given Zoloft and Buspar. (Exhibit B p. 10, 54-55). She first received medication in 1997. (Exhibit B p. 51). According to McBay/Cloud, the Klonopin results in memory loss and impairs her ability to recall events. (Exhibit B p. 12). She acknowledged that she had such memory problems in 1997. (Exhibit B p. 13). She told Kim Judin about her extreme depression and the medications she was taking at the time of trial. (Exhibit B p. 78-79). Kim Judin acted as if that wasn't important. (Exhibit B p. 79-80).

After the trial, McBay/Cloud was diagnosed with a bipolar disorder (Exhibit B p.18) and was given a number of medications whose names she did not fully recall. (Exhibit B p. 19). She told Rycke Marshall that she was taking antidepressants such as Zoloft, Gabapentin, and Klonopin (Exhibit B p. 43), as well as Seroquel, and Ambien. (Exhibit B p. 54). She was treated by Dr. Rayburn, a psychiatrist, from 1997-2000. (Exhibit B p. 51). She next saw another psychiatrist, Vicky Boric, who diagnosed her as being bipolar, as set out in Dr. Marshall's affidavit. (Exhibit B p. 51-52). Since 2004, she has been seeing Dr. Bennett at the Adapt Clinic. (Exhibit B p. 54). In 2003, the Social Security Administration declared these conditions to be disabling. (Exhibit B p. 53). Her mother was appointed to be her legal guardian. (Exhibit B p. 53). Specifically, McBay/Cloud testified that, at the time of the

deposition, she was taking Gabapentin and Klonopin.  (Exhibit B p. 4-5). (See Exhibit B- McBay/Cloud medical records).

### c.      What the Prosecution Knew

McBay/Cloud specifically recalled telling the prosecutor, Kim Judin, on several occasions that she was on medication.  (Exhibit B p. 15-16).  McBay/Cloud thought that this disclosure would keep her from testifying.  (Exhibit B p. 15-16).  She tried to get out of testifying by telling Kim Judin, the prosecutor, that she was on medication, but it didn't work.  (Exhibit B p. 31-32).  According to McBay/Cloud, Kim Judin brushed the matter aside.  (Exhibit B p. 17).  During the trial, mention of her medications did not occur.  (Exhibit B p. 17).

### d.      What She Disclosed to Carpenter and his Lawyers'

McBay/Cloud testified that during the time she lived with David Carpenter, she never discussed any of her mental or emotional problems with Carpenter other than to joke about her obsessive cleanliness.   (Exhibit B p.8).   Six months after McBay/Cloud's second child was born, approximately 1995, she stopped most contact with Carpenter except for letters.  (Exhibit B p. 57).  She never told David of her hallucinations.  (Exhibit B p. 68).

During the time that Carpenter was in jail awaiting trial, McBay/Cloud never disclosed to Carpenter, either by phone or in writing, that she was seeing a doctor and

-14-

had been diagnosed with depression.  (Exhibit B p. 9-10).  McBay/Cloud never told Carpenter that she was taking medications or that she had seen a doctor.  (Exhibit B p. 11).

McBay/Cloud reaffirmed that she refused to talk to Carpenter's investigators prior to trial at her husband John Cloud's urging.  (Exhibit B p. 13-14).  She only spoke to police investigators.  (Exhibit B p. 14).  Cloud had pressured her to get Carpenter in trouble.  (Exhibit B p. 23-24)  Cloud told her that the authorities were going to take her kids away.  (Exhibit B p. 24).  Eventually, she realized her kids would not be taken away.  (Exhibit B p. 24).  She never spoke to the defense team and never wrote David a letter about the promise not to seek the death penalty.  (Exhibit B p. 32).  She never told the defense team that she was opposed to the death penalty, however, she told Prosecutors Judin, Toby Shook, and Penrod that she was opposed to the death penalty and didn't want to go through with this.  (Exhibit B p. 40)

McBay/Cloud acknowledged that she had been contacted by defense investigators on many occasions after the trial.  (Exhibit B p. 21).  (*See* Exhibit B, McBay/Cloud affidavit.)  McBay/Cloud did not speak to any of the investigators because she wanted nothing to do with the case.  (Exhibit B p. 22).  In part, this refusal was attributable to her lack of trust in the system due to the prosecution team's lies.  McBay/Cloud finally decided to speak with investigators.  She spoke to Kenny

Johnson, Carpenter's investigator, after her husband, John Cloud, died.  (Exhibit B

p. 23).  She first spoke to a female investigator that worked with Kenny Johnson

because the investigator seemed nice.   (Exhibit B p. 24-25).   Kenny Johnson

promised her nothing in return for her statement.  (Exhibit B p. 25).  Before that

point, when the female investigator came, she had no intention of giving a statement.

(Exhibit B p. 26).  McBay/Cloud can't remember how many investigators had

attempted to contact her over the years or how often she had refused to speak.

(Exhibit B p. 34).

## G.    Bad Line-up

Armed with Carpenter/McBay's tip, the detectives went back and compiled

another photo lineup for the eyewitnesses to review.[4]   The lineup consisted of six

photographs.  (Exhibit P)  Carpenter's photo, Exhibit P, had height bars, was older,

less focused, of poorer quality, had a washed out, pinker finish and was glossier.

(R.23:84-85)   The line-up does not comply with current standards. It was not

sequential, and not administered by an officer with no information on the case.

Notwithstanding that, Rainey had initially identified the perpetrator as having brown

hair and being skinny, she identified Exhibit P as the perpetrator.

_____

[4] Immediately after the offense, Rainey was taken to the police station and shown a
compilation of photographs; however, she could not make an identification.  (R.23:75) The
record is silent as to whether Carpenter's photo was in this group.

H.    **Evrin Smith–the Co-Conspirator**

1.    **Smith's Confession**

Based upon Carpenter/McBay's statement involving Carpenter and Smith, and in conjunction with the prior Crimestoppers tip regarding Smith's involvement, the police confronted Smith about her involvement in the offense.  Of course, Smith continued to lie and deny her involvement in the case.  (R.25:34-36) Eventually, however, the detectives were able to overcome some ambiguous fears that Smith harbored and she gave an account of the murder, placing full blame on Carpenter.

According to Smith, she asked Carpenter to kill Henin and offered to pay $1,000. (R.25:23) She also insinuated that Henin had jewelry that Carpenter could take. (R.25:23)  Smith even went so far as to drive Carpenter over to Henin's house so he could locate the home.  (R.25:24) She gave Carpenter a down payment of $80. (R.25:26)   He was nonchalant about the contract and told her not to worry about it, that she would find out when it was done. (R.25:26)  Smith claimed that she had second thoughts about the murder and tried to call it off but Carpenter refused stating angrily that he needed the money. (R.25:28)

After the murder, Smith saw Carpenter at Crisler's house. (R.25:30) Carpenter told her "it was a rush".  (R.25:31) Not only did Smith initially refuse to pay Carpenter more money, but she had the temerity to ask for her money back. (R.25:32)

-17-

Nonetheless, Smith gave Carpenter an additional $20. (R.25:33)  Smith's dreams were subsequently realized when she moved in with and married Gary Hall. (R.25:34)

### 2. Evrin Smith's Post-Incarceration Admissions of Guilt

In prison, after Carpenter's conviction , Smith began confessing to her cellmates her true role in the murder. Smith's confessions are clearly against penal interest and are corroborated by the facts of the case.  Debra Sue Curry's ("Curry") affidavit states that Evrin used a knife to kill the female victim.  Curry's affidavit states that Carpenter was not involved in the crime.  Clearly, the affiant knew that a female victim was killed with a knife.  The affiant also knew that Carpenter was accused of this murder.  These are all indisputably objectively true and corroborate Curry's affidavit.

Likewise, Athena Burdick's ("Burdick") affidavit contains a statement by Smith exculpating Carpenter.  Smith referred to Carpenter as her fall partner.  Both Carpenter and Smith were convicted of Henin's murder and that Carpenter received a death sentence. These facts are objectively true and corroborate Smith's confession.

Finally, the affidavit of LeBourney contains an unredacted statement that blood was everywhere, that Smith was at the scene of the murder and saw children on their way to school, that the clothes and murder weapon were not found, and that

-18-

Carpenter was wrongfully convicted of the murder. These facts are all objectively true and corroborate Smith's confession.

Additionally, Smith was, by her own admission, involved in the murder. She had an opportunity to commit the crime. The record indicates that she stalked the deceased and had been to her house often. Thus, Smith was uniquely situated to commit the crime.

## I.      Tailoring the Evidence to Fit

After hearing Smith's ultimate version, the police went back and re-contacted Crisler about her knowledge of the case. Crisler, who had been feuding with Carpenter's family since 1991, (R.26:113-114) now remembered that Smith had specifically mentioned talking with Carpenter about the murder and that she had suspected that Carpenter was involved in the offense.(R.26:116) The State also contacted Carpenter's employer, a temporary service, to establish that Carpenter had been laid off of work just before the murder. (R.25:91)

## J.      Testimony Changes at Trial

Now prepared for trial with the testimony of Carpenter/McBay, the angry, mentally ill former wife, the belated confession of Smith, (since recanted)  the acknowledged mastermind, and the questionable identification of Rainey, the State

went to trial.[5]

### 1.    Rainey's Identification

Rainey, the eyewitness, testified that she was sixteen years old at the time of the offense (R.25:83).  While driving to school, (R.25:85-86) she heard an alarm (R.25:86) saw a man run from the deceased's home, (R.25:86)[6] and drove off. (R.25:86-88)   The suspect's car came so close to her that she noticed an evil look in his eyes.  (R.25:89) She reiterated that the man was 6'2" with long, brown hair, and skinny.  (R.25:90-92) For the first time, at trial, when reviewing Carpenter's photo lineup, Rainey added that the suspect's hair was lighter than in the picture.  (R.25:95) She then observed Carpenter seated in court and determined that he was a little heavier and his hair was a little darker and shorter.  (R.25:97) Incredibly, she then looked at Carpenter, as well as his picture (State's Exhibit 145), and called him "skinny".

On cross-examination, Rainey acknowledged seeing the suspect for just a few seconds. (R.26:77).  She admitted that she had met with the prosecutor five or six times (R.26:80) and that her testimony that the hair was darker and Carpenter was

---

[5] First the State had to overcome "challenges"  to the admissibility of testimony of the eyewitness Rainey and of the "common-law wife" Carpenter/McBay.  (R.23) *See Claims _____ post.*

[6] This information was obtained only from a leading question.

heavier was new and had changed even after the pretrial hearing.  (R.26:82-83) She also acknowledged that Carpenter's photo in the lineup was of a different quality than the other five "pinker, glossier". (R.26:86)

### 2.    Crisler's Subsequent Inconsistent Statement

Rebecca Crisler, Carpenter's cousin, testified regarding her account of the discussions with Smith regarding killing Henin.   She remembered that in the initial discussion, Carpenter's name was specifically mentioned.  (R.24:127) She was asked to describe to the jury how Carpenter's appearance had changed since 1991.  She stated that he had been a little thinner and with sandy blonde, light-colored hair. (R.24:136) She also remembered that he drove a maroon Oldsmobile.  (R.24:137) A recess was called for the evening.  The next morning Crisler specifically stated that Carpenter was not "skinny" in 1991.  (R.25:11)

### 3.    Smith's Inconsistent Statements

Smith, the co-indictee, acknowledged that Carpenter's hair was darker at trial but that his weight was about the same.  (R.26:41)   At trial, Smith admitted that she had lied to the detectives when first visited in 1998 (R.26:36), then provided a false affidavit to them (State's Exhibit 160) (R.26:38), but eventually gave a statement implicating Carpenter.  (State's Exhibit 161)    She admitted finally giving a third statement (Defendant's Exhibit 57) (R.27:24-25).  That statement contradicted the

prior two statements.  It was only in this third statement, given a few weeks before

trial, (R.27:25) that Smith said she paid Carpenter money, took Carpenter over and

pointed out Henin's house, and argued about the money to be paid.  (R.27:28-29)

 She admitted all these lies because she did not want to go to jail.  (R.26:39)

Restated, the entire evidence of a murder for hire, the evidence of payment, came to

light some three months after the indictment (CR: 2-5),  two weeks before the

commencement of testimony and, in fact, *during* jury selection.

### 4.    Carpenter/McBay's Inconsistent Statements

With these descriptions on record, the prosecution then called

Carpenter/McBay to clean up the discrepancies that had been presented.

Carpenter/McBay admitted to living with Carpenter for several years (R.25:27) and

having children by him (R.25:28-29).  However, she adamantly denied being his wife,

(R.26:123)[7]   even though she wore a wedding ring. (R.26:124)   She admitted

believing that Carpenter had caused her mother to be arrested in August of 1997 and

---

[7] Had she been the spouse, Carpenter could have precluded her testimony.  *See Claim ____ post*.  Although not argued at trial, the State claims and the trial court made findings of fact that Carpenter/McBay could have been forced to testify because her cleaning of the knife and shoes made her an accomplice to the crime. (Finding of Fact 477) The State did not present her as an accomplice witness to the court or to the defense, and the charge contains no accomplice witness instruction concerning Carpenter/McBay.  (CR: 135) While this legal proposition is highly dubious, if true, then it appears the State intentionally presented Carpenter/McBay's status in a false light and Carpenter's attorneys rendered ineffective assistance of counsel in not requesting an appropriate instruction.

that she was mad at him for this. (R.25:46-47)   She also admitted being angry with

Carpenter because, while he was incarcerated, she had born a child by another man

(R.26:156) and Carpenter would not agree to give the child his last name.  (R.26:156)

(Defense Exhibit 52 p. 158-160)

Carpenter/McBay reiterated her statement given to the detective that Carpenter

had awoken her one morning, told her of the murder, and asked her to clean his knife

and shoes.  (R.25:37-39)   She acknowledged that her original statement to the police

did not reference any blood or cleaning and that these details were added later.

(R.25:56) Her explanation was that she was afraid she would get into trouble.

(R.26:166)   She acknowledged writing letters to Carpenter in 1997, that the police

were talking to her and that she knew nothing of a stabbing in 1990 or 1991,

(R.26:149) and that she hated to think he would have stabbed somebody (R.26:153).

Her explanation for these letters was that she knew his mail was being read and did

not want to cause any problems.  (R.26:153)

Carpenter/McBay unequivocally stated that at the time of the murder,

Carpenter had "bleach blonde hair" [sic] (R.25:45).   She knew this because she was

the one who dyed his hair.  (R.25:45)  A recess was taken (R.25:57) and after the

recess, and a chance for the witness to speak to the prosecutor, (R.25:63)

Carpenter/McBay changed her testimony again that "his hair wasn't even bleached,"

"it wasn't blonde," "it was just lightened," like "if you went out in the sun". (R.25:62) She did admit telling the defense on a previous occasion that his hair was "a lot lighter" at the time of the offense.  (R.25:63) Carpenter/McBay stated that although Carpenter's weight fluctuates, she could not tell if he was any smaller or larger in 1991.  (R.26:139-140)   She also recalled them driving an Oldsmobile, as pictured in State's Exhibit 20. (R.25:27)

Of course, as set out above, McBay/Carpenter testified under the influence of memory-impairing medications. Her testimony was totally unreliable.

## K.   Third Party Perpetrator

Aside from the three main witnesses against Carpenter, together with the testimony of Crisler, the State presented no other evidence tying Carpenter to the crime. There was absolutely no physical evidence admitted at trial implicating Carpenter in this murder.   The State's remaining police witnesses freely admitted that, no fingerprints, footprints, or hair samples collected matched Carpenter. (R.25:145, 175, 202-203)

The defense approach at trial was to bring the lack of physical evidence to the jury and to impeach the three main witnesses.  The only affirmative defense attempted at trial was the proffer of the testimony of Karen Kedroski through Detective Sparks. As noted earlier, in December 1991, Kedroski had contacted the police and told them

-24-

that Matthew Tolbert had confessed to committing the offense.(R.27:63) Det. Sparks

dutifully recorded her statement.  However, in the intervening six years prior to trial,

Kedroski had seizure surgery and concomitantly lost her memory.   (R.27:61)

Therefore, the only memorialization of Tolbert's confession was the statement she

had given to Det. Sparks.  (State's Exhibit 163) This testimony was precluded by the

court because, in the judge's opinion, the proffer was not sufficiently linked to the

offense.  Aside from the testimony of Detective Sparks,  no other attempt was made

to tie Tolbert to the offense.

## L.    Guilty Verdict

Based on the afore stated evidence, each side rested and submitted the case to

the jury.  The prosecution argued that Rainey had no motive to lie (R.27:86), and

attributed  her description of the suspect as skinny with light brown hair to her "word

choice" (R.27:118-119).   Carpenter/McBay's testimony was bolstered by the notion

that she was afraid to tell the truth anytime earlier because she would get in trouble.

(R.27:120-121) The State acknowledged that Smith was  a liar (R.27:124-125) but

claimed that she had no motive to implicate Carpenter. (R.27:127)    In sum, the

State's theory was that since Carpenter/McBay was the acknowledged instigator of

the investigation, (R.127:128-129) her statement had to be true because it was later

corroborated by Smith.

The defense argued to the contrary that noteworthy discrepancies existed in the evidence as set out above and that it was apparent that the police helped eliminate inconsistent statements through repeated interrogation. (R.27:123) The jury found Carpenter guilty of capital murder. (R.27:126)

## M.   Punishment Phase

### 1.   Prior Convictions

At the punishment phase of trial, the prosecution introduced Carpenter's criminal history. When Carpenter was a juvenile, he had held a smaller child's head under water in an after school altercation. (R.30:27-32)   In April of 1986, he was caught stealing hubcaps at Town East Mall and had led the police in a high speed chase. A club, better described as a metal stick with a black handle, was found in his possession. Thus, he had a conviction for evading arrest and unlawfully carrying a weapon. (R.29:10-13)

In July of 1987, Carpenter stole a car from Devil's Bowl Speedway. When the car was recovered, it had been stripped and burned. Carpenter was convicted of criminal mischief. (R.28:20-21)   In November, 1987, Carpenter broke into an auto parts shop and stole some property. A few days later, the property was located in a truck nearby. When confronted, Carpenter tried to hide. Carpenter was convicted for burglary of a building. (R.29:18-23)

In December, 1988, Carpenter broke into the Webb home in Kaufman County stealing property, guns and a car.  Carpenter confessed to this burglary of a habitation.  (R.29:32-36, 58-61) According to a co-defendant, Carpenter was high on drugs at the time.  (R.29:52)   In 1995, Carpenter was pulled over for a traffic stop. (R.29:73) However, Carpenter fled and led the police on a high speed chase with a two year old child in the car. (R.29:76-85)  For that conduct, Carpenter was convicted of endangering a child and of driving with license suspended and theft.   **2.**

**Uncharged Offenses**

Aside from prior convictions, the State introduced a slew of testimony regarding bad acts that had not been charged as crimes.  Carpenter/McBay testified that she was never permitted to deny Carpenter sex during their relationship and that he sexually assaulted her in 1994 and 1995. She also stated that she began having sex with Carpenter when she was fifteen and under age.  (R.28:27, 31-32)    Carpenter allegedly assaulted her in 1995, and was charged with a class C assault.  (R.28:42) She testified that she got a protective order against Carpenter in 1995.  (R.30:12-13).

She also recalled an occasion when Carpenter had been shot at a nightclub. She characterized Carpenter's activities as "nigger hunting."  (R.28:23)   The State then exploited this race issue by introducing excerpts of letters written by Carpenter to Carpenter/McBay in which he made racist remarks.  (R.28:33-36)

Crisler was recalled by the State to testify that Carpenter had stalked her fourteen year old daughter in 1994.   When she confronted Carpenter, he threatened her and attempted to run her over.  (R.28:48) She also recalled an occasion when Carpenter had argued with his grandmother about money he owed her for a vehicle. Carpenter allegedly got angry and threatened to kill her.  (R.28:46) When another former girlfriend of Carpenter, Sandra Jones, was called to testify regarding Carpenter's "good" character, (R.30:38) the State used that opportunity to introduce State's Exhibit 204-209, a series of lewd drawings that Carpenter had mailed to Jones.  (R.30:47-48)

## 3.    Prison Conduct

The final category of evidence that the State adduced at the punishment phase, were the minor rule violations and petty assaults that Carpenter engaged in while in prison. The most noteworthy fight involved Donald Leonard, an inmate.  Leonard and Carpenter had been playing dominos and Leonard had accused Carpenter of cheating. (R.29:18, 146)  Leonard started the fight and hit Carpenter in the face with a padlock, injuring him.   (R.29:136, 148)

Carpenter had another altercation in the chow line with an inmate named Turner. (R.29:184, 193)  No weapons were involved and Carpenter was docked thirty days recreation and commissary.  (R.29:172-174)   Finally, Carpenter allegedly

-28-

punched an inmate named Douglas Johnson. Johnson stated that his jaw hurt for several days. (R.29:201-202) No reason was given for this fight.

In addition, while in prison, Carpenter got into trouble for gambling over stamped envelopes (a valuable prison commodity), (R.29:178-179) smuggling tobacco into the prison, (R.29:156-210) using indecent language on one occasion and refusing to obey an order on another occasion. (R.29:227)

Finally, Kevin Bryant and Jack Phillips, former parole officers, testified that Carpenter had a poor attitude under supervision, (R.29:111) violated his probation by being rearrested, not paying fees, and not participating in drug treatment. (R.29:117-118, 226) Apparently, Carpenter had never successfully completed a probation or parole. (R.29:228)

### 4.    Mitigation

The defense presented testimony from Angel Terry, a former girlfriend and the mother of one of Carpenter's children, (R.29:234-235) that Carpenter was a good father and husband. Billie Rawlings, Carpenter's grandmother, testified that Carpenter was not a violent person. (R.28:244) Carpenter's father and mother testified Carpenter had worked regularly since age sixteen and, although rambunctious, was a good kid.[8] (R.29:249)    Contrary to Carpenter/McBay's

---

[8] As a child, he had been placed on Ritalin. (R.29:249, 260)

testimony, his parents testified that Carpenter/McBay griped at Carpenter a lot, that Carpenter/McBay controlled Carpenter (R.29:252) and that Carpenter was good to her.  (R.29:263)

## N.    Death

On this evidence the jury was asked to assess punishment.  The prosecution argued that Carpenter was a racist (R.30:62), and that his minor fights in prison and petty offenses (R.30:65) together with the facts of the offense, demonstrated his future dangerousness.  The defense argued that the assaults were not serious, that no weapons were used, and that Carpenter could adjust to prison.  (R.30:70-71) Based on this evidence, the jury assessed the death penalty.  (R.30:83-85)

## IV.  OVERVIEW - THE HEAVY RUBBER STAMP

A review of the following claims must be performed with the appropriate level of deference mandated by the AEDPA.  *See Williams v. Taylor*, 529 U.S. 362 (2000). While each party filed Proposed Findings of Fact for the 11.071 proceeding, and Carpenter even submitted supplemental findings, the trial judge adopted the State's Proposed Findings of Fact *verbatim*. The trial court failed to prepare or draft any findings.  Instead, the judge signed a one page order simply adopting the State's findings.  This "rubber-stamping" of the prosecution's theory of the case is entitled to no deference under the AEDPA.  Without changing a single point of evidence, fact

or law, the trial court blindly accepted the State's position and completely disregarded Carpenter's presentation of his claims.

When Carpenter submitted a subsequent claim of newly discovered evidence that Smith had recanted her testimony, the State district court judge signed an order denying Carpenter all requested relief, including discovery and an investigator. Her order adopted verbatim all of the State's findings. In no fashion did the order acknowledge any of Carpenter's objections. When Carpenter received this order, an *ex parte* request for appointment of an investigator was renewed and granted. A mere one month after the formal appointment of an investigator, the Court of Criminal Appeals set a deadline for resolution of all matters. This prompted the Judge to sign another boilerplate order adopting the State's findings verbatim, again denying Carpenter all requested relief. After Carpenter submitted his affidavits, the court once again adopted the State's findings verbatim and denied all relief. The fact that the court did not review the findings is underscored by that fact that in one of the findings, the judge implicitly found that she herself violated the code of judicial conduct[9].

This "rubber-stamping" procedure has been so roundly condemned that it

---

[9]The trial court was relieved of the necessity of rubber-stamping the state's findings on Carpenter's second supplemental writ because the Court of Criminal Appeals denied Carpenter the opportunity to even present his claims to the District Court.

should have been completely eradicated and needs to be ceased for federal habeas

relief to exist.   As the court stated in *Chicopee Mnfg. Corp. v. Kendall Co.,* 288 F.2d

719,725 (4th Cir.) *cert. denied*, 368 U.S. 825 (1961) reversing the judgment:

> The manner in which the opinion of the District Judge was prepared in this case cannot be approved.  There is authority for the submission to the court of proposed findings of fact and conclusions of law by the attorneys for the opposing parties in a case, and the adoption of such of the proposed findings and conclusions as the judge may find to be proper.  *See United States v. Crescent Amusement Co.*, 323 U.S. 173, 184, 65 S.Ct. 254, 89 L.Ed. 160 [(1994)]; *Saco-Lowell Shops v. Reynolds*, 141 F.2d 587, 589 [(4th Cir. (1994)]; *Schilling v. Schwitzer-Cummins Co.*, 142 F.2d 82, 83 [(D.C. App. 1944)]; *Simons v. Davidson Brick Co.*, 106 F.2d 518 [(9th Cir. 1939)]; *O'Leary v. Liggett Drug Co.*, 150 F.2d 656, 667 [(6th Cir.) *cert. denied, sub nom. O'Leary v. Johnston-Shelton Co.*, 326 U.S. 773 (1945)].  But there is no authority in the federal courts that countenances the preparation of the opinion by the attorney for either side. That practice involves the failure of the trial judge to perform his judicial function and when it occurs without notice to the opposing side, as in this case, it amounts to a denial of due process.

*See also Anderson v. City of Bessemer, North Carolina*,  470 U.S. 564, 571 (1985).

> We, too, have criticized courts for their verbatim adoption of findings of fact prepared by prevailing parties, particularly when those findings have taken the form of conclusory statements unsupported by citation to the record. *See, e.g., United States v. El Paso Natural Gas Co.,* 376 U.S. 651, 656-657, 84 S.Ct. 1044, 1047-1048, 12 L.Ed.2d 12 (1964);   *United States v. Marine Bancorporation,* 418 U.S. 602, 615, n. 13, 94 S.Ct. 2856, 2866, n. 13, 41 L.Ed.2d 978 (1974).   We are also aware of the potential for overreaching and exaggeration on the part of attorneys preparing findings of fact when they have already been informed that the judge has decided in their favor.  *See* J. Wright, The Nonjury Trial--Preparing Findings of Fact, Conclusions of Law, and Opinions, Seminars for Newly Appointed United States District Judges 159, 166 (1962).

Rubber-stamped findings are entitled to less deference than those findings entered by an impartial trier of fact. As the Fifth Circuit stated in *Luhr Bros., Inc. v. Shepp*, 157 F.3d 333, 338(5th Cir1998) *cert. denied, sub nom. Jones v. Luhr Bros., Inc.*, 526 U.S. 1050 (1999).

> In addition, in cases such as the instant one, where the district court's Findings of Fact and Conclusions of Law are near-verbatim recitals of the prevailing party's proposed findings and conclusions, with minimal revision, we should approach such findings with 'caution.' *Sierra Club, Lone Star Chapter v. Cedar Point Oil Co., Inc.,* 73 F.3d 546, 574 (5th Cir. 1996).   We may 'take into account the District Court's lack of personal attention to factual findings in applying the clearly erroneous rule,' *Federal Deposit Insurance Corp. v. Texarkana Nat. Bank,* 874 F.2d 264, 267 (5th Cir. 1989), *[cert. denied,* 493 U.S. 1043 (1990)] (quoting *Amstar Corp. v. Domino's Pizza, Inc.,* 615 F.2d 252, 258 (5th Cir.) *cert. denied,* 449 U.S. 899 (1980)]), and we "can feel slightly more confident in concluding that important evidence has been overlooked or inadequately considered when factual findings [are] not the product of personal analysis and determination by the trial judge." *Amstar Corp.,* 615 F.2d at 258 (quoting *James v. Stockham Valves & Fittings Co.,* 559 F.2d 310, 314 n. 1 (5th Cir.1977)). [FN4]"

> FN4. Stricter appellate scrutiny of "rubber-stamped" findings by the district court is mandated in at least four other circuits.   *See, e.g., Cuthbertson v. Biggers Bros., Inc.,* 702 F.2d 454, 458-59 (4th Cir. 1983);   *Gimbel v. Commodity Futures Trading Com'n.,* 872 F.2d 196, 199 (7th Cir. 1989); *Alcock v. Small Bus. Admin.,* 50 F.3d 1456, 1459 n. 2 (9th Cir. 1995);   *Ramey Constr. Co., Inc. v. Apache Tribe [of Mescalero Reservation],* 616 F.2d 464, 467 (10th Cir. 1980).   The practice of 'rubber-stamping' findings has been routinely discouraged.   *See, e.g., Anderson,* 470 U.S. at 572, 105 S.Ct. at 1510-11;   *Gimbel,* 872 F.2d at 199;   *Amstar Corp.,* 615 F.2d at 258.

As can be seen in the discussions below, the Findings of Fact are replete with factual and legal errors.[10]   For example, the trial court signed off on propositions that legal marriages can by nullified retroactively (Finding 451 ),  that admission of graphically lewd drawings of naked women "humanizes" Carpenter by showing artistic merit (Finding 291), that any relevant evidence is admissible in the punishment phase of a capital case without reservation (Finding 285).  The findings continually misquote the standard of review for harm analysis by requiring Carpenter to prove his innocence.  *See* (Findings of Fact 367, 577, 635, 637).  The fears of the appellate courts are realized in a case like this, where the State, fully aware that their findings would not receive meaningful review, abused the judge's trust by inserting wholly erroneous factual and legal assertions.

Therefore, in reviewing these claims, the court should strip away any veneer of deference normally accorded judicial findings and subject the record to a higher scrutiny.  *See Pulley v. Harris*, 465 U.S. 37 (1984); *California v. Ramos*, 463 U.S. 992 (1983)(holding that a meaningful review is a safeguard against arbitrary application of the death penalty).  The AEDPA was intended to streamline habeas

---

[10]Likewise, the appellate opinion is replete with error. For example, the Court of Criminal Appeals disposed of the marital privilege issue by noting that the <u>wife did not invoke</u> the privilege. This reasoning is clearly erroneous. It refers to a different privilege not even raised at trial Tex.R. Crim Evid. 504(b), instead of 504(a), the spousal communication privilege. The appellate opinion was not released for publication.

proceedings where Carpenters had received meaningful State review.  In states such as Texas, where the state courts routinely delegate the courts' fact-finding process to state prosecutors, individuals are denied meaningful review.   This rubber-stamping process, if accepted by this court, pursuant to the AEDPA, effectively operates as a suspension of federal habeas corpus proceedings in violation of Art.I., §9 of the U.S. Constitution.

## CLAIM I.

**CARPENTER WAS DENIED DUE PROCESS OF LAW AND THE RIGHT TO PRESENT A DEFENSE WHEN THE TRIAL COURT REFUSED TO LET THE JURY HEAR TESTIMONY THAT A THIRD PARTY, MATTHEW TOLBERT, HAD PREVIOUSLY CONFESSED TO THE MURDER.**

### A.    Relevant Facts

Eyewitnesses saw a skinny, dark haired Caucasian male in flight from the scene of the murder. (R.25:90, 91)   Although comparable fingerprints, as well as hair strands and footprints were found at the scene (R.25:145, 175, 202-203)  no physical evidence was ever matched to any suspect in the case.  One of the suspects who came to light in the early stages at the investigation was Matthew Tolbert.(R.27:48) According to Karen Kedroski, Tolbert had confessed to burglarizing a woman's home and killing her with a knife.  Tolbert stated that he had committed this murder in the Pleasant Grove area of Dallas in 1991. (R.27:61)  Kedroski told Detective Sparks of

Tolbert's involvement in December 1991. (R.27:63-64).   Unfortunately, between December 1991 and Carpenter's trial in 1999, Kedroski suffered a seizure and consequently lost independent recollection of her statement. (R.27:61) However, she was able to identify the 1991 statement to Sparks as past recollection recorded. (R.27:62)

In addition to the proffer of the testimony of Kedroski and Sparks, the defense called Tolbert to the stand outside the jury's presence. (R.27:58) Tolbert invoked his privilege of self incrimination.   (R.27:58) At the conclusion of the proffer, the court refused to permit the jury to hear the evidence because of the lack of a sufficient nexus between Tolbert's confession and Henin's murder.  (R.27:65)

## B.    Evidence Not Heard By The Court

A Freedom of Information Act request was made to the Dallas Police Department concerning any murders or attempted murders of women involving bladed objects which occurred in Pleasant Grove in 1991.   The data obtained indicates approximately twenty-three such incidents occurred.   Of those offenses, only six included knife or stab wounds.   The suspects were arrested in four of those cases within twenty days.   All other offenses involved gun wounds, burning, strangulation, assaults by hands or feet, or trauma to the head inflicted by an unknown instrument.   There were only two unsolved offenses.   One occurred on school

grounds, the other is the instant offense – the Henin murder. (*See* Affidavit of Tona Trollinger attached as Exhibit C). Therefore, if Tolbert did stab a woman in Pleasant Grove in 1991, that person was necessarily Henin, the murder victim.

In light of these police records, a summary of which is attached thereto as Exhibit C, a profound nexus is established between the Tolbert confession and the Henin murder. In fact, the only aspect of the Tolbert confession which does not necessarily match the instant offense is the police belief that the perpetrator of the Henin murder entered by the front door while Tolbert's confession indicates that he entered through a window. Most importantly, Tolbert matches the eyewitness identification in every way. He is skinny (135 lbs.), his hair color is variously described as black (October 1993), blonde (May 1993), or brown (January/February 1992). (*See* Exhibit D attached hereto providing various descriptions of Tolbert.) The eyewitnesses described the hair color of the perpetrator as brown. (R.23.67). This identification is consistent with the most contemporaneous of Tolbert's hair colors -- the January, 1992, brown hair description.

## C.   Post Conviction Rulings

On appeal, the defense argued that the right to present a third-party perpetrator was derived from the Due Process Clause of the Constitution and that the Sparks evidence was past recollection recorded. In response, the State claimed that the

purpose for the proffer was unclear in that the statement was not sufficiently tied to the instant murder.

The Court of Appeals determined that Carpenter's objection at trial - - that the statement was an admission - - was different from the argument on appeal - - penal interest.[11] In any event, the court found that the proffer was irrelevant because it was not sufficiently tied to the murder.

In the 11.071 writ, the same claim was raised.   Carpenter's counsel reiterated that the Tolbert admission was proffered to establish third-party culpability and that the admission to Detective Sparks was past recollection recorded.  (Ground 23 p. 164-161)   The State replied that the grounds for the proffer were not clearly stated and that the Sparks statement was hearsay.[12]   The State utterly failed to rebut the Due

---

[11] This ruling is highly questionable.  An objection is deemed sufficient if it communicates to the trial court what the objecting party wants, why the objecting party thinks himself entitled to relief, and does so in a manner clear enough for the court to understand the objection.  *Lankston v. State*, 827 S.W.2d 907, 909 (Tex.Crim.App. 1997).  The record is crystal clear that Tolbert's confession to Kedroski was offered as proof of a third-party perpetrator.  The trial court's finding of fact in accordance with this reasoning is therefore highly disingenuous.  (*See* Finding of Fact 397.)

[12] In Finding of Fact 574, the trial court approved the State's proposed finding of fact that the statement to Sparks was not past recollection recorded because Kedroski only recalled what she told Sparks and not what Tolbert told her.  This finding of fact demonstrates a profound misunderstanding of the hearsay exception for past recollection recorded.  Tex.R.Crim.Ev. 803(5).  The witness need not have current recollection of the statement.  Rather, the witness must be able to state that she once had such knowledge and recorded same.  This glaring misstatement of the law buttresses Carpenter's claim that the findings should be accorded no deference.

Process claim.  The court's findings of fact on the writ parroted the appellate opinion that the objection stated "admission",  not "statement against penal interest" (Findings 397) and that the proffer was not sufficiently tied to the murder.  (Findings 416)

## D.   Argument

### 1.   Third-Party Perpetrator

It is well established that a defendant is entitled to prove his innocence by showing that someone else committed the crime.  1A J.H. Wigmore, *Evidence* §§ 139-141, at 1723-30 (1983) (hereinafter Wigmore).   In *Chambers v. Mississippi,* 410 U.S. 284 (1973), the Supreme Court recognized that an accused has a constitutional right under the Due Process Clause of the fourteenth amendment to offer probative evidence tending to show that a third-party committed the crime charged.  *See also United States v. DeNoyer,* 811 F.2d 436 (8th Cir.1987); *United States v. Green,* 786 F.2d 247 (7th Cir.1986); *United States v. Crenshaw,* 698 F.2d 1060 (9th Cir.1983);   *United States v. Armstrong,* 621 F.2d 951 (9th Cir.1980);   *United States v. Brannon,* 616 F.2d 413 (9th Cir.),  *cert den. sub nom. Cox v. United States,* 447 U.S. 908, (1980);  *Pettijohn v. Hall,* 599 F.2d 476 (1st Cir.1979);   *United States v. Morgan,* 581 F.2d 933 (D.C. Cir.1978);   *United States v. Robinson,* 544 F.2d 110 (2d Cir.1976), *cert. den. sub nom. Robinson v. United States,* 434 U.S. 1050,(1978);  *Holt v. United States,* 342 F.2d 163 (5th Cir.1965).  Likewise, this Court and many other state supreme courts recognize that a defendant may introduce evidence of a third party's guilt.   *State v. Sturdivant,* 31 N.J. 165, 155 A.2d 771 (1959), *cert. den.*, 362 U.S. 956 (1960); *People v. Hall,* 41 Cal.3d 826, 718 P.2d 99, 226 *Cal.Rptr.* 112 (1986); *State v. Echols,* 203 Conn. 385, 524 A.2d 1143 (1987);  *State v. Cotton,* 318 N.C. 663, 351 S.E.2d 277 (1987); *accord State v. Denny,* 120 Wis.2d 614, 357 N.W.2d 12 (1984).

*State v. Koedatich,* 548 A.2d 939, 976-977 (NJ 1988).

## 2.    Standard of Admissibility

Since the accused need only create a reasonable doubt of guilt in order to obtain an acquittal, the courts have determined that any doubts concerning relevance should be resolved in favor of admission of a third party perpetrator evidence. *Holt v. United States*, 342 F.2d 163, 165 (5th Cir. 1965). No higher showing than simple relevance is required for admissibility. *United States v. Stevens*, 935 F.2d 1380, 1402 (3rd Cir. 1991); *see also, State v. Sturdivant*, 155 A.2d 771 (1959)(requiring "some thread capable of inducing reasonable men to regard the event as bearing upon the state's case."*)* The courts have eschewed any suggestion that the proffer must prove or even raise a strong probability that someone else committed the act. *Johnson v. United States*, 552 A.2d 513, 516 (D.C. 1988); *see* also, *People v. Hall*, 718 P.2d 99, 103 (Cal. 1986); *State v. Sturdivant*, 155 A.2d 771 (1959)*:* "To be admissible, the third party evidence need not show 'substantial proof of a probability' that the third person committed the act; it need only be capable of raising a reasonable doubt of defendant's guilt." If the evidence shows the opportunity for the third party to commit the crime and tie the third-party perpetrator to the crime, Texas courts have favored admissibility. *Spence v. State*, 795 S.W.2d 743, 754-5 (Tex. Crim. App. 1990); *see also, Williams v. State*, 643 S.W.2d 477, 483 (Tex. Crim. App. 1982)(Some evidence

-40-

linking third-party perpetrator to crime is only requirement.)  In sum, as long as the proffer is relevant, not confusing to the jury, and links the perpetrator to the crime, the courts should favor admissibility.  *Commonwealth v. O'Brien*, 736 N.E.2d 841 (Mass. 2000).

### 3.    Low Bar for Relief

Given the reduced standard of relevancy necessary to admit evidence of a third party perpetrator, it is not surprising that a number of courts confronted with this issue have reversed convictions for exclusion of such evidence.  *See State v. Cobb*, 920 S.W.2d 136, 140 (Mo.1996)*; Sanders v. Ratelle*, 21 F.3d 1446, 1450 (9th Cir. 1994); *State v. Echols*, 524 Ad 1143 (Conn.1987); *Kucki v. State*, 483 N.E.2d 788 (Ind. 1985); *Commonweath v. Jewett*, 467 N.E.2d 155 (Mass.1984); *Jackson v. State*, 551 S.W.2d 351 (Tex. Crim. App. 1977).  These cases make it clear that prejudicial error requiring reversal occurs whenever third-party perpetrator evidence is excluded.

### 4.    Prejudice to Carpenter

Rainey was the only person who tied Carpenter to the crime scene.  As set out above, even though numerous fingerprints, several shoe prints, and some hair fibers were found at the crime scene, no physical evidence links Carpenter to the Henin household.  No property belonging to Carpenter was found at the crime scene and no one else placed him in its vicinity.   Carpenter/McBay implicated him in the murder

some six years after the fact, and Smith, the co-indictee, eventually did so after repeatedly lying about her involvement and only after some incentives were offered.[13]

DNA testing is available to determine if the hairs on the victim's body are Tolbert's, but such testing has not been conducted.

The appropriate standard for review of due process claims regarding evidentiary matters is whether the error had a substantial and injurious effect or influence in determining the jury's verdict. *Kotteakos v. United States*, 328 U.S. 750 (1946). This standard is appropriate in reviewing such claims in the context of a §2254 motion. *See Brecht v. Abrahamson*, 507 U.S. 619 (1993). Clearly, had the jury been given the opportunity to consider Tolbert as the perpetrator, hearing that he matched the identification given by the eyewitness (thin with brown hair) and was considered a suspect long before Carpenter, there is a substantial likelihood that an acquittal would have resulted.

## E.     Unreasonable Determination of Claim by State Court

In light of the foregoing, it is clear that the trial court, as well as the Court of Criminal Appeals, rendered a decision contrary to clearly established federal law in

---

[13] The detectives who interviewed Smith noted that she was initially reluctant to speak "out of fear". In the end, Smith received only a twenty year sentence for her admitted role in the offense. Apparently, given this context, these fears were sufficiently alleviated.

that the court erroneously applied a higher standard of relevancy than is required for third-party perpetrator evidence. Even where the court cites the appropriate test but applies the wrong analysis, an unreasonable application may be found. *See Williams v. Taylor*, 529 U.S. 362, 413 (2000); *Bell v. Cone*, 535 U.S. 685 (2002); *Lockyer v. Andrade*, 538 U.S. 635 (2003). The proffered evidence shows both that the third-party perpetrator, Tolbert, had the opportunity to commit the offense and that his "admissions" to Kedroski sufficiently linked him to the offense to establish the "thread of culpability" necessary to raise the issue. *See Sturdivant, supra.* By applying a standard of proof constituting "a strong probability of guilt", the Texas Court of Appeals made findings of fact that the proffered statement was not consistent with the facts of the case. *See* Findings of Fact 414-417, 570, 588-589. Clearly, the court applied the wrong test for admissibility contrary not only to well established federal law but even Texas state precedent[14].

For the same reason, the trial court's decision to exclude the evidence and the Court of Criminal Appeals' adoption of this reasoning, was an unreasonable

---

[14] In Finding of Fact 411, the State's contention, as adopted by the trial court, was that under Texas law, Tolbert's third party confession was inadmissible hearsay, citing *Ramirez v. State*, 543 S.W.2d 631, 633 (Tex.Crim.App. 1976). Ironically, the *Ramirez* opinion strongly supports Carpenter's position. *Ramirez* states that a third party confession should be admitted if the evidence is circumstantial and the record shows that the perpetrator might have committed the offense. This is exactly what Carpenter contends herein. This kind of shoddy research is apparently all too typical of the State's response.

determination of the facts in light of the evidence presented.  A finding of fact results in an unreasonable determination if it is objectively unreasonable in light of the facts presented in State court.  *Miller-El v. Cockrell*, 537 U.S.322 (2003).   The evidence shows that in 1991, only one murder involved breaking into a woman's home in Pleasant Grove and attacking her with a knife.  That is the instant offense.  Moreover, this evidence was brought to the attention of the police in 1991, and Tolbert was investigated at that time.   (Findings of Facts 414) In light of the police inquiry limiting the possible suspects for the Henin murder, the trial court's determination that the Tolbert statement was completely irrelevant to the Henin murder is clearly an unreasonable determination of the facts.  *See Miller-El, supra.*

## CLAIM II.

**CARPENTER WAS DENIED DUE PROCESS OF LAW BY THE USE OF AN IMPERMISSIBLY SUGGESTIVE PHOTO LINE-UP THAT TAINTED THE IDENTIFICATION OF THE ONLY EYEWITNESS WHO COULD MAKE AN IDENTIFICATION**

**A.    Crime Scene Identification**

In August 1991, at the time of the offense, two teenagers, Rainey and Whittal, driving to school (R.25:65-80) saw a person running from the house where Henin was found. (R.25:86) The perpetrator got in a car and drove by them so closely that they feared being sideswiped. (R.25:65)  Rainey gave a brief description of the driver as

a taller guy with brown hair. (R.25:90-91)  Her total observation period was five to ten seconds. (R.25:90)  Her brother, sitting in the passenger seat, saw only a white male with dark hair. (R.25:78)

## B.  The Flaws in the Photo Line-Up

Six years later, Rainey and Whittal were shown a photo array containing Carpenter's picture.   The photo array consisted of six photographs.  Two of the photographs contained height bars, the rest did not. (R.23:94)  Only one photograph pictured a male with a mustache.  *See* Affidavit of Pendergraft, Exhibit E. Carpenter's picture was glossier, pinker, and of poorer quality than the remaining photographs. (R.23:84-85, 94)  Apparently, Tolbert's photo was not included in this line-up.  In addition, photograph number one was signed on the back. (R.26:87)

Whittal could not identify anyone. (R.25:69)  However, Rainey identified Carpenter's picture from the lineup. (R.23:72)

## C.  Discrepancies in Identification at Trial

### 1.  Assailant's Physical Appearance

Notwithstanding Rainey's photo line-up identification, the trial record was replete with inconsistencies.  At trial Rainey recalled the driver as being 6'2" with long hair in back and skinny.  (R.25:91) When Rainey was shown photographs from 1991, which showed that Carpenter was a very large man, her response was

-45-

"[Carpenter's] skinny to me."(R.25:97)[15]   Other evidence produced at trial cast doubt on whether Carpenter matched this description in August 1991.  As photographs and testimony from most observers indicated, Carpenter is and was in 1991 a heavy man.[16] Carpenter has never been described as skinny.  Carpenter/McBay admitted she had bleached or lightened Carpenter's hair in 1991, so that it appeared lighter if not blonde.  (R.25:45)

Of course, the State went to great lengths to reconcile this latter discrepancy. (R.25:62) After Carpenter/McBay had testified that Carpenter had blonde hair in August, 1991, a recess was called.  (R.25:57)  After talking to the prosecutor during the break (R.25:63), Carpenter/McBay changed her story and said the hair was not blonde, just lightened a little (R.25:62).[17]   However, other witnesses recalled Carpenter having sandy blonde hair in August, 1991 (R.25:11).   Carpenter/McBay also told the jury that Carpenter's weight fluctuates (R.26:139-140) implying that he

---

[15] Rainey's trial identification of Carpenter, a 250 pound man, as "skinny", given in an effort to reconcile her previous inconsistent statements and after several meetings with the prosecutor, borders on "false light" evidence.

[16]  The State referred to his massive size vis-a-vis the victim, in final argument, to point out the brutality of the offense.   The reference to him as 6'1" and 250 pounds, hardly resembles "skinny". (Vol. 30 p. 57)

[17] Incredibly, the State asserted in proposed Finding of Fact 623 that this chain of events never happened - - that Carpenter/McBay never changed her description after meeting with the prosecutors over a recess.  In light of the plain record, such a finding constitutes the worst sort of revisionism.

might have been thinner in 1991.[18]

## 2..   The Car

Aside from evidence concerning the perpetrator's description, the description

of the vehicle driven also became an issue.   Rainey and Whittal testified that they

saw the suspect driving a brown car.  (R.25:66-68)   However, the evidence at trial

established that Carpenter owned a maroon Oldsmobile Delta 1988.  (R.25:27)  More

importantly, that automobile was not acquired until *after* the murder and did not even

become driveable for several more months.  (*See* Affidavits of Billie Rawlings and

Diana Carpenter attached as Exhibit F).   In post-conviction proceedings, the State

has all but conceded this issue, arguing that even if the car was misidentified,

Carpenter could have used another car to commit the murder. (Finding of Fact 620).

## D.   Totality of Circumstances Indicates Mis-Identification

Given the short time frame, the inconsistencies regarding Carpenter's hair color

and weight and the witnesses' contemporaneous description of the perpetrator, the

suggestive nature of the photo line-up is critical.  As Detective Penrod and Rainey

admitted, Carpenter's photo stands out among the array because the photo is of poorer

quality, is older, has a pinker if not glossier finish to it, and has two signatures.

---

[18] In Finding of Fact 626, the State asserted that this testimony actually favored Carpenter. Again, the trial court signed off on this assertion without correction.  This finding is yet another example of a mischaracterization of the trial record.

(R.23:84-85, 94; R.26:87)   According to a trained observer, the photo array is sufficiently suggestive to taint the identification. (*See* Pendergraft Affidavit, Exhibit E)  Finally, Carpenter's photo, as identified by Rainey, had a second signature on the back which indicates that someone else had identified the photo, which would in turn make the identification suggestive to Rainey.  For these reasons the trial court erred in admitting the photo line-up into evidence.

In light of all of the other discrepancies noted above concerning height, weight, and hair color, the crime scene identification is extremely weak.   The eyewitness testimony connecting Carpenter to the crime was inconsistent, objectively wrong, and irredeemably impeached.   There is no question that the identification was the result of a tainted photo array.

## E.    Post Conviction Rulings

Carpenter filed a motion to suppress the photo line-up identification. (CR:26). A hearing was held on the motion prior to trial.  At the conclusion of the motion defense counsel objected "for the reason stated in the written objection" as well as because the evidence shows that Rainey had made a misidentification. (R:23:98-99). On appeal Carpenter argued that the circumstances of Rainey's identification were so incredible as to not constitute proper evidence.  (Carpenter's Brief p. 133-45, 40). Bafflingly, the Court of Criminal Appeals ruled that Rainey's testimony regarding

-48-

identification was credible and not tainted *because the record reflected no evidence to the contrary.*

In the 11.071 motion, counsel argued that Rainey's identification was so incredible and based upon such tainted identification procedure that Carpenter was denied due process of law.  Counsel also argued that the misidentification tended to undermine the sufficiency of the evidence. (Writ p. 223-224, 226.)  In response, the State contended that the issues were barred because they were not raised on direct appeal, that the array was not suggestive and that Rainey's original view at the crime scene withstood scrutiny.  In so doing, the State argued *some* of the factors referenced above but produced no evidence to rebut the affidavit appended to Carpenter's State Writ.  (State Writ at 127-128)  The trial court dismissed Carpenter's writ arguments, without taking any evidence from the State by either affidavit or testimony, and refusing to grant Carpenter's request for a hearing, determining the lineup was not suggestive. (Findings of Fact 124, 127)  Further, the court determined that Rainey's identification was based on an adequate view at the scene.   (Findings of Fact 130).

F.      **Argument**

1.      **The Criteria for Determining Reliability**

In *United States v. Wade*, 388 U.S. 218 (1967), the court held that a pretrial

identification procedure was a critical stage because of the numerous foibles related

to eyewitness identification.

> "But the confrontation compelled by the State between the accused and the
> victim or witnesses to a crime to elicit identification evidence is peculiarly
> riddled with innumerable dangers and variable factors which might seriously,
> even crucially, derogate from a fair trial.   The vagaries of eyewitness
> identification are well-known; the annals of criminal law are rife with instances
> of mistaken identification. [FN6]  Mr. Justice Frankfurter once said: 'What is
> the worth of identification testimony even when uncontradicted? The
> identification of strangers is proverbially untrustworthy.  The hazards of such
> testimony are established by a formidable number of instances in the records
> of English and American trials.  These instances are recent--not due to the
> brutalities of ancient criminal procedure.'  The Case of Sacco and Vanzetti 30
> (1927).  A major factor contributing to the high incidence of miscarriage of
> justice from mistaken identification has been the degree of suggestion inherent
> in the manner in which the prosecution presents the suspect to witnesses for
> pretrial identification.  A commentator has observed that '(t)he influence of
> improper suggestion upon identifying witnesses probably accounts for more
> miscarriages of justice than any other single factor--perhaps it is responsible
> for more such errors than all other factors combined.'  Wall, Eye- Witness
> Identification in Criminal Cases 26.  Suggestion can be created intentionally
> or unintentionally in many subtle ways. [FN7]  And the dangers for the suspect
> are particularly grave when the witness' opportunity for observation was
> insubstantial, and thus his susceptibility to suggestion the greatest."  *Id*.

The *Wade* court went on to suggest the formulation of a standard test to

determine the reliability of such identification.

> "We think it follows that the proper test to be applied in these situations is that
> quoted in *Wong Sun v. United States*, 371 U.S. 471, 488, 83 S.Ct. 407, 417, 9
> L.Ed.2d 441 (1963) "(W)hether, granting establishment of the primary
> illegality, the evidence to which instant objection is made has been come at by
> exploitation of that illegality or instead by means sufficiently distinguishable
> to be purged of the primary taint.'  Maguire, Evidence of Guilt, 221 (1959).'
> *See also Hoffa v. United States*, 385 U.S. 293, 309, 87 S.Ct. 408, 17 L.Ed.2d

374 (1966).   Application of this test in the present context requires consideration of various factors; for example, the prior opportunity to observe the alleged criminal act, the existence of any discrepancy between any pre-lineup description and the defendant's actual description, any identification prior to lineup of another person, the identification by picture of the defendant prior to the lineup, failure to identify the defendant on a prior occasion, and the lapse of time between the alleged act and the lineup identification.   It is also relevant to consider those facts which, despite the absence of counsel, are disclosed concerning the conduct of the lineup."   *Id*.

After *Wade*, the court revisited the issue in two other noteworthy cases.   In *Neil v. Biggers*, 409 U.S 188 (1972), the court set out a list of the factors to be considered.

"These include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation. Against these factors is to be weighed the corrupting effect of the suggestive identification itself."

In *Manson v. Braithwaite,* 432 U.S. 98 (1977), the Supreme Court determined that the reviewing court must consider the totality of such circumstances in assessing the legality of the lineup.

As a result of these considerations, legal treatises on eyewitness identification have set out the accurate and correct manner in assessing the identification according to the listed criteria.   *See,e.g.*, Loftis and Doyle, EYEWITNESS TESTIMONY: Civil and Criminal, at 11-45, Lexus Publishing, 1992, 2002.      Sobel, EYEWITNESS

IDENTIFICATION: Legal and Practical Problems, Clark Boardman, 1990.

These assessments include the following [paraphrased]:

Opportunity to Observe.  The witness's opportunity for observation during the crime is the factor most frequently considered in both independent source and reliability cases.  Whether it is a supporting or negating factor depends on the facts of each case.

Adequate View.  A crime of long duration affords the witness or victim a good opportunity to observe and retain the image of the perpetrator. Scientific experiments have shown that the *duration of the observation* of a face is more important in later recognition than the length of the interval between the observation of a face and being asked to recognize it. Thus, the witness who claims to have viewed the criminal for several minutes may in fact have had only a few seconds for observation.

Crimes involving more fleeting glimpses of the perpetrator test the outer limits of this criterion of independent source.  Some courts have upheld identifications based on observations of several minutes, or even several seconds.  Others have found the opportunity to observe sufficient despite physical obstacles to observation.

Crimes of brief duration afford limited opportunity for observation.  The measure of independent source or reliability is not the duration of the crime, however, but of the period of observation by the witness.  Where the witness or victim had only a few seconds to observe the criminal, the opportunity to view has been deemed inadequate.

The Accuracy of the Description.  The accuracy of the description of the perpetrator given by the victim to the police is considered as supporting independent source or reliability.  This factor must be weighed with caution, however, since the police will not ordinarily arrest suspects who do not match the description given.

An in-court identification of a defendant who does not match in

substantial respects the description given to the police indicates that the witness did not have a clear image of the perpetrator.

Witness's Degree of Attention.    One of the reliability factors recognized by the Supreme Court in *Manson v. Braithwaite, supra*, was the presence of circumstances likely to attract the witness's attention to the perpetrator, i.e., was the witness predisposed to concentrate on the perpetrator for other reasons.    Examples include the heightened sensitivity of previous crime victims, employment as a security guard or clerk, or bizarre behavior manifested prior to the commission of the offense.

Lack of Attention or Emotional State.  Circumstances that do not tend to attract attention can make a later identification less trustworthy. For instance, an out-of-court show up identification was deemed unreliable in part because the witness simply saw a man running out of a store and did not know that a robbery had occurred.   The Michigan Supreme Court has stated that the physical and psychological state of the victim at the time of the crime should be considered in determining independent source.   The court noted that perceptions may become distorted by strong emotion.  Robert Buckhout, who has written and testified extensively on the subject of eyewitness identification, has stated that a "witness or a victim of a crime who is under stress will be a less reliable witness than he would be under normal conditions." Such observers "are paying more attention to their own safety than to nonessential elements in the environment."   Witnesses or victims of violent crimes often focus their attention on items like the weapon being pointed at them, rather than the criminal's face, out of fear.

Despite the expert and common sense notion that a frightened or emotional witness may not be the most accurate one, many courts have refused to consider the witness's fear or emotional trauma as a negating factor of reliability, either during the crime itself or during the identification process.  Indeed, many courts assume that the witness's attention to the criminal's face will be increased when a gun is being pointed in the witness's direction.

Witness's Prior Identification or Misidentification.  Has the witness failed to identify the perpetrator on previous occasions or made a misidentification of the perpetrator?

Witness's Level of Certainty.  Both *Biggers* and *Braithwaite* listed the witness's level of certainty at the confrontation as a factor of reliability.  Justice Marshall, dissenting in *Braithwaite*, noted that th witness's degree of certainty is "worthless as an indicator that he is correct," because once the witness has publicly selected one person as the perpetrator, he is not likely to change his mind.  Indeed, it is so common for a witness to express confidence in his own opinion that this factor is usually just one of many supporting an identification but it is rarely determinative.

Time Elapsed Between Crime and Identification.  Under both the independent source and the due process reliability test, the time interval between the crime and the identification is considered relevant. Scientific evidence has demonstrated that for the purpose of later recognition the time lapse between viewing and recognizing a face is less important than the duration of the observance of the face in the first instance.

Sobel, Chapter 6.

## 2.   Eyewitness Testimony Discredited

It is beyond debate that the legal and forensic communities have noted the

discrepancies between the common perception of eyewitness testimony as accurate

and the actual unreliability of such testimony.   *See* Samuel R. Gross et al.,

*Exonerations in the United States 1989 Through 2003*, 95 J. of Crim. L. &

Criminology 523-24 (2004) (discussing the high number of persons exonerated from

1989 through 2003 who were convicted based on eyewitness misidentification).

*Wade* acknowledged that "the annals of criminal law are rife with instances of mistaken identification." *Id.* As subsequent cases and studies have confirmed, the identification of strangers is "proverbially untrustworthy." *Id.*; *see also*, Hon. D. Duff McKee, *Challenge to Eyewitness Identification Through Expert Testimony*, 35 Am. Jur. Proof of Facts 3d 1 (Originally published in 1996)("Eyewitness testimony may be the least reliable, and yet the most compelling.").[19] There are a number of contributing factors to misidentification, including the manner in which the suspect is presented to the witness. *Id.* at 229. Furthermore, "the dangers for the suspect are particularly grave when the witness' opportunity for observation was insubstantial, and thus his susceptibility to suggestion the greatest." *Id.*; *but see*, *United States ex rel. Gilliard v. LaVallee,* 376 F. Supp. 205 (S.D. N.Y. 1974)(six victims held captive for two to seven hours, who viewed their captor at close range for periods of twenty minutes to six hours, had an adequate opportunity to view); *People v. Miller*, 65 N.Y.2d 502 (1985)(rape victim spent four hours with defendant prior to assault and

---

[19] *See also*, *Stephenson v. State*, 226 S.W.3d 622 (Tex. App.--Amarillo 2007, no pet.)(Courts from all levels, psychologists, and commentators have accepted the premise that the "identification of strangers is proverbially untrustworthy.")(citations omitted); *Sturgeon v. Quarterman*, 615 F. Supp. 2d 546, 571 (S.D. Tex. 2009)(Texas courts have recognized that this evidence is particularly important when the challenged eyewitness testimony is critical to the prosecution's case); *Manson v. Brathwaite*, 432 U.S. 98, 111-112 (1977)(The driving force behind *Wade* was the court's concern with the "problems of eyewitness identification.").

his face was only a few inches from her face during the assault).[20]

In assessing identifications based upon these criteria, the courts have noted the vast amount of scientific literature and empirical study gainsaying the reliability of eyewitness testimony. *See Brown v. State*, 689 S.W.2d 219, 221 (Tex. Crim. App. 1985)("At one time, before it became an established scientific fact that eyewitness identification testimony may be unreliable, it was permissible to exclude such testimony as was proffered in this cause.  However, but in light of what the experts, who have scientifically studied eyewitness identification testimony, have now shown and proved, is now not the time to abandon in whole or in part the above exclusionary rule?"); *United States v. Hannigan*, 27 F.3d 890, 900 (3d Cir.1994) ("Social science research, for example, has established beyond peradventure that witness identifications, especially when cross-racial … are quite unreliable."); *Watkins v. Sowders*, 449 U.S. 341, 360, fn. 1 (1981)(noting that eyewitness identification evidence is inherently suspect, the court stated that "[t]he special nature of eyewitness identification evidence has produced an enormous reservoir of scholarly writings,

---

[20] *See also*, Hon. Nathan R. Sobel; Second Edition by Dee Pridgen; Updates by Lawrence A. Vogelman and David W. Ruoff, *Eyewitness Identification: Legal & Practical Problems 2d § 6:4*, Scientific experiments have shown that the duration of the observation of a face is more important in later recognition than the length of the interval between the observation of a face and being asked to recognize it.

many based on solid empirical research.").[21]

In fact, the Court of Criminal Appeals has recently issued a unanimous opinion holding that a trial court abused its discretion in refusing to allow an expert witness to testify about the potential pitfalls of eyewitness identification in a capital murder case. *Tillman v. State*, 2011 WL 4577675 (Tex. Crim. App. Oct. 5, 2011). Tillman attempted to submit the testimony of Dr. Roy Malpass of the University of Texas at El Paso. The Court acknowledged that "the study of the reliability of eyewitness identification is a legitimate subject within the area of psychology." *Id.* at *10. The Court also determined that Malpass's testimony "properly relied upon and utilized the principles involved in the relevant field of psychology." Furthermore, his testimony and experience went beyond mere generalities and involved clear and specific principles. Finally, Malpass "tied the relevant facts of the case to the scientific principles about which he testified." *Id.* at 12. For these reasons, the Court concluded that Malpass's testimony is reliable and relevant and remanded the matter. *Id.* at *17.

Recent state legislation has also confirmed that there exists an undeniable issue

---

[21]*See also*, *State v. Maestas*, 63 P.3d 621, 625 (Utah 2002)("Prior cases "have summarized the empirical studies questioning the reliability of eyewitness identification."); *State v. Long*, 721 P.2d 483, 490 (Utah 1986)("research has convincingly demonstrated the weaknesses inherent in eyewitness identification [;however,] jurors are, for the most part, unaware of these problems.").

with eyewitness identifications.  The legislature is currently attempting to conform the identification procedures used by law enforcement.  House Comm. on Criminal Jurisprudence, Bill Analysis, Tex. H.B. 215, 82nd Leg., R.S. (2011); Senate Comm. on Criminal Justice, Bill Analysis, Tex. H.B. 215, 82nd Leg., R.S. (2011).  Under Article 38.20, each law enforcement agency "shall adopt, implement, and as necessary amend a detailed written policy regarding the administration of photograph and live lineup identification procedures in accordance with this article." PHOTOGRAPH AND LIVE LINEUP IDENTIFICATION PROCEDURES IN CRIMINAL CASES, 2011 Tex. Sess. Law Serv. Ch. 219 (H.B. 215) (VERNON'S). Although Article 38.20 will only apply to identification procedures conducted on or after September 2012, this is a strong indicator of the inherent unreliability of previous eyewitness identification.  Revisions include the requirement that law enforcement make a complete written or otherwise statement of the witness' confidence in the identification which must be made in the witness' own words before any feedback is given.  Law enforcement is also required to solicit whether the witness has spoken with anyone about the identification and the substance of said conversation.  Furthermore, the court directed two state committees to draft appropriate jury instructions encompassing the system and estimator variables that the court found to be generally accepted by experts.

These revisions have the potential to change the way state and federal courts approach eyewitness identification evidence as they finally recognize years of studies which have pinpointed the now obvious flaws with eyewitness identifications.

### 3.   Application of the Criteria to the Initial Identification

Had the trial court properly assessed these well-established criteria, the court could not possibly have determined that the crime scene identification was reliable. The view was five to ten seconds, exceedingly brief.   Such fleeting glimpses test the outer limits of this criteria.  Sobel at 6-8.  Rainey saw the perpetrator enter a car at some distance, and observed only the perpetrator's head and shoulders at close range as he drove by.  Based upon these brief and limited observations, Rainey described the perpetrator as skinny with dark hair.[22]   Rainey was on her way to school, not under the throws of any emotional state and her attention was drawn to the perpetrator only because his car nearly hit hers.  The focus was undoubtedly on the car since she was attempting to avoid being sideswiped.   Thus, the record is devoid of any suggestion that she would have had reason to focus upon the perpetrator at the time of the offense.  Shortly after this occurrence, Rainey was shown some identification

---

[22] The record clearly establishes that Carpenter is a large man and the record establishes that his hair was blonde or light colored in August 1991.  (R.25:11, 45).

pictures but could not identify anyone.(R.23:75, 76)  The photo lineup in this case was not developed until October 1997, more than six  years after the event.  Given that much shorter periods of time have been deemed negative factors, (*See United States v. Williams,* 596 F.2d 44, 49 (2nd Cir. 1979)(cert.denied 442 U.S. 946 (1979))(Fifteen months); *People v. Rodgers*, 279 N.E. 2d 72, 78 (ILL. 1972)(Two years was deemed to be "a stern test for the memory"),  this six year intervening period strongly weighs against proper reliable identification.  In sum, the only factor in favor of identification is Rainey's level of certainty, which, as noted above, is the weakest of the factors considered.[23]

### 4.    Significance of Flawed Lineup

Given that this identification is highly suspect, if not incredible, the suggestive nature of the photo lineup requires heightened scrutiny.  *See Wade* at 241-242.  As set out in the attached affidavits, and developed in cross-examination, Carpenter's photo, because of its age and finish, as well as the height bars present in the background, and the pre-exisiting signatures, stood out to the witness.  It is exactly this kind of subtle suggestibility that caused the Supreme Court concern in *Wade* over

---

[23] The State emphasized repeatedly that Rainey's view of the suspect was memorable because of the evil look he gave her.  (R.25:89) However, the evil nature of the this glare was mentioned for the first time at trial.  The evil look was never part of the initial description given to the police.  (R.23:97)

thirty years ago. *Id.* at 228, 229.   Any subtle factor that subconsciously draws the eyewitness' focus to the photograph exacerbates the opportunity for misidentification.

### 5.    Prejudice to Carpenter

This case represents a textbook example of how eyewitness testimony, while perceived as reliable based on "common knowledge" is, in fact, so unreliable as to preclude its use.   Rainey's testimony is the only evidence that places Carpenter at the crime scene.   Absolutely no physical evidence ties Carpenter to the crime scene and no other contemporaneous witness places Carpenter in the vicinity.   Smith, whose testimony is deemed an unreliable witness by Texas procedural rule in that, as an accomplice, her testimony must be corroborated.   *See* Tex.Code Crim.Proc. Art. 38.14.   Likewise, Carpenter/McBay, did not come forward with her evidence for six years and was thoroughly impeached at trial regarding her motive to implicate Carpenter[24] as well as her varying accounts of the incident.   The identification data initially provided by Rainey of a thin person with dark hair more closely resembles Smith and Tolbert than Carpenter.   *See* Chamberlain affidavit attached hereto.   No doubt exists that had Rainey's identification been excluded, the State's case would

---

[24] She believed that Carpenter had her mother arrested and was angry at him.  She was also upset that Carpenter would not give his name to a child she bore by another man.

have been effectively dismantled.  The State would have presented no evidence, physical or otherwise, placing Carpenter in the vicinity of the crime at the time of the offense.

The state court had a duty, one which this Court bears, to ensure that the identification was reliable.  By all standards it was not, and the contrary determination was unreasonable.

### G.    Unreasonable Determination of Claim by State Court

Although the identification lineup issue was not raised on direct appeal, Carpenter's attorney argued that the lineup and identification were so weak as to not constitute competent evidence of Carpenter's guilt.  (Appellant's brief p. 34-35, 40). The issue was raised in Carpenter's writ as Ground 39, p. 226-228.    In that writ, counsel correctly cited the applicable standards as set out in *Wade* and *Biggers, supra.*    The trial court and the Texas Court of Criminal Appeals resolved these complaints by adopting, without comment or edition, the State's Findings of Fact. These findings are thus inherently unreliable - - formulated without any editing by the trial court and constitute an unreasonable application of clearly established federal law as determined by the Supreme Court.  *See Kotteakos v. United States*, 328 U.S. 750, 776 (1946) and *Brecht v. Abrahamson,* 507 U.S. 619, 623 (1993).  According to the *Wade, Biggers, Braithwaite* line of cases and their progeny, a court is required

to consider a number of factors in determining the admissibility and reliability of eyewitness testimony.  The trial court in this case did not do so.  In fact, the only reference to these standards is the recitation of a *portion* of the appropriate test in Finding of Fact 130, wherein the State, and ultimately the court, cited *Loserth v. State*, 963 S.W.2d 770, 772 (Tex. Crim. App. 1998).  *Loserth* refers to the entirety of the Supreme Court standard and thus, the finding of fact which adopts a test that does not entail all of the factors enumerated by the Supreme Court, is clearly contrary to established federal law pursuant to AEDPA.  As set out above, a correct application of this test would lead to an entirely different result.

Further, the findings of fact in regard to Carpenter's complaint also constitute an unreasonable determination of the facts in light of the evidence presented.  *See Miller-El v. Cockrell*, 537 U.S. 322 (2003).  First, without taking further evidence, the court resolved a disputed issue of material fact, the suggestiveness of the lineup, by stating that the discrepancies noted were inconsequential, *ipsi dixit*.  The trial court refused Carpenter's request for a hearing on this disputed factual matter.  The Supreme Court has gone to great lengths to make it clear that issues involving identification are questions of fact necessitating forensic inquiry.  As the State presented not a single piece of controverting evidence to show that the lineup was not suggestive, the trial court acted improperly in dismissing the issue without further

testimony.[25]

Secondly, the court's findings of fact regarding the Supreme Court's criterion contain no discussion or explanation of how the court weighed and balanced the pertinent criteria in reaching its result.  The court made no finding of the eyewitness' mental state or reason for attention.   The court did note that Rainey was confident in her selection (Finding of Fact 135) but fails to note the significance of such confidence.   The court similarly ignored the discrepancies in the description of Carpenter's weight and hair color.  Finally, the court expressed no concern over the six-year delay in identification.     Many, if not all of these shortcomings, are the inevitable result of the court's wholesale adoption of the State's proposed findings. In short, Findings of Facts 129-139 conclusively demonstrate that the court reached the wrong factual determination by failing to apply or discuss the proper balancing tests.[26]

---

[25] Without a hearing, the trial court still found that the factual affidavits would "not have convinced a jury of Carpenter's innocence".  (*See* Finding of Fact 635, 637)    Of course, the appropriate harm analysis is whether the error had a substantial and injurious effect on the jury's verdict - - not whether the evidence would convince a jury Carpenter was innocent.  *See Kotteakos, Brecht, supra.*   That the State would urge the trial court to use a standard of review contrary to some of the most well established precedent in law, is appalling.  The failure to even correct these glaring errors underscores Carpenter's contention that the Findings of Fact are not due any deference.

[26] The findings of fact, as adopted verbatim from the State's submission, contain a glaring misstatement of the record.  Finding of Fact 137 states that Rainey, when shown the photographic lineup, noticed no difference in the color, texture, or age of the pictures.  This statement is ripped out of context and demonstrates the problems inherent in a wholesale

# CLAIM III.

**BY OMITTING THE AGGRAVATING ELEMENT OF THE OFFENSE THAT ELEVATED MURDER TO CAPITAL MURDER, THE TRIAL COURT'S CHARGE TO THE JURY CONSTITUTES AN *APPRENDI* VIOLATION AS WELL AS A VIOLATION OF THE EIGHTH AMENDMENT AND FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION.**

## A.    Overview

The State indicted Carpenter of the offense of capital murder based on murder in the course of committing a burglary, but the trial court did not charge the jury that it must find the intent element of the burglary.   The Due Process Clause of the Fourteenth Amendment provides that no "State [shall] deprive any person of life, liberty, or property, without due process of law.  U.S. Const. amend XIV.  The Sixth Amendment to the United States Constitution provides that, "In all criminal prosecutions, the accused shall have the Assistance of Counsel for his defense.  U.S. Const. amend. VI.  The Eighth Amendment to the United States Constitution provides that cruel and unusual punishment shall not be inflicted.  U.S. Const. amend. VIII. By indicting Carpenter on one offense and then failing to charge the jury on an element of that offense, the State violated Carpenter's rights under each of these

---

adoption of a prosecutor's assertions.   The statement was made during cross-examination.  After Rainey made the statement that she noticed no such differences, she was thoroughly impeached with her testimony from the examining trial wherein she had admitted that the differences existed.  To  even suggest that she noticed no differences is highly disingenuous, betrays an utter disregard for the record, and so undermines the credibility of the findings of fact on this issue as to render them a nullity.

Amendments. *In Re Winship*, 397 U.S. 358, 364 (1970); *Sandstrom v. Montana*, 442 U.S. 510 (1979).

## B.   Wording of Indictment

The State charged Carpenter with capital murder under Tex. Penal Code § 19.03(a)(2), which provides that a person commits the offense of capital murder if he or she commits murder as defined under Section 19.02(b)(1) ("intentionally or knowingly causing the death of an individual") and "the person intentionally commits the murder in the course of committing . . . burglary." The indictment's allegation fell within this section:

> David Lynn Carpenter . . . did unlawfully then and there knowingly and intentionally cause the death of Nelda Bryant Henin, an individual, hereinafter called deceased, by stabbing and cutting Nelda Bryant Henin with a knife, a deadly weapon and a sharp instrument, a deadly weapon, and the defendant intentionally did cause the death of the deceased while the said defendant was in the course of committing and attempting to commit the offense of burglary of a habitation of Nelda Bryant Henin.

(CR:2). Carpenter pleaded not guilty to the indictment. The trial court repeated to the jury in the charge, substantially *verbatim*, the allegations of the indictment, followed by the instruction, "If you do not so believe, or if you have a reasonable doubt thereof, then you will acquit the defendant and say by your verdict 'not guilty.'" (CR:140).

C.     **Elements of Offense**

Under 1991 Texas law, a person commits the offense of burglary of a habitation if, without the effective consent of the owner," the person "enters a habitation . . . not then open to the public, with intent to commit a felony."  Tex. Penal Code Ann. § 30.02(a)(1) (Vernon 1991).  Under 1991 Texas law, a person also commits the offense of burglary of a habitation if, "without the effective consent of the owner," the person "enters a . . . habitation and commits or attempts to commit a felony."  Tex. Penal Code Ann. § 30.02(a)(3) (Vernon 1991).  Carpenter submits that the indictment alleged a burglary under § 30.02(a)(1).

D.     **Variance in Charge**

The trial court, however, apparently attempted to charge the jury under § 30.02(a)(3):

> A  person commits the offense of burglary of a habitation if, without the effective consent of the owner, he enters a habitation and commits or attempts to commit a felony or theft.

Notably, the charge fails to instruct the jury that it must find that Carpenter entered the habitation with intent to commit a felony, as § 30.02(a)(1) requires. Carpenter objected to the instruction, asserting the trial court must define "burglary" under the terms of § 30.02(a)(1):

> [W]e . . . object to the Court's charge for the reason that it fails to specifically

limit a conviction in this case to the State's theory of proof which is the burglary, if any was committed, with intent to commit the offense of murder.

And the Court fails to instruct the jury that they must find that based on the evidence and if they do not find that that was the intent or the crime, the underlying offense that was committed, that they must acquit the defendant and find him not guilty for that reason.

(R.27:79-80).  The trial court refused to instruct the jury as Carpenter requested.

(R.27:79-80).

## E.      Unreasonable Determination by Lower Court

The Court of Criminal Appeals disposed of this contention by noting that a murder in the course of a burglary is capital murder, a decision which sidestepped Carpenter's contention.  When the same issue was raised in the 11.071 writ (claim 21), the trial court adopted the State's findings of fact that the *Homan* case was dispositive of the issue (finding 359).[27]

The omission of the intent element, as alleged in the indictment, violated the principles stated in *Winship* and its progeny that the State prove all elements of the offense beyond a reasonable doubt and the command of *Apprendi v. New Jersey,* 530

---

[27] The State proposed an additional finding that the error was harmless because Carpenter, "must have had the intent to kill Nelda at the time of entry."  This finding of fact is fallacy-ridden for two reasons: First, it is rank speculation concerning the jury's reasoning.  Secondly, it begs the *Apprendi* question on bended knee.  Only the jury is permitted to convict, and then only upon a specific finding as to each and every element of the offense.  This finding is further evidence that the State slipped erroneous factual conclusions past an inattentive jurist.

U.S. 466 (2000) that a factual determination authorizing an increase in punishment must be proven to the jury beyond a reasonable doubt.  Adherence to these principles is particularly acute in capital cases, in which the Eighth Amendment, proscribing cruel and unusual punishment is particularly vigilant.

The presumption of innocence, although not articulated in the Constitution, is a basic component of a fair trial under our system of criminal justice.  *Estelle v. Williams*, 425 U.S. 501 (1976).  "The principle that there is a presumption of innocence in favor of the accused is the undoubted law, axiomatic and elementary, and its enforcement lies at the foundation of the administration of our criminal law."  *Coffin v. United States*, 156 U.S. 432, 453 (1895).

From this principle arose *Winship*'s fundamental precept:  "Lest there remain any doubt about the constitutional stature of the reasonable-doubt standard, we explicitly hold that the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged."  *In re Winship*, 397 U.S. 358, 364,(1970).  *See Sandstrom v. Montana*, 442 U.S. 510,(1979); *Patterson v. New York*, 432 U.S. 197, 210 (1977).  "[R]eliance on the 'reasonable doubt' standard among common-law jurisdictions 'reflects a profound judgment about the way in which law should be enforced and justice administered.'"  *Apprendi v. New Jersey*, 530 U.S. 466,(2000)

-69-

(citing *Winship*, 397 U.S. at 361-62) (quoting *Duncan v. Louisiana*, 391 U.S. 145, 155(1968)).

The principle extends to requiring the State to bear the burden of proving beyond a reasonable doubt all elements that result in imposition of a penalty of death: "Under the Due Process Clause of the Fifth Amendment and the notice and jury trial guarantees of the Sixth Amendment, any fact (other than prior conviction) that increases the maximum penalty for a crime must be charged in an indictment, submitted to a jury, and proven beyond a reasonable doubt." *Jones v. United States*, 526 U.S. 227, 243 n. 6 (1999). The Court recently reaffirmed this principle in *Apprendi* and *Ring*. As stated in *Ring*, "Capital defendants, no less than non-capital defendants, . . . are entitled to a jury determination of any fact on which the legislature conditions an increase in the maximum punishment." *Ring v. Arizona*, 536 U.S. 584, 589 (2002).

These principles are particularly compelling in capital cases. The Eighth Amendment requires States to apply special procedural safeguards when they seek the death penalty. *Gregg v. Georgia*, 428 U.S. 153 (1976). Otherwise, the constitutional prohibition against "cruel and unusual punishments" would forbid its use. *Furman v. Georgia*, 408 U.S. 238 (1972) (*per curiam*).

The decision to exercise the power of the State to execute a defendant is unlike

any other decision citizens and public officials are called upon to make.  The Supreme

Court has affirmed on numerous occasions that the penalty of death is qualitatively

different from a sentence of imprisonment, however long.  *See, e.g., Bullington v.*

*Missouri*, 451 U.S. 430, 442 n. 15,(1981); *Gardner v. Florida*, 430 U.S. 349, 357

(1977) (plurality opinion).  *See also Furman v. Georgia*, 408 U.S. 238, 306 (1972)

(Stewart, J., concurring).  This qualitative difference engenders a corresponding

difference in the need for reliability in the determination that death is the appropriate

punishment in a specific case.  *See Woodson v. North Carolina*, 428 U.S. 280 (1976)

(plurality opinion).  In *California v. Ramos*, 463 U.S. 992, 998-99 (1983), the Court

stated that "the qualitative difference of death from all other punishments requires a

correspondingly greater degree of scrutiny of the capital sentencing determination."

*See id.* at 999 n. 9.  *See also Sawyer v. Smith,* 497 U.S. 227(1990);  *Ford v.*

*Wainwright*, 477 U.S. 399, 411 (1986) (Marshall, J., plurality opinion) ("In capital

proceedings generally, this Court has demanded that fact-finding procedures aspire

to a heightened standard of reliability. . . .  This especial concern is a natural

consequence of the knowledge that execution is the most irremediable and

unfathomable of penalties; that death is different"); *Ake v. Oklahoma*, 470 U.S. 68,

87 (1985) (Burger, C. J., concurring in judgment) (stating, "In capital cases the

finality of the sentence imposed warrants protections that may or may not be required

in other cases"); *Barefoot v. Estelle*, 463 U.S. 880, 924 (1983) (Blackmun, J., dissenting) (stating that, *Woodson*'s concern for assuring heightened reliability in the capital sentencing determination "is as firmly established as any in our Eighth Amendment jurisprudence"); *Godfrey v. Georgia*, 446 U.S. 420, 443 (1980) (Burger, C.J., dissenting) (stating, "[I]n capital cases we must see to it that the jury has rendered its decision with meticulous care"); *Gardner v. Florida*, 430 U.S. 349, 357-358 (1977) (Stevens, J., plurality opinion) (stating, "From the point of view of the defendant, it is different in both its severity and its finality.  From the point of view of society, the action of the sovereign in taking the life of one of its citizens also differs dramatically from any other legitimate state action.  It is of vital importance to the defendant and to the community that any decision to impose the death sentence be, and appear to be, based on reason rather than caprice or emotion").

All of these guiding considerations culminated in the *Apprendi* line of cases, including the statement of Justice Thomas, concurring in the judgment:  "In the area of capital punishment, unlike any other area, we have imposed special constraints on a legislature's ability to determine what facts shall lead to what punishment – we have restricted the legislature's ability to define crime." *Apprendi*, 530 U.S. at 522-23.  In *Apprendi*, the Court ruled the Due Process Clause of the Fourteenth Amendment requires that a factual determination authorizing an increase in the maximum prison

sentence for an offense from ten to twenty years be made by a jury on the basis of proof beyond a reasonable doubt. *Apprendi*, 530 U.S. at 469. "The person who is charged with actions that expose him to the death penalty has an absolute entitlement to a jury trial on all the elements of the charge." *Allendale-Torres v. United States*, 523 U.S. 224, 227 (1998) (Scalia, J., dissenting) (emphasis deleted).

## F.    Failure to Prove All the Necessary Elements

The State did not prove the elements of the offense alleged in the indictment beyond a reasonable doubt, making Carpenter's conviction unconstitutional under the Sixth Amendment, the Eighth Amendment, and the Fourteenth Amendment.

The State simply did not indict Carpenter under § 30.02(a)(3). The indictment alleges "David Lynn Carpenter . . . did unlawfully then and there knowingly and intentionally cause the death of Nelda Bryant Henin . . . and the defendant intentionally did cause the death of the deceased *while* the said defendant *was in the course of* committing and attempting to commit the offense of burglary of a habitation of Nelda Bryant Henin." This charges § 30.02(a)(1) burglary and does not charge 30.02(a)(3) burglary.

Section 30.02(a)(1) differs from § 30.02(a)(3) in at least one important respect. Section 30.02(a)(1) defines the offense of burglary as complete when the alleged

offender enters the habitation with the then present intent to commit a felony. *See Whitaker v. State*, 977 S.W.2d 595, 598 (Tex.Crim.App. 1998), *cert. denied*, 525 U.S. 1108 (1999).  On the other hand, the offense of burglary under §30.02(a)(3) is not complete until the conclusion of the commission (or the attempted commission) of the felony, in this case, the murder.  Prior to the conclusion of the commission (or the attempted commission) of the felony, the entry is nothing more than a criminal trespass.  *See* Tex. Penal Code Ann. §30.05(a) (Vernon 1991).  Only the felony, in addition to an unlawful entry, constitutes burglary.  Stated otherwise, it is only the unlawful entry, in addition to a completed (or completed attempt) of a felony that constitutes burglary.  Until that felony (or attempted felony) is complete, no burglary has occurred.

In truncated form, the indictment in this case alleged Carpenter "knowingly and intentionally cause[d] the death of Nelda Bryant Henin . . . *while . . . in the course of* committing or attempting to commit the offense of burglary of a habitation of Nelda Bryant Henin."  (CR:2).  Effectively, thus, the indictment alleged Carpenter committed murder *while* committing burglary.  Thus, the indictment alleges Carpenter was committing burglary as he murdered – 30(a)(1) -- not that he unlawfully entered and then committed murder and, therefore, upon completion of both elements, committed burglary -- 30(a)(3).

If Carpenter allegedly murdered Henin *while in the course of* committing burglary, he was charged under § 30.02(a)(1) and only § 30.02(a)(1). Thus, the State could not prove its case by relying on § 30.02(a)(3). This is an entirely different offense than that for which Carpenter was indicted. To prove Carpenter was guilty of capital murder, as alleged in the indictment, the State was bound to prove to the jury all of the elements of the offense charged beyond a reasonable doubt.

While the trial court charged the jury that it must find Carpenter entered a habitation, it did not charge the jury that it must find Carpenter entered that habitation with intent to commit a felony. Instead, the trial court authorized the jury to convict Carpenter regardless of his intent at the time of entry. Consequently, the trial court failed to charge the jury on an element of the offense of capital murder as defined under Texas law.

Additionally, § 19.03(a)(2), the capital murder statute under which Carpenter was charged, defines the offense as murder "*in the course of* committing or attempting to commit . . . burglary." Tex. Penal Code Ann. § 19.03(a)(2) (Vernon 1991). Carpenter could not have murdered Henin *in the course of* committing burglary as § 30.02(a)(3) defines the offense. As stated, burglary under § 30.02(a)(3) is complete only after commission (or attempted commission) of the felony. Carpenter could not possibly have murdered in the course of committing a burglary

if he did not commit a "burglary" until after the conclusion of that murder. Consequently, the indictment could not possibly have charged capital murder under § 30.02(a)(3). It is logically and legally impossible. The State of Texas simply did not choose to define as capital murder every murder committed following a criminal trespass.

## G.   Lower Court's Incorrect Citation to Authority

The opinion of the Texas Court of Criminal Appeals in *Homan v. State*, 19 S.W.3d 847 (Tex.Crim.App. 2000), does not undermine this principle. A capital murder prosecution under § 30.02(a)(3) was challenged in *Homan* on the ground that the State improperly bootstrapped to get the capital murder charge. *See id.* at 949. The appellant argued that the State could not use an intentional murder as the circumstance transforming his illegal entry into a burglary and then use the same intentional murder coupled with the burglary to establish the offense of capital murder. *Id.* The court rejected this claim. *Id.*.

Carpenter advances an entirely different claim. He argues that his indictment alleged burglary under § 30.02(a)(1) and, thus, that the State was obligated to prove this. He further argues that, given the statutory language defining capital murder, the State could not logically or legally have indicted Carpenter under § 30.02(a)(3). The defendant in *Homan* presented none of these arguments. The instruction submitted

-76-

"plainly relieved the State of the burden of proof enunciated in *Winship* on the critical question of . . . state of mind. . . ."   *Sandstrom*, 442 U.S. 510, 521,(1979). Considering the charge as a whole, a reasonable juror could have concluded that the State needed to show only an unlawful entry and a murder, when these were not the elements of the capital offense for which Carpenter was indicted.  The charge thus permitted the jury to convict Carpenter of capital murder on less than that which the law mandated.

## H.    Prejudice to Carpenter

Absent a proper instruction, the State could not possibly have proved to the jury beyond a reasonable doubt the intent element of the offense of burglary.  The jury simply did not know, and could not possibly know, it was required to find intent. The commission of the burglary is critical to enhancing the offense from that of murder to capital murder.  Thus, not only did Carpenter's jury not find an element of the offense but it did not find an element of the offense that enhances the sentence. By failing to prove to the jury beyond a reasonable doubt an element of the offense of which Carpenter was convicted, the State violated Carpenter's rights under *Winship* and its progeny, *Apprendi* and its progeny, and the Eighth Amendment.

Importantly, the trial court instructed the jury that it could not find Carpenter guilty of any offense not alleged in the indictment:

You are instructed that if there is any testimony before you in this case regarding the defendant's having committed offenses, if any other than the offense, if any, alleged against them in the indictment in this cause, you cannot consider said testimony as any evidence of the defendant's guilt in this case.

(CR:138).  This instruction both clarifies and compounds the error.  The only offense alleged in the indictment was the offense of capital murder as defined as murder in the course of unlawfully entering a habitation with intent to commit a felony.  The jury was not instructed that it must find this.  Consequently, if any evidence existed of the offense of capital murder as defined as murder in the course of unlawfully entering a habitation and committing a felony, which is what the instructions apparently charged, the jury could not consider this as evidence of Carpenter's guilt and could not return a verdict of guilt predicated on any such evidence.

Under the Supreme Court's decision in *Brecht v. Abrahamson*, a federal court may grant habeas relief for constitutional error only if it determines that the constitutional error had a "substantial and injurious effect or influence in determining the jury's verdict."  507 U.S. 619, 623, (1993) (quoting *Kotteakos v. United States*, 328 U.S. 750, 776,(1946)).  Under this standard, Carpenter should prevail whenever the record is "so evenly balanced that a conscientious judge is in grave doubt as to the harmlessness of the error."  *O'Neal v. McAninch*, 513 U.S. 432, 436,(1995).  As the

Fifth Circuit explained, "If your minds are 'in virtual equipoise as to the harmlessness' under the *Brecht* standard, of the error, then we must conclude that it was harmful." *Robertson v. Cain*, 324 F.3d 297, 305 (5th Cir. 2003) (quoting *Woods v. Johnson*, 76 F.3d 1017, 1026027 (5th Cir. 1996)) (quoting *O'Neal*, 513 U.S. at 435).

The instruction undoubtedly had a substantial and injurious effect or influence on the jury's verdict. The State presented evidence that a man broke into Henin's residence and killed her. Ricky Jackson, who had known Henin since 1966 or 1967, testified, that, on the morning of August 28, 1991, he called Henin and she told him to call the police because someone was breaking in. (R.24:37-39). Bernard Melvin White, II, testified that, on the morning of August 28, 1991, he heard an alarm running and saw a lady standing in her nightgown, bleeding profusely, with her hand at her throat. (R.24:57-59). Verle Douglas Trammel, a Dallas police officer, testified that he responded to a dispatch and saw a door kicked in and a white female lying on the floor. (R.24:87-89).

Rainey, whose allegedly eyewitness testimony Carpenter challenges, testified that she heard a burglar alarm and saw a man running from a house and then jump in a car and take off. (R.25:86). She testified she saw Carpenter leaving Henin's residence. (R.25:86). She identified Carpenter as the perpetrator of Henin's alleged

murder. (R.25:88-92). She also purported to identify Carpenter in a lineup. (R.25:93-94). None of this testimony evidences intent.

Crisler testified that Smith, her friend and coworker, was in love with Gary Hall, who had a relationship with Henin. (R.24:120-122). She stated Smith was obsessed with Hall. (R.24:123). Crisler testified Smith asked her if she knew anybody who would do a hit for her on Henin and if Carpenter would do a hit. (R.24:126-128). Crisler stated she responded that Carpenter did not have the guts for anything like that. (R.26:101).

Smith testified she currently was under indictment for solicitation of capital murder. (R.26:13). She testified she paid Carpenter to kill Henin. (R.26:13). Smith testified Carpenter agreed to kill Henin for $1,000.00, paid out, (R.26:23), that she took Carpenter to Henin's house, and that she paid him $100.00. (R.26:24-25). She stated that, a few days later, she called Carpenter to cancel the deal, but he stated he needed the money. (R.26:27).

Smith testified that Carpenter called her and told her he had done it. (R.26:31). She stated she told him, "I told you not to do it," and he responded that "the bitch deserved it anyway" and "[I]t was as rush." (R.26:31). Smith testified Carpenter wanted more money, but she told him she was not paying him any more and later went over and told him she wanted her money back. (R.26:31-32). She stated

Carpenter threatened her life and that she paid $120 in total.  (R.26:33).

Possibly, the jury could have believed the testimony of Smith and Smith

tending to prove that Carpenter entered Henin's residence with intent to murder her.

However, the jury just as possibly could have believed that Crisler's response that

Carpenter "did not have the guts" to commit a murder ended any discussion, if any

occurred.  Further, the jury easily could have disbelieved Smith's entire testimony.

She was, at the time, under indictment for solicitation of capital murder and,

consequently, had substantial incentive to please the State.  Further, that a woman

who solicited murder refused to pay a man who had just committed that murder even

when he threatened to kill her is nothing but incredible.

Under these circumstances, the evidence of intent is, at most, in equipoise.  It

hardly is so overwhelming that the Court can assert, with conviction, that the

instruction excluding the element of intent did not substantially and injuriously affect

the verdict of the jury.

The Fifth Circuit in *Robertson* faced virtually precisely the same error evident

in this case:  Failure to instruct on specific intent.  324 F.3d at 303.  Addressing the

evidence of intent for purpose of assessing the effect of the omission, the court found

"strong evidence" on both sides of the issue.  324 F.3d at 309.  The court concluded

that, "in the light of all the evidence and the testimony, we must say that we have

'grave doubt' about the harmlessness of the *Sandstrom* error in this case." *Id.* The court stated it seriously doubted that the jury actually evaluated the evidence with the purpose of determining intent. *Id.* "Accordingly, we are left with the conclusion that the state trial court's erroneous jury instruction did have a 'substantial and injurious effect or influence in determining the jury's verdict.'" *Id.* at 309-10.

Similarly, the evidence in this case must present this Court with "grave doubt" regarding the harmlessness of the error. This Court cannot but seriously doubt that the jury actually evaluated Carpenter's intent at the time he allegedly entered Henin's residence. Accordingly, the constitutional error is not harmless, and Carpenter is entitled to a new trial.

## CLAIM IV

### CLAIM IV(A).

**THE DISTRICT COURT DENIED CARPENTER A HEARING ON HIS CLAIM OF NEWLY DISCOVERED EVIDENCE BASED UPON AN UNREASONABLE APPLICATION OF EXISTING LEGAL PRECEDENT.**

### CLAIM IV(B).

**THE DISTRICT COURT ERRED IN DENYING CARPENTER'S CLAIM FOR RELIEF BASED UPON NEWLY DISCOVERED EVIDENCE DUE TO AN UNREASONABLE DETERMINATION OF OBJECTIVE FACTS.**

## OVERVIEW

These claims, having been exhausted in the state court system, replace Claim IV of the original application for relief.

## A.    Introduction

There can be no question that, on August 28, 1991, Nelda Henin was gruesomely murdered.  Someone broke into her house and slit her throat with a sharp knife.  Ms. Henin managed to stagger into the street and attract attention.  Her blood was everywhere.  Fingerprints, shoe prints, and biological material, including hair and blood samples were found.  Significantly, the State was never ever able to tie David Carpenter ("Carpenter") to the murder scene by any physical evidence–no weapon, clothing, DNA, nor fingerprint.  All comparison tests exonerated Carpenter.

While there is significant question as to whether Carpenter played any role in the murder, there is no question that Evrin Smith ("Smith") bore responsibility.  She admitted her dislike and jealousy of Henin. (R26.16-17)  She stalked both Henin and her boyfriend, Gary Hall.  Smith was obsessed with breaking up that relationship. (R24.122)  Indeed, Smith had requested assistance in finding someone to murder Henin for her. (R24.127, 129)

The crime was unresolved for more than six years.  When the facts of Smith's

relationship to Henin came to light, Smith repeatedly denied complicity until it became apparent that she could not escape blame. (R.26:34-36).[28]  Realizing the investigation already centered on Carpenter as a suspect, Smith admitted soliciting capital murder and  named Carpenter as her accomplice.  In return for her testimony, she received only a twenty-year sentence.

Smith's statements, coupled with the testimony of a vindictive ex-spouse/girlfriend named Mandee McBay ("McBay"), implicated Carpenter.  When Carpenter's picture in a highly suggestive photo line-up was shown to a teenager who happened to be in the vicinity of the murder, Tessica Rainey ("Rainey"), she picked Carpenter out.  The State obtained a capital murder conviction.

Smith  was incarcerated in the Woodman Unit of the Texas Department of Criminal Justice.  Smith bragged to her cell mates, including Dana Chamberlain ("Chamberlain") and Debra Lebourney ("Lebourney"), that she committed the murder and that  Carpenter was innocent.

Smith made statements admitting her complicity in the murder.  She confessed that Carpenter played no role.  Her account of the murders is extremely detailed.  *See* affidavits of Lebourney and Chamberlain Exhibits G and H.

---

[28]Not coincidentally, Smith is tall and thin with brown hair, a description which more closely resembles the suspect than does Carpenter's. (See Affidavit of Chamberlain)

Now, the State contends that Smith's admissions never happened–based largely on Smith's current denials.   In seeking the truth, this Court must be ever mindful of the overarching fact that Smith, the State's star witness, is an admitted perjurer, liar, and deceiver.  Her mendacity permeates every line of the lower court's findings.  She stalked her rival, murdered her or had her murdered with the aid of an unknown third party, and then married her rival's lover.   Smith was cold and calculating enough to live with this man for the better part of a decade and never even hint at her role in the offense.  She is so deceitful that she is capable of misleading even her most intimate acquaintances perpetually.  Once caught, and under oath, she told at least three or more different stories.  Yet, the State has absurdly taken her denials at face value without the need for further investigation.

The State has never compared the physical evidence at the scene to Smith.   In the interest of justice, the State ought to conduct a hearing and investigation regarding the truth of Smith's third- party confession to assure that the right person was convicted.  *Berger v. United States*, 295 U.S. 78, 88 (1935) *overruled on other grounds by Stirone v. United States*, 361 U.S. 212 (1960)("The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it

shall win a case, but that justice shall be done.... It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.").

The State has chosen a different path. Carpenter has been denied a proper investigation in support of his claims. In fact, the district court judge presiding over the case has refused Carpenter even the opportunity for a hearing, even though there is no showing that the district court has familiarized itself with Carpenter's trial or the other evidence submitted in the case. Instead, the district court adopted wholesale the argumentative, speculative and disingenuous contentions of the State's case. This constitutes an egregious denial of Carpenter's due process rights for the reasons set out below.

## B.    Post Trial Proceedings

Originally, Carpenter alleged that Smith's recantations were overlooked by the State court. By agreement, this claim was remanded to the state court for an adjudication on the merits on April 13, 2004. Subsequent to Carpenter's filing, (April 19, 2004), the District Attorney's office requested that the court delay appointing counsel and an investigator until the State's response had been filed, even though Carpenter was, at all times, indigent. When the District Attorney filed her

response (March 21 ,2005), Carpenter immediately filed for an evidentiary hearing and a motion for discovery (May 10, 2005). The court delayed ruling upon Carpenter's request for a hearing until February 8, 2006, some nine months later. At that time, the District Attorney filed an amended response further objecting to the appointment of an investigator or an attorney. Carpenter's renewed request to have counsel was granted in March 2006, but, his request for an investigator to pursue his State court claims was not simultaneously granted. On April 17, 2006, the State district court judge, the Honorable Susan Hawk, signed an order, denying Carpenter all requested relief, including discovery and an investigator. Her order adopted verbatim all of the State's findings. In no fashion did the order acknowledge any of Carpenter's objections. When Carpenter received this order, an *ex parte* request for appointment of an investigator was renewed and granted.

The State filed its proposed findings on May 10, 2006, which, *inter alia*, suggested that Carpenter be denied all relief without a hearing. On May 23, 2006, the trial court agreed that Carpenter was entitled to an investigator. The Court permitted Carpenter to conduct a limited investigation to gather affidavits from his witnesses. Carpenter was then to select a hearing date with the District Attorney for consideration of any unresolved evidentiary matters. In the interim, on June 28, 2006, a mere one month after the formal appointment of an investigator, the Court of

Criminal Appeals set a deadline for resolution of all matters in this case by September 28, 2006. This prompted Judge Hawk to sign another boilerplate order adopting the State's findings verbatim, again denying Carpenter all requested relief. On the July 17, 2006, the state district court issued an order in which the trial judge granted Carpenter a mere twenty (20) days to submit his evidence and his findings of fact and conclusions of law. That order did not rescind the trial court's previous adoption of the State's findings of fact and conclusions of law. On August 8, 2006, Carpenter filed affidavits obtained by his investigator and renewed his hearing request. In response, the State filed supplemental findings of fact on August 22, 2006. Carpenter immediately renewed his objections, (August 25,2006), and renewed his request for a hearing. Nonetheless, on October 18, 2006, the court once again adopted the State's findings verbatim and denied all relief. Carpenter took his objections to the Court of Criminal Appeals, where they were ignored. Relief was denied on March 7, 2007.

## C.    Newly Discovered Evidence

The recantation of false testimony constitutes newly discovered evidence when the evidence was unknown at the time of his trial if the evidence could not have been discovered at that time with the exercise of due diligence, if the new evidence is material, and if the new evidence is probably true and would bring about a different result. *Ex Parte Elizondo*, 947 S.W.2d 202 (Tex. Crim. App. 1992); *Williams v.*

*State,* 375 S.W.2d 449, 451 (Tex. Crim. App. 1964).   The failure to consider newly

discovered evidence constitutes a violation of the Due Process Clause if the perjured

testimony at trial was material and the reviewing court is left with the firm belief that,

but for the perjured testimony, the accused most likely would not have been

convicted.  *Boyd v. Puckett*, 905 F.2d 895, 896-7 (5th Cir. 1990), *cert. denied* 498 U.S.

988 (1990).   *See also United States v. Wallach*, 935 F.2d 445, 456 (2nd Cir. 1991).

Newly discovered evidence is cognizable by a subsequent writ if the claims

could not have been presented previously because the factual basis for the claim was

unavailable on the date a movant filed the previous application.  Tex. Code Crim.

Proc. Ann. Art. 11.071 §5a(1).  *Graham v. Texas Board of Pardons & Paroles,* 913

S.W.2d 745, 751 (Tex. Civ. App. Austin 1996).  Smith's confessions were not made

until she was incarcerated in prison many months after the conclusion of the trial.

The affidavits were not obtained until July 20, 2001, almost a year after the filing of

the State writ.  Therefore, by definition, the evidence is newly discovered.

**D.     The Materiality of Recantations**

Justice Oliver Wendell Holmes has stated that "No other statement is so much

against interest as a confession of murder."  *Donnelly v. United States*, 228 U.S. 243,

278 (1912) (dissenting opinion).  Exculpatory evidence is never more probative than

the confession of a third party, if believed.  *United States v. Carmichael,* 269 F.

Supp.2d 588, 598 (D.N.J. 2003).  The courts have uniformly held that the accused

must be allowed to produce "reliable third party confessions, despite any hearsay

rules, when necessary to assist in separating the guilty from the innocent." *United*

*States v. Hall*, 165 F.3d 1095, 1113 (7th Cir. 1999),  *cert. denied*,  527 U.S. 1029

(1999); *see also, Gacy v. Welborn*, 994 F2d 305, 316 (7th Cir. 1993) cert. denied, 510

U.S. 889 (1993)(citing *Chambers v. Mississippi*, 410 U.S. 284 (1973))(". . .states

must permit defendants to introduce reliable third-party confessions when direct

evidence is unavailable.").[29]   Since the accused need only create a reasonable doubt

of guilt in order to obtain an acquittal, the courts have determined that any doubts

concerning relevance should be resolved in favor of admission of third party

perpetrator evidence.  *Holt v. United States*, 342 F.2d 163, 165 (5th Cir. 1965).  No

higher showing than simple relevance is required for admissibility.  *United States v.*

*Stevens*, 935 F.2d 1380, 1402 (3rd Cir. 1991), *see also State v. Sturdivant*, 155 A.2d

771 (1959) (requiring "some thread capable of inducing reasonable men to regard the

---

[29] Third party confessions are never, by definition, merely impeachment evidence, contrary to Finding of Fact 86.  Newly discovered evidence is merely impeaching when there is no exculpatory connection between it and the underlying case.  New evidence that calls into question the validity of Carpenter's guilt is by definition not merely impeachment.  *United States v. Saada*, 212 F.3d 210, 216 (3rd Cir. 2000); *Carmichael, supra* at 598.  By the same token, third party confessions are not inadmissible hearsay.  Compare tr. finding of fact number 9.

event as bearing upon the state's case.")  The courts have eschewed any suggestion that the proffer must prove or even raise a strong probability that someone else committed the act. *Johnson v. United States*, 552 A.2d 513, 516 (D.C. 1988), *see also People v. Hall*, 718 P.2d 99, 103 (Cal. 1986); *State v. Sturdivant*, 155 A.2d 771 (1959). "[T]o be admissible, the third party evidence need not show 'substantial proof of a probability' that the third person committed the act;  it need only be capable of raising a reasonable doubt of defendant's guilt." *Hall*, 718 P.2d at 99.  If the evidence shows an opportunity for the third party to commit the crime and tie the third-party perpetrator to the crime, Texas courts have favored admissibility. *Spence v. State*, 795 S.W.2d 743, 754-5 (Tex. Crim. App. 1990); *see also, Williams v. State*, 643 S.W.2d 477, 483 (Tex. Crim. App. 1982)(some evidence linking third-party perpetrator to crime is only requirement).  In sum, as long as the proffer is relevant, not confusing to the jury, and links the perpetrator to the crime, the courts should favor admissibility. *Commonwealth v. O'Brien*, 736 N.E.2d 841 (Mass. 2000).

## E.    Three-Step Determination of Materiality of Recantation

Case law suggests a three-step process to determine the validity of such claims.  First, Carpenter must produce affidavits that, on their face, show a clear statement against penal interest and some corroborating details.  Secondly, an in-court hearing is to determine the veracity of the witnesses to the third party confession.  Finally, if

the court deemed the confession believable, the finder of fact must be allowed to consider the confession in ascertaining Carpenter's guilt.

The first step is to analyze the affidavits. The corroboration requirement is not an exercise in minute scrutiny, as suggested by the court below. Indeed, there is no definitive test to determine whether corroborating circumstances exist and any number of factors may be considered. *Davis v. State* 872 S.W.2d 743, 749 (Tex. Crim. App. 1994). Initially, in *Chambers v. Mississippi*, the factors were identified as follows: 1) the statement was made to a close acquaintance shortly after the crime was committed; 2) the statement was against the declarant's interest; 3) the statement was corroborated by other evidence; and 4) the declarant was available for cross-examination. These factors are not exhaustive or absolute. *Cunningham v. Peters*, 941 F.2d 535, 540 (7th Cir. 1991).

In *Woods v. State*, 152 S.W.3d 105, 113 (Tex. Crim. App. 2004), the Court of Criminal Appeals identified the following factors:  1) whether the guilt of the declarant is inconsistent with the guilt of the accused; 2) whether the declarant was so situated that he might have committed the crime; 3) the timing of the declaration; 4) the spontaneity of the declaration; 5) the relationship between the declarant and the recipient of the statement; and 6) the existence of corroborative facts.  Reviewing courts have stressed that the sheer number of statements, coupled with the knowledge

-92-

that disclosure would subject the declarant to criminal prosecution, weigh heavily in determining admissibility. *Chambers,* 410 U.S. at 310; *Revels v. Diguglielmo,* 2005 WL 1677951 at *7 (E. D. Pa. 2005).

## F.   Smith's Recantations are Material

As Carpenter's affidavits demonstrate, Smith's confessions are clearly against penal interest and are corroborated by the facts of the case.  Debra Sue Curry's ("Curry") affidavit[30] states that Evrin used a knife to kill the female victim.  Curry's affidavit states that Carpenter was not involved in the crime.  Clearly, the affiant knew that a female victim was killed with a knife.  The affiant also knew that Carpenter was accused of this murder.  These are all indisputably objectively true and corroborate Curry's affidavit.

Likewise, Athena Burdick's ("Burdick")  affidavit[31] contains a statement by Smith exculpating Carpenter.  Smith referred to Carpenter as her fall partner.  Both Carpenter and Smith were convicted of Henin's murder and that Carpenter received a death sentence. These facts are objectively true and corroborate Smith's confession.

Finally, the affidavit of LeBourney contains an unredacted statement that blood was everywhere, that Smith was at the scene of the murder and saw children

---

[30] Exhibit N attached hereto.

[31] Exhibit O attached hereto.

on their way to school, that the clothes and murder weapon were not found, and that Carpenter was wrongfully convicted of the murder. These facts are all objectively true and corroborate Smith's confession.

Additionally, Smith was, by her own admission, involved in the murder. She had an opportunity to commit the crime. The record indicates that she stalked the deceased and had been to her house often. Thus, Smith was uniquely situated to commit the crime. Her statement acknowledging guilt inherently carried the risk of further prosecution. Compare *Chambers,* 410 U.S. at 300-01. Smith's statements were spontaneous acknowledgments of guilt. As the court is aware, jailhouse informant evidence is prevalent because so many people discuss their cases while incarcerated. Further, at the time Smith's statements were made, several of the affiants were close acquaintances. The sheer number of confessions buttresses their reliability because the confessions corroborate each other. *Id.* at 301. Finally, and most importantly, Smith is available for cross-examination so that the court may ascertain her credibility. When properly analyzed, all of these factors favor a new trial, or, at a minimum, a hearing on their probity.

## G.   Hearing Wrongfully Denied

Carpenter strongly and repeatedly objected to the court's ruling that the conflict in the affidavits could be resolved without a hearing in a capital case as an objectively

unreasonable application of prevailing Supreme Court precedent.

The State's findings, as adopted by the district court, seem to suggest that all credibility determinations can be made in the absence of a hearing. Such a finding is unprecedented. The credibility of witnesses presents an "in court" issue for the finder of fact. *Cunningham,* 941 F.2d at 312. An evidentiary hearing on the reliability of a third-party confession is a prototypical instance in which an evidentiary hearing is appropriate. This is particularly true when the reviewing judge did not preside over the trial. *United States v. Phillips*, 2006 WL 1117882 at 16 (11th Cir. 2006).

Credibility determinations cannot be made in the absence of live testimony, particularly when they are contrary to the plain meaning of the affidavits. Carpenter, therefore, once again, asserts the need for an evidentiary hearing to resolve the facts. *See, Perillo v. Johnson*, 79 F.3d 441, 444 (5th Cir. 1996) (petitioner entitled to discovery when there is factual dispute which if resolved in petitioner's favor would entitle petitioner to relief and state has not afforded petitioner a full and fair evidentiary hearing); *Brown v. Johnson*, 224 F.3d 461, 466-67 (5th Cir. 2000). A live hearing is not required if the district court has sufficient facts before it to make an informed decision. As a rule, if the material issues of fact are not clear, a judge must hold an evidentiary hearing to decide the truth of the matter. *Taylor v. United States*,

287 F.3d 658, 660 (7th Cir. 2002); *United States v. Alanis*, 88 Fed. Appx. 15, 19-20 (5th Cir. 2004). This is particularly true when the trial judge's personal knowledge does not conclusively negate the facts set out in the claim. See *United States v. Castro*, 2003 WL 1922967 (5th Cir. 2003). The whole issue in this writ is the meaning of trial counsel's affidavit regarding any strategy in failing to consult with an expert or consider refuting the extraneous offenses. Since the district judge did not consider this issue at trial, trial counsel's credibility cannot be determined by a cursory review of the affidavit. The Court of Criminal Appeals' affirmation of the trial court's refusal to consider live testimony is simply an endorsement of an unreasonable factual determination.

Clearly, the State courts were required to conduct a hearing and to determine the credibility of the affiants in court subject to cross-examination. Some form of evidentiary hearing is required to fully and fairly adjudicate Carpenter's claims. *Brown v. Johnson*, 224 F.3d 461, 466-67 (5th Cir. 2000) A live hearing is not required if the district court has sufficient facts before it to make an informed decision. As a rule, however, and contrary to the court's findings, if the record contains an evidentiary conflict on a material issue of fact, a judge must hold an evidentiary hearing to decide who is telling the truth. *Taylor v. United States*, 287 F.3d 658, 660 (7th Cir. 2002); *United States v. Alanis*, 88 Fed. Appx. 15, 19-20 (5th Cir. 2004). This

is particularly true when the trial judge's personal knowledge does not conclusively negate the facts set out in the claim. *See United States v. Castro*, 2003 WL 1922967 (5th Cir. 2003). When faced with conflicting affidavits, an evidentiary hearing is ordinarily required, particularly when as in this case there is no tribunal from which the court can measure testimony. Appellate review of these disputed issues can be better performed following the district court's credibility assessment of the live witnesses. *See Wiggins v. Smith,* 539 U.S. 510 (2003)(relying on the state trial judge's credibility determinations based on live testimony);( *Guy v. Cockrell,* 343 F.3d 348, 354 (5th Cir. 2003) the summary judgment procedure did not suffice here because the affidavits and evidence on file raised genuine, material fact issues that could not be resolved without adversarial testing).

Carpenter's trial judge was the Honorable Gerry Meier. The current state judge, the Honorable Susan Hawk, did not hear *any* evidence regarding this case. While it may be appropriate, under rare circumstances, for a trial judge to rule upon the credibility of affidavits in the absence of live testimony, such a procedure has never been condoned when the judge was not the trial judge. *Louis v. Blackburn*, 630 F.2d 1105, 1109 (C.A. La. 1980)("The Supreme Court has emphasized, in cases that involve the constitutional rights of criminal defendants, that factual findings may not be made by someone who decides on the basis of a cold record without the

opportunity to hear and observe the witnesses in order to determine their credibility."). Whether Smith's recantation is believable is a determination that cannot be made from mere affidavits. This is particularly true because, even excising the contested portions of the affidavits, the remainder clearly establish a recantation. Secondly, whether the remaining evidence (the testimony of Tessica Rainey and Mandee McBee), still coalesce to establish guilt is a determination that can only be made by a fact finder who is thoroughly familiar with the trial record.

## H.    Objectively unreasonable factual determinations

The common thread between Smith's recantation and the viability of the remaining evidence, is the factual credibility of the affidavits. This issue should have been determined by the state court. The state court found that the affidavits were not true simply because the affidavits contradicted the statements originally given in the investigation.   Under this standard of review, no recantation would ever be considered credible. Since the district judge did not observe Smith testify at trial, her credibility cannot be determined by a cursory review of conflicting affidavits. A live hearing was required. *Guy v. Cockrell,* 343 F.3d 348, 354 (5th Cir. 2003).

In a two-page order, the trial court simply adopted, again, all of the State's findings and overruled Carpenter's submissions.   Carpenter has repeatedly and

persistently complained that the state court has not made an adequate review of the record, particularly since the current judge did not preside over the trial of the underlying case. Even worse, the court in this instance has merely adopted the findings submitted by the State's attorney wholesale. The order provides no explanation for its failure to even mention Carpenter's objections or proposed findings. In a death penalty case, such matters are due at least minimal consideration.

### 1.    The Judge Did Not Read What She Signed

Primarily and initially, Carpenter contends that Judge Hawk never reviewed the record and had no justification for the wholesale adoption of the State's findings. The adoption of additional findings 104-110 from the State's submission underscores Carpenter's belief that his cause has not received meaningful review. In these findings, the State's attorney accuses Carpenter's attorney, and, by implication, Judge Hawk, of engaging in improper ex parte communications concerning the appointment and utilization of an investigator. As Carpenter pointed out in his proposed findings, he is under no obligation to notify the State of such request. Further, Carpenter specifically rejects the notion that the trial judge did anything wrong in granting an ex parte request for an investigator or the time to utilize the services of same.

In effect, the trial judge has entered findings that the court implicitly violated

the code of judicial conduct.  Nothing could be further from the truth.  The trial court acted properly in this respect.

However, that the trial judge would sign off on findings that impugn her integrity, demonstrates that no meaningful review has been undertaken.

In light of this, no comfort can be taken in finding 113, that recites the court actually read the record. Carpenter contends that the court adopted a finding that the judge had  read the record without actually reading the finding that stated same. The inference that the record was not read can be gleaned from the following inaccuracies in the findings.

### 2.    Finding that Smith did not drive the car observed at the scene

The State contended, and the judge found, that Smith's recantation is not credible because she could not have driven the vehicle described by Tessica Rainey and her brother as the one seen driving from Henin's address.

Carpenter objected to proposed findings, numbers 68-70, that Smith did not drive a car which matched the description given by the eyewitnesses and, therefore, could not have been the murderer.  The mere fact that the State proved ownership of a smaller vehicle does not preclude Smith's involvement in the murder.  In fact, Carpenter alleged that he did not own a vehicle similar to the one described by the witnesses. The State dismissed his contention by noting that he could have used other

transportation.  *See* finding of fact 620 on Carpenter's original 11.071 submission.

That explanation, though, also fits Smith.  The trial record shows that she had Rebecca Crisler ("Crisler") drive her to stalk the deceased in Crisler's vehicle, (R26.121) which Smith did not own.  Therefore, Smith had an established practice of using other vehicles.  Common sense would indicate that, in planning the murder, she did not wish to be identified by her car because she had expressed similar concerns to Crisler.  Nonetheless, the court "found" that Smith was not present based solely on her alleged ownership of a dissimilar vehicle.

### 3.    Finding that one affiant is inherently more credible than another

The State contended, and therefore the judge "found," that Chamberlain's affidavits are not credible because a member of the District Attorney's office allegedly obtained contrary information.  Carpenter objected to the trial court's endorsement of the affidavit of an investigator, Espinoza (Finding of Fact 6).  That affidavit is hearsay.

Mr. Espinoza has never been subject to examination in court.  His credibility cannot be ascertained from a written submission.  This is particularly true since he is an agent of the State who did not testify at trial. His boss, the District Attorney, is a party against interest in this matter.  The court cannot logically credit his assertions

and discount affidavits to the contrary without having met, much less heard from, any of the witnesses. Still, that is what happened below.

### 4.      Finding that Smith had an unimpeachable alibi

The State alleged that Smith was at work, and her alibi was unassailable. This finding was likewise rubber-stamped. Carpenter objected to the trial court's finding that the State has conclusively established an alibi for Smith. (Findings of Fact 8, 24-28). Crisler saw Smith at work as late as an hour and ten minutes after the murder. (R26.84, 102). Crisler is deceased and, thus, not available as a witness.

Adrian Cook's ("Cook") affidavit was obtained some twenty years after the murder. He did not testify at trial. An affidavit asserting knowledge of a twenty-five year old event, without more, is inherently suspect and highly improbable.

Further, Cook cannot say where Smith was after 7:00 a.m. and does not know when she left work. At the very least, Cook's recollection should be subjected to cross-examination. Carpenter knows nothing of his background, his relationship to Smith, or his motivation for providing an affidavit based on an event that occurred approximately fourteen years earlier.

Carpenter asserts that ProSet Press was a business that employed time cards to document work hours. These time cards, if they exist, would be a better demonstration of Evrin's whereabouts. Needless to say, Carpenter is unwilling, in

a death penalty case, to accept the alibi of a complete stranger without a face-to-face meeting and an in-court testing of his credibility.   Apparently, the trial court entertained no such misgivings.

5.      **Finding that Smith's knowledge of the crime, as relayed to the affiants, was based solely on media accounts and not personal knowledge**

The State contended that the particularized details of the murder that Smith disclosed to the affiants came from media accounts, not from Smith's personal observations.   Carpenter objected to the court's finding that Smith knew about the murder from reading newspapers and watching television. (Findings of Fact 21, 22). The findings are no more than speculation and conjecture.   Smith has admitted some direct knowledge of the offense, having been convicted as a party.   Her self-serving denials of liability cry out for closer scrutiny.   The court, at the behest of the State, did not provide any scrutiny.

6.      **Finding that a knife owned by Carpenter was positively identified as the murder weapon**

Carpenter objected to the court's finding that his knife was the murder weapon. (Findings of Fact 29, 30).   The medical examiner testified that the murderer used a sharp knife.   He/she noted that any knife - including a small kitchen knife - could have been the murder weapon.

Thus, contrary to the assertion that only a buck knife could have been used, anyone with kitchen utensils, including Smith, could have been the murderer. These findings demonstrate the lack of candor prevalent throughout the State's submission as adopted by the trial court. These findings are not a reasonable deduction from the evidence and are, in fact, a direct misstatement of the record. They therefore strongly indicate that the findings were adopted without an independent review of the record.

### 7. Finding that Smith lacked the physical strength to break into Henin's home.

The State alleged that Smith could not have committed the murder because the murderer kicked down Henin's door – an act requiring massive power. Carpenter objected to the finding that Smith could not have broken into the deceased's house. The court faulted Carpenter,[32] who has been denied discovery, for failing to produce scientific evidence that Smith could kick in a door. Without going into the impossibility of obtaining such evidence, the State presented no evidence that Smith was too weak to force open the door. The issue cannot be determined by a mere reading of conflicting affidavits. Still, the judge found that a witness she had never

---

[32] In making this argument, the finding implicitly contrasts Evrin Smith as a small person with Carpenter, a large person. Elsewhere, the State argues that Carpenter was the murderer because he matched Tessica Rainey's description of a skinny person. In these findings, the State has no compunction in submitting internally inconsistent and self-contradictory claims. The State's findings, as adopted by the trial court, show no regard for the adage that "the truth never changes."

laid eyes on and had never heard from was too weak to commit the murder.

### 8.      Finding that Smith is credible

Carpenter objected to the trial court's findings 58-59, that Smith's affidavit is credible in the absence of a hearing.  The record shows that Smith repeatedly lied about her involvement and made efforts to minimize her guilt.  She is part and parcel of the murder.  It is hardly surprising, based upon her previous denials, to learn that she is once again minimizing her involvement in order to escape liability.  It is impossible for the district court to determine that Smith is an honest person without ever having seen her or heard her testify.

In her affidavit Smith denies that any disciplinary charges were filed against her by Carpenter's affiants.   Smith suggests that Carpenter has sent two attorneys to visit her.  To Carpenter's knowledge, no attorneys have visited her. The prison records, on information and belief, do not substantiate these allegations.  In light of the impossibility of disproving a negative, the court should have conducted a hearing on Smith's allegations.  Yet, the court simply deemed all of the State's evidence credible and all of Carpenter's evidence incredible.

### 9.      Finding that Rainey's identification was accurate

In its submission, the State persists in casting the high school student description of the assailant in a false light.  The person that Rainey saw had long

brown hair and was skinny.  Carpenter is a large man of great girth who is not and can never have been even remotely characterized as skinny.

To side step this glaring discrepancy, the State suggests that Carpenter met this description at the time of the offense. The inaccuracy and unreliability of this identification is the basis of an independent claim already on file with the court. Carpenter had blond hair and was large, if not obese.  Smith was tall, skinny and had dark hair.  In fact, she can pass for a man.

The issue of identification is thus far from settled.  Still the court unhesitatingly adopted this highly argumentative assertion without seeking any proof or evidence to substantiate this finding.

### 10.    Finding that Smith's recantation is insignificant in light of other evidence of guilt.

Carpenter objected to findings 45, 71-85, 92-94, that knowledge of Smith's confessions would not have resulted in an acquittal.  These findings, deeply rooted in misstatements of the record, speak most loudly to the need of an independent review and live testimony.

There is no physical evidence whatsoever linking Carpenter to the murder.  The available physical evidence, including a shoe print, hair fibers, fingerprints, bodily fluids and tissue have all been compared to Carpenter and have all been found <u>not to</u>

<u>match</u> Carpenter.

Rainey's eyewitness identification was thoroughly impeached at trial and does not meet the standards of admissibility.[33]   Likewise, the State's other witness, McBay/Carpenter was the former girlfriend/spouse of Carpenter.  Her account of the murder, including her claim that Carpenter had virtually no blood on him, was patently incredible.  Even though Henin had been "nearly decapitated" and there was a large "pool of blood" in her living room, McBay/Carpenter's testimony indicates that she merely saw one drop of blood on the knife and a couple of small droplets of blood on Carpenter's shoe, an impossible factual scenario.  As noted in the writ application, page 6, McBay/Carpenter is admittedly mentally ill and was under the influence of memory altering drugs. Her account of the incident changed based upon the testimonial needs of the State at trial.

McBay/Carpenter has repeatedly denied that Carpenter was involved in the murder, has admitted her recollection was impaired and has given numerous conflicting accounts.  The strength of this evidence has not been finally resolved in light of Smith's confessions of what allegedly occurred.  Even the Court of Criminal

---

[33] In fact, as set out in Carpenter's federal claim, attached hereto and incorporated herein for all purposes as Exhibit A, the trial court's finding on the reliability of Rainey's identification are flawed for the same reason that its findings in the initial 11.071 application are deficient.  The findings constitute an objectively unreasonable application of prevailing Supreme Court precedent concerning the criteria for reliability.

Appeals' affirmation of the conviction does not suffice as a fair determination that Smith's recantation is inconsequential.  If Smith's statements are true, then Carpenter is innocent.

**11.      Findings that Carpenter's affidavits are incredible because they are not consistent with every other piece of evidence submitted. (The State court nitpicks the affidavits)**

The State faults Carpenter's affidavits because Smith's confessions, while numerous, were not detailed.  The State seizes upon this lack of detail in arguing that the statements are not worthy of admission.  That contention begs the question of whether the statements are worthy of consideration in a hearing.  Clearly, they are. This is a capital murder case where <u>none of the physical evidence</u> obtained from the crime scene, including DNA evidence, matches or even implicates Carpenter.

Further, Carpenter is aware of no rule that a third party confession must be dramatically detailed in order to be admissible.   Since Smith is available for testimony, as are the affiants, the trial court needs to hear from each in person to determine the truth of the matter.

By the same token, the State has cherry-picked minute details from the trial record to impeach the affidavits.  By claiming that these details are inconsistent with Smith's guilt, the State suggests that the third party confessions are not credible. However, this approach directly conflicts with the approach set out in *Chambers* and

*Woods* above.  The confessions must be reliable, not bulletproof and unassailable. All of the State's contentions relate to the credibility of the witnesses, a matter that must be determined in court.

All of the State's authority suggests that, after an appropriate hearing, if the statements are not corroborated, they should not be admitted before the finder of fact. Nowhere can the State cite a case supporting the proposition that a hearing can be denied simply on written review of submitted affidavits conducted by a judge who did not preside at the trial, has no familiarity with the witnesses, and has not reviewed the record.

The State's findings, as adopted by the trial court, fail to address any of the other factors mentioned in *Chambers* or *Woods*, including the number of statements, whether Smith was so situated that she might have committed the crime, whether her statement is inconsistent with Carpenter's guilt, the relationship between Smith and the affiants, and whether Smith is available for cross-examination.

Carpenter objected to findings 16, 21, 38-44, that the affidavits are incredible because they are not consistent with the other eyewitness testimony.  According to Lebourney, Smith saw the deceased collapse on the sidewalk outside.  The State faults this account because other witnesses did not see the deceased fall.   It is well understood that recollections of startling events differ dramatically.   *Compare*

"Mental Shock Can Produce Retrograde Amnesia", Loftis and Burns, <u>Journal of Memory and Cognition</u>, Vol. 10, page. 318-323, 1982.   That Smith's recollection is slightly different from the other witnesses does not make the statement to Lebourney incredible.  It merely shows that Smith's recollection is different.

Secondly, the State faults Chamberlain's affidavit because she quotes Smith as having seen a small girl outside at the time of the murder.   The murder occurred in a residential neighborhood while children were on their way to school.  The finding rests on the assumption that only three people could have witnessed the event.  There is no support in the record for this contention.  Smith saw a small child not mentioned by the other witnesses.  The validity of Smith's account to Lebourney can only be determined by live, in-court testimony.

### 12.    The findings that an amended affidavit is inherently incredible

After Chamberlain submitted an affidavit, she was approached by the State to verify it. Chamberlain made minor alterations.  Carpenter objects to Findings 6-7, 49-51, that Chamberlain's redactions to her 2001 affidavit completely discredit that affidavit.  The redactions are minimal.  Even in the absence, Chamberlain's affidavit is clear that Smith framed Carpenter, that Smith personally witnessed the murder scene noting the blood and gore, that Carpenter is innocent, and that Smith knew it

was wrong to implicate Carpenter. Even the redacted affidavit constitutes a third party admission exculpating Carpenter, and one that is consistent with the crime scene.

**13.    The findings that the affiants have conspired with Carpenter to present false testimony.**

Carpenter objected to Findings 61-67, that the affiants are not credible because the affiants corresponded with Carpenter. Any such contact only occurred <u>after</u> Smith had made her confessions. The affiants corresponded with Carpenter merely to advise him that they had learned of evidence confirming Carpenter's innocence. Apparently, the only way that the affiants would be deemed credible by the court is if they had told no one of Smith's statements. Such a finding is absurd. Revelation of a crime does not constitute an inherent bias.

**14.    The findings that post-conviction confessions are not "newly discovered" evidence**

Carpenter objected to Findings 89-91, that the tendered affidavits do not constitute newly discovered evidence. These affidavits concern statements made while Smith was incarcerated. They did not exist at the time of trial. They were, however, brought to light at the first opportunity. Once the affiants heard the statements, they contacted Carpenter, who, in turn, sent an investigator to interview the witnesses. By definition, this is new evidence.

## I.      The ultimate irony

Notwithstanding over 120 findings of fact that were premised upon the uncompromising truth of Smith's denials, the State hedged its bets in Finding of Fact 60.  In that finding of fact, the State assumed that Smith had indeed made all of the false statements which the State has so painstakingly denied.  However, in this finding, Smith's lies were ultimately dismissed as puffery.  In other words, Smith indeed admitted the killings but did so only to impress her cellmates.  Obviously, it is impossible to ascertain that Smith's statements were tongue-in-cheek without having seen her or without having heard her express that explanation.  Still, the trial court found it appropriate to adopt that finding of fact as well, without questioning it.  Therefore, the District Court found that Smith is completely honest and that she never confessed to the murder.   The District Court also found that Smith was a liar who confessed to the murders, but didn't mean it.  The District Court made both these findings without ever having met Smith in person.  There is no way in the world that these findings are objectively reasonable.

## J.      Prejudice to Carpenter

Smith's testimony was the only testimony providing motive for the offense. As the co-indictee, she was one of the most prominent witnesses at trial.  Her physical description more closely resembles the perpetrator observed by eyewitness Rainey,

than it does Carpenter.  Had Smith told the police that Carpenter was not at all involved in the offense, he likely would never have been prosecuted since the investigators did not seek to charge Carpenter until after obtaining Smith's statement. Under these circumstances, Smith's recantation of her perjured trial testimony and her exculpation of Carpenter is critical.  It is a textbook example of the kind of evidence that would have probably resulted in an acquittal.

As noted throughout this application, there is <u>no physical evidence</u> linking Carpenter to the crime scene.  The eyewitness testimony of Rainey was irredeemably impeached, and the testimony of Carpenter/McBay was riddled with inconsistencies, given while impaired by medication, and transparently manipulated by the prosecution team.  Without Smith's statement that she hired Carpenter, the evidence before the jury would consist of the identification of a skinny white male with dark hair and the testimony of an embittered ex-wife.[34]

Because the trial court failed to conduct a meaningful inquiry into the proffered evidence, and failed to fairly evaluate the submission through live testimony, its findings and determinations  are unreasonable determinations of fact and should be

---

[34] The State and therefore, the trial court did not perceive any weakness in the prosecution case.  The trial court adopted the State's contention that these women were "highly persuasive" and their testimony was unrefuted.  (Finding of Fact 647).  In light of all the inconsistencies presented at trial, that rubber-stamped observation is the most amazing Finding of Fact in the record.

accorded no deference.

## CLAIM V.

**CARPENTER WAS DENIED DUE PROCESS OF LAW WHEN THE PROSECUTION FAILED TO DISCLOSE TO THE DEFENSE THAT MANDEE MCBAY/CLOUD SUFFERED FROM A MENTAL DISABILITY AND WAS TAKING MEDICATIONS AT THE TIME SHE TESTIFIED THAT AFFECTED HER ABILITY TO RECALL EVENTS AND TESTIFY TRUTHFULLY.**

### A.    Overview

Claims V and VI are based on newly discovered evidence and supplement the claims made in the Original Application.

### B.    Relevant Facts

#### 1.    Mandee's Relationship with Carpenter

Mandee Mcbay/Cloud ("Mandee") is the mother of three children, two of whom were fathered by David Lynn Carpenter ("Carpenter").  (R.25:24).  These children were the result of a romantic relationship that began when Mandee was only twelve years old when she began communicating with Carpenter through letters for two years while he was incarcerated.  (R.25:25). After Carpenter's release in 1991, Mandee and Carpenter began living together when Mandee was fifteen.  A major factor motivating Mandee to move in with Carpenter at such a young age was her need to escape from a broken household where her mother was a drug addict and her

father was constantly in trouble with either law enforcement or criminal elements. (R.25:26).

Following the birth of their two children and several years of cohabitation, Mandee's and Carpenter's relationship came to an end in early 1995. (R.25:28-30, 32). Despite their breakup, Mandee and Carpenter kept in contact by letter-writing through at least 1999. (R.25:32, 46-49). When the police investigation concerning the death of the victim first began, Mandee was reluctant to talk to law enforcement. It took several affidavits for her to reveal key bits of information to the police, including her claim that Carpenter asked her to wash off the alleged murder weapon and his shoes. (R.25:48, 55-56).

## 2.     The Statements to Dr. Marshall

Attached hereto as Exhibit A is the affidavit of Dr. Rycke Marshall. The affidavit was based upon interviews with McBay/Cloud. The federal court requested that a deposition of McBay/Cloud be taken and testimony, as set out hereinafter, was adduced. The transcript of the deposition is attached hereto as Exhibit B.

McBay/Cloud reviewed the affidavit she had given to Rycke Marshall line-by-line and affirmed everything in the affidavit was correct. (Exhibit B p. 33-80). She met with Rycke Marshall for three or four sessions before giving the affidavit. (Exhibit B p. 42). McBay/Cloud insisted she was truthful with Rycke Marshall.

(Exhibit B p. 44).  She affirmed that her parents divorced when she was age two (2), and she rarely saw her father.  (Exhibit B p. 44).  Her father was a drug addict, an alcoholic who physically abused his children, and sexually abused Mandee's sister. (Exhibit B p. 45).  Her mother was an alcoholic, a junkee, and a prostitute.  (Exhibit B p. 46).  Her childhood was extremely unstable and rife with abuse.  (Exhibit B p. 46). Often, there was no food or electricity.  (Exhibit B p. 46).  Her mother frequently abandoned her children for days.  (Exhibit B p. 47).  From an early age she was exposed to alcohol, drugs, sex, pornography, and violence.  (Exhibit B p. 47). McBay/Cloud began abusing alcohol and drugs at age five (5).  (Exhibit B p. 47). She was sexually abused by a stepfather.  (Exhibit B p. 48).  She was the victim of child pornography by her mother's boyfriend.  (Exhibit B p. 48).  She became sexually active at age 12.  The family moved frequently.  (Exhibit B p. 48).  She did not do well in school and dropped out in seventh grade.  (Exhibit B p. 49).  She had only two long-term relationships--Carpenter and McBay/Cloud. (Exhibit B p. 49-50).

 3.    McBay/Cloud's Deposition Testimony

 McBay/Cloud testified that throughout her life she had suffered panic attacks, mood swings and depression (Exhibit B p. 8) as well as  suicidal ideation, anxiety, and substance abuse.  (Exhibit B p. 51).  In retrospect, McBay/Cloud believes that she had been bipolar her whole life.  (Exhibit B p. 19).  Around the time of the murder,

McBay/Cloud was having hallucinations, like hearing people call her name while she was in the shower.  (Exhibit B p. 68).  She had these hallucinations whenever she was not taking drugs.  (Exhibit B p. 68).  McBay/Cloud also stated that certain noises, like scratching a nail on a chalkboard, would "set her off."  (Exhibit B p. 100-101).

Prior to trial, McBay/Cloud was diagnosed with depression and was given Zoloft and Buspar.  (Exhibit B p. 10, 54-55).  She first received medication in 1997.  (Exhibit B p. 51).  According to McBay/Cloud, the Klonopin results in memory loss and impairs her ability to recall events.  (Exhibit B p. 12).  She acknowledged that she had such memory problems in 1997.  (Exhibit B p. 13).  She told the prosecutor, Kim Judin, about her extreme depression and the medications she was taking at the time of trial.  (Exhibit B p. 78-79).  Kim Judin acted as if that wasn't important.  (Exhibit B p. 79-80).

After the trial, McBay/Cloud was diagnosed with a bipolar disorder (Exhibit B p.18) and was given a number of medications whose names she did not fully recall.  (Exhibit B p. 19).  She told Dr. Marshall that she was taking antidepressants such as Zoloft, Gabapentin, and Klonopin (Exhibit B p. 43), as well as Seroquel, and Ambien.  (Exhibit B p. 54).  She was treated by Dr. Rayburn, a psychiatrist, from 1997-2000.  (Exhibit B p. 51).  She next saw another psychiatrist, Vicky Boric, who diagnosed her as being bipolar, as set out in Dr. Marshall's affidavit.  (Exhibit B p. 51-52).  Since

-117-

2004, she has been seeing Dr. Bennett at the Adapt Clinic.  (Exhibit B p. 54).  In

2003, the Social Security Administration declared these conditions to be disabling.

(Exhibit B p. 53).  Her mother was appointed to be her legal guardian.  (Exhibit B p.

53).  Specifically, McBay/Cloud testified that, at the time of the deposition, she was

taking Gabapentin and Klonopin.  (Exhibit B p. 4-5); (*See* Exhibit B - McBay/Cloud

medical records).

       4.      What the Prosecution Team Knew

McBay/Cloud specifically recalled telling the prosecutor, Kim Judin, on several

occasions that she was on medication.  (Exhibit B p. 15-16).  McBay/Cloud thought

that this disclosure would keep her from testifying.  (Exhibit B p. 15-16).  She tried

to get out of testifying by telling the prosecutor that she was on medication, but it

didn't work.  (Exhibit B p. 31-32).  According to McBay/Cloud, Kim Judin brushed

the matter aside.  (Exhibit B p. 17).  During the trial, mention of her medications did

not occur.  (Exhibit B p. 17).

       **5.**      **What Carpenter and His Lawyers  Knew of Her Condition**

McBay/Cloud testified that during the time she lived with David Carpenter, she

never discussed any of her mental or emotional problems with Carpenter other than

to joke about her obsessive cleanliness.   (Exhibit B p.8).   Six months after

McBay/Cloud's second child was born, approximately 1995, she stopped most

contact with Carpenter except for letters.  (Exhibit B p. 57).  She never told Carpenter of her hallucinations.  (Exhibit B p. 68).

During the time that Carpenter was in jail awaiting trial, McBay/Cloud never disclosed to Carpenter, either by phone or in writing, that she was seeing a doctor and had been diagnosed with depression.  (Exhibit B p. 9-10).  McBay/Cloud never told Carpenter that she was taking medications or that she had seen a doctor.  (Exhibit B p. 11).

McBay/Cloud reaffirmed that she refused to talk to Carpenter's investigators prior to trial at her husband John Cloud's urging.  (Exhibit B p. 13-14).  She only spoke to police investigators.  (Exhibit B p. 14).  Cloud had pressured her to get Carpenter in trouble.  (Exhibit B p. 23-24)  Cloud told her that the authorities were going to take her kids away.  (Exhibit B p. 24).  Eventually, she realized her kids would not be taken away.  (Exhibit B p. 24).  She never spoke to the defense team and never wrote David a letter about the promise not to seek the death penalty.  (Exhibit B p. 32).  She never told the defense team that she was opposed to the death penalty, however, she told Prosecutors Judin, Toby Shook, and Penrod that she was opposed to the death penalty and didn't want to go through with this.  (Exhibit B p. 40)

McBay/Cloud acknowledged that she had been contacted by defense investigators on many occasions after the trial.  (Exhibit B p. 21).  (See Exhibit B,

McBay/Cloud affidvit.)   McBay/Cloud did not speak to any of the investigators because she wanted nothing to do with the case.  (Exhibit B p. 22).  In part, this refusal was attributable to her lack of trust in the system due to the prosecution team's lies.  McBay/Cloud finally decided to speak with investigators.  She spoke to Kenny Johnson, Carpenter's investigator, after her husband, John Cloud, died.  (Exhibit B p. 23).  She first spoke to a female investigator that worked with Kenny Johnson because the investigator seemed nice.  (Exhibit B p. 24-25).  Kenny Johnson promised her nothing in return for her statement.  (Exhibit B p. 25).  Before that point, when the female investigator came, she had no intention of giving a statement. (Exhibit B p. 26).  McBay/Cloud can't remember how many investigators had attempted to contact her over the years or how often she had refused to speak. (Exhibit B p. 34).

## C.    Argument

### 1.    *Brady* Violation

The State failed to reveal to the defense team the existence of any information regarding the medications McBay/Cloud was taking at the time of trial and the condition for which she was taking the medications.  Because the State did not reveal this impeachment evidence, a *Brady* violation has occurred, and Carpenter was denied his right to due process of the law.

The *Brady* rule does not require prosecutors to turn over the entirety of their files to the defense.   Rather, the State is required only to turn over exculpatory evidence which, if withheld, would deprive the defendant of a fair trial.   *United States v. Bagley*, 473 U.S. 667, 675 (1985).   To establish a *Brady* claim, a petitioner must demonstrate that:   (1) the prosecution suppressed evidence; (2) the evidence was favorable to the petitioner; and (3) the evidence was material.   *Kyles v. Whitley,* 514 U.S. 419, 432-34 (1995); *Spence v. Johnson,* 80 F.3d 989, 994 (5th Cir. 1996). "Favorable evidence" in this context includes that which is exculpatory and that which could be used to impeach a prosecution witness.   *Bagley*, 473 U.S. at 676-677. Evidence which could be used to impeach a prosecution witness is also considered "favorable" and is included within the disclosure requirement of the *Brady* rule.   *See e.g.*, *Giglio v. United States,* 405 U.S. 150, 154 (1972); *Brady v. Maryland,* 373 U.S. 83 (1963).

Undisclosed evidence must rise to the level of being "material" in order for a *Brady* violation to have occurred.   While it is indisputable that *Brady* sets the standard for disclosure by the prosecution, *Brady's* materiality standard is simply not the limit of the duty to disclose, but rather the floor.   *See U.S.*

Carpenter concedes that a *Brady* violation does not automatically entitle a defendant to a new trial.   Rather, a new trial would only be appropriate where it is

determined that "there is a reasonable probability that the trial result would have been different" had the evidence at issue been properly disclosed. *United States v. Nixon*, 881 F.2d 1305, 1308 (5th Cir. 1989); *see also Banks v. Dretke*, 540 U.S. 668 (2004). A probability is a reasonable probability if it is "sufficient to undermine confidence in the outcome of the trial." *United States v. Weintraub*, 871 F.2d 1257 (5th Cir. 1989). *United States v. Acosta*, 357 F. Supp.2d 1228 (D. Nev. 2005).

It is unquestionably true that evidence of Mandee's bipolar disorder would have been helpful to the defense at trial. This is not the standard by which a new trial based on newly discovered evidence is to be granted, however. Instead, the question "is whether the evidence 'would probably produce a different verdict in the event of re-trial.'" *United States v. Snoddy*, 862 F.2d 1154, 1156 (5th Cir. 1989) (quoting *United States v. Kahn*, 472 F.2d 272, 287 (2d Cir. 1973)). Following the Second Circuit's holding in Kahn, the Supreme Court further elaborated on the materiality of newly discovered evidence:

> [I]f the omitted evidence creates a reasonable doubt that did not otherwise exist, constitutional error has been committed. This means that the omission must be evaluated in the context of the entire record. If there is no reasonable doubt about guilt whether or not the additional evidence is considered, there is no justification for a new trial.

*United States v. Agurs*, 427 U.S. 97, 112-13 (1976).

The key portions of Mandee's testimony are thrown into serious doubt when

-122-

reviewed with the knowledge contained in Dr. Marshall's psychiatric evaluation as well as other pieces of her medical records. A 2007 assessment of Mandee conducted by psychiatrists at the Timberlawn Mental Health System found that Mandee had a history of blackouts and that she does not take her medication as prescribed by frequently missing doses. ["Admission History," p. 1; "Admission Medication Information," p. 3]. While Mandee's immediate memory is without issue, her longer term "recent" and "remote" memory abilities are poor. In testing, she was able to name only the 43rd and 42nd presidents when asked to recite as many of the previous presidents in order as she could. Further, she missed three out of three questions which tested her recent memory abilities. ["Integrated Assessment," p. 4]. Perhaps most disturbingly, a 2003 psychiatric evaluation found that "[s]he hears sirens and children yelling on a daily basis for several months now." ["Medical Consultant's Review of Mental Residua Functional Capacity Assessment," p. 4]. These were concluded in the same assessment to be "auditory hallucinations" and "psychotic features. [*Id*. at 5]. At trial, Mandee testified as to the events on the morning of August 28th, 1991, the day of the murder. She stated that in the morning when Carpenter allegedly confessed to her that she "was just like in shock or whatever." (RR.25:37). Going back to Dr. Marshall's psychiatric evaluation, Mandee was found to "misrepresent things, not in a conscious and deliberate fashion, but because she is

emotionally overwhelmed and falling apart." ["Psychiatric Evaluation," p. 8.] Further, "[d]uring times of stress she regresses, and her judgment and reality testing deteriorate. . . . At these times, it is difficult for her to determine what is real and what is fantasy." [*Id*.].   By her own admission on the stand and in her psychiatric evaluations, Mandee was under tremendous stress at the time of the murder. [RR.25:7; "Psychiatric Evaluation," p. 4.   ("Theirs was an intense and stormy relationship. . . ." )].  In sum, all the stressor elements were in place to cause Mandee to lose her grip on the line between reality and fantasy.  She was experiencing daily auditory hallucinations, was not on any medication to stabilize her condition, and has what is best described as poor long term memory.  It was with these factors in play that Mandee was asked to testify to events that happened approximately six years before the trial.

Thus, with serious questions raised about the competency of the State's star witness to testify, an acquittal would probably have been produced.

Carpenter concedes that a *Brady* violation does not automatically entitle a defendant to a new trial.  Rather, a new trial would only be appropriate where it is determined that "there is a reasonable probability that the trial result would have been different" had the evidence at issue been properly disclosed. *United States v. Nixon*, 881 F.2d 1305, 1308 (5th Cir. 1989); *see also Banks v. Dretke*, 540 U.S. 668, ----, 124

S.Ct. 1256, 1276 (2004).  A probability is a reasonable probability if it is "sufficient to undermine confidence in the outcome of the trial." *United States v. Weintraub,* 871 F.2d 1257 (5th Cir.1989).

### 2.    Prejudicial Effect To Carpenter

McBay/Cloud was the most damaging witness against Carpenter.  Her testimony constituted the only admission of guilt by Carpenter, as well as the only observation of blood on Carpenter.  Without her, the State's case rested upon the dubious identification made by Rainey, an identification of a few seconds made from a moving vehicle and not made until years after the offense.  This Court must be cognizant of the fact that the number of DNA exonerations in recent years is largely based upon the inadequacy of eye-witness testimony.  *Causes of Wrongful Convictions,* Texas Innocence Project Network, http://www.texasinnocencenetwork.com/Wrongful-Convictions-Causes.cfm  (last visited December 12, 2010).  The State also presented  the testimony of the co-indictee, Smith, an admitted liar.  Credibility has also been the subject of post-conviction litigation.  The State had no physical evidence of any nature tying Carpenter to the crime scene.  It was crucial to the defensive theory to present direct evidence that Carpenter was seen with a knife and admitted his involvement to

McBay/Cloud.  In the absence of McBay/Cloud's testimony, there is no doubt that the

prosecution's case was substantially weakened, if not destroyed.


**D.     Unreasonable Determination of Claim by Lower Court**

When presented to the Texas Courts, the Court of Criminal Appeals refused to

consider the claim at all, inferentially contending that Carpenter failed to satisfy the

requirements of a subsequent writ under Tex. Code Crim Proc. Art 1.071§5(a), to wit:

Sec. 5. (a) If a subsequent application for a writ of habeas corpus is filed after filing
an initial application, a court may not consider the merits of or grant relief based on
the subsequent application unless the application contains sufficient specific facts
establishing that:

(1) the current claims and issues have not been and could not have been presented
previously in a timely initial application or in a previously considered application
filed under this article or Article 11.07 because the factual or legal basis for the claim
was unavailable on the date the applicant filed the previous application;

(2) by a preponderance of the evidence, but for a violation of the United States
Constitution no rational juror could have found the applicant guilty beyond a
reasonable doubt; or

(3) by clear and convincing evidence, but for a violation of the United States
Constitution no rational juror would have answered in the state's favor one or more
of the special issues that were submitted to the jury in the applicant's trial under
Article 37.071, 37.0711, or 37.072.

The state court's one-half page opinion failed to explain why the application

was inadequate.  The state courts completely ignored the many facts and evidence

Carpenter presented demonstrating that the factual basis of his claim could not have been previously established because the witness refused for several years to speak with the numerous investigators Carpenter sent to her home. Carpenter vigorously, and consistently, attempted to interview McBay/Carpenter regarding his *Brady* claims. Carpenter has been diligent, if not dogged, in his unyielding attempts to prove his claims. Further, and equally important, the State of Texas regularly ignored Carpenter's requests for information about McBay/Carpenter and the information regarding the claims he believe his evidence could prove and since has, arguably, proven regarding the alleged Brady violation.

A federal court generally cannot review the merits of a state prisoner's habeas petition if the claims in the petition are procedurally defaulted. A habeas claim can be procedurally defaulted in either of two ways. First, if the prisoner has never fairly presented that claim to the highest available state court, the claim is unexhausted. Second, if the prisoner has presented the claim to the highest available state court but that court has dismissed the claim on a state-law procedural ground instead of deciding it on the merits, the claim has been decided on an independent and adequate state-law ground. *Rocha v. Thaler* 626 F.3d 815, 820 (5th Cir. 2010).

> Where, as here, the TCCA does not identify the subsection on which it relied in dismissing the application as an abuse of the writ, we look to the application itself to determine the subsection the petitioner

relied on in presenting his subsequent application to the TCCA. *Balentine v. Thaler* 629 F.3d 470, 474 (5th. Cir.2010).

*Adams v. Thaler,* 421 Fed. Appx. 322, 330 (5th Cir. 2011). If the Court of Criminal Appeals disposition is unclear as to whether it applied state or federal law, or both, in reaching its decision, review is necessary because a dismissal under §5(a)(1) inherently incorporates a federal question of whether a constitutional violation was alleged.

*Balentine v. Thaler* 629 F.3d 470, 474 (5th. Cir.2010), citing *Michigan v. Long,* 463 U.S. 1032, 1041(1983)( "[W]hen ... a state court decision fairly appears to rest primarily on federal law, or to be interwoven with the federal law, and when the adequacy and independence of any possible state ground is not clear from the face of the opinion, we will accept as the most reasonable explanation that the state court decided the case the way it did because it believed that federal law required it do so.").

Under *Michigan v. Long*, state courts must clearly indicate within the four corners of its opinion if it is reaching a decision based on an adequate an independent state ground. If no such statement is set forth, federal courts are permitted to presume that the decision rests upon federal law, as here, with Carpenter's *Brady* allegations.

-128-

Employing a "common sense" reading of opinion *Washington v. Thaler* 2012 WL 245236, 5 (5th Cir. 2012), there is no dispute that Carpenter's claim in the Court of Criminal Appeals was brought squarely under §5(a)(1).  It is equally clear, in the absence of any contrary evidence, that the evidence of McBay/Carpenter's known mental illness and medications were unavailable to Carpenter until either she or the State of Texas chose to disclose them.

Therefore, the Court of Criminal Appeals dismissed the claim on its merits in contravention of clearly established federal law, as set out above. Evidence that the only person to relate Carpenter's confession was delusional, was known by the state to have mental illness, had known memory lapses and was known by the State to be heavily medicated at trial would undoubtedly produce an entirely different result than the original trial produced.  *United States v. Wall*, 398 F.3d 457, n. 6 (5th Cir. 2004), *United States v. Agurs*, 427 U.S. 97, 112-13 (1976).  The requirement under *Brady* and its progeny that the state disclose material impeachment evidence is so clear that it is beyond dispute.  *See e.g.*, *Giglio v. United States,* 405 U.S. 150, 154 (1972); *Brady v. Maryland,* 373 U.S. 83 (1963).

**CLAIM VI.**

**THE EXECUTION OF CARPENTER WITHOUT EXAMINATION OF NEWLY DISCOVERED EVIDENCE RELATING TO THE MENTAL CONDITION OF MANDEE MCBAY/CLOUD WOULD BE SO FUNDAMENTALLY UNFAIR AS TO VIOLATE CARPENTER'S DUE PROCESS RIGHTS UNDER THE FOURTEENTH AMENDMENT.**

**A.      Relevant Facts**

**1.      Psychological Evaluation of Mandee**

As detailed more thoroughly *supra*, Mandee was a key witness for the State at Carpenter's trial.  On May 15, 2009, a psychological evaluation was performed on Mandee by Dr. Rycke L. Marshall, a clinical professor of psychology at UT Southwestern Medical Center.  Based on Dr. Marshall's evaluation, the veracity of Mandee's testimony and, indeed, her ability to testify at all have been called into serious question.

In evaluating Mandee, Dr. Marshall employed the Minnesota Multiphasic Personality Inventory-2 ("MMPI-2").  There can be little doubt that the MMPI-2 is a widely used and well-researched psychological test, which provides information about current symptoms, long-term functioning, and the manner in which the individual approached the evaluation.  In addition to the MMPI-2, Dr. Marshall further familiarized herself with Mandee by reviewing her medical records and her 2009 affidavit.  (Exhibits I and J).

-130-

During the course of the interview, Dr. Marshall noted that Mandee's behavior and language indicated that Mandee "approached the assessment in an open and forthright manner," which resulted in the assessment "as presenting a valid and reliable picture of her functioning." (*See* Exhibit I).

## 2.    Relevant Medical History

Mandee described to Dr. Marshall how she has had longstanding psychological problems which began in her childhood and have persisted to this day. Specifically, Mandee has suffered from depression, suicidal ideation, anxiety, and polysubstance abuse (a technical term for being a user of multiple forms of narcotics). Perhaps most significantly, the first treatment Mandee received for her psychological issues began in 1997, when her primary care physician, Dr. Westley Raborn, began prescribing her Zoloft. (Psychological Evaluation, p. 2-3). It was not until 2000, however, that the true severity of Mandee's condition was diagnosed by a psychiatrist, Dr. Vicky Borck, as bipolar disorder. *Id*. at 4. Since then, Mandee has seen two other psychiatrists who have agreed with the original bipolar diagnosis and has been under their care and treatment. She has been on a cocktail of antidepressants, mood stabilizers, anti-anxiety, anti-psychotics, and sleep medication for many years while under psychological treatment. *Id*.

Prior to her bipolar diagnosis, Mandee was able to work only sporadically. Indeed, by August of 2003, the Social Security Administration ("SSA") declared her to be disabled and eligible for benefits due entirely to her mental condition. The SSA in fact determined that Mandee had become disabled a year earlier on August 1, 2002, based on her medical records. Her disability was determined to be so severe that Mandee was deemed to be incapable of handling her own affairs. Her mother, Nedra Caldwell, was appointed as her legal guardian for this reason. (Psychological Evaluation, p. 4).

Ultimately, Dr. Marshall's testing lead her to the following conclusion:

> Mrs. Cloud has serious and longterm psychological difficulties that are best described as a Bipolar Disorder. This is a severe mood disorder that significantly disrupts an individual's functioning. Substance abuse is one of the most common problems associated with this disorder, and may mask the symptoms of Bipolar Disorder. For this reason, the diagnosis is frequently not detected in early psychiatric contracts, and *it is highly likely that Mrs. Cloud experienced symptoms long before she was actually diagnosed*.

*Id*. at 8 (emphasis added).

Because Mandee's condition was not diagnosed at the time of the trial, Dr. Marshall further concluded that she "had not yet been placed on an adequate medication regimen," which lead to an impairment of her "reality testing and judgment." (Psychological Evaluation, p. 9). The lack of an appropriate medication

regimen could have easily allowed Mandee to become overpowered by her vulnerabilities "to delusional or paranoid thinking, and prone to distortion." (*Id*. at 8). Based on the evaluations of Mandee, it was Dr. Marshall's professional opinion "with a reasonable degree of psychological probability that Mrs. Cloud was not competent to testify at the time of Mr. Carpenter's trial." (*Id*. at 9).

### 3.   Effect of Mandee's Medical Condition on Her Testimony

According to Mandee's statements to Dr. Marshall, the events on the day of the murder are fuzzy and unclear in her memory. To begin with, Mandee cannot remember Carpenter's exact words to her after he had woken her up. (Psychological Evaluation, p. 5). This directly contradicts her testimony at trial where she stated that Carpenter "said that he had just cut Nelda's throat." (RR.25: 37). Along the same lines, Mandee stated to Dr. Marshall that she did not remember Carpenter getting rid of any clothes. (Psychological Evaluation, p. 5). Again, this is in direct opposition to her testimony at trial where she stated Carpenter "took his shoes off and gave me his shoes." (RR.25: 37, 39). Dr. Marshall also stated that it "is important to note that Mrs. Cloud was only 16 years old at the time this allegedly occurred." (Psychological Evaluation, p. 6).

On the day of the murder, Mandee was pregnant with her and Carpenter's first child. Consequently, Mandee was not taking any medication to treat her depression

-133-

nor was she using any drugs.  (Psychological Evaluation, p. 6).  This lead to her being depressed and having mood swings.  Further, Mandee stated that when she was not on her medications, such as on the day in question, she would experience auditory hallucinations.  *Id*.

Further, as set out above, McBay/Cloud herself admitted that, the Klonopin results in memory loss and impairs her ability to recall events.  (Exhibit B p. 12)  She acknowledged that she had such memory problems in 1997.  (Exhibit B p. 13)  She told prosecutor Judin about her extreme depression and the medications she was taking at the time of trial.  (Exhibit B p. 78-79)

## B.   Evaluating Materiality of New Evidence

The role of a federal habeas court is to ensure that applicants are not imprisoned in violation of their constitutional rights.  It is not the habeas court's role to correct errors of fact.  *Lucas v. Johnson*, 132 F.3d 1069, 1074 (5th Cir. 1998) (citing *Herrera v. Collins*, 506 U.S. 390, 400,(1993)).  In other words, "[a] federal habeas court asks only whether a constitutional violation infected the trial." *Pemberton v. Collins*, 991 F.2d 1218, 1223 (5th Cir. 1993).

In order to obtain relief in the form of a new trial based on a claim of newly-discovered evidence, the applicant must satisfy the four- part "*Berry* Rule":  (1) the evidence is newly discovered and was unknown to the defendant at the time of the

trial; (2) the defendant's failure to detect the evidence was not due to a lack of diligence; (3) the evidence is material, not merely cumulative or impeaching; and (4) the evidence would probably produce an acquittal at a new trial.[35]  *United States v. Freeman*, 77 F.3d 812, 817 (5th Cir. 1996) (citing *United States v. Pena*, 949 F.2d 751, 758 (5th Cir. 1991)).  If one of these parts is missing, then a new trial is not warranted.  *Pena*, 949 F.2d at 758.

1.   **Mandee's Condition Was Unknown to the Defense at the Time of Trial.**

The diagnosis of Mandee's bipolar condition did not occur until 2000, when she began seeing her first psychiatrist, Dr. Borck.  (Psychological Evaluation, p. 4). Carpenter's murder trial took place in December 1997, a full three years prior to Mandee's diagnosis.  In the lead-up to the trial, the only indicators of Mandee's poor mental state available to the State and the defense was her prescription for Zoloft from her general care practitioner, as well as her admission to the State that she suffered from anxiety attacks.  (Mandee Cloud's Affidavit of Fact, June 19, 2009. Exhibit J).  As described more thoroughly *supra*, questions abound as to whether the

---

[35]It should be noted that the Fifth Circuit has alternatively described the *Berry* test as having either four or five parts.  *See United States v. Erwin*, 277 F.3d 727, 731-32 (5th Cir. 2001) (five-part test); *United States v. Sullivan*, 112 F.3d 180, 183 (5th Cir. 1997) (four-part test).  The difference arises from the occasional combination of the element of materiality with whether the evidence is merely impeaching or cumulative.  *United States v. Wall*, 398 F.3d 457, n. 6 (5th Cir. 2004).

State revealed these facts to the defense as per *Brady*.  Additionally, the lack of the defense being in possession of an affidavit has previously been found to satisfy this element.  *See United States v. Wall*, 389 F.3d 457, 469 (5th Cir. 2004).

McBay/Cloud acknowledged that she had been contacted by defense investigators on many occasions after the trial.  (Exhibit B p. 21) McBay/Cloud did not speak to any of the investigators because she wanted nothing to do with the case.  (Exhibit B p. 22).  In part, this refusal was attributable to her lack of trust in the system due to the prosecution team's lies.  McBay/Cloud finally decided to speak with investigators.  She spoke to Kenny Johnson, Carpenter's investigator, after her husband, John Cloud, died. (Exhibit B p. 23)  She first spoke to a female investigator that worked with Kenny Johnson, because the investigator seemed nice.  (Exhibit B p. 24-25).  Kenny Johnson promised her nothing in return for her statement.  (Exhibit B p. 25).  Before that point, when the female investigator came, she had no intention of giving a statement.  (Exhibit B p. 26).  McBay/Cloud can't remember how many investigators had attempted to contact her over the years or how often she had refused to speak. (Exhibit B p. 34)       Considering the poor indicators available at the time and the questions as to whether the State even shared these indicators with the defense, there can be little doubt that the full extent of Mandee's bipolar disorder was completely unknown to the defense at the time of Carpenter's trial.  Because the

proffered evidence was not readily available at the time of trial, the first element of the newly discovered evidence test is readily met.

### 2. Failure to Discover Mandee's Condition Was Not Due to a Lack of Diligence.

Applicant concedes that in situations where defense counsel makes a deliberate and strategic decision which results in a conviction, a new trial to allow the defendant to employ a new strategy is not warranted. *United States v. Beasley*, 582 F.2d 337, 339 (5th Cir. 1978). This is not the case with Mandee's diagnosis, however, as the decision not to have a detailed psychological evaluation done on her can hardly be said to be a strategic decision by the defense. Even though Carpenter knew that Mandee would be testifying and that she would play a central role in the State's course, a psychiatric evaluation of her was not available until after the trial.

As stated by Dr. Marshall in her 2009 psychiatric evaluation of Mandee, the presence of bipolar disorder "is frequently not detected in early psychiatric contacts[.]" Psychiatric Evaluation, Exhibit B, p. 8. Therefore, it stands to reason that even if the defense team had decided to have detailed psychiatric testing take place, the tests may not have revealed the presence of a bipolar condition even if Mandee was experiencing the condition's symptoms, as Dr. Marshall believes she was. *Id*. (". . . it is highly likely that Mrs. Cloud experienced symptoms long before

she was actually diagnosed.")  Even by exercising the utmost diligence, Carpenter's

counsel could not reasonably have been expected to discover a bipolar condition that

the witness herself was not even aware of at the time of trial.

### 3.    New Evidence is Material

Evidence of Mandee's mental condition is material.  She was the only witness

to testify that   Carpenter had blood on his clothes and his knife. Without her

testimony, only the inadequate eyewitness identification made by Tessica Rainey

would have linked Carpenter to the crime scene. In previous filings in this post-

conviction litigation, the State has trumpeted McBay/Cloud as the key witness.

Evidence of Mandee's condition would probably produce an acquittal at a new

trial. It is unquestionably true that evidence of Mandee's bipolar disorder would have

been helpful to the defense at trial.  This is not the standard by which a new trial

based on newly discovered evidence is to be granted, however.  Instead, the question

is "whether the evidence 'would probably produce a different verdict in the event of

re-trial.'"  *United States v. Snoddy*, 862 F.2d 1154, 1156 (5th Cir. 1989) (quoting

*United States v. Kahn*, 472 F.2d 272, 287 (2nd  Cir. 1973)).  Following the Second

Circuit's holding in *Kahn*, the Supreme Court further elaborated on the materiality

of newly discovered evidence:

[I]f the omitted evidence creates a reasonable doubt that did not otherwise exist, constitutional error has been committed. This means that the omission must be evaluated in the context of the entire record.  If there is no reasonable doubt about guilt whether or not the additional evidence is considered, there is no justification for a new trial.

*United States v. Agurs*, 427 U.S. 97, 112-13 (1976).

The key portions of Mandee's testimony are thrown into serious doubt when reviewed with the knowledge contained in Dr. Marshall's psychiatric evaluation as well as other pieces of her medical records.  A 2007 assessment of Mandee conducted by psychiatrists at the Timberlawn Mental Health System found that Mandee has a history of blackouts and that she does not take her medication as prescribed, by frequently missing doses.   (Admission History, p. 1; Admission Medication Information," p. 3).  While Mandee's immediate memory is without issue, her longer term "recent" and "remote" memory abilities are poor.

In testing, she was able to name only the 43rd and 42nd presidents when asked to recite as many of the previous presidents in order as she could.  Further, she missed three out of three questions which tested her recent memory abilities.  (Integrated Assessment, p. 4).  Perhaps most disturbingly, a 2003 psychiatric evaluation found that "[s]he hears sirens and children yelling on a daily basis for several months now." (Medical Consultant's Review of Mental Residual Functional Capacity Assessment, p. 4.)  These were concluded in the same assessment to be "auditory hallucinations"

and "psychotic features." *Id*. at 5.  At trial, Mandee testified as to the events on the morning of August 28, 1991, the day of the murder.  She stated that in the morning when Carpenter allegedly confessed to her that she "was just like in shock or whatever."  (RR.25: 37).   Going back to Dr. Marshall's psychiatric evaluation, Mandee was found to "misrepresent things, not in a conscious and deliberate fashion, but because she is emotionally overwhelmed and falling apart."  (Psychiatric Evaluation, p. 8.)  Further, "[d]uring times of stress she regresses, and her judgment and reality testing deteriorate . . . .  At these times, it is difficult for her to determine what is real and what is fantasy." *Id*.  By her own admission, on the stand and in her psychiatric evaluations, Mandee was under tremendous stress at the time of the murder.  (RR. 25:7); (Psychiatric Evaluation, p. 4).  ("Theirs was an intense and stormy relationship . . . .")  In sum, all the stressor elements were in place to cause Mandee to lose her grip on the line between reality and fantasy; she was experiencing daily auditory hallucinations, was not on any medication to stabilize her condition, and has what is best described as poor long-term memory.  It was with these factors in play that Mandee was asked to testify to events that happened approximately six years before the trial.

Thus, with serious questions raised about the competency of the State's star witness to testify, an acquittal would probably have been produced.

## C.   Unreasonable Determination by Lower Court duplicate

When presented to the Texas Courts, the Court of Criminal Appeals refused to

consider the claim at all, inferentially contending that Carpenter failed to satisfy the

requirements of a subsequent writ under Tex. Code Crim Proc. Art 1.071§5(a), to wit:

Sec. 5. (a) If a subsequent application for a writ of habeas corpus is filed after filing
an initial application, a court may not consider the merits of or grant relief based on
the subsequent application unless the application contains sufficient specific facts
establishing that:
(1) the current claims and issues have not been and could not have been presented
previously in a timely initial application or in a previously considered application
filed under this article or Article 11.07 because the factual or legal basis for the claim
was unavailable on the date the applicant filed the previous application;

(2) by a preponderance of the evidence, but for a violation of the United States
Constitution no rational juror could have found the applicant guilty beyond a
reasonable doubt; or

(3) by clear and convincing evidence, but for a violation of the United States
Constitution no rational juror would have answered in the state's favor one or more
of the special issues that were submitted to the jury in the applicant's trial under
Article 37.071, 37.0711, or 37.072.

The state court's one-half page opinion failed to explain why the application

was inadequate.  The state courts completely ignored the many facts and evidence

Carpenter presented demonstrating that the factual basis of his claim could not have

been previously established because the witness refused for several years to speak

with the numerous investigators Carpenter sent to her home.  Carpenter vigorously,

and consistently attempted to interview McBay/Carpenter regarding his *Brady* claims.

Carpenter has been diligent, if not dogged, in his unyielding attempts to prove his claims. Further, and equally important, the State of Texas regularly ignored Carpenter's requests for information about McBay/Carpenter and the information regarding the claims he believe his evidence could prove and since has, arguably, proven regarding the alleged Brady violation.

A federal court generally cannot review the merits of a state prisoner's habeas petition if the claims in the petition are procedurally defaulted. A habeas claim can be procedurally defaulted in either of two ways. First, if the prisoner has never fairly presented that claim to the highest available state court, the claim is unexhausted. Second, if the prisoner has presented the claim to the highest available state court but that court has dismissed the claim on a state-law procedural ground instead of deciding it on the merits, the claim has been decided on an independent and adequate state-law ground. *Rocha v. Thaler* 626 F.3d 815, 820 (5th Cir. 2010).

Where, as here, the TCCA does not identify the subsection on which it relied in dismissing the application as an abuse of the writ, we look to the application itself to determine the subsection the petitioner relied on in presenting his subsequent application to the TCCA. *Balentine,* 626 F.3d at 854

*Adams v. Thaler* 421 Fed.Appx. 322, 330, 2011 WL 1304894, 7 (5th Cir. ,2011). If the Court of Criminal Appeals disposition is unclear as to whether it applied state or federal law, or both, in reaching its decision, review is necessary because a dismissal

under §5(a)(1) inherently incorporates a federal question of whether a constitutional violation was alleged. *Balentine v. Thaler* 629 F.3d 470, 474 (5th. Cir.2010); citing *Michigan v. Long,* 463 U.S. 1032, 1041(1983),( "[W]hen ... a state court decision fairly appears to rest primarily on federal law, or to be interwoven with the federal law, and when the adequacy and independence of any possible state ground is not clear from the face of the opinion, we will accept as the most reasonable explanation that the state court decided the case the way it did because it believed that federal law required it do so.").

Under *Michigan v. Long*, state courts must clearly indicate within the four corners of its opinion if it is reaching a decision based on an adequate independent state ground.  If no such statement is set forth, federal courts are permitted to presume that the decision rests upon federal law, as here, on Carpenter's Due Process Claims.

Employing a "common sense" reading of opinion (*Washington v. Thaler* 2012 WL 245236, 5 (5th. Cir. 2012), there is no dispute that Carpenter's claim in the Court of Criminal Appeals was brought squarely under §5(a)(1). It is equally clear, in the absence of any contrary evidence, that the evidence of McBay/Carpenter's known mental illness and medications were unavailable to Carpenter until either she or the

-143-

State of Texas chose to disclose them. [1]

Therefore, the Court of Criminal Appeals dismissed the claim on its merits in contravention of clearly established federal law, as set out above. Evidence that the only person to relate Carpenter's confession was delusional, was known by the state to have mental illness, had known memory lapses and was known by the State to be heavily medicated at trial would undoubtedly produce an entirely different result than the original trial produced. *U.S. v. Wall*, 398 F.3d 457, n. 6 (5th Cir. 2004), *United States v. Agurs*, 427 U.S. 97, 112-13 (1976)

## CLAIM VII.

**CARPENTER IS ENTITLED TO A NEW TRIAL CONCERNING HIS GUILT AS WELL AS A REDETERMINATION OF THE APPROPRIATENESS OF THE DEATH SENTENCE IMPOSED UPON HIM BECAUSE HIS TRIAL COUNSEL FAILED TO PROPERLY INVESTIGATE HIS CASE, RESEARCH AND PRESENT PERTINENT LEGAL ARGUMENT, REVIEW EVIDENCE AND CONTACT PERTINENT WITNESSES AT BOTH THE GUILT/INNOCENCE AND PENALTY PHASES OF TRIAL, THUS DENYING CARPENTER THE EFFECTIVE ASSISTANCE OF COUNSEL GUARANTEED TO HIM BY THE SIXTH AND FOURTEENTH AMENDMENTS OF THE U.S. CONSTITUTION.**

The Sixth Amendment recognizes the right to the assistance of counsel because it envisions counsel's playing a role that is critical to the ability of the adversarial system to produce just results. *Strickland v. Washington,* 466 U.S. 668, 685 (1984).

---

[1] Carpenter's *Brady* claim asserts that the state prosecution team, aware of these issues, had a duty to disclose them, but utterly failed to do so.

## A.   The Legal Standard

A defendant is entitled to the effective assistance of counsel as required by the Sixth and Fourteenth Amendments.  *Gideon v. Wainwright,* 372 U.S. 335 (1963). Effective assistance is denied if "counsel's representation fell below an objective standard of reasonableness," and "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Strickland v. Washington*, 466 U.S. 668 (1984).[2]

To establish a deficient performance, Carpenter must show that his counsel's representation "fell below an objective standard of reasonableness."  *Jones v. Jones*, 163 F.3d 285, 301 (5th Cir. 1998) (quoting *Strickland*, 466 U.S. at 688).  The court applies a highly deferential standard to the examination of counsel's performance, making every effort to eliminate the distorting effects of hindsight and to evaluate the conduct from counsel's perspective at the time of trial.  *See Id.* (quoting *Pitts v. Anderson*, 122 F.3d 275, 279 (5th Cir. 1997)).  To satisfy the prejudice prong, the record must demonstrate that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.  "A reasonable probability is a probability sufficient to

---

[2]The *Strickland* standard applies to retained as well as appointed counsel.  *Cuyler v. Sullivan*, 446 U.S. 335 (1980).

undermine confidence in the outcome." *Id.; Nealy v. Cabana,* 764 F.2d 1173, 1178 (5th Cir. 1985). That is, "a criminal defendant alleging prejudice must show 'that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.' " *Lockhart v. Fretwell*, 506 U.S. 364, 369 (1993) (*quoting Strickland*, 466 U.S. at 687). This in not an outcome-determinative test. *Nix v. Whiteside*, 475 U.S. 157 (1986). The question is not whether Carpenter would have more likely than not received a different verdict but for counsel's performance, but whether "he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles v. Whitley*, 514 U.S. 419, 454 (1995).[3]

Although *Strickland* requires a showing of prejudice, it does not require the defendant to show that his counsel's deficient performance, *more likely than not*, altered the outcome of the case. *Id.* at 693. The result at trial "can be rendered unreliable, and hence the proceeding itself unfair, even if the error of counsel cannot be shown by a preponderance of the evidence to have determined the outcome." *Id.* at 694. Thus the *Strickland* requirement, that an Applicant must show a "reasonable

---

[3]Although *Kyles* involves the determination of prejudice following the state's suppression of evidence favorable to the defense (*Brady* error) (*Brady v. Maryland*, 373 U.S. 83 (1963)), the standard for prejudice employed in such cases is adopted from, and is identical to, that in *Strickland. United States v. Bagley*, 473 U.S. 667, 682 (1985). In both circumstances, to demonstrate prejudice a petitioner must show that " 'there is a reasonable probability that . . . the result of the proceeding would have been different.'" *Kyles*, 514 U.S. at 433-434 (quoting *Bagley*, 473 U.S. at 682).

probability" that the outcome of trial would have been different absent error of counsel, does not mean that Carpenter must show a better than 50-50 chance. *Strickland* merely imparts the idea that "showing some conceivable effect on the outcome of the proceeding" would not suffice to overturn a conviction. 466 U.S. at 693. Instead, according to *Strickland*, a "reasonable probability" means a reasonable chance that counsel's mistake could have affected the outcome of the case, based upon concrete and identifiable facts and circumstances reflected in the record.

**B.      Carpenter Was Denied Effective Assistance of Counsel at All Stages of the Trial.**

      **1.      Pre-trial**

            **a.      Effective Preparation**

In preparation for the defense of a capital murder prosecution, counsel is expected to familiarize himself with the facts of the case and with the applicable standards of law attendant to the various anticipated legal questions which will be presented at trial. *Magill v. Dugger*, 824 F.2d 879, 866 (11th Cir. 1987).  If pretrial motions are filed, counsel should be expected to know and articulate the appropriate legal standards and to present evidence sufficient to carry the burden of proof. Counsel has an obligation to contact the witnesses and review the reports in advance of trial so that a fair determination of the evidence can be made.  *Williams v. Taylor*,

529 U.S. 362 (2000).   Failure to follow-up on established leads or known defenses, and failure to be prepared to effectively present such defenses, is not excusable.  *See Battenfield v. Gibson*, 236 F.2d 1215, 1228 (10th Cir. 2000); *Turner v. Duncan*, 158 F.3d 449, 457 (9th Cir. 1995); *Harris, by and through Ramseyer v. Wood*, 64 F.3d 1432, 1435, 1436 (9th Cir. 1995); *Henderson v. Sargent*, 976 F.2d 706 (5th Cir. 1991); *Kenley v. Armontrout*, 937 F.2d 1128, 1304 (8th Cir. 1991) *cert. denied*, 502 U.S. 964 (1991); *Crandell v. Bunnell*, 144 F.3d 1213, 1217 (9th Cir. 1998).     This is particularly true if the readily available witnesses are family members.  *United States ex rel. Maxwell v. Gibson*, 37 F.Supp.2d 1078, 1091 (N.D. Ill 1999).  While counsel cannot be expected to literally overturn every stone in investigating the case (*compare Hall v. Washington*, 106 F.3d 742, 749-50 (7th Cir.) *cert. denied*, 522 U.S. 907 (1997), *Strickland* presupposes a thorough legal and factual investigation of the case.   466 U.S. at 691.

While decisions concerning the quantity and quality of evidence to present in support of pretrial motions is certainly a strategic consideration for trial counsel, such strategy must be based upon a thorough grasp of the facts and applicable law and a thorough investigation of the case.   The failure to present certain types of critical evidence may not be condoned if it stems from trial counsel's lack of preparation.  *See*, *e.g., Horton v. Zant*, 941 F.2d 1449, 1462 (11th Cir. 1991) ("our case law rejects

the notion that a 'strategic' decision can be reasonable when the attorney has failed to investigate his options and make a reasonable choice between them"), *cert. denied*, 503 U.S. 952, 112 S.Ct. 1516, 117 L.Ed.2d 652 (1992); *Cunningham v. Zant*, 928 F.2d 1006, 1018 (11th Cir. 1991); *Profitt v. Waldron*, 831 F.2d 1245, 1249 (5th Cir. 1987); *Cook v. Lynaugh*, 821 F.2d 1072, 1078 (5th Cir. 1987).   Any trial "strategy" that flows "from lack of diligence in preparation and investigation is not protected by the presumption in favor of counsel." *Kenley v. Armontrout*, 937 F.2d 1298, 1304 (8th Cir.), *cert. denied*, 502 U.S. 964 (1991).

The reasonableness of trial strategy and preparation was  clarified in *Wiggins v. Smith*, 535 U.S. 520 (2003).   Wiggins was convicted of capital murder and sentenced to death.   His trial counsel put on no expert testimony and little or no evidence of the abuse suffered in childhood in mitigation of evidence.   Against a backdrop of prosecution contentions that the decisions to forego such testimony and evidence were reasonable, the Court discussed the negative impact that inadequate investigation has on strategic trial decisions.   The trial court noted that the issue at hand was not whether the decision to forego such evidence was reasonable but rather whether the investigation conducted leading up to that decision was reasonable. *Id* at 7.   The reasonableness of the investigation is measured against "prevailing professional norms, including a context-dependent consideration of the challenge

-149-

conduct as seen from counsel's perspective at the time of the conduct." The court emphasized that, while counsel is not required to investigate every conceivable lead, strategic decisions are deemed reasonable only to the extent that "reasonable professional judgments support the limitations on investigation...a decision not to investigate thus must be directly assessed for reasonableness in a circumstances." The court strongly stated that a cursory investigation [does not] automatically [justify], a tactical decision, citing *Strickland* at 691.

The court then found Wiggins' attorneys to have failed to conduct an adequate investigation. Citing ABA standards and the ready availability of funds for a social history report, the Court chastised counsel for failing to avail themselves of these resources. Further, even though their limited investigation brought mitigation issues, including chid abuse and neglect, to counsel's attention, the attorneys failed to follow up on those leads. The court concluded that the attorneys did not exercise reasonable judgment in their truncated investigation. The *Wiggins* opinion thus emphatically reaffirms counsel's duty to fully investigate the case in order to make intelligent, professional decisions.

### b.      Identification issues

A review of the record clearly establishes that Carpenter's defensive theory at trial was that he did not participate in the Henin murder at all. Part and parcel of this

defense was that the identification of Carpenter by Rainey was mistaken.  The issue was deemed of sufficient critical importance to merit a pretrial hearing.

## 1.  Preparation for Challenging Identification

As set out above, the criteria for evaluating the admissibility of an eyewitness identification and a photo lineup are well established in the law, so much so that even a cursory examination of the case law leads immediately to the *Wade, Biggers, Braithwaite* line of cases.  As these cases suggest, a purported eyewitness identification may be excluded from evidence if it is found to be unreliable.  A photo lineup identification may be suppressed if it is unduly suggestive.  The burden is on Carpenter to establish such suggestiveness.  *See Claim II , post*.  In this case, Carpenter filed a perfunctory pretrial motion to suppress the identification.  (R.1:26)  The motion contains no citation of authority, references the court to no criteria for conducting the hearing, and does not allude to the highly questionable nature of the initial identification at all.

At the pretrial motion to suppress Rainey's identification, defense counsel took the witness on cross-examination and inquired about viewing previous lineups and established that Rainey had viewed one in 1991.  (R.23:75-76)  She admitted that her initial description was of a 6' to 6'2" individual with light brown, ratty hair, who was skinny.  (R.23:76)  Counsel established that the witness was unclear about how the

suspect was dressed.   (R.23:79) Counsel further established that Carpenter's photograph appeared of poor quality, older, pinker and glossier than the other five photos.  (R.23:84-85)  While counsel established that Rainey was on her way to school (R.23:77), no inquiry was made into her emotional state or the degree of attentiveness to the suspect.

The prosecutor, on direct, established that the view was for only five to ten seconds.  (R.23:69)  The prosecutor also established that the Rainey had "no doubt" about her identification.  (R.23:73)

Other witnesses, including Carpenter/McBay, Darren Carpenter, Carpenter's brother, and Diana Carpenter, Carpenter's mother, were on hand to testify that Carpenter had always been a heavyset individual and never skinny.  Further, the defense had in its possession photos from late 1991 showing Carpenter's build and weight, which would have established that he was not skinny.  These were never submitted.  Further, the same witnesses were available to testify that Carpenter's hair was blonde or lightened in late 1991, and not brown as suggested by Rainey.  (R.23:90)  Finally, the same witnesses were available to testify that Carpenter did not own a vehicle comparable to the one seen driven by the suspect - - a brown 4-door sedan.  (R.23:80)

No reason was given for the failure to call these witnesses to testify regarding

Carpenter's appearance or the car at the time of the offense.   According to affidavits dated July 11, 2000 of the Carpenters, (Exhibit K attached) defense counsel did not interview them at all before the trial.

At the conclusion of the hearing, counsel made a perfunctory argument that the lineup was suggestive because of the differences between Carpenter's photo and the other photos in the lineup.   (R.23:99).   Regarding Rainey's initial identification, counsel pointed out only that she had called the suspect "skinny" and that even the police investigator, Kenneth Penrod, who testified at the hearing, admitted Carpenter was not skinny.   (R:23:98-99).   Trial counsel never mentioned the *Wade, Biggers* factors, never suggested a manner in which the court should have weighed the various factors to determine the admissibility of the eyewitness testimony and the suggestiveness of the lineup and, in fact, never asked the court to consider striking the identification at all.   Not surprisingly, the court refused to suppress the identification.

### 2.     Deficient Challenge

Counsel's conduct at the pretrial motion to suppress hearing clearly falls below an objective standard of reasonableness. The failure to make a proper objection to inadmissible evidence is grounds for relief. *Crotts v. Smith*, 73 F.3d 861(9th Cir. 1986), as is the failure to pursue a motion to suppress evidence. *Kimmelman v.*

*Morrison*, 477 U.S. 365 (1986).  Such a failure is cognizable in a §2254 claim. *See Mason v. Hawks,* 97 F.3d 887, 894(7th Cir. 1996).  The trial record does not reflect that counsel was familiar with the pertinent legal standards for suppressing an identification and therefore, did not make a presentation geared toward an effective balancing of the totality of the circumstances required by well-established federal precedent.  *See Wade, Biggers, supra*.

Inexplicably, counsel chose to attack the identification only through brief cross-examination of the State's witnesses.  Even though a picture is worth a thousand words, defense counsel failed to present photographic evidence, which was available at trial. (State's Exhibit 145, R.25:9).  Moreover, counsel failed to call a host of other family members who could have attested that Carpenter was heavyset and blonde in 1991 and thus not similar to Rainey's identification.

The failure to call witnesses cannot be deemed a strategic choice since counsel had not interviewed the witnesses and was, thus, unprepared.  *Compare Horton v. Zant*, 941 F.2d 1449, 1462 (11th Cir. 1991), *Cunningham v. Zant*, 928 F.2d 1006, 1018 (11th Cir. 1991); *Profitt v. Waldron*, 831 F.2d 1245, 1249 (5th Cir. 1987); *Cook v. Lynaugh*, 821 F.2d 1072, 1078 (5th Cir. 1987).  There are no professional norms that justify an inadequately researched objection.  As noted above, the courts have consistently held that the fact finder must be educated about the fallacy of eyewitness

identification. *See People v. Kindle*, 2002 W.L. 1554118 Cal. 2002; *State v. Maestas*, 63 P.3d 621, 626 (Utah 2002). Finally, there is no apparent excuse for refusing to call defense witnesses to describe Carpenter's appearance in 1991. Given the Supreme Court's explanation of "strategic decisions" based on inadequate investigation in the recent *Wiggins* opinion, counsel was clearly ineffective.

### 3.    Prejudicial Effect

Rainey was the only crime scene witness. Her testimony was crucial in corroborating the testimony of Smith, and Carpenter/McBay. Both Carpenter/McBay and Smith had motives to implicate Carpenter, as discussed above. Had defense counsel been successful in suppressing Rainey's identification, the State's case would have been significantly weakened. In fact, given the absence of any physical evidence linking Carpenter to the crime scene, and any other witness putting him in the vicinity of the crime, the State would have had *no* evidence tying him to the murder. Counsel's performance cannot be condoned.

### 4.    Unreasonable Determination

As stated in Claim II above, the court's determination of the line-up procedures was factually and legally unreasonable under *Williams v. Taylor, supra*, and *Miller-El vs. Cockrell, supra*. The trial court and ultimately the Texas Court of Criminal Appeals determined that the line-up was not suggestive, citing only a portion of the

*Wade/Biggers* criteria set in the *Loserth* opinion (Finding of Fact 130).  Further, even though Carpenter had requested a hearing on the factual allegations raised in the Pendergraff affidavit (Exhibit E), the court refused to conduct a hearing and then found that the photo line-up was not suggestive *ipse dixit* (Finding of Fact 128).  Not only are these findings factually and legally erroneous, they are merely the "rubber-stamped approval" of the State's proposed findings, and are entitled to no deference.

### c.   Common Law Marriage

The second pre-trial issue was the existence of a common law marriage between Carpenter and Carpenter/McBay.  The police had no viable suspect for six years after the murder.  Only when Carpenter/McBay implicated Carpenter, as a result of her belief that Carpenter had orchestrated her mother's arrest, did the police begin to make a case against him.  The record is crystal clear that the defense intended to preclude her testimony by invoking the spousal privilege rule. Tex.R.Evid. 504(a).  To that end, counsel filed a request for a hearing on the matter. (CR:109-110).  As with the lineup motion, the pretrial motion contained no recitation of case law and did not address the criteria for evaluating such a claim.

### 1.   Who is a Spouse?

The requirements for an informal, or common law marriage were governed Tex.Fam.Code §1.91 until 1995.[4]  That section required that the parties co-habitate together and hold themselves out to the public as married.  The existence of an informal marriage is a question of fact to be determined by the court. *See Lee v. Lee* 44 S.W.3d 151, 154 n.5 (Tex. Civ. App.-- Hous. 1st 2001); *Jenkins v. Jenkins,* 16 S.W.3d, 473, 450 (Tex. Civ. App.– El Paso 2000); *Welch v. State,* 908 S.W.2d 258 (Tex.Civ.App. El Paso 1995).  Usually, such proof is highly circumstantial.  Proof of a common law marriage is not determined by whether the parties occasionally admit or deny the relationship. *See Ex Parte Threet*, 333 S.W.2d 561 (Tex. 1960).  Rather, it depends upon a continuity of co-habitation and representations to others.  *Ganesan v. Vallavhaneni*, 96 S.W.3d 345, 350 (Tex.Civ.App. Austin 2002),  *Lee v. Lee*, 981 S.W.2d 903 (Tex.Civ. App. -Hou 1st 1998), *Faglie v. Williams*, 569 S.W.2d 557(Tex. Civ. App.-- Austin 1978); *Winfield v. Renfro,* 821 S.W.2d 640(Tex. Civ. App. Hou-[1st] 1991).  A common law marriage is based upon a widely known reputation in the

---

[4] Although not argued in the trial court, the State argued in its response to Carpenter's writ that a common law marriage had a third requirement that the parties must be over the age of 18 years, citing Tex.Fam.Code 2.401. (Finding of Fact 448)  This argument was in turn drafted by the State in the Findings of Fact and subsequently adopted by the trial court. (Finding of Fact 451) This argument completely misinterprets the law.  If the parties co-habitated and held themselves out as married in 1991, then they *were* married in 1991.  That the legislature later enacted an additional requirement clearly does not mean that all prior marriages were retroactively invalidated.  While Carpenter agrees that the existence of the privilege is not subject to an *ex post facto* challenge (Finding of Fact 451), it is ludicrous to suggest that the State can nullify bonafide marriages.  This reasoning is all too typical of the legal analysis and factual findings made at the state level.

community, a secret relationship is the antithesis of such a marital status.  *In re Estate of Giessel*, 734 S.W.2d 27, 31, 32 (Tex. Civ. App. Hous. [1st Dist.] 1987).  Therefore, counsel should be prepared to establish, by reputation evidence, the existence of the marriage.  Specific statements regarding the relationship are no more indicative of marriage than individual acts of conduct are indicative of character.

### 2.      Evidence at the Hearing

The primary issue concerning Carpenter/McBay's testimony was whether she was the common law wife of Carpenter at the time of the offense.  The testimony in that regard strongly indicates she was.  Carpenter/McBay had known Carpenter since age 12.  (R.23:19). They began co-habitating in 1991 when she was 15 years of age. (R.23:19)  They had maintained a sexual relationship since April of that year. (R.23:20)  She signed lease affidavits using the name Carpenter/McBay (R.23: 26-28) and she lived with him up until 1995 when he was re-arrested.  During that time she had two children by him (R.23:20) whom she named Carpenter.  She wore a wedding ring (R.23:49-50) and identified herself as Carpenter's spouse in order to purchase alcohol.   (R.23:50).   In addition, while Carpenter was incarcerated she wrote numerous letters identifying herself as Carpenter/McBay.  (R.23:22-25).

To   controvert   this   evidence   the   State   adduced   testimony   from Carpenter/McBay that she did not consider herself to be Carpenter's wife at the time

of the murder.  (R.23:24).  She listed her name as McBay on the children's birth certificates.  (R.23:35-36)  The State called Barry Cook, Carpenter's parole officer in 1991, who stated that his paperwork showed that Carpenter was single. (R.23:58-61).  The State also called Amy Phillips, another parole officer, who testified that in 1995, some four years after the murder, while under oath in a parole hearing, Carpenter/McBay denied being married to Carpenter.  In addition, the State produced several letters subsequent to 1995 in which Carpenter promised Carpenter/McBay that he would marry her once he was released from prison.   (R.23:41-44).

Although several members of Carpenter's family, including his mother, Diana, and his brother, Darren, would have testified that Carpenter/McBay continually held herself out as Carpenter's wife, none of these witnesses was called to present evidence, probably because the defense had interviewed none of them prior to trial. *See* Exhibits F and L attached.  In fact, no reputation evidence of any sort was adduced by either side during the hearing.

At the conclusion of the hearing, the defense did not present any further argument, stating only, "We would urge the court to grant our motion." (R.23:102). The defense did not ask to present briefs in support of their presentation, nor did they attempt to provide a framework for the trial court to properly evaluate the issue. Instead, the court immediately ruled from the bench against the motion.  (R.23:102).

### 3.    Deficient Performance

Trial counsel is obliged to educate himself concerning the appropriate legal standards and to adduce available evidence to support his contentions.   *See Battenfield v. Gibson*, 236 F.2d 1215, 1228 (10th Cir. 2000); *Crandell v. Bunnell*, 144 F.3d 1213, 1217 (9th Cir. 1998); *Turner v. Duncan*, 158 F.3d 449 (9th Cir. 1995) at 457; *Harris, by and through Ramseyer v. Wood*, 64 F.3d 1432, 1435, 11436 (9th Cir. 1995); *Henderson v. Sargent*, 976 F.2d 706 (5th Cir. 1991); *Kenley v. Armontrout*, 937 F.2d 1298,1304 (8th Cir. 1991) *cert. denied* 502 U.S. 964 (1991).   Ineffective assistance of counsel for failure to pursue a purely state claim is nonetheless cognizable by the federal courts.  *Stewart v. Duckworth*, 93 F.3d  262, 268(7th Cir. 1996).

In this case, it is readily apparent from the record, that trial counsel had no firm grasp upon the legal requirements of an informal marriage and thus, was not prepared to make a cogent legal and factual presentation to the court concerning the defense objection. Failure to pursue a valid claim of privilege may constitute ineffective assistance of counsel. *See Combs v. Coyle* 205 F.3d 268 (6th Cir. 2000).   Rather than focusing upon the couple's reputation in the community, trial counsel was content to let the State set the agenda by focusing upon specific statements taken out of context. These occasional representations do not represent the determinative factors.  *See*

*Threet*, *supra.*

Given that the community's view of the relationship is the hallmark of an informal marriage, it is inconceivable that trial counsel would not call readily available witnesses to address this issue.  By filing the motion, defense counsel had to know that the witness was not going to admit the marriage.    It certainly appears self-defeating to attempt to establish a common law marriage through a hostile witness alone.   However, the decision not to call witnesses can hardly be deemed a strategic one, since defense counsel had not interviewed the witnesses.  *See Horton v. Zant*, 941 F.2d 1449, 1462 (11th Cir. 1991); *Cunningham v. Zant*, 928 F.2d 1006, 1018 (11th Cir. 1991); *Profitt v. Waldron*, 831 F.2d 1245, 1249 (5th Cir. 1987); *Cook v. Lynaugh*, 821 F.2d 1072, 1078 (5th Cir. 1987).  Ultimately, the failure to properly challenge evidence is a solid demonstration of ineffectiveness. *United States v. Kissick,* 69 F.3d 1048,1056 (6th Cir. 1995), *Mason v. Scully,* 16 F.3d 88(2nd Cir. 2000).  In light of the Supreme Court's admonishment that strategic decisions are worthy of deference only to the extent that they are grounded in thorough investigation, (*See Wiggins, supra)* counsel's performance is clearly deficient.

### 4.    Prejudicial Effect

Carpenter/McBay was the most damaging witness against Carpenter.  Her testimony constituted the only admission of guilt by Carpenter.  Without her, the

State's case rested upon the dubious identification made by Rainey and the testimony of the co-indictee, Smith, an admitted liar who has subsequently recanted her accusations. *See* Claim II. The State had no physical evidence of any nature tying Carpenter to the crime scene. It was crucial to the defensive theory to establish the common law marital relationship between Carpenter and Carpenter/McBay. Although ample evidence of the relationship existed, it was not presented to the court. In the absence of Carpenter/McBay's testimony, there is no doubt that the prosecution's case was substantially weakened, if not destroyed.

### 2.   Trial Performance

#### a.   Identification.

Even though the motion to suppress was overruled, trial counsel had an excellent opportunity for an acquittal by thoroughly impeaching Rainey's eyewitness identification.   To this end, counsel cross-examined Rainey concerning the discrepancies in her description of the perpetrator.

#### 1.   Educating the Jury

Counsel had an obligation to call an expert witness to explain the foibles of eyewitness identification, or in the alternative, thoroughly examine the lay witnesses and detectives concerning the *Wade/Biggers* identification criteria in order to demonstrate why Rainey's testimony was incredible in the context of those criteria.

As a result of the acknowledged inability of jurors to understand the complexity of eyewitness identification without further education, the courts have suggested several ways to present the issue at trial. *See Jones v. Smith*, 772 F.2d 668, 674 (11th Cir. 1978)(A full and detailed cross-examination of the witnesses covering all of the relevant factors); *U.S. v. Hill*, 967 F.2d 226, 233 (C.A.6 (Ky.) 1992)(defense was free to attack the reliability of the identification vigorously and to present its arguments to the jury); *State v. Maestas*, 63 P.3d 621, 647 (Utah 2002)(A cautionary instruction to the jury regarding eyewitness testimony); *People v. Kindle*, _____ P.3d _____ (2002 W.L. 1554118 Cal. 2002)(Counsel found ineffective for failing to call expert on eyewitness identification given weak and unusual nature of eyewitness testimony.).

However, Texas courts do not permit such a cautionary instruction. *Roberson v. State,* 852 S.W.2d 508, 511 (Tex. Crim. App.1993).  However, Texas courts have recognized that expert testimony on eyewitness identification is permissible. *Tillman v. State*, 2011 WL 4577675 (Tex. Crim. App. Oct. 5, 2011)(psychologist's proffered expert testimony was relevant and thus admissible)*; see also*, *Jordan v. State*, 928 S.W.2d 550 (Tex. Crim. App. 1996)(held that scientific testimony of psychologist regarding reliability of eyewitness identifications was relevant).

When the State's case relies upon technical evidence as its most damaging evidence, then counsel is deficient in failing to object and exclude such testimony. *Compare Chatom v. White*, 858 F.2d 1479, 1486 (11th Cir. 1998) (failure to object to atomic absorption evidence was ineffective); *see also*, *People v. Moore*, 2001 ___ P.3d ___ (WL 1190796 Cal. App. 1 Dist. 2001)(Counsel ineffective for failing to procure independent fingerprint evidence that would have strengthened the defense position).

## 2.    Deficient Performance

In this case, counsel was obliged to educate the jury in some fashion regarding the foibles of eyewitness identification. Without a chart to measure Rainey's identification against, the jury was undoubtedly left with the impression that her identification was strong.  No one told the jury it wasn't.  Once the *Wade/Biggers* criteria is applied, however, it is clearly seen that the identification is woefully inadequate.  Once the suggestive nature of the lineup is demonstrated, there can be no doubt of its unreliability.  Even though counsel engaged in some cross-examination, his overall approach was impaired by a lack of investigation.  This is now the hallmark of a deficient performance.  *See Wiggins*, *supra*.

## 3.    Prejudicial Effect

Rainey's testimony was, essentially, one leg of a tripod used to support the

State's theory.  Had that leg been effectively removed, the remaining two legs (Carpenter/McBay and Smith) could not have supported the State's case.  *See* Claims II and V A(2).  Prejudice is manifest.

### b.    Third Party Perpetrator

As stated above, the defense found out in pretrial discovery, that an individual named Matthew Tolbert had been previously suspected of the Henin murder and, in fact, had confessed his involvement to Karen Kedroski.   The defense attempted to proffer this defense at trial but the proffer was excluded by the court.

### 1.    Deficient Performance

The threshold for the admission of evidence of a third party perpetrator is extremely lax.  Admissibility is strongly favored if any thread tying the third party to the offense can be established.  *See* Claim I.  That thread was readily apparent in this case.  As the summary of records from the Freedom of Information Act request demonstrates, the police knew that, of all the assaults on women in Pleasant Grove in 1991, the only offense that was unsolved and that involved a burglary and murder was the Henin murder.  *See* Trollinger Affidavit, Exhibit C.

This evidence could easily have been adduced by subpoena, or by questioning of Detective Sparks, who investigated the Henin murder, and was aware of the suspects in the case.  (R.27:42-50).  The defense did not attempt to corroborate the

Tolbert statement, but simply proffered the prior statement, which in substance, was comprised of only three lines.

While Carpenter maintains that even this truncated offer was sufficient to justify the admission, it is clear that the defense team was horribly deficient in preparing for this key testimony. Not only did the defense fail to apprize the court of the appropriate legal standard, possibly fail to understand the proper objection, or provide the court guidance through published case law, but also failed to present further available evidence which would have made the Tolbert statement more probative. The defense tantalized the trial judge with the possibility of a defense, but failed to put forward the basis for the defense in any meaningful way. The trial court was never informed of the preference toward admission of such evidence, as the Findings of Fact reflect. *See* Findings of Fact 414-419.

## 2.    Prejudicial Effect

As noted in the cases cited in Claim I above, the failure to present evidence of a third party perpetrator is always reversible error, provided that the evidence meets the minimal standards of relevance. The defense is obliged only to raise a reasonable doubt of the accused guilt to seek an acquittal. As has been stated repeatedly throughout this motion, no physical evidence ties Carpenter to the crime scene. The description given of the perpetrator, as brown haired and skinny, matches the

description of Tolbert and Smith more closely than it does Carpenter, who had blonde hair and weighed 250 pounds. *See* Claim II. Given the credibility problems of Smith, an admitted liar, who implicated Carpenter in order to avoid jail, and has subsequently recanted, (*see* Claim IV), as well as the credibility problems of Carpenter/McBay, whose dislike of Carpenter gave her more than sufficient motive to implicate him, and whose testimony was demonstrably manipulated by the prosecution (*see* Claim II), there is a strong probability that a jury presented with Tolbert as a suspect would have rendered an acquittal.

### 3.    Punishment Phase

The crucial issue and the most contested issue at the punishment phase of Carpenter's trial was the question of future dangerousness. The State's punishment presentation was geared almost exclusively to the presentation of his prior offenses and his prison conduct. The defense presentation was spent in explaining or mitigating the effect of these prior bad acts as well as presenting witnesses describing Carpenter as nonviolent. That punishment evidence is set out in detail above at pages 6 to 30 of the Statement of the Case and is incorporated herein for all purposes.

Suffice it to say, that Carpenter's prior criminal history is primarily for property offenses (burglary, theft, criminal mischief), and fleeing arrest. His prior prison conduct involves three minor altercations, where no weapons were used, and four

violations of prison rules (gambling, tobacco, vulgar language, and disobeying an order). To understand how such conduct could be elevated in the minds of the finder of fact to justify the death penalty, it is necessary to review how the stage was set at jury selection.

### a.   Education on the Special Issues

The trial court gave a generalized *voir dire* to the jury panel in three parts on December 14 and 15, 1998. (R.2). The *voir dire* touched on special issues but discussed neither the concept of mitigation nor the concepts of future dangerousness, society, nor probability. Additionally, the venirepersons completed questionnaires, but these questionnaires did not refer to any of the special issues. Specifically, they failed to mention mitigation, future dangerousness, or probability. Instead, instruction to the jury on these issues was left to the attorneys. A careful review of the questioning of these jurors establishes that no proper framework or consideration of these concepts was provided.

### 1.   Future Dangerousness

Juror No. 1. (R.3:112-169). Initially, the prosecutor advised David Sinclair that in answering the punishment issues he could consider the facts of the case as well as other crimes and bad acts. (R.3:122). When asked specifically what juror Sinclair thought Special Issue No. 2 considered, he answered, "Will it happen again?"

(R.3:127).   He was told that "probability" is less than certainty but more than a

probability, greater than a one in a million chance but less than a high or substantial

probability.  (R.3:127-128).  As examples of future acts of violence he was told that

the question could concern fighting or threatening someone.  (R.3:128).  The defense

was apparently satisfied in letting the state frame the issue that way, choosing only

to ask juror Sinclair if he would automatically find a probability of future

dangerousness based upon the underlying offense alone.  The defense never discussed

the types of conduct that would create a future danger or the degree of certainty

required.

Juror No. 2.  The State asked Joan Patmore if she could find a continuing threat

to society based upon the underlying offense alone, and she assured the State that she

could.   She acknowledged "probability" simply meant more likely than not.

(R.3:203-204).  To her, criminal acts of violence meant nothing more than "hurting

someone."  (R.3:204-205).  She acknowledged to the defense that, if she had found

somebody guilty of capital murder, she would lean toward answering the second

special issue "yes."  (R.3:225, 227-228).  The defense never explored the kind of

conduct necessary to answer the second special issue "yes," nor the degree of

certainty involved.

Juror No. 3.  Mary Zumberge was advised that in answering question no. 2,

prior probation, prison time, and criminal acts could be considered.  (R.4:149-150).

However, the jury could find future dangerousness based upon the offense alone.

(R.4:150).  Ms. Zumberge defined "probability" as "probably would be that it could

occur," not a certainty.  (R.4:151).  She defined criminal acts of violence as "if they

have been convicted or that is a convictable crime,   . . . bodily harm to someone."

(R.4:151-152).  While she agreed that assault would be an act of violence, she did not

consider burglary of a home to be violent.  (R.4:152).  Violence would be actual harm

or creating mental harm such as terror (R.4:152).  The defense explored her concept

of probability.  Zumberge elaborated that probability means, "it could happen . . .

could go either way, may not, could happen."  (R.4:171).  She acknowledged a slight

difference between probability and possibility.  (R.4:172).  The defense made no

effort to further define "future acts of violence."

Juror No. 4.  Edna Melton told the prosecution she could answer the special

issues based upon the issues alone.  (R.5:26).  She determined future dangerousness

based upon the violence in the underlying murder alone.  (R.5:31).  She defined

"probability" as, "could happen again."  To her, violence meant "harm to another."

(R.5:31).  The State advised her that burglary or vandalism could also be acts of

violence.  (R.5:32).  The defense utterly failed to address future dangerousness

except to get Juror Melton to define "probability" as "more likely than not."  (R.5:60).

Juror No. 5.  Edith Olsen defined "probability" as "even one percent of a chance."  (R.7:34).  She said that she assumed the question was asking for significantly more than a fifty percent chance.  (R.7:34).  Juror Melton did not consider a simple assault sufficient to answer issue no. 2 "yes."  She required more brutal conduct or the use of a deadly weapon.  An assailant without a weapon would be sufficient only if there was an attempt to kill or the assailant was large and strong and the victim small and frail.  (R.7:36-37).  She did not agree that burglary of a vehicle or house was a violent act.  She acknowledged to the defense that she would not answer special issue no. 2 "yes" simply because the person had been found guilty of capital murder.  (R.7:59).

Juror No. 6.  Fred Nash stated that he would have to hear about a criminal's background to determine the probability of future violence.  (R.7:127-128).  However, he could answer the Special Issue No. 2 based upon the offense alone.  (R.7:128).  According to Juror Nash, "probability" meant the odds are in favor of it.  (R.7:129).  He defined physical violence as hurting other people,  for example a gun shot.  A threat would qualify only if it were severe.  (R.7:130).  He assured the defense that he would not automatically answer Special Issue No. 2 "yes." (R.7:155).  However, if the underlying offense involved long-range planning he could answer based upon the facts alone.  (R.7:158).

Juror No. 7, the jury foreman.  Randy Fast stated that he would need to know the defendant's "track record in answering the special issues." (R.7:152-153).  He could answer Special Issue No. 2 "yes" based upon the crime alone if heinous enough.  (R.7:145)  Probability meant better than 50-50 (R.7:154-155) and acts of violence meant crimes against people instead of property.  (R.7:155).  However, he would only consider assault based upon its severity. (R.7:155).  The defense failed to explore the degree of severity required.

Juror No. 8.  Ronald Collier stated that he would consider "other crimes" in answering other issues. (R.14:21-22).  "Probability" meant a "likelihood" and "violent acts" meant any type of violence that was criminal, including fighting, threats, burglary. (R.14:24).  He agreed with the defense that he would not automatically answer question no. 2 "yes." (R.14:44).  The defense did not otherwise explore the definition of "violent acts."

Juror No. 9.  Michael Bourgeois stated that "probability" meant more than a fifty percent chance (R.16:22)  and that "criminal acts of violence" meant causing bodily harm to others.  (R.16:23). To him this included assaults, burglary,  but not threats. (R.16:23).  He assured the defense he would not automatically answer Special Issue No. 2 "yes."

Juror no. 10.  (R.19).  Paul Cariker stated that he would like to know the prior

criminal history in answering the Special Issues. (R.19:28). He would also consider the thought and planning involved. (R.19:28). When determining probability, the State used the example that a murderer who had become a quadriplegic after the offense would not constitute a future danger. (R.19:29). Cariker defined "probability" as "likely." (R.19:37). He agreed that assaults, threats, burglaries, and vandalism constitute criminal acts of violence. (R.19:30). He assured the defense that he would need to know the person's past in determining future dangerousness.

Juror No. ll. Francis Rangel stated that he would need to know a person's criminal history. (R.22:51). "Probability" meant "more likely than not" and "criminal acts of violence" meant assaults or anything against someone else. (R.22:52).

Juror No. 12. Amy Anderson stated that she would like to know the person's criminal history in answering the Special Issues. (R22-136). She was instructed that "probability" meant greater than fifty percent, (R.22-137) and assaults, threats, vandalism, and breaking into homes were "acts of violence." She agreed with those definitions. (R22 -138). The defense conducted no relevant questioning on those issues.

## 2.    Mitigation

In a similar fashion, the jury was questioned about their views on mitigation.

Juror No. 1.  David Sinclair was told that mitigation is anything you want it to be based on the evidence that would reduce the punishment from death to life. (R.3:131).   Examples given of mitigation were mental retardation, upbringing, poverty, or intoxication at the time of the offense.

Juror No. 2.  Joan Patmore was told that mitigation is any evidence that lessens a person's culpability.  (R.3:206).  Examples given were mental impairment, birth defect, the environment in which a person is raised, or youth.  (R.3:207).  She agreed that upbringing, or substance abuse could be mitigating.  (R.3:226).

Juror No. 3.  (R.4).  Mary Zumberge was told that mitigation is something in the background that tells you in your heart that the defendant should get a life sentence.  (R.4:154).  An example given was intelligence.  (R.4:154).  She suggested child abuse, but she did not consider age to be a mitigating factor, (R.4:156) nor did she consider drugs and alcohol mitigating.  (R.4:157).

Juror No. 4.  (R.5).  Edna Melton was told that mitigation is, "something in the evidence that warrants a life sentence."  (R.5:35).  She could not think of any mitigating circumstances.  (R.5:36).  However, the prosecution suggested upbringing, mental capacity, age or substance abuse.  (R.5:36-37).

Juror No. 5.  (R.5).  Edith Olsen was told that mitigation was a safety net. Examples given were mental retardation, age, child abuse, or drug abuse.  She agreed

mental retardation could be mitigating but that she would find mitigation only in a rare circumstance. (R.5:40).

Juror No. 6. (R.6). Fred Nash was told that mitigation was a safety net-- a decision of the heart. (R.6:134). Examples given were intelligence, life-threatening illness, mental retardation, age or drugs. (R.6:134-137). He agreed that age could be mitigating, (R.6:136) but not drug use or upbringing. (R.6:137).

Juror No. 7. (R.7). Randy Fast was told that mitigation was a safety net–something in the defendant's background that may allow the jurors to spare his life. (R.7:158). Examples offered were intelligence, age, poverty, child abuse, or drug abuse. (R.7:158-162). He could not come up with a mitigating circumstance. He agreed that age could be mitigating, (R.7:160) as well as child abuse (R.7:160), but not economic background or drug use. (R.7:160).

Juror No. 8. Ronald Collier could not describe a mitigating circumstance, but did agree to keep an open mind. (R.14:28).

Juror No. 9. (R.16). Michael Bourgeois could not describe a mitigating circumstance and believed that poverty, drug abuse, youth, age, or mental health would not be mitigating circumstances. (R.16:29-30).

Juror No. 10. (R.19). Paul Cariker thought that mental incapacity could be a mitigating circumstance. He had no opinion as to whether age, drug use, or

upbringing could be considered mitigating.

Juror No. 11. (R.22:53). Francis Rangle said she could consider mitigating evidence but would not consider drug use, upbringing, or child abuse as mitigating evidence.

Juror No. 12. (R.22:142). Amy Anderson could not come up with a mitigating circumstance but did not think that drug use, poverty, child abuse, mental retardation or handicap were mitigating circumstances. (R.22:142-143).

### b.   Punishment Evidence Without Context

Against this backdrop, the jury was asked to consider whether or not Carpenter presented a probability that he would commit a future act of violence. The failure to distinguish between serious and petty assaultive conduct, as well as the difference between assaultive and property crime became apparent in the punishment phase.

Carpenter's prior criminal history was brought before the jury to establish future dangerousness. Carpenter was convicted of criminal mischief. The criminal mischief apparently consisted of Carpenter stealing a car and burning it. (R:28:18-21). He was also convicted of burglary of a building when he broke into an auto accessory store and stole some items. (R:29:18-20). When confronted by the police he attempted to hide. (R.29:22). He was convicted of burglary of habitation for breaking into a home in Kaufman County. According to the co-defendant, Carpenter

was on drugs at the time.  He stole weapons and a car and later wrecked the car. (R.28:26-62).

Carpenter was arrested twice for driving while license suspended and once for carrying a weapon that turned out to be a long metal stick with a black handle on it. (R.29:13).  In addition, he had a conviction for theft.  The State introduced a series of lewd drawings (State Exhibits 204-209) that Carpenter mailed to Sandra Jones, a friend.[5]  Finally, the State introduced evidence that while Carpenter was in prison, he was not an ideal prisoner.  He smuggled tobacco into a unit, shot dice for stamped envelopes, refused to obey an order from a guard and used vulgar language (R.29:177-179, 210-228).

His assaultive conduct was not broken down into serious and minor altercations.  The prosecution introduced evidence of three fights in prison.  In no case did Carpenter use a weapon and in no case was the other person seriously injured.  (R.29:98, 207, 134-155).  In fact, in the case most emphasized by the prosecution, a fight with inmate Donald Leonard (R.29:141), all the witnesses acknowledged that Leonard was the aggressor and that Carpenter received the most serious injuries.  (R.29:148, 136).  The only felony offense that remotely resembled

---

[5] The record is not clear on how these drawings merited consideration in the punishment phase of a death penalty case.  Nonetheless, Carpenter's relevance objection was overruled.  *See* Claim IX below.

serious assaultive conduct was a juvenile adjudication Carpenter had for holding another child's head under water (R.29:28, 34-35).   The State introduced into evidence several incidents of the defendant fleeing from the police. (R.29:11; 28:21). The most serious of these involved a high speed car chase while Carpenter had a child in the front seat of the car.   (R.29:76-93).   For this, Carpenter was convicted of endangering a child.

Additionally, the State introduced evidence of a number of uncharged petty assaults with family members.   While in prison, Carpenter wrote a letter to Carpenter/McBay saying he was going to get even with a person name Vennie for getting him in trouble.  He was charged with a Class C Assault on Carpenter/McBay. (R.28:42).  He argued with his aunt, Crisler, about stalking her daughter, Kacey. (R.28:93-97).  After the argument, Carpenter tried to run Crisler over.  He got into a verbal dispute with his grandmother over a truck payment that he owed her. (R.28:46).  According to his parole officer, Carpenter apparently had an unstable relationship with Carpenter/McBay,  (R.29:111).  He allegedly forced himself on Carpenter/McBay while they lived together, and was verbally abusive to her. (R.28:30-33, 50).   At one point she obtained a protective order against him. (R.30:12-13).

Finally, the State attempted to show that Carpenter was a racist.  Letters he

wrote to Carpenter/McBay talked about fighting with black inmates, whom he called "niggers" were introduced.  (State Exhibits 179, 181).  On one occasion, he told Carpenter/McBay that he went out "nigger hunting" at night. (R.50:33, 47).  All-in-all, according to parole officials,  he showed a poor attitude toward supervision. (R.29:111).  He never successfully completed any supervised program.  (R.29:228).

### c.    Effect of Lack of Education

What can readily be observed from the interrogation of the members of the venire who actually sat on the jury, is that the State was allowed to set the table for punishment by inducing the jurors to think that any kind of property crime, or petty assault, was sufficient to return a "yes" answer to the issue on future dangerousness. The defense never attempted to question the jurors to establish that the death penalty was not a proportional response if imposed solely for property crimes and petty assaults.  The defense never attempted to disqualify the jurors or seek an additional instruction from the court regarding the future dangerousness issue so as to preclude, or at least limit, the jury's ability to answer the future dangerousness issue in the affirmative.  This problem was further compounded by the charge to the jury.

### d.   Charge of the Court

By your verdict in this case you have found the defendant, David

Lynn Carpenter, guilty of the offense of capital murder as charged in the indictment. It is now your duty to answer special issues which will determine the punishment assessed in the case. You are instructed that the punishment for capital murder is either death or confinement in the Institutional Division of the Texas Department of Criminal Justice for life.

Three special issues, number one, two, and three, are included in this charge. You are instructed to answer the first two issues either yes or no in accordance with the instructions given in this charge. Issue three should be answered only if you have answered yes to both issues one and two. If you have not answered yes to both issue one and issue two, then you shall make no answer to issue three.

In deliberating your answers to both issues one and two you are instructed as follows:

1) the State has the burden of proving beyond a reasonable doubt that the issues should be answered yes. A reasonable doubt is a doubt based on reason and common sense after a careful and impartial consideration of all the evidence in the case. It is the kind of doubt that would make a reasonable person hesitate to act in the most important of his or her own affairs. Proof beyond a reasonable doubt, therefore, must be proof of such a convincing character that you would be willing to rely and act upon it without hesitation in the most important of your own affairs;

2) you shall consider all evidence admitted at the guilt or innocence stage and the punishment stage, including evidence of the defendant's background or character or the circumstances of the offense that militates for or mitigates against the imposition of the death penalty;

3) you may not answer either issue yes unless the jury unanimously agrees and you may not answer either issue no unless 10 or more members of the jury agree; and,

4) members of the jury need not agree on what particular evidence

supports a negative answer to either issue.

If you do not find and believe from the evidence beyond a reasonable doubt that an answer should be yes, or if you have a reasonable doubt thereof, then your answer shall be no.

If you have answered either issue one or issue two or both issues no, then you shall cease your deliberations. If you have found beyond a reasonable doubt that the answers to both issue one and issue two are yes, then you shall next consider issue three.

In deliberating your answer to issue three, you are instructed as follows:

1) you may not answer the issue no unless the jury unanimously agrees and you may not answer the issue yes unless 10 or more jurors agree;

2) members of the jury need not agree on what particular evidence supports an affirmative finding; and,

3) you shall consider mitigating evidence to be evidence that a juror might regard as reducing the defendant's moral blameworthiness.

You are further instructed that if the jury returns an affirmative finding on both issue one and issue two and a negative finding on issue three, the court shall sentence the defendant to death. If the jury returns a negative finding on either or both issue one and issue two or an affirmative finding on issue three, the court shall sentence the defendant to confinement in the Institutional Division of the Texas Department of Criminal Justice for life.

If the jury's answers are unanimous to the issues answered, then the presiding juror may sign each issue for the entire jury. If any answer or answers are not unanimous but agreed to by at least 10 members of the jury, as set out above, then the 10 or more jurors who agree shall

individually sign the issue.

You are instructed that if there is evidence before you in this case regarding the defendant having committed offenses or acts other than that alleged in the indictment, you may not consider same unless you find and believe from the evidence beyond a reasonable doubt that the defendant committed said acts, if any.  If you do not so believe, or if you have a reasonable doubt thereof, then you shall disregard said evidence and not consider if for any purpose whatsoever.

The court further instructs you that the law allows the defendant to testify in his own behalf but a decision on his part to remain silent is not a circumstance against him.  I instruct you not to consider, discuss or even refer to such silence on the part of the defendant during your consideration of this case.

You are further instructed that you cannot consider how long the defendant may be required to serve a sentence that is imposed.  Such matters come within the exclusive jurisdiction of the Board of Pardons and Paroles and are no concern of yours.

You are further instructed that your answers to the issues shall be arrived at by due deliberation and not by drawing lots or by any other method of chance.

You are the exclusive judges of the facts proved, the credibility of the witnesses, and the weight to be given their testimony, but you are bound to receive the law which is herein given you by the court and be governed thereby.

### e.    No Definitions

As noted in Ground 10 of Carpenter's 11.071 State writ, the trial court failed to give the requested charge on the meaning of "probability" and "future

dangerousness."[6]   Therefore, the jury had no guidance in weighing the evidence

presented except for their common experience viewed through the prism of the State's

slanted *voir dire*.   Since the jury had been preconditioned to accept such evidence as

sufficient for a death penalty, it's no surprise that such a verdict was returned.

*Compare* Finding of Fact 229-230 (stating that no prejudice resulted from the failure

to define terms).

### f.    Lack of Expert Testimony

As with the analysis of eyewitness testimony, the defense can explain the

intricacies of the future dangerousness issue in several fashions.   One would be to

request a jury charge defining the operative terms, which, as noted above, is not

permitted in Texas.   The other manner would be to call an expert on the issue of

future dangerousness to review Carpenter's background and prior conduct to establish

that he would not constitute a danger to society in the prison environment.   Except

for brief cross-examination of the State's witnesses, the defense team did not put on

one shred of evidence that Carpenter could be considered a non-threatening prisoner.

As the attached affidavit of Dr. Kessner (Exhibit M ) demonstrates, expert

testimony was, and is, available to show that Carpenter would not be a violent

---

[6] No such charge was requested by the defense.  (R.30:48).  However, as noted in the court's findings of fact and conclusions of law, such requests have been repeatedly denied (Finding of Fact 224-226) and therefore such an objection would have been futile.

offender and would not constitute a threat to society if incarcerated for life.  As noted in the affidavit, this conclusion may be reached because Carpenter's prior criminal history involves property crimes, and petty assaultive conduct.  In a high security prison, serving a life sentence, Carpenter would pose no danger to the life or limb of the prison population.  This conclusion may be reached because while incarcerated in the past, Carpenter engaged in no such conduct <u>even when attacked</u>.  This is not to say that Carpenter would not violate minor administrative rules, but the use of vulgar language, gambling, and smuggling tobacco, does not make a prisoner a violent offender.

        **g.**        **Deficient Performance**: **Duty to Obtain Expert Assistance**

Counsel has a duty to consult with mental health experts to determine the mitigating value to any mental health problems or disorders.  *Compare People v. Perez*, 592 N.E.2d 984 (Ill. 1992)(counsel ineffective for failing to consult with expert regarding client's mental deficiencies); *Blanco v. Singletary*, 943 F.2d 1477 (11th Cir. 1991), *cert. denied*, 504 U.S. 943 (1992)(counsel found ineffective for failing to introduce evidence that defendant had mental-health problems and very low IQ and had suffered from various bouts of paranoia and depression); *Loyd v. Whitley*, 977 F.2d 149 (5th Cir. 1992) (counsel ineffective in conducting minimal effort to

investigate insanity defense); *Mauldin v. Wainwright*, 723 F.2d 799 (11th Cir. 1984)(counsel ineffective for failing to consult with expert on alcohol abuse); *Commonwealth v. Roberio*, 700 N.E.2d 830 (Mass. 1998)(counsel ineffective for failing to consult with mental health expert).  It is error to exclude evidence opining that the defendant would not commit acts of violence in the future.  *See Robinson v. Texas,* 548 S.W.2d 63, 66 (Tex. Crim. App. 1977)(en banc).

Further, if but one strategic approach exists at the punishment phase, then counsel is professionally obliged to pursue such a strategy.  *Compare Battenfield v. Gibson*, 236 F.3d 1215, 1228 (10th Cir. 2000)(counsel has a duty to conduct a reasonable investigation including all ... possible mitigating aspects of the client's background.)  *See also, Mauldin v. Wainwright,* 723 F.2d 799 (counsel has a duty to conduct a reasonable inquiry to the sole theory of the case).  Particularly in this case, some better explanation of future dangerousness is required because the State explained the concept in an extremely slanted manner, imposing upon counsel a duty to present evidence that balanced the scale.  *See Collier v. Turpin*, 177 F.3d 1184 (11th Cir. 1999).  Particularly noteworthy is *Mayfield v. Woodford*, 270 F.3d 915, 932 (9th Cir. 2001).  There, even though a psychologist was presented, counsel's performance was still found wanting because no explanation was given the jury concerning the significance of the testimony.

-185-

Of course consideration of Carpenter's criminal history shows nothing more than a variety of property crimes coupled with petty assaults and flight to avoid arrest. Carpenter had absolutely no history of serious injury to anyone, no history of using a weapon in an altercation, and no convictions for serious assaultive conduct. The record shows that Carpenter had engaged in several minor altercations in prison and was verbally abusive to his family. However, the record did not show any indication that Carpenter had ever committed an offense involving serious bodily injury and no evidence that, if incarcerated in the future, Carpenter would use a weapon or cause serious bodily injury to any other inmate.

Had the jury been advised not to evaluate property and non-violent offenses as predictors of future violent conduct, (the thrust of Special Issue No. 2) the answer might well have been "no." Clearly, an indication is apparent in the record that Carpenter would engage in verbal threats and petty assaults. However, such conduct has never been considered sufficient to justify a death penalty. Of course, the jury must be informed of their duty to evaluate the personal culpability of Carpenter in order to make a reasoned decision. The sentencer in a capital case must be permitted to consider any constitutionally relevant mitigating evidence. *See Eddings v. Oklahoma,* 455 U.S. 104, 112 (1982). Such evidence is "directly related to the personal culpability of the criminal defendant.*" Penry v. Lynaugh,* 492 U.S. 302, 319

(1989)(abrogated by *Atkins v. Virginia,* 536 U.S. 304 (2002)). "Only then can we be sure that the sentencer has treated the defendant as a 'uniquely individual human bein[g]' and has made a reliable determination that death is the appropriate sentence." *Id.* (quoting *Woodson v. North Carolina,* 428 U.S. 280, 304-05 (1976)).

### h.  Prejudicial Effect

It should be readily apparent from a review of the trial record that had the jury been permitted to evaluate the punishment evidence with the assistance of a trained psychologist on the issues of future dangerousness in the prison environment, there is a strong probability that the answer to the second Special Issue would have been no.  The State presented no evidence to suggest that in a prison environment, while serving a life sentence, Carpenter would have done more than engage in minor violations of administrative rules and petty assaults.  These acts do not merit the death penalty and do not constitute proof of future dangerousness as contemplated by the Supreme Court.  Clearly, Carpenter received the death penalty because of counsel's failing to properly frame and present the issue.  If counsel in *Wiggins, supra*, was ineffective for failing to fully explore mitigating aspects of the case and for failing to consult with expert witnesses, then counsel in Carpenter's case was likewise deficient.  As noted in *Wiggins*, current professional norms require that counsel fully investigate all mitigation issues, including psychological factors.  Trial counsel did

-187-

not do so, with a tragic result.  Like *Wiggins*, Carpenter did not have a record of violent conduct sufficient to merit the death penalty.  Trial counsel's utter failure to present Carpenter's history in the appropriate light foretold the imposition of the death penalty.

### 4.      Ineffective assistance of 11.071 Counsel

The right of habeas counsel is one of the few individual rights specifically delineated in the United States Constitution.  As early as 1969, the United States Supreme Court explained that:

> The writ of habeas corpus is the fundamental instrument for safeguarding individual freedom against arbitrary and lawless state action.  Its pre-eminent role is recognized by the admonition in the Constitution that: "The Privilege of the Writ of Habeas Corpus shall not be suspended . . . . " U.S. Const. Art. 1, 9 cl. 2.  The scope and flexibility of the writ – its capacity to reach all manner of illegal detention – its ability to cut through barriers of form and procedural mazes – have always been emphasized and jealously guarded by courts and lawmakers.  The very nature of the writ demands that it be administered with the initiative and flexibility  essential to insure that miscarriages of justice within its reach are surfaced and corrected.

*Harris v. Nelson*, 394 U.S. 286, 290-291 (1969).

Despite the foundational importance of habeas corpus to correct constitutional errors in criminal cases, the right to the effective assistance of counsel – as such – has not yet been extended to apply to indigent individuals who are statutorily entitled to receive competent counsel during state habeas proceedings.  *See* Tex. Code Crim.

Pro. Art. 11.071, sec. 2(a)(unequivocally stating that an "applicant *shall be represented by competent counsel*")(emphasis added).  However, this very issue is before the Supreme Court in *Martinez v. Ryan,* 131 S.Ct. 2960 (2011).  Because Carpenter is entitled to receive competent counsel by statutory guarantee via Texas state statute, he believes that the traditional tests under due process and the Sixth Amendment further guarantee him the right to the effective assistance of counsel.  *See Evitts v. Lucey*, 469 U.S. 387 (1985)(establishing a due process right to the effective assistance of counsel on first right of appeal).  *See* Tex. Code Crim. Pro. Art. 11.071, sec. 3(a)("Investigation of Grounds for Application:  Sec. 3. (a) On appointment, *counsel shall investigate* expeditiously, before and after the appellate record is filed in the court of criminal appeals, the factual and legal grounds for the filing of an application for a writ of habeas corpus")(emphasis added).

### a.    Pending Issue

The United States Supreme Court has never directly addressed the issue of whether death row inmates are constitutionally entitled to receive the effective assistance of counsel during state writ proceedings.  *See* Eric M. Freedman, *Giarratano is a Scarecrow:  The Right to Counsel in State Capital Post-conviction Proceedings,* 91 Cornell L. Rev. 1079 (2006).  This is particularly relevant as the passage of the Antiterrorism and Effective Death Penalty Act radically restructured

the nature of federal habeas review – putting a heightened emphasis on state proceedings. Without the assistance of capable or competent counsel during state writ proceedings, state death row inmates will not be able to fairly or fully present their viable federal claims. And, as many of the means of overturning state convictions can only be raised during state writ proceedings, it is no longer acceptable simply to say that state appellate challenges adequately protect capital convicts. And, unlike other state cases involving ineffectiveness challenges, cases involving capital convicts are irreversible and require, both legally and morally, additional protections.

The question of whether an indigent capital convict is constitutionally entitled to the effective assistance of counsel in his first state writ application where he is first able to assert constitutional deficiencies in his conviction and sentence remains an open question.

Carpenter  urges that if this court finds his claims are not preserved due to errors committed by 11.071 counsel,  this court  find that the United States Constitution provides him protection during his state writ proceedings. *See* U.S. Con., art. I, § 9. The United States Constitution provides that the "writ of habeas corpus shall not be suspended. . . ," and, yet, where death row inmates receive the ineffective assistance of counsel from their state-appointed attorneys, these inmates

will be effectively precluded from resorting to the Great Writ.

In reviewing the applicability of *Evitts*, *supra* to the issue at hand, it bears noting several important components of Carpenter's claim. First, in Texas, death row convicts are statutorily entitled to receive the aid of "competent counsel." That phrase, when interpreted by the United States Supreme Court, has ALWAYS meant the effective assistance of counsel as defined by *Strickland v. Washington*, 466 U.S. 668 (1984). *See Evitts v. Lucey*, 469 U.S. 387 (1985). Harkening back to the genesis of the right to counsel, the *Evitts* court reminded that "Gideon rested on the 'obvious truth' that lawyers are 'necessities, not luxuries' in our adversarial system of criminal justice." *Id.* at 394.

Further, the United States Supreme Court has consistently held that "if a State has created appellate courts as 'an integral part of the . . . system for finally adjudicating the guilt or innocence of a defendant,' the procedures used in deciding appeals must comport with the demand of Due Process and Equal Protection." *Id.* at 393. The same should be true if a State has created habeas review as an integral part of the system for finally adjudicating the guilt or innocence of a defendant. In Texas, appellate courts do not readily receive challenges to the effective assistance of counsel at trial – or, obviously, on appeal – and, instead, segregate those claims to habeas review. The reasons that *Evitts* extended the right to effective assistance of

counsel on appeal apply with equal force to the first habeas challenge for Texas death row inmates.  As the *Evitts* court noted, the United States Supreme Court has "made clear, the guarantee of counsel 'cannot be satisfied by mere formal appointment.'" *Id.* at 395.

A cursory review of the Supreme Court's death penalty jurisprudence during the past 10 years underscores the need for the effective assistance of counsel during state writ proceedings.  *See Terry Williams v. Taylor*, 529 U.S. 362 (2000); *Williams v. Taylor*, 529 U.S. 420 (2000); *Wiggins v. Smith*, 539 U.S. 510 (2003).  The majority of death penalty cases that have been overturned as invalid or as violating the Constitution were held so during habeas corpus proceedings – not during direct appellate proceedings.  *See Rompilla v. Beard*, 545 U.S. 374 (2005); *Miller-El v. Cockrell*, 537 U.S. 322 (2003); *Miller-El v. Dretke*, 545 U.S. 231 (2005); *Roper v. Simmons*, 543 U.S. 551; *Panetti v. Quaterman*, 551 U.S.930 (2007).  The role of habeas corpus in preserving Constitutional rights is vital.  Without ensuring that state death row inmates receive competent counsel, the right to raise these Constitutional challenges becomes chimerical.  For these reasons, Carpenter respectfully requests that if this Court finds his claims were defaulted by 11.071 counsel, Carpenter was deprived his Constitutional right to counsel.  At a minimum, Carpenter should be permitted to return to state court to pursue claims that he requested be investigated

and raised prior to this Court determining the sustainability of his conviction and sentence.

Carpenter is an indigent criminal defendant. Our system of criminal procedure provides certain protections to indigents to ensure that they are not victims of poverty and, thereby, lose procedural rights that other, more wealthy, individuals maintain. The State of Texas has a statutory scheme in place to ensure that indigent criminal defendants are provided the right to "competent counsel." Tex. Code Crim. Pro. Art. 11.071, sec. 2(a).

The right to the effective assistance of counsel should exist for rich and poor alike. The economic status of an individual should not determine whether that individual receives the effective assistance of counsel. *See Gideon v. Wainwright*, 372 U.S. 335 (1963). Rather, under Equal Protection, counsel appointed pursuant to Article 11.071 should be required to *perform* their job in a competent fashion. Likewise, where a state statutory scheme promises indigent defendants the right to "competent counsel," the Due Process Clause requires that the promise be fulfilled, not eviscerated through an absurdly narrow reading of plain statutory language. The failure of Carpenter's counsel to so perform under the Texas mandate of "compete counsel" violates both Due Process and Equal Protection.

### b.    Alleged Deficiencies

The State has alleged that many of Carpenter's claims are invalid because they were not properly presented to the state court by 11.07 state counsel.  *See* Answer of Dretke at 13-20.  These include the following claims:

1.    The Failure to conduct a hearing on the newly discovered evidence that a third party, Matthew Tolbert, had committed the murder;

2.    The inadequacy of the mitigation instruction;

3.    The ineffective assistance of trial counsel in failing to
      a.    raise the spousal privilege;
      b.    educating and presenting expert testimony on the eye-witness issue;
      c.    jury selection issues;
      d.    failure to utilize and present a mitigation expert.

Contrary to the State's allegation, even in the original application, Carpenter raised the issue of the inadequacy of state habeas counsel, as the Answer indicates at pages 33-34.  These issues are preserved for review.

## CLAIM VIII.

**THE TRIAL COURT'S INSTRUCTIONS ON THE SPECIAL ISSUES AT THE PUNISHMENT PHASE OF CARPENTER'S TRIAL VIOLATED THE EIGHTH AND FOURTEENTH AMENDMENTS OF THE UNITED STATES CONSTITUTION.**

**A.    Overview**

The Fourteenth Amendment to the United States Constitution proscribes any State from "depriv[ing] a person of life, liberty, or property, without due process of law."  U.S. Const. amend. XIV.  The Eighth Amendment to the United States

Constitution mandates that "nor [shall] cruel and unusual punishment [be] inflicted."

U.S. Const. amend. VIII.  Carpenter submits that the instructions submitted to the

jurors at the punishment phase of his trial violated these constraints.

## B.     Instructions Given the Jury

Upon conclusion of the presentation of evidence at the punishment phase of

Carpenter's trial, the jury was instructed to answer Issue Three:

> Do you find, whether, taking into consideration all of the evidence,
> including the circumstances of the offense, the defendant's character and
> background, and the personal moral culpability of the defendant, there
> is a sufficient mitigating circumstance or circumstances to warrant that
> a sentence of life imprisonment rather than a death sentence be
> imposed?

(CR:129).  This instruction is consistent with Tex. Code Crim. Proc. Ann. art. 37.071

§ 2 (e)(1) (Vernon 2003).

The trial court further instructed the jury on the procedure governing

consideration of the issue:

> In deliberating your answer to issue three, you are instructed as follows:
>
> 1) you may not answer the issue no unless the jury unanimously agrees
> and you may not answer the issue yes unless 10 or more jurors agree;
>
> 2) members of the jury need not agree on what particular evidence
> supports an affirmative finding; and
>
> 3) you shall consider mitigating evidence to be evidence that a juror
> might regard as reducing the defendant's moral blameworthiness.

-195-

(CR:123).

Additionally, the trial court instructed the jury to answer Issue One, which read

as follows:

> Do you find from the evidence beyond a reasonable doubt that the
> conduct of the defendant that caused the death of the deceased was
> committed deliberately and with the reasonable expectation that the
> death of the deceased or another would result?

(CR:127).  This instruction is consistent with TEX. CODE CRIM. PROC. ANN. art.

37.071 § 2(b) (Vernon 2003).

The trial court further instructed the jury to answer Issue Two, which read as

follows:

> Do you find from the evidence beyond a reasonable doubt that there is
> a probability that the defendant would commit criminal acts of violence
> that would constitute a continuing threat to society?

(CR:128).  This instruction is consistent with TEX. CODE CRIM. PROC. ANN. art.

37.071 § 2 (b)(1) (Vernon 2003).

The trial court charged the jury on the procedure governing its responses to

issues one and two:

> [Y]ou may not answer either issue yes unless the jury unanimously
> agrees and you may not answer either issue no unless 10 or more
> members of the jury agree[.]

-196-

(CR:123).

The trial court further advised the jury of the effect of its answers:

You are further instructed that if the jury returns an affirmative finding on both issue one and issue two and a negative finding on issue three, the court shall sentence the defendant to death.  If the jury returns a negative finding on either or both issue one and issue two or an affirmative finding on issue three, the court shall sentence the defendant to confinement in the Institutional Division of the Texas Department of Criminal Justice for life.

(CR:124).   The trial court instructed the jury that, with respect to issues one (deliberateness) and two (future dangerousness), the State carried the burden of proof and described this burden of proof as "beyond a reasonable doubt":

[T]he State has the burden of proving beyond a reasonable doubt that the issues should be answered yes.  A reasonable doubt is a doubt based on reason and commonsense after a careful and impartial consideration of all the evidence in the case.  It is the kind of doubt that would make a reasonable person hesitate to act in the most important of his or her own affairs.  Proof beyond a reasonable doubt, therefore, must be proof of such a convincing character that you would be willing to rely and act upon such without hesitation in the most important of your own affairs.

(CR:123).  With respect to issue three, however, the trial court did not instruct the jury on any burden of proof or on which party carried any burden of proof.

All members of the jury answered issue one and issue two affirmatively. (CR:127, 128).  All members of the jury answered issue three negatively.  (CR:129).

Consequently, under the trial court's instructions and under the law of Texas,

Carpenter was sentenced to death.  From these instructions, each juror knew that affirmative answers on the first two issues and a negative answer on the mitigation issue resulted in a death sentence.  Each juror further knew – or thought -- that the only means of avoiding this result was to convince nine others to answer the issues affirmatively.

## C.   Deficiencies in Instructions

The aforementioned instructions violated Carpenter's United States Constitutional rights for the following reasons: (1) they prevented the jurors from giving due consideration to mitigating evidence in violation of the United States Supreme Court decision in *Mills v. Maryland*, 486 U.S. 367 (1988); (2) they undermined the jury's sense of responsibility for imposing a death sentence, in violation of the Eighth Amendment and so infected the sentencing proceeding with unfairness as to render the jury's imposition of the death penalty a denial of due process; (3) they relieved the State from proving beyond a reasonable doubt that Carpenter merited a sentence of death, denying Carpenter due process; and (4) they constituted excessively vague, arbitrary, and capricious sentencing patterns in violation of the Eighth Amendment and the Due Process Clause of the Fourteenth Amendment.  U.S. Const. amend. XIV.

### 1.   The Instructions in the Charge at the Sentencing Phase Relating to

**the Mitigation Issue that Unanimity Was Required for a Answer That Would Result in Death and Ten Votes Were Necessary for an Answer that Would Result in Life Imprisonment Prevented the Jury from Giving Due Consideration to Mitigating Evidence in Violation of *Mills v. Maryland*, 486 U.S. 367 (1988).**

In *Mills v. Maryland*, 486 U.S. 367 (1988), the Supreme Court reviewed a statute requiring imposition of a death sentence if the jury unanimously found an aggravating circumstance but could not agree unanimously regarding the existence of any particular mitigating circumstance. Similarly, the Texas procedure requires a death sentence if the jury unanimously fails to find that sufficient mitigating circumstances exist to warrant imposition of a sentence of life imprisonment but permits imposition of a life sentence only if ten jurors agree that sufficient mitigating circumstances exist.

This procedure prevents the jurors from giving due consideration to mitigating evidence, in violation of the principles stated in *Lockett v. Ohio*, 438 U.S. 586, 604 (1978), and reiterated in *Eddings v. Oklahoma*, 455 U.S. 104, 110 (1982)("the sentencer may not refuse to consider or be precluded from considering 'any relevant mitigating evidence" is equally "well established"). The *Mills* Court enunciated the following governing principle:

> It is beyond dispute that, in a capital case, the sentencer [may] not be precluded from considering, *as a mitigating factor,* any aspect of a defendant's character or record and any of the circumstances of the

> offense that the defendant proffers as a basis for a sentence less than death.  The corollary that the sentencer may not refuse to consider or be precluded from considering 'any relevant mitigating evidence' is equally 'well established.'

*Mills*, 486 U.S. at 374-75 (citations omitted) (internal quotations omitted) (emphasis in original).

Carpenter's jurors could not impose life imprisonment if a few – or even one – thought mitigating circumstances warranted that sentence.  Under the deficient instructions the trial court submitted, the dissenting juror or jurors must garner ten total votes to reach that verdict.  Thus, the juror or jurors who believed the mitigating evidence were coerced into joining with the majority to reach a verdict.  These jurors, then by virtue of the instructions submitted, were prevented from giving due consideration to mitigating evidence.

In reviewing death sentences, the Court has demanded even greater certainty that the jury's conclusions rested on proper grounds.  *See, e.g., Lockett v. Ohio*, 438 U.S. at 605 ("The risk that the death penalty will be imposed in spite of factors which may call for a less severe penalty . . . is unacceptable and incompatible with the commands of the Eighth and Fourteenth Amendments"); *Andres v. United States*, 333 U.S. 740, 752 (1948) ("That reasonable men might derive a meaning from the instructions given other than the proper meaning of §567 is probable.  In death cases

doubts such as those presented here should be resolved in favor of the accused"). Unless a reviewing court can rule out the substantial possibility that the jury may have rested its verdict on the "improper" ground, it must remand for re-sentencing. *Mills*, 486 U.S. at 377. This is the governing legal standard as set forth and developed by the United States Supreme Court. The failure of the state court to properly apply this standard constitutes sufficient error to warrant granting Carpenter habeas relief under the AEDPA. *See Williams v. Taylor*, 529 U.S. 362 (2000).

Under the instructions proffered at the sentencing phase of Carpenter's trial, a reasonable juror could have believed -- in fact, most certainly would have believed -- that he/she had no ability to give effect to mitigating evidence unless nine other jurors joined in the vote. The Seventh Circuit so ruled when confronted with a capital murder sentencing scheme virtually identical to the one at issue:

> [Defendant's] jurors were never expressly informed in plain and simple language that even if one juror believed that the death penalty should not be imposed, [defendant] would not be sentenced to death. . . . [T]here is a substantial possibility that one or more of [defendant's] jurors might have been precluded from granting mercy to [defendant] because of a mistaken belief that the sufficiency of mitigating factors had to be found unanimously.

*Kubat v. Theiret*, 867 F.2d 351, 373 (7th Cir.), *cert. denied sub nom Kubat v. Greer*, 493 U.S. 874 (1989).

Certainly, no one can assert with absolute confidence that this is what

transpired. Absolute certainty, however, is not the standard. The jury was instructed to return at least 10 votes for life and repeatedly told, from *voir dire* through the process of the trial, through sentencing and in closing argument, of the gravity of their decision, implying, at the very least, the necessity of reaching a decision. The *Mills* Court recognized this element:

> We cannot say with any degree of confidence which interpretation Mills' jury adopted. But common sense and what little extrinsic evidence we possess suggest that juries do not leave blanks and do not report themselves as deadlocked over mitigating circumstances after reasonable deliberation . . . , unless they are expressly instructed to do so.

*Mills*, 486 U.S. at 383.

"The risk that the death penalty will be imposed in spite of facts which may call for a less severe penalty . . . is unacceptable and incompatible with the commands of the Eighth and Fourteenth Amendments."

*Mills*, 486 U.S. at 376-77. Because of the instructions advanced in Carpenter's case – instructions that inaccurately stated Texas law – combined with the jury's -knowledge of the effect of its answers, that risk is readily apparent in this case. Accordingly, the Court must vacate Carpenter's sentence.

**2.    The Instruction in the Charge at the Sentencing Phase that Unanimity was Required for a Negative Answer and Ten Votes Were Necessary for An Affirmative Answer Undermined the Jury's Sense of Responsibility for Imposing A Death Sentence, in Violation of the Eighth Amendment, and So Infected the Sentencing Proceeding with Unfairness As to Render the Jury's Imposition of**

**the Death Penalty a Denial of Due Process.**

The instructions to the jury at the sentencing phase of Carpenter's trial effectively requiring ten jurors to agree to impose a life sentence inaccurately stated the governing law.  In fact, the holdout of only one juror would have resulted in imposition of a life sentence.  By inaccurately stating the law and impressing upon the jurors that no single juror could have a determinative impact on the outcome of the sentencing phase of the trial, the instructions undermined the juror's sense of responsibility for imposing a death sentence, in violation of the Eighth Amendment, and so infected the sentencing proceeding with unfairness as to render the jury's imposition of the death penalty a denial of due process.  *See Mills v. Maryland*, 486 U.S. 367 (1988).

In the State's Proposed Factual Findings and Legal Conclusions, adopted in full by the trial court, the State states that, "The Court finds that the Court of Criminal Appeals has previously addressed identical arguments."  (Finding 546).  The State misses one salient point: Carpenter raised then, and raises herein, a *Mills* claim.  The conclusions of the Texas Court of Criminal Appeals are irrelevant to Carpenter's federal constitutional arguments.  The renderings of the Texas Court of Criminal Appeals hardly are binding on this Court.

The State further writes that, "The Court notes that a version of the Texas death

penalty scheme that had the same 12/10 requirement was held to be constitutional by the United States Supreme Court in *Jurek v. Texas*, 428 U.S. 262 (1976). (Finding 548). In *Jurek,* however, the Court never specifically addressed the constitutionality of the 12/10 requirement.

The decision to exercise the power of the State to execute a defendant is unlike any other decision citizens and public officials are called upon to make. State-sanctioned depravation of life is one of the most sobering and irreversible powers any State can exercise. The Supreme Court has affirmed on numerous occasions that the penalty of death is qualitatively different from a sentence of imprisonment, however long. *See, e.g., Bullington v. Missouri*, 451 U.S. 430, 442 n. 15,(1981); *Gardner v. Florida*, 430 U.S. 349, 357,(1977) (plurality opinion). *See also Furman v. Georgia*, 408 U.S. 238, 306,(1972) (Stewart, J., concurring). This qualitative difference engenders a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case. *See Woodson v. North Carolina*, 428 U.S. 280,(1976) (plurality opinion). In *California v. Ramos*, 463 U.S. 992, 998-99,(1983), the Court stated that "the qualitative difference of death from all other punishments requires a correspondingly greater degree of scrutiny of the capital sentencing determination." *See id.* at 999 n. 9. *See also Sawyer v. Smith,* 497 U.S. 227 (1990) *Ford* v. *Wainwright*, 477 U.S. 399, 411 (1986) (Marshall, J., plurality

opinion) ("In capital proceedings generally, this Court has demanded that fact-finding procedures aspire to a heightened standard of reliability. . . .  This especial concern is a natural consequence of the knowledge that execution is the most irremediable and unfathomable of penalties; that death is different"); *Ake v. Oklahoma*, 470 U.S. 68, 87 (1985) (Burger, C. J., concurring in judgment) ("In capital cases the finality of the sentence imposed warrants protections that may or may not be required in other cases"); *Barefoot v. Estelle*, 463 U.S. 880 (1983) (Blackmun, J., dissenting) (stating that, *Woodson*'s concern for assuring heightened reliability in the capital sentencing determination "is as firmly established as any in our Eighth Amendment jurisprudence"); *Godfrey v. Georgia*, 446 U.S. 420, 443 (1980) (Burger, C.J., dissenting) ("...in capital cases we must see to it that the jury has rendered its decision with meticulous care"); *Gardner v. Florida*, 430 U.S. 349, 357-358 (1977) (Stevens, J., plurality opinion)("From the point of view of the defendant, it is different in both its severity and its finality.  From the point of view of society, the action of the sovereign in taking the life of one of its citizens also differs dramatically from any other legitimate state action.  It is of vital importance to the defendant and to the community that any decision to impose the death sentence be, and appear to be, based on reason rather than caprice or emotion"). The Eighth Amendment requires that the jury not be misled in the role it plays in the sentencing decision.  *Romano v.*

*Oklahoma*, 512 U.S. 1, 8 (1994); *Caldwell v. Mississippi*, 472 U.S. 320, 336 (1985) (plurality opinion).   Inaccurate information proffered to the jury renders the sentencing proceeding so unreliable that the proceeding violated the Eighth Amendment.  *See Lockett v. Ohio*, 438 U.S. 586, 604,(1978) (plurality opinion); *Woodson v. North Carolina*, 428 U.S. 280, 305 (1976).

Further, a component of heightened reliability is the Eighth Amendment and Due Process command that the jury be capable of a reasoned moral judgment about whether death, rather than a lesser sentence, ought to be imposed.  *See Simmons*, 512 U.S. at 172.   Part and parcel of this requirement is the provision of "accurate sentencing information [as] an indispensable prerequisite to a reasonable determination of whether a defendant shall live or die," *Gregg v. Georgia*, 428 U.S. 153, 190 (1976)(joint opinion of Stewart, Powell, and Stevens, JJ.), and the invalidation of "procedural rules that tend to diminish the reliability of the sentencing determination." *Beck v. Alabama*, 447 U.S. 625, 638 (1980).

In this case, that correspondingly high requirement of reliability dictates finding that the Texas jury scheme as applied to Carpenter is unconstitutional.  Under Texas law, the prosecution can secure the death penalty only if it the jurors answer the deliberateness and future dangerousness issues in the affirmative and the mitigation issue unanimously in the negative.  Thus, if even one juror determines to

answer any of these issues differently, Carpenter would, as a matter of law, be sentenced to life imprisonment.

The instructions, however, do not inform the jury of this procedure and result. Instead, they affirmatively mislead the jurors by stating, *inaccurately*, that ten jurors must agree to an answer that will result in life imprisonment. The instructions effectively provide the jury with a false statement of Texas law.

The several instructions that informed the jury that ten votes were essential for imposition of life imprisonment inaccurately stated Texas law and affirmatively misled the jurors. Each individual juror knew, from the instructions, that his or her single vote could not determine the outcome. Rather, that juror must convince at least nine others to join the decision.

Consequently, each juror's responsibility for the ultimate decision was undermined. Each juror could take solace in the fact that his or her single decision would have only minimal (1/10 or 1/12) effect on the ultimate decision. Thus, the instructions unconstitutionally minimized each juror's responsibility for the ultimate sentence. *Romano,* 512 U.S. at 8; *Beck*, 447 U.S. at 638; *Lockett*, 438 U.S. at 604.

The inaccuracy in the instructions and their probable effect on the jurors so infected the sentencing proceeding with unfairness as to render the jury's imposition of the death penalty a denial of due process. *See Sawyer v. Smith*, 497 U.S. 227, 243-

44 (1990)(observing that the *Caldwell* rule was added to the guarantee in *Donnelly v. DeChristoforo*, 416 U.S. 637 (1974), of due process protection against fundamental unfairness).   *See also Darden v. Wainwright*, 477 U.S. 168, 178-81, (1986).   The jurors were seriously and unconstitutionally constrained from imposing a sentence of life imprisonment.   An instruction that required the votes of ten jurors seriously impeded the capacity of any single juror to vote for life, as was his or her right under the law.   *See Romano*, 512 U.S. at 8.

The Supreme Court recognizes that the jury cannot be "affirmatively misled regarding its role in the sentencing process."   *Romano v. Oklahoma*, 512 U.S. 1, 9, (1994).   *See Jones v. United States*, 527 U.S. 373, 370 (1999).   The Court applies a single standard for reviewing instructions, asking "'whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way' that violates the Constitution."   *Estelle v. McGuire*, 502 U.S. 62, 72,(1991) (quoting *Boyd v. California*, 494 U.S. 370, 380 (1990)).   Further, the reviewing court must find that the error, in the context of the particular case, had a substantial and injurious effect or influence on the jury's verdict.   *Brecht v. Abrahamson*, 507 U.S. 619, 637-38 (1983); *O'Neal v. McAninch*, 513 U.S. 432, 435-36 (1995).

The instructions further violate the tenant of fundamental fairness that is the bedrock of due process.   The Due Process Clause guarantees the fundamental elements of

fairness in a criminal trial.   *See, e.g., Sheppard v. Maxwell*, 384 U.S. 333,(1966); *Gideon v. Wainwright*, 372 U.S. 335,(1963); *Betts v. Brady*, 316 U.S. 455,(1942); *Tumey v. Ohio*, 273 U.S. 510,(1927); *see also, Estes v. Texas*, 381 U.S. 532,(1965). *Cf. Griffin v. Illinois*, 351 U.S. 12,(1956).   Carpenter was not granted this requisite opportunity of fundamental fairness.   Instead, he was sentenced to death by a jury that improperly was charged on the effect of their votes.

### 3.   Prejudice from Instructions

A reasonable likelihood exists that the jury applied the challenged instruction in a manner that violated the Constitution.   Further, a reasonable likelihood exists that this influenced the jury's ultimate verdict, to the substantial prejudicial effect of Carpenter.

The one or more who might be inclined to answer any of the issues differently from the majority, who effectively would vote to sentence Carpenter to life imprisonment, cannot take comfort in what truly is the law, knowing that one vote would result in life imprisonment.   Rather, they are misled into believing that the only means of avoiding the death penalty is to persuade enough jurors to answer as they intend to do until the total number reaches ten.   This false impression undermines the reliability in the sentencing determination that death is the appropriate punishment in violation of the Eighth Amendment.   *See Woodson v. North Carolina*, 428 U.S.

280, 305 (1976) (plurality opinion).

Further, the instructions are inherently coercive.  Holdouts feel obligated to vote negatively inasmuch as the jury has been instructed to return a verdict, and no possibility of a life sentence, under the instructions as given, is possible.  *See Mills v. Maryland*, 486 U.S. 367, 383,(1988) ("[C]ommon sense . . . suggest[s] that juries do not leave blanks and do not report themselves as deadlocked over mitigating circumstances after reasonable deliberation unless they are expressly instructed to do so") (citation omitted).

The Supreme Court has expressed concern regarding minority coercion such as this in a slightly different context.  The Court has criticized the practice of trial courts of inquiring into the numerical division of deadlocked juries prior to sending the jury back for further deliberation.  *See, e.g., Lowenfield v. Phelps*, 484 U.S. 231, 239-40 (1988); *Brasfield v. United States*, 272 U.S. 448, 450 (1926).  Specifically, the Supreme Court has held that "inquiry into the jury's numerical division necessitated reversal because it was generally coercive and almost always brought to bear 'in some degree, serious although not measurable, an improper influence upon the jury.'"  *Lowenfield*, 484 U.S. at 239 (citing *Brasfield*, 272 U.S. at 450)).

Thus, the gravamen of the problem with inquiry into numerical division or a "dynamite charge" is its coercive effect upon the jury.  It is this coercive effect that

violates the Constitution.   Thus, the coercive effect inherent in the instructions on

mitigation in Carpenter's case necessarily violated Carpenter's federal constitutional

rights and, accordingly, merits federal habeas corpus relief.   Without accurate

instructions, any assurance of reliability in the final decision seriously is undermined.

Further, simple due process fairness commands accurate jury instruction.   The

Supreme "Court has gone to extraordinary measures to ensure that the prisoner

sentenced to be executed is afforded process that will guarantee, as much as is

humanly possible, that the sentence was not imposed out of whim, passion, prejudice,

or mistake."   *Eddings v. Oklahoma*, 455 U.S. 104, 188 (1982) (O'Connor, J.,

concurring).   This guarantee does not exist in Carpenter's case.   The inaccuracy of the

instructions submitted to the jury at the sentencing phase of Carpenter's trial violated

the Eighth and Fourteenth Amendments.

The entire sentencing proceeding was grossly unfair to Carpenter:   The

instructions stacked the cards against him.   The reliability of the ultimate sentence of

death was, consequently, seriously undermined.   This denied Carpenter his federally

guaranteed right to due process of law.   The Court must vacate Carpenter's sentence

and grant Carpenter's request for federal habeas relief.

**4.   The Failure to Place Upon the State the Burden of Proving the Mitigation Issue Beyond a Reasonable Doubt Relieved the State from Proving Beyond a Reasonable Doubt that Carpenter Merited**

-211-

### a Death Sentence, Denying Carpenter Due Process.

As related, *ante*, the instructions at the sentencing phase of Carpenter's trial placed upon the State the burden of proving beyond a reasonable doubt Carpenter's deliberateness and future dangerousness but did not allocate any burden of proof on the mitigation issue.  Defense counsel objected to the charge on the mitigation issue for failure to properly place the burden of proof on the State in violation of the Fourteenth Amendment's Due Process Clause. (R.30:48).  Because these instructions relieved the State of proving beyond a reasonable doubt every fact necessary to the imposition of a sentence of death, they violated Carpenter's rights under the Eighth and Fourteenth Amendments.

In proffering proposed findings and conclusions in response to the state writ, the State purports to respond to this claim.  *See* State's Proposed Factual Findings and Legal Conclusions at pp. 11-15.  However, the text reveals no findings bearing on the burden of proof issue.   Thus, the trial court issued no findings on this issue. Inasmuch as the court thus ignored one of Carpenter's claim, Carpenter is entitled to *de novo* review.  *DiBenedetto v. Hall*, 272 F.3d 1 (1st Cir. 2001), *cert. denied*, 535 U.S. 1024 (2002).

The presumption of innocence, although not specifically articulated in the United States Constitution, is a basic component of a fair trial under the American

system of criminal justice. *Estelle v. Williams*, 425 U.S. 501, 503,(1976). "The principle that there is a presumption of innocence in favor of the accused is the undoubted law, axiomatic and elementary, and its enforcement lies at the foundation of the administration of our criminal law." *Coffin v. United States*, 156 U.S. 432, 453 (1895).

From this principle arose *Winship*'s fundamental precept: "Lest there remain any doubt about the constitutional stature of the reasonable-doubt standard, we explicitly hold that the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970). *See Sandstrom v. Montana*, 442 U.S. 510,(1979); *Patterson v. New York*, 432 U.S. 197, 210 (1977). The sentencing process, as well as the trial itself, must satisfy the requirements of the Due Process Clause. *Gardner v. Florida*, 430 U.S. 349, 358 (1977). "[R]eliance on the "reasonable doubt" standard among common-law jurisdictions 'reflects a profound judgment about the way in which law should be enforced and justice administered.'" *Apprendi v. New Jersey*, 530 U.S. 466,(2000) (citing *Winship*, 397 U.S. at 361-62) (quoting *Duncan v. Louisiana*, 391 U.S. 145, 155,(1968)).

The *Winship* principle extends to requiring the State to bear the burden of

proving beyond a reasonable doubt all elements that result in imposition of a penalty of death: "Under the Due Process Clause of the Fifth Amendment and the notice and jury trial guarantees of the Sixth Amendment, any fact (other than prior conviction) that increases the maximum penalty for a crime must be charged in an indictment, submitted to a jury, and proven beyond a reasonable doubt." *Jones v. United States*, 526 U.S. 227, 243 n. 6 (1999). The United States Supreme Court recently reaffirmed this principle in *Apprendi* and *Ring*. As stated in *Ring*, "[c]apital defendants, no less than non-capital defendants, . . . are entitled to a jury determination of any fact on which the legislature conditions an increase in the maximum punishment." *Ring v. Arizona*, 536 U.S. 584, 589 (2002).

These principles are particularly compelling in capital cases. The Eighth Amendment simply requires States to apply special procedural safeguards when they seek the death penalty. *Gregg v. Georgia*, 428 U.S. 153 (1976). When the State fails to afford these minimal protections, the constitutional prohibition against "cruel and unusual punishments" forbids its use. *Furman v. Georgia*, 408 U.S. 238 (1972) (*per curiam*).

The decision to exercise the power of the State to execute a defendant is unlike any other decision citizens and public officials are called upon to make. The Supreme Court has affirmed on numerous occasions that the penalty of death is qualitatively

-214-

different from a sentence of imprisonment, however long. *See, e.g., Bullington v. Missouri*, 451 U.S. 430, 442 n. 15,(1981); *Gardner v. Florida*, 430 U.S. 349, 357 (1977)(plurality opinion); *see also*, *Furman v. Georgia*, 408 U.S. 238, 306 (1972) (Stewart, J., concurring).   This qualitative difference engenders a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case.  *See Woodson v. North Carolina*, 428 U.S. 280 (1976)(plurality opinion).  In *California v. Ramos*, 463 U.S. 992, 998-99 (1983), the Court stated that "the qualitative difference of death from all other punishments requires a correspondingly greater degree of scrutiny of the capital sentencing determination." *See id.* at 999 n. 9; *see also Sawyer v. Smith,* 497 U.S. 227 (1990); *Ford v. Wainwright*, 477 U.S. 399, 411 (1986) (Marshall, J., plurality opinion) ("In capital proceedings generally, this Court has demanded that fact-finding procedures aspire to a heightened standard of reliability. . . .  This especial concern is a natural consequence of the knowledge that execution is the most irremediable and unfathomable of penalties; that death is different."); *Ake v. Oklahoma*, 470 U.S. 68, 87 (1985) (Burger, C. J., concurring in judgment) ("In capital cases the finality of the sentence imposed warrants protections that may or may not be required in other cases"); *Barefoot v. Estelle*, 463 U.S. 880, 924 (1983) (Blackmun, J., dissenting) (concern for assuring heightened reliability in the capital sentencing determination

"is as firmly established as any in our Eighth Amendment jurisprudence"); *Godfrey v. Georgia*, 446 U.S. 420, 443 (1980) (Burger, C.J., dissenting) ("[I]n capital cases we must see to it that the jury has rendered its decision with meticulous care."); *Gardner v. Florida*, 430 U.S. 349, 357-358 (1977) (Stevens, J., plurality opinion) ("From the point of view of the defendant, [the death penalty] is different in both its severity and its finality. From the point of view of society, the action of the sovereign in taking the life of one of its citizens also differs dramatically from any other legitimate state action. It is of vital importance to the defendant and to the community that any decision to impose the death sentence be, and appear to be, based on reason rather than caprice or emotion").

These guiding considerations culminated in the *Apprendi* line of cases, including the statement of Justice Thomas, concurring in the judgment: "In the areas of capital punishment, unlike any other area, we have imposed special constraints on a legislature's ability to determine what facts shall lead to what punishment – we have restricted the legislature's ability to define crime." *Apprendi*, 530 U.S. at 522-23. In *Apprendi*, the Court ruled the Due Process Clause of the Fourteenth Amendment requires that a factual determination authorizing an increase in the maximum prison sentence for an offense from ten to twenty years be made by a jury on the basis of proof beyond a reasonable doubt. *Apprendi*, 530 U.S. at 469.

-216-

The application of this principle to Carpenter's case is clear.  Because a negative finding on the mitigation issue, which the State so assiduously advanced, mandates the death penalty, rather than life imprisonment, the State must prove the elements of the issue beyond a reasonable doubt:  "When a judge's finding based on a mere preponderance of the evidence authorizes an increase in the maximum punishment, it is appropriately characterized as 'a tail which wags the dog of the substantive offense.'"  *Id.* at 495 (quoting *McMillan v. Pennsylvania*, 477 U.S. 79, 88 (1986)).  "The person who is charged with actions that expose him to the death penalty has an absolute entitlement to a jury trial on all the elements of the charge." *Almendarez-Torres v. United States*, 523 U.S. 224, 227 (1998) (Scalia, J., dissenting) (emphasis deleted).  The State did not prove the elements of the mitigation issue beyond a reasonable doubt, making Carpenter's conviction unconstitutional under the Due Process Clause.

The instruction submitted to the jury asks whether the jury finds sufficient mitigating circumstances exist such that a sentence of death is not appropriate.  The jury is also instructed that certain answers on the three punishment issues submitted will result in imposition of a death sentence, while the opposite answers will result in imposition of a life sentence.  Thus, the jury is aware of the effect of its answers.

The mitigation instruction effectively asks the jury to find whether the sentence

of death is appropriate – a fact on which the State bears the burden of proof. However, the jury receives no instruction that the State bears this burden, much less the scope of that burden. This transgresses the Due Process Clause and the Eighth Amendment. *See Apprendi*, 530 U.S. at 469; *Winship*, 397 U.S. at 394.

In *Walton v. Arizona*, 497 U.S. 639, 650 (1990), *overruled in part, Ring v. Arizona*, 536 U.S. 584, 589 (2002), the Supreme Court wrote that, "[s]o long as a State's method of allocating the burdens of proof does not lessen the State's burden to prove every element of the offense charged, or in this case to prove the existence of aggravating circumstances, a defendant's constitutional rights are not trial violated by placing on him the burden of proving mitigating circumstances sufficiently substantial to call for leniency." *Id.* The *Walton* case is, however, distinguishable from the instant application. In Carpenter's case, Texas' method of allocating the burden of proof (or not allocating it at all) unconstitutionally lessened the State's burden to prove the existence of aggravating circumstances. As *Apprendi* instructs trial courts, such a failure is unconstitutional and grounds for federal habeas relief. While the State steadfastly advocated a penalty of death, the State bore no burden to prove that a sentence of death was appropriate because mitigating circumstances did not warrant a sentence of life imprisonment. Thus, as to the mitigation issue, the State bore no burden of proving death was the punishment the jurors should impose --

-218-

which is precisely the inquiry the issue posed.  This failure is legally inappropriate and unconstitutional.

The State cannot shift to a capital defendant the burden of proving he does not merit death.  This shifting of burdens effectively would impose upon the defendant the burden of disproving the State's case -- something the federal Constitution does not permit.  If the State chooses to seek death, it must prove, beyond a reasonable doubt, all elements necessary to impose that punishment, including that the mitigating circumstances do not warrant a lesser penalty.  Due process – and the Eighth Amendment in the context of capital cases – requires the State to bear the onus of proving its case.  Because it did not do so at Carpenter's trial, the Court must vacate Carpenter's sentence.

> **5.** **The Instructions Relating to the Mitigation Issue Given to the Jury in the Charge at the Sentencing Phase of Carpenter's Trial Constituted Excessively Vague, Arbitrary, and Capricious Sentencing Patterns in Violation of the Eighth Amendment and the Due Process Clause of the Fourteenth Amendment.**

The Supreme Court in *Furman v. Georgia*, 408 U.S. 238 (1972), held that the death penalty may not be imposed under sentencing procedures that create a substantial risk that the penalty will be inflicted in an arbitrary and capricious manner. *See Gregg v. Georgia*, 428 U.S. 153, 189 (1976).  Thus, a state imposing capital punishment "has a constitutional responsibility to tailor and apply its law in a manner

that avoids the arbitrary and capricious infliction of the death penalty." *Godfrey v. Georgia*, 446 U.S. 420, 428 (1980). The Constitution requires the state to "channel the sentencer's discretion by 'clear and objective standards' that provide 'specific and detailed guidance' and that 'make rationally reviewable the process for imposing the sentence of death.'" *Id.* at 428 (citations and footnotes omitted). *See Maynard v. Cartwright*, 486 U.S. 356, 362 (1988). Absent such constitutionally mandated standards, a state sentence of death is unconstitutional as "wantonly or freakishly" applied. *Furman v. Georgia*, 408 U.S. 238, 310,(1972) (Stewart, J., concurring).

The instructions relating to the mitigation issue in this case violated these jealously guarded tenets of federal constitutional law. The jury was not informed which party held the burden of proof or what standard guided that burden. Rather, the jurors were informed, inaccurately and unlawfully, that ten of their number must concur to reach a sentence imposing life imprisonment. Absent accurate and specific guidance, arbitrariness and capriciousness infected the procedure.

The Supreme Court's holding in *Jurek v. Texas*, 428 U.S. 262, 276 (1976), upholding the constitutionality of the Texas death penalty scheme as it then existed, does not undermine Carpenter's claim. The petitioner in *Jurek* did not challenge the Texas statutory scheme on the bases Carpenter asserts and, consequently, *Jurek* has no precedential value on these issues.

Cumulatively, the instructions submitted at the punishment phase of Carpenter's trial were arbitrary and capricious in violation of the Eighth Amendment and the Due Process Clause. Carpenter's sentence of death was "wantonly and freakishly" applied, and, consequently, is constitutionally deficient under federal law as interpreted by the Supreme Court. Accordingly, Carpenter has demonstrated, even under the most arduous standards of the AEDPA, that he qualifies for federal habeas relief.

## CLAIM IX.

**CARPENTER'S RIGHT TO DUE PROCESS OF LAW AND HIS EIGHTH AMENDMENT FREEDOM FROM CRUEL AND UNUSUAL PUNISHMENT WERE VIOLATED BY THE TRIAL JUDGE'S INSTRUCTIONS ON THE DEFINITION OF "PROBABILITY."**

### A.    Overview

The Fourteenth Amendment to the United States Constitution proscribes any State from "depriv[ing] a person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV. The Eighth Amendment to the United States Constitution mandates that "nor [shall] cruel and unusual punishment [be] inflicted." U.S. Const. amend. VIII. Applicant submits that the failure to instruct the jury on the definition of "probability," a term in the "future dangerousness" issue in the punishment phase of his trial, violated due process and resulted in infliction of cruel

and unusual punishment.

## B.   Instructions Given

Upon conclusion of the presentation of evidence at the punishment phase of Applicant's trial, the trial court instructed the jury to answer Issue Two, which read as follows:

> Do you find from the evidence beyond a reasonable doubt that there is a <u>probability</u> that the defendant would commit criminal acts of violence that would constitute a continuing threat to society?

(CR:128)(emphasis added).  The instruction is consistent with Tex. Code Crim. Proc. Ann. Art. 37.071 § 2 (b)(1).   All members of the jury answered the issue affirmatively.  (CR:128).

The trial court further instructed the jury on the evidence they could consider in answering the issue:

> [Y]ou shall consider all evidence admitted at the guilt or innocence stage and the punishment stage, including evidence of the defendant's background or character or the circumstances of the offense that militates for or mitigates against the imposition of the death penalty.

(CR:123).

The trial court never defined for the jury the term "probability" as used in Issue Two.  The failure to define the term violated Applicant's rights under the Due Process Clause of the Fourteenth Amendment and his right to freedom from cruel and unusual

punishment under the Eighth Amendment.

## C.    Determination Below

On the 11.071 writ, the trial court found that, because the Texas Court of Criminal Appeals has repeatedly held that the term "probability" requires no definition (Finding 59), the "Court concludes the failure to define the term[] 'probability' . . . does not violate applicant's constitutional right to due process." (Finding 60).

## D.    Need for Definitions

Applicant's constitutional right to due process is predicated on the United States Constitution.  The Texas Court of Criminal Appeals hardly is the court of last resort on interpretation of the federal Constitution.  The conclusions of the Texas court present absolutely no binding effect upon this Court.   As Justice Souter recognized in *Simmons v. South Carolina*, the need for "heightened reliability mandates recognition of a capital defendant's right to require instructions on the meaning of the legal terms used to describe the sentences . . . a jury is required to consider, in making the reasoned moral choice between sentencing alternative." 512 U.S. 154, 172 (1994) (Souter, J., concurring).   Thus, whenever a reasonable likelihood exists that a juror will misunderstand a sentencing term, the Court must instruct on the meaning of the term.   In fact, "[a] trial judge's duty is to give

instructions sufficient to explain the law, an obligation that exists independently of any question from the jurors or any other indication of perplexity on their part." *Kelly v. South Carolina*, 534 U.S. 246, 256 (2002) (citing Charles A. Wright and Arthur Miller, Federal Prac. and Proc. § 485 at 375 (3d ed. 2000)) ("It is the duty of the trial judge to charge the jury on all essential questions of law, whether requested or not.").

The complete failure to define the term left the jury free to speculate on its meaning, rendering the term unconstitutionally vague and indefinite. The Texas Court of Criminal Appeals has, on a number of occasions, held that the term requires "more than a mere possibility" or "bare chance." *See, e.g. Murphy v. State*,112 S.W.3d 192 (Tex. Crim. App. 2003) (citing *Hughes v. State*, 878 S.W.2d 142, 148 (Tex. Crim. App. 1992), *Cuevas v. State*, 742 S.W.2d 331 (Tex. Crim. App. 1987)); *Chambers v. State*, 903 S.W.2d 21, 35 (Tex. Crim. App. 1995); *Garcia v. State*, 887 S.W.2d 846, 859 (Tex. Crim. App. 1994)*, cert. denied*, 514 U.S. 1005 (1995). Only this construction of the term renders it not vague and prevents the freakish and wanton assessment of the death penalty. *See Furman v. Georgia*, 408 U.S. at 310. *See also Maynard v. Cartwright*, 486 U.S. 356 (1988).

The reasoning of the state court is, however, wholly specious. The jury did not know the meaning the court ascribes to the word. It was never told. According to the Texas Court of Criminal Appeals, the jury is presumed to understand the term without

-224-

instruction.  *See Feldman v. State*, 71 S.W.3d 738, 757 (Tex.Crim.App. 2002); *Ladd v. State*, 3 S.W.3d 547, 572-73 (Tex.Crim.App. 1999)*, cert denied*, 529 U.S. 1070, (2000).  That the jury is able to know, without any explanation, that "probability" means more than a bare chance or mere probability – a definition necessary to make the term constitutional -- is ludicrous.  Apparently, the term is not so common that a legion of case law was not necessary to define it.  Yet the jurors, who obviously do not read that case law, somehow are presumed to know its meaning, sufficiently to make imposition of capital punishment constitutional.  Just how this occurs, the court does not explain.  Nor can it.

The Due Process Clause requires a definition of legal terms.  In this case, the trial court did not give the jury a definition of legal terms.  In this case, the trial court did not give the jury a definition of a term the Texas Court of Criminal Appeals has held is essential to render imposition of capital punishment constitutional.  Under the circumstances presented, Applicant's death sentence was "arbitrarily or discriminatorily" and "wantonly and . . . freakishly imposed" in violation of the Eighth Amendment.  *See Furman v. Georgia*, 408 U.S. 238, 249 (1972).  The Court must vacate Applicant's sentence and provide him with the requisite federal habeas corpus relief he legally is entitled to receive.

## CLAIM X.

**THE TRIAL COURT'S REFUSAL TO INFORM THE JURY OF THE CONSEQUENCES OF A LIFE SENTENCE FOR CAPITAL MURDER, TO WIT: THAT CARPENTER WOULD BE REQUIRED TO SERVE FIFTEEN CALENDAR YEARS BEFORE BEING ELIGIBLE FOR RELEASE, DENIED CARPENTER DUE PROCESS OF LAW UNDER THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION AND RESULTED IN CRUEL AND UNUSUAL PUNISHMENT UNDER THE EIGHTH AMENDMENT TO THE UNITED STATES CONSTITUTION.**

**A.    Overview**

The Fourteenth Amendment to the United States Constitution proscribes any State from "depriv[ing] a person of life, liberty, or property, without due process of law."  U.S. Const. amend. XIV.  The Eighth Amendment to the United States Constitution mandates that "nor [shall] cruel and unusual punishment [be] inflicted."  U.S. Const. amend. VIII.  Applicant submits that failure to inform the jury of the impact of parole on a life sentence, coupled with the instruction actually submitted, denied him due process and resulted in cruel and unusual punishment.

**B.    Instruction Given**

Upon conclusion of the presentation of evidence at the punishment phase of Applicant's trial, the trial court instructed the jury to answer Issue Two, which read as follows:

> Do you find from the evidence beyond a reasonable doubt that there is a probability that the defendant would commit criminal acts of violence

that would constitute a continuing threat to society?

(CR:128).  The instruction is consistent with Tex. Code Crim. Proc. Ann. art. 37.071

§ 2 (b)(1).  All members of the jury answered the issue affirmatively.  (CR:128).

> The trial court further instructed the jury to answer Issue Three:

> Do you find, whether, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed?

(CR:129).  The instruction is consistent with Tex. Code Crim. Proc. Ann. art. 37.071

§ 2 (e)(1).  All members of the jury answered the issue negatively. (CR:129).

> The trial court further instructed the jury that it could not consider Applicant's

eligibility for parole:

> You are further instructed that you cannot consider how long the defendant may be required to serve a sentence that is imposed. Such matters come within the exclusive jurisdiction of the Board of Pardons and Paroles and are no concern of yours.

(CR:125).  Texas procedural law mandated the instruction.  Texas legislature has

since amended the law to mandate the following instruction:

> Under the law applicable in this case, if the defendant is sentenced to imprisonment in the institutional division of the Texas Department of Criminal Justice for life, the defendant will become eligible for release on parole, but not until the actual time served by the defendant equals 40 years, without consideration of any good conduct time.  It cannot

accurately be predicted how the parole laws might be applied to this defendant if the defendant is sentenced to a term of imprisonment for life because the application of these laws will depend on decisions made by prison and parole authorities, but eligibility for parole does not guarantee that parole will be granted.

Tex. Code Crim. Proc. Ann. art. 37.071 § 2(e)(2)(B).

The trial court further instructed the jury that "the punishment for capital murder is either death or confinement in the Institutional Division of the Texas Department of Criminal Justice for life." (CR:122). At the time of Applicant's trial, if sentenced to life imprisonment, rather than death, he was, under Texas law, "not eligible for release on parole until his actual calendar time served, without consideration of good conduct time, equals one-fourth of the maximum sentence or 15 calendar years." Tex. Code Crim. Proc. Ann. art. 42.18 § 8(b) (Vernon 1991).

## C.    Harm from Instruction

The failure to advise the jury that Applicant, if sentenced to death, would have been ineligible for parole under any circumstances for fifteen years violated Applicant's constitutional rights for the following reasons: (1) it deprived Applicant of his right, under the Due Process Clause of the Fourteenth Amendment, to rebut any evidence of future dangerousness; and (2) it constituted cruel and unusual punishment in violation of the Eighth Amendment and violated Applicant's right to due process of law under the Fourteenth Amendment in that it impermissibly diminished the

-228-

reliability of the jury's ultimate determination that death was the appropriate punishment by failing to fully inform the jury on the meaning of "life," a legal term of art.

    **1.**    **The Failure to Advise the Jury that Applicant, If Sentenced to Life Imprisonment, Would Have Been Ineligible for Parole Under Any Circumstances for Fifteen Years Deprived Applicant of His Right, Under the Due Process Clause of the Fourteenth Amendment, to Rebut Any Evidence of Future Dangerousness.**

    **a.**    **Factual Background:  Future Dangerousness**

Carpenter was convicted of criminal mischief.  (R:28:18-21).  He was also convicted of burglary of a building for stealing from an auto parts store. (R:29:18-20). He was convicted of burglary of a habitation for breaking into a home in Kaufman County.  (R.28:26-62).  He was arrested twice for driving while his license was suspended and once for carrying a club.  (R.29:13).  Carpenter also had another conviction for theft.

The State introduced a series of lewd drawings (State's Exhibits 204-209) to show that Carpenter degraded women.  The State introduced evidence that while Carpenter was in prison he was not an ideal prisoner, that he smuggled tobacco into a unit, shot dice for stamped envelopes,  (R.29:177-179) refused to obey an order from a guard, and used vulgar language (R.29:210-228).

The prosecution introduced three fights in prison.  Carpenter never used a

weapon and the other person was never seriously injured. (R.29:98, 207, 134-155). In fact, in the assault most emphasized by the prosecution, the fight with inmate Donald Leonard (R.29:141), all the parties acknowledged that Leonard was the aggressor and that Carpenter received the most serious injuries. (R.29:148, 136). The most serious misconduct established was a juvenile adjudication for holding another child's head under water (R.29:28, 34-35). As an adult, Carpenter was convicted of endangering a child when he fled from the police with a child in the car. (R.29:76-93).

Carpenter had a number of uncharged petty assaults with family members. He was charged with a Class C Assault on Carpenter/McBay. (R.28:42). He argued with his aunt, Crisler, about stalking her daughter, Kacey. (R.28:93-97). After the argument, Carpenter allegedly tried to run Crisler over. He got into a verbal dispute with his grandmother over a truck payment that he owed her. (CR:46). He allegedly forced Carpenter/McBay to have sex with him while they lived together. (R.28:30-33).

Finally, the State claimed Carpenter was a racist. He wrote letters to Carpenter/McBay in which he talked about fighting with black inmates and called them "niggers." State Exhibits 179, 181. He also would tell his wife that he would go out nigger hunting at night. (R. 28:33, 47). In closing argument, the prosecution

-230-

made a plea regarding future dangerousness, striving to characterize Carpenter's prior conduct, particularly his alleged racism, as posing a continuing threat for the remainder of his life. (CR:79-81).

The defense countered this evidence, stating that both options available to the jury – life imprisonment and death – were "significant punishment." (R.30:68, 75). The defense argued that, when Carpenter was out of prison, he worked and supported Carpenter/McBay and his children. (R.30:70). The defense focused on the fact that Carpenter had been imprisoned since 1995 and that the State had shown nothing but three fights, one of which was in self-defense. (R.30:70). Fights in prison, the defense stated, were common. (R.30:71, 72).

The defense argued that the prison system was more than adequate to handle Carpenter. (R.30:72). Because of Texas law, it could not, however, inform the jury that the prison system, with all its constraints and confinements, would handle Carpenter for at least fifteen years.

The defense concluded by again stating that both punishment options were "significant punishments." (R.30:75). "In fact I think reasonable people might disagree on which one of those is actually worse." (R.30:75). Again, it could not inform the jury on the meaning of "life."

      **b.**    **Need for Definition**

The Supreme Court repeatedly has affirmed that the Due Process Clause of the Fourteenth Amendment does not allow the execution of a person "on the basis of information which he had no opportunity to deny or explain." *Gardner v. Florida*, 430 U.S. 349, 362 (1977). *See also Crane v. Kentucky*, 476 U.S. 683, *690 (1986); Skipper v. South Carolina*, 467 U.S. 1, 9 (1986) (Powell, J., concurring in the judgment)("Because petitioner was not allowed to rebut evidence and argument used against him," he clearly was denied due process). Thus, denial of a capital defendant's right to explain the impact of parole laws on the issue of future dangerousness denies due process, particularly its requirement of a right to a fair hearing. *See Simmons v. South Carolina*, 512 U.S. 154, 174 (1994) (Ginsburg, J., concurring in the judgment).

In this case, Applicant was precluded by Texas law from presenting evidence to the jury that he was not a future danger to society inasmuch as, if sentenced to life imprisonment– the only alternative to death – he would not be paroled until, if at all, he was in his mid-forties. (CR:2). The Texas procedure followed in this case directly violated the rule enunciated in *Simmons*:

> In assessing future dangerousness, the actual duration of the defendant's prison sentence is indisputably relevant. Holding all other factors constant, it is entirely reasonable for a sentencing jury to view a defendant who is eligible for parole as a greater threat to society than a defendant who is not. Indeed, there may be no greater assurance of a

> defendant's future nondangerousness to the public than the fact that he never will be released on parole. The trial court's refusal to apprise the jury of information so crucial to its sentencing determination, particularly when the prosecution alluded to the defendant's future dangerousness in its argument to the jury, cannot be reconciled with our well-established precedents interpreting the Due Process Clause.

512 U.S. 163-64. The length of Carpenter's actual length of incarceration if sentenced to life imprisonment was "indisputably relevant" to the issue of his future dangerousness. This argument was particularly critical to the defense given the gross dearth of evidence that Carpenter had committed, or likely would commit, crimes of violence. *See* Point of Error 1. However, Texas law precluded the defense from arguing this. The State denied Carpenter the right to refute its arguments regarding his dangerousness, depriving him of due process.

### c. Prejudice

The prosecution argued Carpenter, if sentenced to life, would certainly harm Carpenter/McBay, Smith, and Crisler. The defense could not rebut this by arguing that, fifteen years from the date of the sentence, the lives of Carpenter and the three women would differ so dramatically that Carpenter might not even be able to locate them, if he chose to do so. Further, fifteen years is a long time for hatred and anger to continue to so rage that retribution is the only option.

The instruction in the charge informing the jurors they could not consider how long Carpenter would be required to serve a sentence imposed, adding that this is within the jurisdiction of the Board of Paroles, compounded the predicament in which Texas law placed the defense.  As the Supreme Court recognized in *Simmons,* the instruction suggested parole availability.  *Simmons*, 512 U.S. at 170-71.  The Court has recognized that, in some circumstances, "the risk that the jury will not, or cannot, follow instructions is too great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored."  *Bruton v. United States*, 391 U.S. 123, 135 (1968).  *See also Beck v. Alabama*, 447 U.S. 625, 642 (1980); *Barclay v. Florida*, 463 U.S. 939, 950 (1983)("Any sentencing decision calls for the exercises of judgment.  It is neither possible nor desirable for a person to whom the State entrusts an important judgment to decide in a vacuum, as if he had no experiences.").

The instruction inevitably placed the issue of parole in the minds of the jurors.  Only the most oblivious juror could not have wondered how long Carpenter would serve a sentence, if that juror chose to answer the issues so as to lead to the imposition of life imprisonment.  In fact, the *voir dire* confirms this.  The State, in questioning Jeffrey Hartman, asked about the issue of future dangerousness.  Hartman responded, "I think a person's past, of course, has a lot to do with it.  But then in a case like this,

-234-

you're talking life or death, that question doesn't mean much unless if he has life.  Is there a chance of parol?  [sic].  If there's no chance of parole, that question really doesn't mean anything." (R.3:24).    The jurors in this case, as a matter of Due Process, should have been allowed to weigh the effect of parole.  Because Carpenter would be incarcerated for fifteen years, at the very minimum, any future dangerousness to society at large substantially was diminished.  In effect, at Carpenter's trial, the State could argue future dangerousness.  Carpenter could not fully rebut this argument.  This defies the command of due process, particularly its requirement of a right to a fair trial.

Texas law effectively made the jury death prone.  If the jurors believed the State's evidence regarding Carpenter's dangerousness and concluded he would be a danger if released, they could not, under Texas law, do anything but vote for a sentence of death.  They simply were precluded from weighing the critical evidence that Carpenter would not be released, if at all, until after fifteen years of incarceration in a highly restricted environment and, consequently, any danger was minimal.  This effect is particularly acute given the stark absence of evidence Carpenter had committed or would commit violent criminal activities.

Justice Stevens, writing on a denial of a writ of certiorari in *Brown v. Texas*, 522 U.S. 940 (1997), recognized this aspect of the law:

> The situation in Texas is especially troubling.  In Texas, the jury determines the sentence to be imposed after conviction in a significant number of noncapital felony cases.  In those noncapital cases, Texas law requires that the jury be given an instruction explaining when the defendant will become eligible for parole.  Thus, the Texas Legislature has recognized that, without such an instruction, Texas jurors may not fully understand the range of sentencing options available to them.  Perversely, however, in capital cases, Texas law *prohibits* the judge from letting the jury know when the defendant will become eligible for parole if he is not sentenced to death.  The Texas rule unquestionably tips the scales in favor of a death sentence that a fully informed jury might not impose.

(footnote omitted) (emphasis in original).  Justice Stevens evinces his recognition that the Texas scheme is unconstitutional under the *Simmons* principle.  Any rule that "tips the scales in favor of a death sentence that a fully informed jury might not impose" violates the Due Process Clause.  The scheme is, as Justice Stevens states, wholly "perverse."

The Texas legislature now apparently recognizes this.  As noted, *ante*, the legislature amended the statute to require an instruction on the eligibility of parole.  The legislature apparently recognized that parole eligibility evidence is critical to a capital defendant's constitutional rights and the defendant's right to defend the State's case.

The defense argued both options available to the jury were "significant punishments," but they could not inform the jury of the scope of that significance.

The jury was free to speculate that Carpenter, if sentenced to life, might be released in a very few years – an assumption that, under the law, was in error. The defense, however, hamstrung by Texas law, was precluded from informing the jurors of the truth.

Carpenter recognized that, in *Simmons*, the capital defendant was completely ineligible for parole, while Carpenter would be eligible in 40 years. However, this is a distinction without a difference. The constitutional principle undergirding *Simmons* was the right of a capital defendant to rebut evidence of future dangerousness with evidence regarding eligibility for parole. This principle is fully applicable to Carpenter's case.

Under these circumstances, the decision of the Texas Court of Criminal Appeals "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. §2254(d)(1). A state court acts contrary to clearly established federal law if it applies a legal rule that contradicts prior Supreme Court holdings or reaches a different result from one of the Supreme Court cases despite confronting indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 405,(2000).

The statute also authorizes federal habeas corpus relief if, under clearly established federal law, a state court has been unreasonable in applying the governing

-237-

legal principle to the facts of the case.  A state determination may be set aside under this standard if, under clearly established federal law, the state court was unreasonable in refusing to extend the governing legal principle to a context in which the should have controlled.  *Id.* at 407.

In this case, the governing legal principle was clearly established under *Simmons*.  The refusal of the Texas courts to extend it to this context, in which a capital defendant confronts evidence of future dangerousness that State law constrains him from rebutting, was unreasonable.  The principle underlying *Simmons* applies with full force:  The Due Process Clause commands that a capital defendant be allowed to refute the State's evidence of future dangerousness.  The statement in *Simmons* of its principle cogently reveals this:  "Because truthful information of parole ineligibility allows the defendant to 'deny or explain' the showing of future dangerousness, due process plainly requires that he be allowed to bring it to the jury's attention by way of argument by defense counsel or an instruction from the court."  *Simmons*, 512 U.S. at 169; *see also, Gardner*, 430 U.S. at 362.

The Supreme Court's most recent pronouncement on this issue, *Ramdass v. Angelone*, 530 U.S. 156, 166 (2000), does not undermine this result.  In *Ramdass*, the Court faced a capital defendant claiming entitlement to *Simmons* evidence and instructions when the prior convictions that would have made him ineligible for

parole under state law were not final. *Id.* at 159, 161. The Court stated that, "We have not extended *Simmons* to cases where parole ineligibility has not been established as a matter of state law at the time of the jury's future dangerousness deliberations in a capital case." *Id.* at 165. The Court further noted that, "[t]he instruction was required in *Simmons* because it was agreed that 'an instruction informing the jury that petitioner is ineligible for parole is legally accurate.'" *Id.* at 166-67 (quoting *Simmons*, 512 U.S. at 166). The Court added that, "In this case, a *Simmons* instruction would not have been accurate under the law." *Id.* at 167.

In Carpenter's case, evidence of the length of time Carpenter would be required to serve before eligibility for parole was critical to rebutting the State's purported evidence of future dangerousness. The fifteen-year requirement would have been an accurate statement of Texas law, and at the time of trial. Thus, *Ramdass* is inapposite.

The Due Process Clause does not tolerate placing a capital defendant in a straight jacket by barring him from rebutting the prosecution's arguments regarding future dangerousness with the fact that, given Texas' parole laws, any danger is minimal, if it exists at all. As the Court recognized in *Shafer v. South Carolina*, 532 U.S. 36 (2001), when the jury endeavors to make the moral judgment whether to impose the death penalty, parole eligibility may become critical. The failure to advise

the jury that Carpenter, if sentenced to life imprisonment, would serve at least fifteen years violated Carpenter's due process rights.   Accordingly, Carpenter's death sentence must be vacated.

>   **2.      The Failure to Advise the Jury that Carpenter, If Sentenced to Life Imprisonment, Would Have Been Ineligible for Parole Under Any Circumstances for Fifteen Years Constituted Cruel and Unusual Punishment in Violation of the Eighth Amendment and Violated Carpenter's Right to Due Process of Law Under the Fourteenth Amendment In That It Impermissibly Diminished the Reliability of the Jury's Ultimate Determination that Death Was the Appropriate Punishment by Failing to Fully Inform the Jury on the Meaning of "Life," a Legal Term of Art.**

>    **a.      Overview**

The Supreme Court has affirmed on numerous occasions that the penalty of death is qualitatively different from a sentence of imprisonment, however long.  *See, e.g., Bullington v. Missouri*, 451 U.S. 430, 442 n. 15 (1981); *Gardner v. Florida*, 430 U.S. 349, 357 (1977) (plurality opinion); *see also, Furman v. Georgia*, 408 U.S. 238, 306 (1972) (Stewart, J., concurring).   This qualitative difference engenders a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case.  *See Woodson v. North Carolina*, 428 U.S. 280,(1976) (plurality opinion); *California v. Ramos*, 463 U.S. 992, 998-99, 999 n. 9 (1983).   *See generally, Sawyer v. Smith,* 497 U.S. 227 (1990)*; Ford v.*

*Wainwright*, 477 U.S. 399, 411 (1986) (Marshall, J., plurality opinion)("In capital proceedings generally, this Court has demanded that fact-finding procedures aspire to a heightened standard of reliability. . . . This especial concern is a natural consequence of the knowledge that execution is the most irremediable and unfathomable of penalties; that death is different"); *Ake v. Oklahoma*, 470 U.S. 68, 87 (1985) (Burger, C. J., concurring in judgment) ("In capital cases the finality of the sentence imposed warrants protections that may or may not be required in other cases"); *Gardner v. Florida*, 430 U.S. 349, 357-358 (1977) (Stevens, J., plurality opinion)("From the point of view of the defendant, it is different in both its severity and its finality. From the point of view of society, the action of the sovereign in taking the life of one of its citizens also differs dramatically from any other legitimate state action. It is of vital importance to the defendant and to the community that any decision to impose the death sentence be, and appear to be, based on reason rather than caprice or emotion").

A component of heightened reliability is the Eighth Amendment and Due Process command that the jury be capable of a reasoned moral judgment about whether death, rather than a lesser sentence, ought to be imposed. *See Simmons*, 512 U.S. at 172. Part and parcel of this requirement is the provision of "accurate sentencing information [as] an indispensable prerequisite to a reasonable

determination of whether a defendant shall live or die," *Gregg v. Georgia*, 428 U.S. 153, 190 (1976)(joint opinion of Stewart, Powell, and Stevens, JJ.), and the invalidation of "procedural rules that tend to diminish the reliability of the sentencing determination." *Beck v. Alabama*, 447 U.S. 625, 638 (1980).  As explained, *ante*, the failure to inform the jury regarding the effect of parole deprives the jury of accurate information essential to ensure a reliable sentencing decision.

Further, as Justice Souter recognized in *Simmons*, the need for "heightened reliability mandates recognition of a capital defendant's right to require instructions on the meaning of the legal terms used to describe the sentences . . . a jury is required to consider, in making the reasoned moral choice between sentencing alternative." *Simmons*, 512 U.S. at 172.  Thus, whenever a reasonable likelihood exists that a juror will misunderstand a sentencing term, the Court must instruct on the meaning of the term.  In fact, "[a] trial judge's duty is to give instructions sufficient to explain the law, an obligation that exists independently of any question from the jurors or any other indication of perplexity on their part." *Kelly v. South Carolina*, 534 U.S. 246, 256 (2002)(citing Charles A. Wright and Arthur Miller, Federal Prac. and Proc. § 485 at 375 (3d ed. 2000)("It is the duty of the trial judge to charge the jury on all essential questions of law, whether requested or not").

  **b.**  **Charge Given**

In this case, the charge of the Court instructed the jury that the punishment for capital murder is either death or "confinement . . . for life." (CR:122). The Court further instructed the jury that, if it returned a negative finding on either or both issue one and issue two or an affirmative finding on issue three, the court shall sentence the defendant to "confinement . . . for life." (CR:124).

The charge, by omitting the effect of Texas' parole laws, failed to explain to the jury the meaning of "confinement . . . for life." The jury was left to speculate on the length of a "life" sentence. Particularly given the instruction, quoted *ante*, admonishing the jurors not to consider the effect of parole laws, the jurors unquestionably must have wondered how long Carpenter actually would serve a "life" sentence if they chose to impose that punishment. Thus, the charge, absent an affirmative instruction detailing parole laws, inevitably caused the jury to remain in the dark regarding the full meaning of "life." Absent a fully accurate definition of the term, the choice between life or death was skewed, unconstitutionally undermining the reliability of the ultimate sentence of death.

### c.   Prejudice

Under the Supreme Court's decision in *Brecht v. Abrahamson*, a federal court may grant habeas relief for constitutional error only if it determines that the constitutional error had a "substantial and injurious effect or influence in determining

the jury's verdict."  507 U.S. 619, 623 (1993) (quoting *Kotteakos v. United States*, 328 U.S. 750, 776,(1946)).  Under this standard, Carpenter should prevail whenever the record is "so evenly balanced that a conscientious judge is in grave doubt as to the harmlessness of the error."  *O'Neal v. McAninch*, 513 U.S. 432, 436 (1995).  As the Fifth Circuit explained, "If your minds are 'in virtual equipoise as to the harmlessness' under the *Brecht* standard, of the error, then we must conclude that it was harmful."  *Robertson v. Cain*, 324 F.3d 297, 305 (5th Cir. 2003) (quoting *Woods v. Johnson*, 76 F.3d 1017, 1026027 (5th Cir. 1996)) (quoting *O'Neal*, 513 U.S. at 435).

The scant evidence that Carpenter had committed acts of criminal violence or would in the future commit acts of criminal violence raises "grave doubt" as to the absence of a substantial and injurious effect on the jury of the failure to instruct or allow evidence on eligibility for parole, compounded by the instruction that the jurors could not consider parole.  As related at length in Point of Error One and described *ante,* the best the State could do to demonstrate future dangerousness was to introduce evidence of such alleged offenses as stealing hubcaps, burglarizing a building, and Carpenter's alleged racism.  This is not a man who had a significant history of prior violent acts against the person that would cause him to pose a threat. Under these circumstances, that Carpenter would have served, at a minimum, fifteen

years in a strictly confined and regulated environment could have persuaded a juror

that Carpenter would not present a danger at the time of release.  Harm existed.

Consequently, Carpenter's death sentence was "arbitrarily or discriminatorily"

and "wantonly and . . . freakishly imposed" in violation of the Eighth Amendment.

*See Furman v. Georgia*, 408 U.S. 238, 249, Further, absent reliability in the jury's

decision making, the sentence violated the Due Process Clause of the Fourteenth

Amendment.  Accordingly, the Court must vacate Carpenter's sentence.


## CLAIM XI(A).

**CARPENTER WAS DENIED DUE PROCESS OF LAW WHEN THE TRIAL COURT INTRODUCED LETTERS WRITTEN BY APPLICANT WHICH CONTAINED RACIST COMMENTS THAT WERE IRRELEVANT TO SENTENCING CONSIDERATIONS BEFORE THE JURY.**


## CLAIM XI(B).

**CARPENTER WAS DENIED DUE PROCESS OF LAW WHEN THE TRIAL COURT INTRODUCED LEWD DRAWINGS DRAFTED  BY CARPENTER THAT WERE IRRELEVANT TO SENTENCING CONSIDERATIONS BEFORE THE JURY.**

**A.    Overview**

Because the issues concerning the admission of the letters and the drawings

involved the same applications and doctrines of law, and because both were admitted

-245-

at the punishment stage as proof of bad character, these claims are argued together.

## B.   Relevant Facts

### 1.   Letters

At the punishment phase of trial, and over Carpenter's timely objections that the prejudicial effect outweighed the probative value, the State introduced Exhibits 149, 180, 181, 183 for all purposes and Exhibits 178, 179 for record purposes only. These letters were introduced through Carpenter/McBay, the common law wife. State's Exhibit 149 contains a statement that Carpenter expected to get into a fight the next day because he had "beat the shit out of this nigger who stole stuff from him." State's Exhibit 180 is a statement from a letter taken out of context that Carpenter "hates niggers." State's Exhibit 183 is a statement from a letter that he "almost got into it with a nigger." The State offered no explanation for the letters but argued to the jury in the punishment phase that, "you know that's true from the letters he has written how he feels. He's a racist." (R.30:62)

This was a white-on-white murder. There is no evidence of racial motivation in the record. Allegedly, this was a murder-for-hire. Insinuations and accusation of racism are totally superfluous to the issues at trial. Introduction of "race" was solely aimed at inflaming the jury.

### 2.   Drawings

At the punishment phase of trial, during the cross-examination of Sandra Carlson, a former girlfriend of Carpenter's, the State introduced Exhibits 204-209 (R.30:45-46). Counsel made a timely objection that the drawings were irrelevant to any of the punishment issues and the prejudicial effect of them outweighed the probative value. There was no allegation of sexual misconduct. There was no evidence of a sexual purpose in the murder. Therefore, the sole purpose in waving the pictures before the jury was to portray Carpenter as a sexual deviant.[7]

## C.    Determination Below

### 1.    Letters

The issue of the letters was not raised on direct appeal. In Point of Error No. 20 of the state writ, counsel argued that the prejudicial effect of the bigotry outweighed its probative value since the letters did not assist the jury in resolving any significant factual controversy. (Carpenter's 11.071 writ, p. 138-140). The point of error concluded quite rightly that race played no part in the murder or the trial and the

---

[7] The trial court found, based upon the State's submitted Findings of Fact, that the drawings were favorable to Carpenter because they humanized him. (Finding of Fact 291). Apparently, trial counsel did not think so because a strenuous objection was lodged. This finding is simply the State's belated effort to try and minimize the damage. Of course, since the trial court did not bother to read the proposed findings, this assertion was also stamped "approved."

sole apparent purpose was to inflame the jurors.   In response, the State argued that bigotry is a matter relevant to future dangerousness and mitigation citing *Gholson v. State*, 542 S.W.2d 395, 397-98 (Tex. Crim. App. 1976).   The State also made the fanciful assertion that although the letters were prejudicial, they were not extreme or inflammatory.   The state court and the Court of Criminal Appeals adopted the State's findings that any evidence deemed relevant is admissible (Finding of Fact 330), that bigotry is relevant to future dangerousness and mitigation, again citing *Gholson,* (Finding of Fact  331) and that the evidence was harmless.   The reliability of these findings is minimal since the prosecutor wrote the findings, and the trial court adopted all of them *verbatim.*

### 2.    Drawings

This issue was not raised on direct appeal.   In the state writ, Carpenter argued that the prejudicial effect outweighed the probative value and that the drawings were not relevant to any of the special issues.   *See* Point of Error 18 p. 133-136 of the state writ.   The State responded that any evidence deemed relevant at sentencing is admissible and that the lewd drawings of the women evinced "an objectification of women, if not a disrespect for them."   The only citation for this reasoning was *Corwin v. State*, 870 S.W.2d 23, 35 (Tex. Crim. App. 1993).   Incredibly, the State opined that the pictures were so well drawn, that they demonstrated Carpenter's artistic merit.

In turn, the State asserted that the jury could have used this artistry as a reason to save his life.

Once again, the court fully adopted the State's proposed findings of fact. These findings included the legal assertion that any relevant evidence is admissible, (Finding of Fact 285), the factual assertion that drawings evinced an objectification of women, if not a disrespect for them (Finding of Fact 287) and the factual assertion that the artistic merit of the drawings "humanized" Carpenter and made it more likely that the jury would find this as mitigating evidence (Finding 291).

## D.      Protection of First Amendment Interests

In *Dawson v. Delaware*, 503 U.S. 159 (1992) the Supreme Court was faced with the issue of whether racism is per se admissible in the punishment phase of a capital case.  Dawson was a white on white murder.  Dawson belonged to the Aryan brotherhood, a notorious racist prison gang.  Although the prosecution could not adduce any direct evidence that Dawson would be violent toward black people, his membership in the Aryan brotherhood was introduced against him as evidence of bad character.  *Id.*

The Supreme Court, while noting that even those accused of murder possessed First Amendment rights, held that such writings are not admissible as evidence of general character.  *Id*.  If the State has evidence of specific desires and stated intents

to engage in violence toward minorities, such evidence would be admissible for future dangerousness. Otherwise, mere writings are not. This is in accordance with due process notions that using a person's private opinions against him violates the "fundamental conceptions of justice which lie at the base of our civil and political institutions." *Dowling v. United States*, 493 U.S. 342, 352-53 (1990).

In accordance with *Dowling*, state and federal courts have had to consider various types of such protected material. In *State v. Oden*, 2002 WL 31082064 (2002), the State of Washington ruled that a prisoner's artwork deserves First Amendment protection. In *The People of the Territory of Guam v. Shymanovitz*, 157 F.3d 1154 (9th Cir. 1998), the court precluded use of gay pornography in the accused's possession. Virtually every court addressing the issue has found that such evidence is not admissible merely to show character, it must demonstrate a specific malevolent motivation relevant to the underlying crime or to the motivation to commit race crimes. *See State v. Leitner*, 34 P.3d 42 (Kansas 2001); *Zebroski v. State*, 715 A.2d 75, 79 (D.C. 1980).

## E.    Prejudice

Carpenter is entitled to relief if he can establish the substantial and injurious effect the wrongly-admitted evidence had on the finder of fact - - the jury. *See Kotteakos* and *Brecht, supra.* The evidence against Carpenter in this case is highly

circumstantial.  Aside from an extremely dubious eyewitness identification (*see* Claim II above), the testimony of a co-conspirator who has repeatedly lied about her involvement and has recanted her implication of Carpenter's guilt, (*see* Claim IV above) and the testimony of Carpenter's common law wife, who admittedly hated Carpenter because she believed he had caused her mother to be arrested, there is no physical evidence tying Carpenter to the crime.

Likewise, the evidence of future dangerousness was quite minimal.  Carpenter engaged in one somewhat serious assault as a juvenile.  Since that time, every fight or altercation was minor, not involving weapons and not resulting in any more than temporal pain.  Carpenter has a temper which manifests itself in threats, but none of the threats were ever carried out.  Rather, the majority of Carpenter's crimes are simple property crimes, not violent crime.


Against this backdrop, the State apparently felt it was necessary to buttress their case by painting Carpenter as a racist and as a sex pervert.  The purpose of this characterization of Carpenter was simply to inflame the jury.  The underlying offense involved neither issues of race nor issues of sexual misconduct.  Under the totality of the circumstances, it cannot be said with confidence that these pieces of evidence did not cause the jury to return a negative answer to the mitigation issue or an affirmative

answer to the future dangerousness issue. The Supreme Court has held such attempts to be improper.

## F.     Unreasonable Determination Below

The court's findings (Finding 285) that any relevant evidence is admissible in the sentencing phase of a capital murder case is contrary to the well-established Supreme Court precedent announced in *Dawson v. Delaware, supra. See Williams v. Taylor*, *supra* at 413. The trial court and the state courts were obligated to review the admissibility of the drawings, in light of Carpenter's protected First Amendment rights, and determine if the drawings were relevant to any punishment issue. Thus, the finding that the drawings were "relevant to Carpenter's character" (Finding of Fact 288) is nothing more than a misapplication of established federal law.

Likewise, the court's finding that the letters were similarly admissible (Finding of Fact 321) is equally flawed. The court was obliged to prohibit admission of the letters unless they were related to a case-specific sentencing issue. These letters were not. As noted above, this was a white-on-white crime. The letters do not contain threats of violence, but simply refer to altercations that Carpenter had with other prisoners of color who had stolen his property. Findings of Fact 327-329. Further, the court's finding that bigotry alone is relevant to future dangerousness and

mitigation, is directly contrary to the holdings of *Dawson, supra*, and its progeny.[8]

Even under the stringent AEDPA this Court should find a reasonable application of federal law in permitting the admission of evidence in violation of Carpenter's First Amendment rights.  Had the court not merely rubber stamped the prosecutor's findings, but rather conducted independent legal research regarding the claims, it is likely that the court would have found, and applied, the *Dawson* standard.

 The court would undoubtedly have found that the letters and pictures were a transparent attempt to portray Carpenter in an unfavorable light not relevant to case-specific sentencing considerations.  Further, because the United States Supreme Court decision regarding the First Amendment is controlling, the trial court's refusal to grant Carpenter his full realm of First Amendment protection, is a direct violation of Carpenter's constitutional rights and merits the relief sought in this writ.  The AEDPA standard of deference toward state court findings does not apply when the state refuses to acknowledge or apply governing Supreme Court precedent.

## CLAIM XII.

## NONE OF THE FOREGOING CLAIMS RAISED BY CARPENTER SHOULD

---

[8] The trial court and state appellate courts rely upon the prosecutors' misuse of *Gholson v. State*, 542 S.W.2d 395 (Tex.Crim.App. 1976) to justify admission of the pictures.  The State also cited *Corwin v. State*, 870 S.W.2d 23 (Tex. Crim. App. 1993). These cases precede and do not refer to *Dawson* or its progeny.  Findings of Fact 293, 331.  Again, the State's proposed findings of fact and conclusions of law were adopted verbatim without any apparent meaningful review by the courts.

**BE CONSIDERED PROCEDURALLY BARRED AS CARPENTER HAS PROPERLY ESTABLISHED HIS CLAIM OF ACTUAL INNOCENCE PURSUANT TO *SCHLUP V. DELO* AND THE FAILURE TO REVIEW THESE CLAIMS WILL RESULT IN THE MISCARRIAGE OF JUSTICE.**

A.    Introduction

Carpenter has vigorously protested his guilt and has continually maintained his actual innocence throughout all the proceedings against him.  Carpenter did not kill Henin.  Accordingly, and through the above proffered evidence and attached exhibits, this Court should not consider any of the claims presented, which may not have been previously submitted by Carpenter, to be procedurally barred and incapable to review by this court.  Rather, to protect against the most grave and unfathomable miscarriage of justice -- the execution of one who is factually innocent -- this court should review each and every one of the claims raised above by Carpenter to ensure that he was not wrongly convicted and, more importantly, to ensure that he is not wrongly executed.

B.    **Application of the Law**

Carpenter alleges that various occasions of constitutional error have deprived him of the right and opportunity to present probative evidence to the jury that, if considered, would have established his innocence.  *Schlup v. Delo*, 513 U.S. 298 (1995).  *Schlup* provides this court with the necessary authority to review each and

every one of the claims submitted in this application by Carpenter.

*Schlup* states that "if a petition such as [Carpenter's] presents evidence of innocence so strong that a court cannot have confidence in the outcome of the trial unless the court is also satisfied that the trial was free of non-harmless constitutional error, [Carpenter] should be allowed to pass through the gateway and argue the merits of his underlying claim." *Schlup*, 513 U.S. at 316.   *Schlup* does not provide an independent basis for habeas relief but, rather, simply protects individuals, such as Carpenter, from having their constitutional claims procedurally barred.   *Id.*

Carpenter fully appreciates the ironic fact that his actual innocence, standing alone, will not provide him with a basis for federal habeas corpus relief.   *See Herrera v. Collins*, 506 U.S. 390 (1993).   Under Supreme Court authority, Carpenter  must first establish that his trial was infected with error of a constitutional magnitude to thereafter enable him to raise and present his claims of actual innocence.   *Schlup*, 513 U.S. at 315-16.   A conviction obtained through the benefit of constitutional error is not "entitled to the same degree of respect as one . . . that is the product of an error free trial."   *Id.* at 316 (distinguishing a *Herrera*-type substantive claim of actual innocence from the *Schlup* variety claim challenging the constitutional infirmities of trial resulting in an unsound verdict).

As cogently set forth above, Carpenter maintains that his trial -- at both the

-255-

guilt/innocence phase and the punishment phase -- were tainted by numerous instances of constitutional error.  Evidence of these constitutional infractions are set forth in the preceding hundred plus  pages of this brief and are supported by numerous pieces of evidence and affidavits from witnesses supporting the claims raised by Carpenter.  "To be credible, such a claim requires petitioner to support his allegations of constitutional error with new reliable evidence -- whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence -- that was not presented at trial." *Schlup,* 513 U.S. at 324.  In the instant case, Carpenter has provided this Court with examples of newly discovered evidence including the Freedom of Information Act data tying Tolbert to the instant offense as well as the Smith recantation establishing Carpenter's innocence.  Further, Carpenter has established that the trial court both admitted and precluded crucial evidence, such as the Kedroski statement, Rainey's mis-identification,  Carpenter/McBay's status as common law wife, the lewd pictures and vulgar letters,  by applying grossly incorrect legal standards.

To obtain relief, Carpenter must now demonstrate that it is more "likely than not" that no reasonable jury would have convicted him in the light of the new evidence.  *Id* at 327.  The "more likely than not" paradigm is less rigorous than the clear and convincing standard previously used.  *Id*.  Carpenter maintains that he is

innocent and that the perpetrator was a third party. *Schlup* assures Carpenter that all

of the constitutional error noted above will be considered by this Court. *Id* at 325-

327. For these reasons, Carpenter now requests that the court consider all of the

claims raised above and the totality of the circumstances to ensure that a gross

miscarriage of justice has not occurred.

## PRAYER FOR RELIEF

WHEREFORE, PREMISES CONSIDERED, Applicant respectfully requests

this court to order the following:

1.      That all relief requested herein, including the request pursuant to 28 U.S.C.§

2254 to set aside Applicant's sentence of death in the underlying cause and

remand the case for a new trial be GRANTED.

2.      Or, in the alternative, that an evidentiary hearing providing Applicant with

further opportunity to establish the claims set forth in this application be

GRANTED.

3.      And, to grant all additional relief, not specifically requested herein, to which

Applicant is or may be lawfully entitled.

Respectfully submitted,

/s/ Bruce Anton_____
BRUCE ANTON

-257-

State Bar No. 01274700

SORRELS UDASHEN &ANTON
2311 Cedar Springs Road
Suite 250
Dallas, Texas 75201
(214) 468-8100
(214) 468-8104 (fax)

MARY MARGARET PENROSE
State Bar No. 00788179

Texas Wesleyan University
     School of Law
1515 Commerce Street
Fort Worth, TX 76102
(972) 310-8669
(972) 943 3578 (fax)
mpenrose@law.txwes.edu

## CERTIFICATE OF SERVICE

I, Bruce Anton, hereby certify that a true and correct copy of the above and

foregoing Third Amended Application for Writ of Habeas Corpus was mailed by

United States Mail to Leslie K. Kuykendall, Assistant Attorney General, PO Box

12548, Capitol Station, Austin, TX 78711-2548, on this the 2 day of March 2012.

-258-

/s/ Bruce Anton
BRUCE ANTON