VII.   **Carpenter Is Not Entitled To Federal Habeas Relief Concerning His Ineffective Assistance of Trial Counsel Claim. (Claim VII).**

A.   **Several aspects of Carpenter's ineffective assistance claim are procedurally barred from federal review.**

To the extent Carpenter alleges in Claim VII that trial counsel was ineffective for (1) not excluding McBay's testimony on spousal privilege grounds; (2) not informing the jury about the perils of eyewitness identifications; (3) his conduct during jury selection; and (4) not calling a future-dangerousness expert, he has never presented these allegations to the state courts. They are thus unexhausted and procedurally defaulted under state law because the CCA would dismiss them as an abuse of the writ if Carpenter were to raise them now in a successive writ application.[66] *Gray*, 518 U.S. at 161; *see also Graham*, 94 F.3d at 969. The default rests on an independent and adequate state law ground. *Nobles*, 127 F.3d at 423; *Muniz*, 132 F.3d at 221. Because Carpenter cannot show either cause and prejudice for his state procedural default or that a miscarriage of justice will occur if the Court does not reach the merits of these

---

[66]   As discussed in note 21, *supra*, Article 11.071, Section 5(a), provides that a state court may not consider the merits of or grant relief on claims presented in a successive state habeas application absent facts giving rise to a statutory exception. Carpenter cannot show that one of the Article 11.071 exceptions would apply to allow review of these previously unpresented ineffective assistance of counsel allegations in state court. And as also discussed in note 21, *supra*, the CCA will not allow a successive application on equitable grounds under *Martinez* based on an assertion of state habeas counsel's ineffectiveness. *See Hernandez*, No. 62,840-02, slip op. at * 2 (Tex. Crim. App. 2012) (Price, J. concurring).

claims, they are procedurally barred from federal review. *Gray*, 518 U.S. at 162;
*Coleman*, 501 U.S. at 750. And regardless, all of his ineffective assistance of
trial counsel claims lack merit.

Carpenter makes a conclusory assertion that state habeas counsel's
ineffectiveness is to blame for his procedural default. *See* 3d Am. Pet. 217, 219.
But as discussed at length in Part I.A.4.a, *supra*, under *Coleman*'s well-
established rule, the ineffective assistance of state writ counsel cannot
constitute "cause" under the cause-and-prejudice test. *Coleman*, 501 U.S. at
752. Further, the narrow exception to this rule that the Supreme Court carved
out in *Martinez* does not apply to Texas criminal convictions. And even if it did,
to avail himself of the *Martinez* exception, Carpenter would have to
demonstrate that state writ counsel was actually ineffective under the
*Strickland* standard, which Carpenter cannot do.[67] *Martinez*, 132 S. Ct. at
1318–19.

The Supreme Court has emphasized that *Strickland*'s high bar is
extremely difficult to overcome even on de novo review. *Richter*, 131 S. Ct. at
787–88. Initially, Carpenter's vague, conclusory assertion that, regarding any
of his claims found to be procedurally defaulted, initial state habeas counsel's
ineffective assistance is to blame is precisely the kind of "mere allegation" that

---

[67]    The *Strickland* standard is set forth in Part I.A.4.a, *supra*, of this Answer.

is insufficient to satisfy both prongs of *Strickland*'s test for ineffective assistance. *Armstead*, 37 F.3d at 206; *see Strickland,* 466 U.S. at 697. It is additionally insufficient to overcome the strong presumption of effective assistance that *Strickland* affords counsel even under a de novo standard of review. *Richter*, 131 S. Ct. at 787–88. For these reasons alone, any attempt under *Martinez* to use state habeas counsel's representation as cause for Carpenter's procedural default must fail.

The attempt also must fail on the basis of the record. It shows that Carpenter's initial state writ counsel filed a lengthy state habeas application raising forty-one grounds for relief. SHCR-01 4–234 (initial state writ application), 235–50 (exhibits). These forty-one grounds for relief contained two claims of ineffective assistance of trial counsel, SHCR-01 93–123 (Grounds for Relief Nos. 13 & 14), and one claim that appellate counsel rendered ineffective assistance, SHCR-01 138–40 (Ground for Relief No. 19). The fact that state habeas counsel did not raise all the theories of ineffectiveness that Carpenter now advances does not render writ counsel's performance ineffective. *See Jones*, 463 U.S. at 751–53.

Moreover, Carpenter cannot satisfy *Strickland*'s prejudice prong because, as shown below, none of his ineffective assistance allegations have merit. In addition, for all the reasons discussed in Part I.A.4.b, *supra*, Carpenter cannot

show that a miscarriage of justice will result if the Court declines to reach the merits of his defaulted claims.

### B.   Carpenter's claim that counsel was ineffective at all stages of trial has no merit.

Carpenter contends he received ineffective assistance of counsel because counsel failed to: properly investigate, research and present pertinent legal argument; and review evidence and contact pertinent witnesses for both phases of the trial. 3d Am. Pet. Petition 171. Carpenter further breaks his arguments down into the three phases of trial: pre-trial, trial and punishment. Specifically, he claims counsel was ineffective during pre-trial hearings in regard to his failure to suppress the identification by Rainey and his failure to have McBay's testimony excluded by spousal privilege. *Id.* at 178–88. Carpenter claims counsel was ineffective at trial for failing to inform the jury on the perils of eyewitness identification and for failing in his attempt to have the confession of a third-party perpetrator admitted. *Id.* at 188–93. Finally, Carpenter contends counsel was ineffective during the punishment phase for his conduct during jury selection;[68] and for his failure to call an expert on future

---

[68]   Jury selection is actually a pre-trial phase complaint but Carpenter includes it in his punishment phase complaints because he contends that "the stage was set at jury selection" in obtaining/pre-disposing a jury to find that he would be a future danger to society despite his criminal history of property offenses and minor prison altercations. 3d Am. Pet. 195.

dangerousness. *Id.* at 194–215. As noted above, several of Carpenter's claims are procedurally defaulted and thus not entitled to review. Nevertheless, these claims are discussed below, although the Director notes for the court's convenience which claims are defaulted. To the extent that Carpenter raised these issues in his state habeas application and they were rejected by the adopted findings and conclusions of the CCA, he must demonstrate that the court was unreasonable in its determination to deny relief. *Rivera*, 505 F.3d at 356.

### 1.   Pretrial Issues

#### a.   Identification Issues

Carpenter claims trial counsel was ineffective during the pre-trial hearing regarding his motion to suppress the identification by Rainey. 3d Am. Pet. 177–83. Although Carpenter did not have a specific claim regarding the suppression hearing in his state writ application, because he complained about the hearing in his section addressing counsel's trial performance, the Director does not assert that this claim is procedurally defaulted. But nevertheless, the claim lacks merit. Thus, the state court did not unreasonably deny Carpenter relief.

Carpenter claims that counsel was ineffective for failing to suppress Rainey's eyewitness identification, even though counsel filed a motion to

suppress and was granted a hearing. Carpenter bases his claim on counsel's failure to inform the trial court on the law regarding unduly suggestive identifications. However, it is both ludicrous and insulting for Carpenter to imply that the trial court was not fully aware of the law surrounding unduly suggestive identifications. While it may be good practice to include legal authorities for the court's convenience, counsel's motion was not a brief and he was not asking for an uncommon procedure based on obscure law. Because the trial judge had undoubtedly conducted many of these hearings before, counsel was not deficient in failing to cite or argue authority. Further, even though counsel did not cite to authority in his motion, he used the language of the relevant cases by referring to "unconstitutionally suggestive procedures in violation of the due process clause," and questioning "whether any in-court identification" was "directly related to the impermissible out-of-court identification procedure." CR 26. Thus, counsel was clearly aware of the applicable standards.

Carpenter also faults counsel for failing to call witnesses who would have established that Carpenter did not match the eyewitness's description at the time the crime was committed. 3d Am. Pet. 179–80. He relies on procedurally

defaulted evidence[69] to argue that such a decision could not be the basis of trial strategy since these witnesses were not interviewed prior to trial. *Id.* at 181. However, as explained above, such evidence is not properly considered by this court. *Pinholster*, 131 S. Ct. at 1398; *Dowthitt*, 230 F.3d at 745–46; *Woods*, 75 F.3d at 1029. More importantly, this evidence does not establish what Carpenter claims. None of the affiants state that they were not interviewed before trial. *See* 3d Am. Pet. Ex. F, K-1, K-2, L *passim*. In addition, they do not mention Carpenter's physical appearance at the time of Henin's murder in 1991. *See* 3d Am. Pet. Ex. F, K-1, K-2, L *passim*. Thus, these exhibits do not indicate when counsel became aware of such information. As such, counsel could have been making a "'conscious and informed decision on trial tactics and strategy'" that "'cannot be the basis for constitutionally ineffective assistance of counsel unless it is so ill chosen that it permeates the entire trial with obvious unfairness.'" *Green v. Johnson,* 116 F.3d 1115, 1122 (5th Cir. 1997)(*quoting Garland v. Maggio,* 717 F.2d 199, 206 (5th Cir. 1983)).

Moreover, the record shows that counsel was able to effectively cross-examine Rainey regarding her description without the aid of such witnesses. *See* SHCR-01 498 (para.113); 23 RR 76-87. Further, Rainey's testimony

---

[69]    Carpenter refers to affidavits not presented to the state courts. *See* 3d Am. Pet. Ex F. (B. Rawlings Affs.), Ex. K-1 (Diana Carpenter Aff.), K-2 (David Eugene Carpenter Aff.), Ex. L (Darren Carpenter Aff.); *see also* SHCR-01 493 (para. 90).

established that she based her identification upon the image of only Carpenter's face, which even Carpenter admits is an important factor in a proper identification. 23 RR 67; *see* 3d Am. Pet. 79–80. Therefore, the discrepancies in height and weight are of little consequence, particularly as Rainey was not trained in giving such descriptions. Thus, Carpenter has not established that trial counsel's performance was deficient.

Finally, even assuming counsel was somehow deficient, Carpenter cannot demonstrate prejudice. As explained in detail above in Part II, the trial court did not err in declining to suppress Rainey's identification of Carpenter. *See also* SHCR-01 502 (para. 138–39). Because Carpenter cannot show the court erred in declining to suppress the identification, he cannot show prejudice in regard to this claim under de novo review and certainly not under the even more deferential standard that applies under 28 U.S.C. § 2254(d)(1). *Richter*, 131 S. Ct. at 786. Moreover, Carpenter has not shown that the state courts unreasonably determined this claim under clearly established federal law.

### b.   Marital Privilege

Next, Carpenter contends that trial counsel was ineffective because he did not succeed in his effort to exclude McBay's testimony on the grounds of spousal privilege. 3d Am. Pet. 183. First, Carpenter did not present this claim on direct appeal or his state habeas application and is thus procedurally defaulted and

procedurally barred as argued above. Second, the trial court found as a matter of fact that McBay was not Carpenter's wife at the time of the offense. 23 RR 102. This is not only a factual finding entitled to deference but also a determination of state law. It is not a federal habeas corpus court's function to review a state's interpretation of its own law. *Weeks v. Scott*, 55 F.3d 1059, 1063 (5th Cir. 1995); *Moreno v. Estelle*, 717 F.2d 171, 179 (5th Cir. 1983). Although Carpenter attempts to overcome the deference owed to this finding by alleging counsel was ineffective for failing to argue the law and to present additional evidence that McBay was his wife, Carpenter again fails to satisfy *Strickland*'s required deficiency and prejudice prongs.

Carpenter states that proof of common law marriage requires a showing of the "continuity of co-habitation and representation to others." 3d Am. Pet. 184. However, he is only partially correct. The law also requires a showing of an agreement to be married. *See Russell v. Russell*, 865 S.W.2d 929, 932 (Tex. 1993) ("Rather than abolishing the doctrine of informal marriage as had been proposed on numerous occasions in the past, the legislature tightened the rules for reliance on the doctrine by repealing the provision that allowed a court to infer an agreement to be married from proof of cohabitation and holding-out."). Therefore, although he argues that proof of such is not determined by "whether the parties occasionally admit or deny the relationship," he is incorrect. 3d Am.

Pet. 68. The law requires a weighing of circumstantial and direct evidence of both an agreement to married and representations to others by the fact-finder. *Russell,* 865 S.W.2d at 933. Thus, whether, when, and how often both parties admit or deny the relationship is of extreme importance in determination of both of these factors. And notably on this point, as recently as November 9, 2011, in a letter written from death row, Carpenter has denied that he and McBay were married. *See* Ex. D at 5 (stating that "we weren't married. [McBay] though[t] that just because we had a kid together, she owned me. NOT!!") (original emphasis).

Counsel presented the case that a common law marriage existed. 23 RR 16–33, 48–53. However, the State was able to rebut his presentation with evidence that at times both parties failed to acknowledge a marriage. 23 RR 34-48, 55–57; *see also* Ex. D (Carpenter's recent assertion that he and McBay were not married). Although counsel could have presented additional evidence, there is nothing he could do to overcome the State's proof that both parties did not continually and consistently hold themselves out as married, nor have an agreement to be married. Therefore, Carpenter fails to demonstrate that counsel was deficient or that any prejudice resulted from the failure to present cumulative evidence. *See Emery v. Johnson,* 139 F.3d 191, 197 (5th Cir. 1997) (petitioner could not demonstrate prejudice by duplicative evidence).

c.   **Trial Issues**

i.   **Identification Issues**

Carpenter next contends claims that counsel was ineffective at the trial because he did not gain an acquittal by throughly impeaching Rainey's eyewitness identification. 3d Am. Pet. 189. Specifically, he claims counsel had a duty to call an expert on the perils of eyewitness identification, or alternatively to thoroughly examine the witnesses regarding the suppression criteria to demonstrate that Rainey's identification was incredible. *Id.* at 189. However, Carpenter did not present this claim in his direct appeal or his initial state writ application. In his initial state writ application, he contends only that the identification was unduly suggestive. SHCR-01 94. Thus, this claim is procedurally defaulted as argued above. Nevertheless, this claim is also without merit.

It is settled that counsel cannot be deemed ineffective for failing to call witnesses who are not shown to have been available and willing to testify. *Lockhart v. McCotter,* 782 F.2d 1275, 1282 (5th Cir. 1986); *Gomez v. McKaskle,* 734 F.2d 1107, 1110 (5th Cir. 1984). Carpenter has not provided any affidavits in support of his claim that counsel should have called an expert on identification problems. "Where the only evidence of a missing witness' testimony is from the defendant, [the Fifth Circuit] views claims of ineffective

assistance with great caution." *See Lockhart,*782 F.2d at 1282 (*citing Schwander v. Blackburn,*750 F.2d 494, 500 (5th Cir. 1985)); *see also United States v. Cockrell,*720 F.2d 1423, 1427 (5th Cir. 1983) (noting that Cockrell failed to produce the affidavit of the uncalled witness). Further, "[c]omplaints of uncalled witnesses are not favored, because the presentation of testimonial evidence is a matter of trial strategy and because allegations of what a witness would have testified are largely speculative." *See Boyd v. Estelle,* 661 F.2d 388, 390 (5th Cir. 1981) (quoting *Buckelew v. United States,* 575 F.2d 515, 521 (5th Cir. 1978)). For these reasons alone, Carpenter's claim that counsel should have called an identification expert is without merit. And to the extent Carpenter is arguing more expansively that counsel should have done more to impeach Rainey's testimony, his argument also lacks merit.

Counsel extensively cross-examined Rainey on her identification. 26 RR 71-88. Moreover, although Carpenter faults counsel for not doing so at the suppression hearing, at trial, counsel doggedly questioned witnesses to establish that Carpenter looked different in 1991 than Rainey described. 25 RR 11, 45. While Carpenter asserts that counsel should have done more in this regard, he ignores the fact that the jury rejected his theory and chose to believe Rainey. Therefore, assuming counsel's performance was somehow deficient, Carpenter cannot prove prejudice. Although Carpenter contends that the

identification is "woefully inadequate," he fails to understand that Rainey's testimony made an impression on the jury, specifically, that she was able to identify him from a photo-lineup six years after the crime. 23 RR 93-96. Further, Rainey's identification was corroborated by the testimony of McBay and Smith. 25 RR 36-40; 26 RR 12-23. Counsel could have throughly impeached every word Rainey said but the fact remains that she identified him, and other testimony supports the finding of guilt. Thus, even had Carpenter properly raised this claim in the state courts, those courts would not have been unreasonable in rejecting it.

### ii.    Third-Party Perpetrator

Carpenter also contends that counsel was ineffective at trial for failing in his attempt to have evidence concerning Matthew Tolbert's purported confession admitted. Specifically, he contends that counsel should have proven that this evidence was relevant to the case and informed the trial court of the "preference toward the admission of such evidence." 3d Am. Pet. 193. However, Carpenter has not shown that trial counsel's performance was deficient. Moreover, he cannot prove prejudice. Thus, he fails to demonstrate that the CCA was unreasonable in its refusal to grant him relief.

Although Carpenter claims to have proven that Tolbert's confession had to be to Henin's murder, the Director refuted this argument in Part I.A.4.b,

when discussing his actual innocence claim. Therefore, Carpenter still has not demonstrated Tolbert's confession was relevant. Further, even assuming that Carpenter has now demonstrated that Tolbert confessed to Henin's murder, Carpenter still has not shown it to be a credible confession. He cannot complain that trial counsel was unable to show that Tolbert's confession was relevant or credible when he, himself, cannot make this showing. Moreover, Carpenter has done nothing to establish that counsel could have obtained this evidence at the time of trial. In determining the merits of an alleged Sixth Amendment violation, courts "must be highly deferential," and every effort must be made to eliminate the "distorting effect of hindsight." *Strickland,* 466 U.S. at 689. Carpenter has failed to demonstrate counsel's deficient performance. Moreover, in light of the fact that he cannot show Tolbert's confession is relevant or credible, he has not affirmatively proven prejudice as *Strickland* requires. Because the state courts were not unreasonable in rejecting this allegation, Carpenter is undeserving of federal relief.

### d.   Punishment Phase Issues

Finally, Carpenter contends that his trial counsel was ineffective during the punishment phase because his conduct during jury selection predisposed the jury to give the death penalty on a record of property crimes and for his failure to call an expert on future dangerousness. But Carpenter did not present either

of these claims to the state courts and thus they are procedurally barred from federal review, as argued above. Moreover, these claims are meritless.

Even if one assumes counsel was somehow deficient, Carpenter cannot show prejudice. Carpenter repeatedly claims that he has a history of only property crimes and minor altercations while in prison. However, Carpenter misconstrues the record. As the evidence previously set forth in the Statement of the Case demonstrates, Carpenter is a violent individual. When only a juvenile, Carpenter nearly drowned a child five years his junior. 29 RR 254; 30 RR 26–32. Carpenter repeatedly assaulted McBay, 28 RR 30–32, 40–42, threatened members of his own family, 28 RR 45–49, and has been involved in altercations both in and out of prison, 28 RR 33, 47; 29 RR 135–37, 148, 150–52, 183–84, 192–93, 200. Further, although Carpenter's criminal history of "property" crimes resulted in increasingly stiffer sentences, he continued his criminal career.

Even without this evidence, the heinous nature of the crime was sufficient in itself for the jury to find the death penalty was appropriate. The evidence shows that Carpenter cut Henin's throat at least twice and that the wound was deep and ran ear to ear. 26 RR 51, 59; 32 RR SX 121–27. Henin's wounds were so severe in fact that the paramedic responding to the scene initially thought she had been decapitated. 24 RR 106–07. That this was a murder for hire makes

Carpenter's crime seem even more atrocious, especially in light of testimony that Smith tried to call off the hit but Carpenter insisted on pursuing it. 26 RR 28. With this brutal a crime, Carpenter could have been a model citizen—which he was not—and the jury could have found the death penalty appropriate. As such, Carpenter cannot prove prejudice. *See Wong v. Belmontes*, 130 S. Ct. 383, 391 (2009) (per curiam) ("It is hard to imagine expert testimony and additional facts about Belmontes'[s] difficult childhood outweighing the facts of McConnell's murder. . . [T]he notion that the result could have been different if [counsel] had put on more than the nine witnesses he did, or called expert witnesses to bolster his case, is fanciful."), *Leavitt v. Arave*, 646 F.3d 605, 616 (9th Cir. 2011) ("Given the exceptional depravity of this murder, it is unlikely that additional evidence . . . would have made a difference.").

Carpenter relies heavily on *Wiggins v. Smith,* to prove that counsel's performance was deficient. 539 U.S. 510 (2003); 3d Am. Pet. 176–77. However, Carpenter's case is easily distinguished from *Wiggins*. In *Wiggins*, the petitioner was able to point at specific and notable *mitigation* evidence that counsel did not introduce. 539 U.S. at 516. More importantly, the petitioner was able to show that although counsel might have been aware of some of the evidence, counsel's investigation was inadequate even for the purpose of making a strategic decision to exclude such evidence. *Id.* at 524. Presently, Carpenter

has not made any claims that counsel was otherwise ineffective for failing to put on mitigation evidence or for failing to investigate. This is because Carpenter does not have a past that makes him less morally culpable. Therefore, he cannot complain of counsel's actions in failing to present evidence that does not exist. Although Carpenter claims that the prosecution was allowed to set the stage during voir dire to enable them to convict a person he claims did not present a continuing danger to society, he has not pointed out one instance where counsel should have objected to the prosecution's statements, nor has he shown anything representing the professional norms that counsel allegedly failed to meet in his voir dire conduct.

Similarly, Carpenter has not shown that the use of experts in regard to future dangerousness is professionally mandated.[70] The *Strickland* analysis strongly presumes even under a de novo standard that counsel's strategic decisions cannot amount to ineffectiveness. "A conscious and informed decision on trial tactics and strategy cannot be the basis for constitutionally ineffective assistance of counsel unless it is so ill chosen that it permeates the entire trial with obvious unfairness.'" *Green,* 116 F.3d at 1122 (quoting *Garland,* 717 F.2d

---

[70]     Regarding Carpenter's assertion that counsel should have called an expert on future dangerousness, as discussed above, the federal courts look at claims of uncalled witnesses with disfavor. *Lockhart,* 782 F.2d at 1282; *Cockrell,* 720 F.2d at 1427. In addition to Carpenter's expert claim being procedurally defaulted, the evidence he relies upon is also procedurally defaulted. *See* 3d Am. Pet., Ex. M. (Kessner Aff.).

at 206). Thus, counsel will not be deemed ineffective for failing to advance a defensive theory when his decision "was a reasonable strategic choice based upon a reasonable professional assessment of the plausibility of the defense and its likelihood of success." *Moreno,* 717 F.2d at 177.

Here, counsel reasonably could have concluded that an expert who opined that Carpenter was not likely to re-offend, but could not state that conclusion with certainty, could prove to be more damaging than helpful; such testimony would allow the prosecution to reiterate their entire future dangerousness case on cross-examination. Indeed, although Carpenter now presents a procedurally defaulted affidavit from Dr. Kessner in which she concludes that Carpenter poses a "low" risk of future danger, *see* 3d Am. Pet., Ex. M 4, Kessner reached her opinion without reviewing the guilt-phase testimony, *see id.* at 3 (listing the bases for Kessner's opinion that Carpenter would not pose a future danger). As discussed above, the guilt-phase testimony was more than sufficient by itself to support a future dangerousness finding. Kessner's failure to review it would have (1) seriously undermined the value of her opinion; and (2) permitted the prosecution to present the highly damaging evidence from the guilt phase all over again during cross-examination. It would not be an unreasonable trial strategy to want the jury to hear the prosecution's damning evidence only once.

Given *Strickland*'s deference to defense counsel's informed decisions on

trial strategy, the Fifth Circuit has consistently rejected ineffectiveness claims based on counsel's decision to not investigate or present evidence for the defense. *See Rector v. Johnson,* 120 F.3d 551, 564 (5th Cir. 1997); *Green,* 116 F.3d at 1121–22; *Andrews v. Collins,* 21 F.3d 612 (5th Cir. 1994). Because Carpenter did not present these allegations to the state courts, counsel has not been given an opportunity to respond. Therefore, Carpenter cannot escape the presumption that counsel's actions were the result of sound trial strategy. As such, he has not demonstrated that counsel performed deficiently or that there was any prejudice to his case. Therefore, federal habeas relief should be denied.

## VIII. Federal Habeas Relief Is Not Warranted On Carpenter's Claim That The Trial Court's Instructions Concerning The Punishment Phase Special Issues Violated His Eighth and Fourteenth Amendment Rights. (Petitioner's Claim VIII(A)-VIII(D)).

In Claim VIII, Carpenter challenges the constitutionality of Texas's capital punishment scheme in four subclaims. 3d Am. Pet 221–48. Specifically, he alleges that the 12/10 rule prevented the jury from giving due consideration to the mitigating evidence, in violation of *Mills,* 486 U.S. 367, *id.* at 225–29 (Claim VIII(A)); the 12/10 rule undermined the jury's sense of responsibility for imposing a death sentence, in violation of the Eighth Amendment, *id.* at 229–38 (Claim VIII(B)); the failure to require the State to prove the mitigation issue beyond a reasonable doubt relieved the State from its burden to establish

beyond a reasonable doubt that Carpenter merited a death sentence, thereby denying him due process, *id.* at 228–46 (Claim VIII(C)); and the instructions relating to the mitigation issue given to the jury at the punishment phase constituted excessively vague, arbitrary, and capricious sentencing patterns in violation of the Eighth and Fourteenth Amendments, *id.* at 246–48 (Claim VIII(D)).

Carpenter presented Claims VIII(A), VIII(B), and VIII(C) to the CCA in his initial state writ. The state courts denied relief based on prior precedent rejecting similar claims. SHCR-01 488–92, 626, Order. Carpenter has not demonstrated that as to Claims VIII(A), VIII(B), and VIII(C), this adjudication was unreasonable. Carpenter's final subclaim, Claim VIII(D), is unexhausted, procedurally defaulted, procedurally barred from federal review, and lacking in merit. Accordingly, federal habeas relief is not warranted as to any of the four subclaims Carpenter raises under Claim VIII.

### A.   Carpenter's challenges to the constitutionality of the 12/10 rule have no merit. (Claims VIII(A) and VIII(B)).

Carpenter's allegations regarding the 12/10 rule lack merit. He argues that the jury instructions regarding the "12-10 rule"[71] prevented the jury from

---

[71]   During the punishment phase of Carpenter's trial, the jury was instructed to consider the following three special issues: the first asking if the victim's death was caused deliberately; the second asking whether the defendant would constitute a continuing threat to society; and the third asking whether sufficient mitigating

giving due consideration of his mitigating evidence, in violation of *Mills,* 486 U.S. 367. Carpenter also claims that the instructions undermined the jury's sense of responsibility for the verdict, in violation of the Eighth Amendment. These claims not only lack merit, but are also barred by *Teague's* nonretroactivity rule and foreclosed by both Fifth Circuit and Supreme Court precedent.

The Fifth Circuit has consistently rejected identical claims raised by other Texas habeas petitioners, based both on the substantive merits of the claim and on the court's conclusion that to extend *Mills* to grant relief in a Texas case would require the court to announce and apply a new rule of constitutional law, which *Teague's* nonretroactivity principle prohibits on federal habeas review. *See Alexander v. Johnson,* 211 F.3d 895, 897 (5th Cir. 2000) (relief denied

---

evidence exists to warrant the imposition of a life sentence. CR 122-26. Pursuant to article 37.071 of the Texas Code of Criminal Procedure, the jurors were further instructed regarding special issues one and two that they could not answer "Yes" unless they agreed unanimously and could not answer "No" unless ten or more jurors agreed. Similarly, regarding special issue three, the jury was instructed:

> [Y]ou may not answer the issue no unless the jury unanimously agrees and you may not answer yes unless 10 or more jurors agree. [M]embers of the jury need not agree on what particular evidence supports an affirmative finding; and you shall consider mitigating evidence to be evidence that a juror might regard as reducing the defendant's moral blameworthiness.

CR 124; *see* Tex. Code Crim. Proc. article 37.071 § 2(c)&(f). This is commonly referred to in Texas as the "12-10 rule."

based on *Teague*); *Jacobs v. Scott*, 31 F.3d 1319, 1328–29 (5th Cir. 1994) (relief denied on the merits); *Webb v. Collins*, 2 F.3d 93, 95 (5th Cir. 1993) (relief denied based on *Teague*); *Woods*, 75 F.3d at 1036 (relief denied based both on *Teague* and on the merits). Therefore, circuit precedent compels rejection of this claim as a matter of law.

Moreover, in an analogous case, the Supreme Court rejected the theory that a trial court's failure to instruct the jury regarding the consequences of deadlock gives rise to an Eighth Amendment violation. *Jones v. United States*, 527 U.S. 373, 381 (1999). In *Jones*, the capital defendant wished to inform the jury that the trial judge would impose a life sentence without parole if the jury could not reach a punishment verdict. *Id.* at 380–381. The Court noted that such issues do not involve the failure to provide the jury with mitigating evidence, but only whether the jury was misled as to its role in the sentencing process. *Id.* at 381–382. In rejecting this contention, the Court held:

> The truth of the matter is that the proposed instruction has no bearing on the jury's role in the sentencing process. Rather, it speaks to what happens in the event that the jury is unable to fulfill its role . . . . Petitioner's argument . . . appears to be that a death sentence is arbitrary within the meaning of the Eighth Amendment if the jury is not given any bit of information that might possibly influence an individual juror's voting behavior. That contention has no merit.

*Id.* at 2099. As the Court pointed out, "we have long been of the view that '[t]he very object of the jury system is to secure unanimity by a comparison of views,

and by arguments among the jurors themselves,'" and "the Government has 'a strong interest in having the jury express the conscience of the community on the ultimate question of life or death.'" *Id.* (citations omitted).

The *Jones* Court cited with approval a Virginia Supreme Court decision in which the court upheld the refusal to give an instruction offered by the defendant which would have told the jury that the court would impose a life sentence if the jury could not reach agreement. The Virginia court stated that "while this was a correct statement of law, it concerned a procedural matter and was not one which should have been the subject of an instruction. It would have been an open invitation for the jury to avoid its responsibility and to disagree." *Justus v. Virginia,* 266 S.E.2d 87, 92-93 (Va. 1980). In citing *Justus* with approval, the Supreme Court reiterated its long-held view that the government has a strong interest in having a jury both reach a verdict and put forth the community conscience on the ultimate question of life or death. *Jones,* 527 U.S. at 382.

While recognizing that a jury cannot be affirmatively misled regarding its role in the sentencing process, *Jones,* 527 U.S. at 381–82 (citing *Romano v. Oklahoma,* 512 U.S. 1, 9 (1994)), the Court specifically rejected the contention that the refusal to give the proposed instruction was affirmatively misleading to the jury, *id.* at 382. Instead, the Court found that the proposed instruction

had no bearing on the jury's role in the sentencing process, since it dealt only with the situation of the jury being unable to fulfill its role. *Id.* Recognizing that a capital jury has never been entitled to all information that might possibly influence an individual juror's voting behavior, the Court reiterated that the Eighth Amendment does not require that a jury be instructed as to the consequences of its failure to reach a verdict. *Id.* In light of the foregoing Supreme Court and Fifth Circuit authority, Carpenter is not entitled to relief based on this claim.

Further, Carpenter's reliance on *Mills* is misplaced because the holding in *Mills* has no application to states such as Texas that do not require the jury to make threshold factual determinations that limit the mitigating evidence available to be weighed during deliberations on the ultimate sentencing issues. In *Mills,* the Supreme Court found Eighth Amendment error because jury unanimity instructions created a "substantial probability that individual jurors . . . may well have thought they were precluded from considering any mitigating evidence unless all 12 jurors agreed on the existence of a particular such circumstance." 486 U.S. at 384. Unlike Texas, Maryland is a "weighing" state with a two-step sentencing process: the jury was required to first make preliminary factual determinations whether aggravating and/or mitigating circumstances had been proven and, next, to weigh the proven aggravating and

171

mitigating facts to actually decide the sentence in a particular case. The Court's concern was that a single juror's belief that a mitigating circumstance had not been proven would prevent the entire jury from weighing that factor when deciding the ultimate sentencing issues. *Id.* at 373–74; *McKoy v. North Carolina*, 494 U.S. 433, 438 (1990). The constitutional infirmity pertained to the first part of this two-step process, which has no counterpart under the Texas statute. Under Texas's system, all jurors can take into account any mitigating circumstance. One juror cannot preclude the entire jury from considering a mitigating circumstance. Thus, *Mills* is inapplicable.[72]

Further, nothing in *Mills* or its progeny holds that a state may not require unanimity or some lesser degree of juror agreement on the ultimate sentencing issues in a capital case. To the contrary, as Justice Blackmun explained:

> Juries are typically called upon to render unanimous verdicts on the ultimate issues in a given case. But it is understood that different jurors may be persuaded by different pieces of evidence,

---

[72]    While the Seventh Circuit Court of Appeals has concluded that *Mills* and *McKoy*, require a jury to be informed that a single juror has the power to block a death sentence and to impose his or her assessment of the evidence as the verdict of the jury, *see Kubat v. Thieret*, 867 F.2d 351, 373 (7th Cir. 1989), the defect identified in those cases does not exist in Carpenter's case. Unlike the instructions at issue here, "a reasonable jury might well have thought that [under the instructions in *Kubat*] it was supposed to continue deliberating until it reached agreement." *Gacy v. Welborn*, 994 F.2d 305, 308 (7th Cir. 1993) (delineating defect in *Kubat* instructions). In contrast, there is absolutely no indication in the record in Carpenter's case that the jury was at any point deadlocked on the special issues or had trouble returning a verdict on the special issues. Thus, even if the Seventh Circuit correctly construes *Mills*, the identified error would not exist here.

even when they agree on the bottom line. Plainly, there is no general requirement that the jury reach agreement on the preliminary factual issues which underlie the verdict.

*McKoy*, 494 U.S. at 449–50 (concurring opinion) (footnote omitted). Carpenter argues that the instructions as given do not accurately state Texas law, i.e. that the failure of the jury to render a unanimous decision in favor of death results in a life sentence. Therefore, he essentially claims entitlement to an instruction authorizing or inviting a jury deadlock. However, the Constitution does not require this. Both the State and the defendant have legitimate interests in achieving a verdict, and the Constitution does not guarantee any defendant the right to a deadlocked jury. *See Illinois v. Somerville*, 410 U.S. 458, 463 (1973) (public's interest in seeing its criminal prosecutions proceed to verdict "need not be forsaken by the formulation of rigid rules that necessarily preclude the vindication of that interest"); *Arizona v. Washington*, 434 U.S. 497, 503 (1978) (defendant has a "valued right to have his trial completed by a particular tribunal"). Therefore, Carpenter's first claim is without merit.

Carpenter also maintains that the 12/10 rule diminished the jurors' individual sense of responsibility for the ultimate verdict. However, the plain language of the jury instruction given in the instant case does not support his assertion that a reasonable juror would believe that an individual negative response was meaningless unless accompanied by similar responses from nine

other jurors. The instructions clearly stated that, individually, they were to vote "no" if, after considering the evidence, they had a reasonable doubt as to whether a special issue should be answered "yes." CR 123–24. The jurors were further instructed that the presiding juror could record an affirmative response to a special issue on the verdict sheet only if all twelve members so decided, and that the court would assess the death penalty if all three special issues were answered in the affirmative. CR 124–25. With this knowledge, a reasonable juror could deduce, at minimum, that a jury verdict for a death sentence required unanimity—which one single "no" vote could defeat. Thus, even without the specific knowledge that the effect of a single "no" vote was the automatic imposition of a life sentence, a juror could reasonably find value and meaning in his or her individual vote.

Thus, because neither the Eighth nor the Fourteenth Amendment necessitates a jury instruction regarding the consequences of a jury's inability to reach a unanimous verdict during capital sentencing hearings, these claims must fail. Carpenter has not, therefore, stated a ground upon which this Court may grant relief.

**B.    Contrary to Carpenter's assertions, the Texas death penalty is not unconstitutional under *Apprendi* and *Ring*.[73] (Claim VIII(C)).**

Carpenter also claims the Texas death penalty statute is unconstitutional because it fails to place the burden of proof on the State in regard to the mitigation special issue. 3d Am. Pet. 238–46. He argues that the instruction as given unconstitutionally shifts the burden of proof to the defendant, who must show that he does not merit a sentence of death. Carpenter contends that this shifting violates his due process rights and his right to be free of cruel and unusual punishment. To support his arguments, Carpenter relies upon "the *Apprendi* line of cases." 3d Am. Pet. 243; *Apprendi*, 530 U.S. 466; *Ring*, 536 U.S. at 593 n.4. Invoking *Apprendi* and *Ring*, Carpenter argues that "[i]f the State chooses to seek death, it must prove, beyond a reasonable doubt, all elements necessary to imposition of that punishment, including that mitigating circumstances do not warrant a lesser penalty." 3d Am. Pet. 246. However, as discussed below, *Ring* and *Apprendi* do not mandate relief on Carpenter's claim because those cases were decided on the narrow grounds that a jury must determine beyond a reasonable doubt whether *aggravating* factors exist that increase a defendant's punishment beyond the range authorized by the jury's verdict. The Texas system clearly complies with this requirement by mandating

---

[73]    *Ring v. Arizona*, 536 U.S. 584 (2002).

that the jury determine beyond a reasonable doubt that statutory aggravating factors exist at both the guilt phase and punishment phase of a capital murder trial. Under these circumstances, Carpenter has again failed to demonstrate that the state courts unreasonably applied clearly established federal law in denying him relief.

In *Apprendi*, the Supreme Court reversed a non-capital conviction because the trial court unconstitutionally increased the defendant's sentence beyond the statutory maximum based upon a separate—but unindicted—hate crime statute. 530 U.S. at 470–71. The underlying indicted offense carried only a maximum penalty of ten years incarceration, while the unindicted hate crime offense was punishable by an extended term of imprisonment, between ten and twenty years, "if the trial judge [found], by a preponderance of the evidence, that the defendant in committing the crime acted with a purpose to intimidate an individual or group of individuals because of race...." *Id.* at 468–69 (internal quotations omitted). Apprendi was sentenced to twelve years. *Id.* at 471. The Court reasoned that the New Jersey provision at issue violated "basic principles" which mandate that a jury try all facts necessary to constitute a statutory offense, and that these facts be proven beyond a reasonable doubt. *Id.* at 483–84. Consequently, the Court held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed

statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Id.* at 490. Because the New Jersey hate crime statute required (1) the trial judge to resolve (2) the fact question of the defendant's state of mind or criminal motive, and (3) the burden of proof was a preponderance of the evidence, the statute was declared unconstitutional. *Id.* at 491–93.

In *Ring*, the Supreme Court applied its rationale in *Apprendi* to Arizona's capital sentencing scheme. 536 U.S. at 588–89. Ring was convicted by a jury of the lesser-included offense of felony murder because the evidence tied him to the proceeds of an armored car robbery, but not the actual murder of the driver. *Id.* at 591–92. Under Arizona law, Ring was not eligible for the death penalty, the statutory maximum for first-degree murder, unless further findings were made by the judge. *Id.* at 592. During the sentencing proceeding, new evidence led the trial court to conclude that Ring murdered the armored car driver, and the court sentenced him to death. *Id.* at 593–594. The Supreme Court noted that, "[b]ased solely on the jury's verdict finding Ring guilty of first-degree felony murder, the maximum punishment he could have received was life imprisonment." *Id.* at 596. The Court further explained that, where an increase in punishment is contingent on an additional finding of fact, the Constitution requires that fact to be found by a jury beyond a reasonable doubt. *Id.* at 602.

Thus, to the extent that Arizona's sentencing scheme "[allowed] a sentencing judge, sitting without a jury, to find an aggravating circumstance necessary for the imposition of the death penalty," the Supreme Court held it unconstitutional. *Id.* at 609.

Carpenter maintains that the Texas death penalty statute is inconsistent with the Sixth and Fourteenth Amendment principles announced in *Apprendi* and *Ring* because the State is not required to prove the mitigation issue beyond a reasonable doubt. Carpenter argues that, because the death penalty cannot be imposed under Texas law unless the jury unanimously responds "no" to the mitigation special issue, the absence of sufficient mitigation becomes functionally equivalent to an element of a greater offense and must, therefore, be proven beyond a reasonable doubt. However, beyond the logical impossibility of requiring the State to prove a negative, the Sixth and Fourteenth Amendment considerations of *Apprendi* and *Ring* do not apply to jury determinations of *mitigating* factors that might *reduce* a defendant's sentence.

Carpenter improperly attempts to construe the mitigation special issue as an aggravating factor by suggesting that the *absence* of sufficient mitigation evidence functionally aggravates his sentence from life to death.[74] 3d Am. Pet

---

[74]    To the extent Carpenter argues that the State does not have to prove the two aggravating specials issues beyond a reasonable doubt, 3d Am. Pet. 245–46, such claim is clearly foreclosed by actual instructions read to the jury. CR 123.

245–46. However, the Fifth Circuit has rejected similar arguments. *See Woods*, 75 F.3d at 1034 ("*Jurek* held that the Texas punishment phase issues do not function as aggravating circumstances, but rather adequately 'guide and focus the jury's objective consideration of particularized circumstances of the individual offense and the individual offender before it can impose a sentence of death.'")(internal citations omitted). Although Carpenter is correct that a Texas capital sentencing jury must specifically answer the disputed issue in the negative to render a death sentence, the actual function of that special issue is plainly meant to inure to the defendant's benefit by allowing the jury an avenue to give effect to mitigating evidence.

It is also relevant to consider that capital punishment jurisprudence has traditionally recognized the distinction between aggravating factors and mitigating circumstances. In *Tuilaepa v. California*, the Supreme Court explained that there are "two different aspects of the capital decision making process: the eligibility decision and the selection decision." 512 U.S. 967, 971 (1994). To determine that an individual is eligible for the death penalty the jury must convict the defendant of murder and find one "aggravating circumstance" at either the guilt or punishment phase of trial. *Id.* at 972. "The aggravating circumstance may be contained in the definition of the crime or in a separate sentencing factor (or in both)," and may not be a factor applicable to

every defendant convicted of murder. *Id.* The selection decision, however, serves an entirely different function. Here, the jury decides whether a defendant who is eligible for the death penalty should, in fact, receive that sentence. *Id.* "What is important at the selection stage is an *individualized* determination on the basis of the character of the individual and the circumstance of the crime." *Id.* (citing *Zant v. Stephens*, 461 U.S. 862, 879 (1983)) (emphasis original).

Under Texas law, the mitigation special issue is not an element of the offense of capital murder nor is it an aggravating circumstance as defined by *Tuilaepa*. Rather, it constitutes the vehicle through which the jury is given the opportunity to make an individualized determination of the offender's moral culpability, as the Supreme Court requires. *Penry v. Johnson*, 532 U.S. 782, 797 (2001); *Eddings v. Oklahoma*, 455 U.S. 104, 111–12 (1982); *Woodson v. North Carolina*, 428 U.S. 280, 303–04 (1976). In making the decision, the jury is instructed to consider all the evidence, including the circumstances of the offense, the defendant's character and background, and general moral culpability of the defendant. Tex. Code Crim. Proc. art. 37.071 § 2 (e) & (f). The jury is not required to agree on what evidence supports an affirmative answer. Tex. Code Crim. Proc. art. 37.071 § 2 (e) & (f). Clearly, the mitigation issue confers upon the jury a broad ability to show leniency and *reduce* the

defendant's sentence to life imprisonment. Thus, it is untenable that this special issue is functionally equivalent to an aggravating factor.

Moreover, both the *Apprendi* and *Ring* decisions expressly acknowledged this distinction between aggravating factors and mitigating circumstances. In *Ring*, the Court emphasized that the defendant's claim was "tightly delineated" to the issue of whether the Sixth Amendment requires a jury finding on the aggravating circumstances asserted against him, and made no assertions with respect to mitigating circumstances. *Ring*, 536 U.S. at 597 n.4. The Court's ultimate conclusion was limited accordingly. *Ring*, 536 U.S. at 609 (holding that *Walton v. Arizona*, 497 U.S. 639 (1990), was overruled to the extent that it "allows a sentencing, sitting without a jury to find an *aggravating* circumstance necessary for the imposition of the death penalty," and that "[b]ecause Arizona's enumerated *aggravating factors* operate as the functional equivalent of an elements of a greater offense, the Sixth Amendment required that they be found by a jury") (internal citations and quotations omitted).

Likewise, the *Apprendi* decision explicitly noted and reaffirmed the distinction between "facts in aggravation of punishment and facts in mitigation." *Apprendi*, 530 U.S. at 490 n.16. There, the Court noted that when a judge finds a fact which allows a defendant to "escape the statutory maximum" attached to a jury verdict, the judge's finding "neither expos[es] the

defendant to a deprivation of liberty greater than that authorized by the verdict according to the statute, nor is the judge imposing upon the defendant a greater stigma than that accompanying the verdict alone." *Id.* Similarly, in a concurring opinion joined by Justice Scalia, Justice Thomas emphasized that facts with the potential to mitigate punishment are not an element of a crime that might increase a sentencing decision. *Id.* at 501(Thomas, J. concurring, joined by Scalia, J.). Clearly, neither the *Ring* nor *Apprendi* holdings contemplates extending the Sixth Amendment's "reasonable doubt requirement" to a capital jury's finding regarding mitigating evidence.

Equally important here is the portion of *Walton* left untouched by the *Ring* majority, wherein the Supreme Court stated that the Eighth Amendment does not bar a state from imposing a burden of proof *on the defendant* to "establish, by a preponderance of the evidence, the existence of mitigating circumstances sufficiently substantial to call for leniency." *Walton*, 497 U.S. at 649–51. The Court noted that nothing in its Eighth Amendment jurisprudence precluded the state from "specifying how mitigating circumstances are to be proved." *Id.* at 649. Indeed, it noted that in several other capital cases, it found it constitutional for a state to impose a burden of proof on the defendant to prove issues such as self-defense, insanity, and "the affirmative defense of

extreme emotional disturbance." *Id.* at 650 (citations omitted). The Court

gleaned from these cases the following rule:

> So long as a State's method of allocating the burdens of proof does
> not lessen the State's burden to prove every element of the offense
> charged, or in this case to prove the existence of aggravating
> circumstances, a defendant's constitutional rights are not violated
> by placing on him the burden to prove mitigating circumstances
> sufficiently substantial to call for leniency.

*Id.*

Finally, the practical implications of Carpenter's argument preclude the

adoption of his reading of *Apprendi* and *Ring*. Prosecutors would be in the

absurd position of proving a negative beyond a reasonable doubt. This is

impossible under the Texas system, in which jurors are left to decide what

evidence is mitigating and whether that evidence suggests that mercy is

appropriate and where individual jurors need not agree on what evidence is

mitigating when voting on this issue. Thus, not only would accepting

Carpenter's assertion improperly extend *Apprendi* and *Ring* without basis and

pervert much of the Supreme Court's Eighth Amendment jurisprudence, it

would also be highly impractical. For the foregoing reasons, federal habeas

relief is not warranted on this claim.

**C.** **Carpenter's final contention that the Texas death penalty statute is unconstitutional is not only procedurally barred but lacks merit. (Claim VIII(D)).**

**1.** **Claim VIII(D) is procedurally defaulted and procedurally barred from federal review.**

In his last sub-argument, Carpenter claims that the instructions relating to the mitigation issue given to the jury at the punishment phase constituted excessively vague, arbitrary, and capricious sentencing patterns in violation of the Eighth and Fourteenth Amendments. Because Carpenter did not raise this record-based claim on direct appeal or state collateral review, it is unexhausted and procedurally defaulted under state law because the CCA would dismiss it as an abuse of the writ if Carpenter were to raise it now in a successive writ application. *Gray*, 518 U.S. at 161; *see also Graham*, 94 F.3d at 969. The default rests on an independent and adequate state law ground. *Nobles*, 127 F.3d at 423; *Muniz*, 132 F.3d at 221. Because Carpenter cannot show either cause and prejudice for his state procedural default or that a miscarriage of justice will occur if the Court does not reach the merits of this claim, it is procedurally barred from federal review. *Gray*, 518 U.S. at 162; *Coleman*, 501 U.S. at 750. And regardless, the claim lacks merit.

Carpenter makes a conclusory assertion that state habeas counsel's ineffectiveness is to blame for his procedural default. *See* 3d Am. Pet. 217, 219. But as discussed at length in Part I.A.4.a, *supra*, under *Coleman*'s well-

established rule, the ineffective assistance of state writ counsel cannot constitute "cause" under the cause-and-prejudice test. *Coleman*, 501 U.S. at 752. Further, the narrow exception to this rule that the Supreme Court carved out in *Martinez* does not apply to Texas criminal convictions. And even if *Martinez* did apply to Texas criminal convictions, it would still not afford Carpenter an avenue to a merits review of Claim VIII(D) because *Martinez* is strictly limited to procedurally defaulted ineffective assistance of trial counsel claims. Here, Carpenter's procedurally defaulted claim is not an ineffective assistance of trial counsel allegation, but rather a record-based Eighth and Fourteenth Amendment challenge to the trial court's jury instructions at the punishment phase. Further, to avail himself of the *Martinez* exception, Carpenter would have to demonstrate that state writ counsel was actually ineffective under the *Strickland* standard, which he cannot do. *Martinez*, 132 S. Ct. at 1318–19.

*Strickland*'s high bar is extremely difficult to overcome even on de novo review. *Richter*, 131 S. Ct. at 787–88. Here, where Carpenter makes only a vague, conclusory assertion that initial state habeas counsel's ineffective assistance is to blame for his procedural default, 3d Am. Pet. 217–20, he cannot overcome *Strickland*'s high bar. Carpenter's conclusory, non-specific assertion that state habeas counsel rendered ineffective assistance is precisely the kind

of "mere allegation" that is insufficient to satisfy both prongs of *Strickland*'s test for ineffective assistance. *Armstead*, 37 F.3d at 206; *see Strickland*, 466 U.S. at 697. It is further insufficient to overcome the strong presumption of effective assistance that *Strickland* affords counsel even under a de novo standard of review. *Richter*, 131 S. Ct. at 787–88. Solely on these grounds, any attempt by Carpenter to invoke state habeas counsel's representation as cause for Carpenter's procedural default under *Martinez* must fail.

The attempt also must fail in light of the record, which shows that Carpenter's initial state writ counsel filed a lengthy state habeas application raising forty-one grounds for relief on Carpenter's behalf. SHCR-01 4–234 (initial state writ application), 235–50 (exhibits). These forty-one grounds for relief included the three constitutional challenges to Texas's death penalty scheme that Carpenter now presents as Claims VIII(A)-(C). The mere fact that state habeas counsel did not also raise the additional constitutional challenge to Texas's death penalty scheme that Carpenter now raises as Claim VIII(D) does not render writ counsel's performance ineffective. *See Jones*, 463 U.S. at 751–53. That is even more true when, as demonstrated below, Carpenter cannot satisfy *Strickland*'s prejudice prong. Where a claim has no merit, counsel cannot be deemed ineffective for declining to raise it. In addition, for all the reasons discussed in Part I.A.4.b, *supra*, Carpenter cannot show that a miscarriage of

justice will result if the Court declines to reach the merits of this defaulted claim.

### 2.   Claim VIII(D) has no merit.

As demonstrated above, none of Carpenter's complaints about the Texas death penalty statute are meritorious. In his last point, he argues that the instructions submitted, which he repeatedly characterizes as inaccurate, are arbitrary and capricious. Thus, Carpenter contends that his death sentence was "wantonly and freakishly" applied and violated the mandate of *Furman v. Georgia*, 408 U.S. 238 (1972), that the death penalty must be imposed fairly and with reasonable consistency, or not at all. 3d Am. Pet 246–47. But Carpenter ignores the fact that the Supreme Court has repeatedly upheld Texas's death penalty scheme, and instead simply argues that *Jurek v. Texas*, 428 U.S. 262 (1976), is not relevant to his claim. *Jurek*, 428 U.S. at 269–71; *Franklin*, 487 U.S. at 182; *Johnson v. Texas*, 509 U.S. 350, 373 (1993).

However, *Jurek* is applicable to Carpenter's case because, regardless of that petitioner's complaint, the Supreme Court nevertheless held that Texas's death penalty scheme fulfills the Eighth Amendment's requirements. 428 U.S. at 269–271. Carpenter shows no valid basis for overturning that decision. And indeed, the Texas scheme is constitutionally sound. It both genuinely narrows the class of death-eligible defendants, thus guarding against arbitrary and

capricious imposition of the death penalty, and provides for individualized sentencing based on the individual's character and the crime's circumstances.

To pass constitutional muster, a capital punishment system must be "at once consistent and principled but also humane and sensible to the uniqueness of the individual." *Eddings*, 455 U.S. at 110. Explained further, a system must "channel the [capital] sentencer's discretion by 'clear and objective standards' that provide 'specific and detailed guidance' and that 'make rationally reviewable the process for imposing a sentence of death.'" *Franklin v. Lynaugh*, 487 U.S. 164, 181 (1988) (quoting *Godfrey v. Georgia*, 446 U.S. 420, 428 (1980)(footnotes omitted)). Sentencers must not have unbridled discretion when determining a defendant's fate, nor may the death penalty be administered in an "arbitrary and unpredictable fashion." *Franklin*, 487 U.S. at 181(citing *California v. Brown*, 479 U.S. 538, 541 (1987)).

To the extent Carpenter alleges that these twin objectives of limited discretion but individualized sentencing are impossible to achieve as a practical matter, as he argued to the state courts, his claim must also fail. Again, the Supreme Court has repeatedly held that Texas's capital sentencing scheme is constitutionally sound. *Jurek*, 428 U.S. 269–71; *Franklin*, 487 U.S. at 182; *Johnson*, 509 U.S. at 373. Specifically, the Court has stated that "we have previously recognized that the Texas Special Issues adequately 'allo[w] the jury

to consider the mitigating aspects of the crime and the unique characteristics of the perpetrator, and therefore sufficiently provid[e] for jury discretion."' *Franklin*, 487 U.S. at 182 (quoting *Lowenfield v. Phelps*, 484 U.S. 231 (1988)). Texas's scheme ensures that the sentencer will have adequate guidance when determining sentencing because it authorizes the defense to present to the jury, in a separate hearing, any relevant mitigating circumstance related to the defendant. *Johnson*, 509 U.S. at 363. Texas's special issues system therefore guides "the jury's consideration of the mitigating evidence while still providing for sufficient jury discretion." *Id.* at 364. Further, the mitigation instruction was crafted pursuant to legislative changes resulting from the Supreme Court's decision in *Penry v. Lynaugh*, 492 U.S. 302 (1989) (*Penry I*), *see Cockrell v. State,* 933 S.W.2d 73, 92–93 (Tex. Crim. App. 1996), and was approved, at least implicitly, by the Supreme Court in *Penry v. Johnson*, 532 U.S. 782, 803 (2001) (*Penry II*), when the Court noted that

> [a] clearly drafted catchall instruction on mitigating evidence also might have complied with *Penry I.* Texas's current capital sentencing scheme (revised after Penry's second trial and sentencing) provides a helpful frame of reference. ... Penry's counsel, while not conceding the issue, admitted that he "would have a tough time saying that [*Penry I*] was not complied with under the new Texas procedure."

*Id. at* 803. In light of these holdings, it is impossible for Carpenter to show that the state courts unreasonably applied clearly established federal law in finding

that Carpenter's death sentence was constitutionally imposed. Therefore, Carpenter is also not entitled to federal relief concerning Claim VIII(D).

## IX. Carpenter's Eighth and Fourteenth Amendment Rights Were Not Violated by the Trial Court's Instructions Failing to Include a Definition of the Term "Probability." (Claim IX).

Carpenter claims the failure of the trial court to instruct the jury on the definition of "probability," used in one of the special issues of the punishment phase, violated his Eighth and Fourteenth Amendment rights. 3d Am. Pet. 248. He argues that this term is "unconstitutionally vague" and that the Constitution requires definitions of legal terms. *Id.* at 252. However, Texas's special issue on future dangerousness has been held to be a constitutionally acceptable criterion for imposing the death penalty. *Jurek*, 428 U.S. at 269–71. Therefore, as further demonstrated below, the state courts did not unreasonably apply federal law in disposing of Carpenter's claim, and as such he is not entitled to federal habeas relief.

The state habeas court and the CCA addressed Carpenter's claim during the state habeas proceedings. The state courts held that this claim lacked merit because:

> [The CCA] has repeatedly held that the terms "probability" and "society" require no definition. Rather, the terms are applied in the "their usual acceptation in common language." [citations omitted]

> Thus, the Court concludes that the failure to define the terms "probability," "society," and "confinement for life" does not violate [Carpenter's] constitutional right to due process.

SHCR-01 487 (para. 59–60). The state courts's conclusions are consistent with established federal precedent.

As the federal courts have stated, precise definitions are not a prerequisite to an appropriate sentencing scheme. The Supreme Court has held that

> [e]nsuring that a sentence of death is not so infected with bias or caprice is our "controlling objective when we examine eligibility and selection factors for vagueness." Our vagueness review, however, is 'quite deferential.' As long as an aggravating factor has a core meaning that criminal juries should be capable of understanding, it will pass constitutional muster.

*Jones*, 527 U.S. at 400 (quoting *Tuilaepa*, 512 U.S. at 973); *see also Jurek*, 428 U.S. at 274–76 (rejecting vagueness challenge to the future dangerousness special issue). Further, in *Milton v. Procunier*, the Fifth Circuit rejected the argument that words used in the punishment issues have such imprecise meanings in the context of a capital murder trial that the jury cannot discern what is being asked without having those terms defined in the jury instructions. 744 F.2d 1091, 1096 (5th Cir. 1984); *see also James v. Collins*, 987 F.2d 1116, 1120 (5th Cir. 1993)(rejecting claim that court should have defined "deliberately"); *Netherly v. Collins*, 993 F.2d 1154, 1162 (5th Cir. 1993). "Under Texas law, these terms are sufficiently common that their definition is not

required in a jury charge under the capital murder statute." *Milton*, 744 F.2d at 1095; *see also Pulley v. Harris*, 465 U.S. 37, 50 n.10 (1983)(stating that Texas punishment issues are not impermissibly vague as they have a "common sense core of meaning").

Although Carpenter argues that state courts cannot know what meaning the jury ascribed to the complained-of term, the Fifth Circuit has repeatedly rejected arguments that terms used in the Texas punishment phase special issues have such imprecise meanings that the jury cannot discern what is being asked without a definition of the terms in the jury instructions. *Hughes v. Johnson*, 191 F.3d 607, 615 (5th Cir. 1999) ("[t]o the extent that the words strike distinct chords in individual jurors, or play to differing philosophies and attitudes, nothing more is at work than the jury system....The answer is that such words, often of great consequence, do have a common understanding in the sense that they ultimately mean what the jury says by their verdict they mean.") (citation omitted). As the Fifth Circuit explained:

> *Jurek* expressly rejects the contention that the [future dangerousness] issue is impermissibly vague. [428 U.S. at 275–76]. We have likewise frequently rejected challenges to the lack of definition of diverse terms in the [former deliberateness and current future dangerousness] special issues. *See* [*Milton*, 744 F.2d at 1095–96] ("deliberately," "probability," and "criminal acts of violence" "have a plain meaning of sufficient content that the discretion left to the jury" is "no more than that inherent in the jury system itself"), *cert. denied*, 471 U.S. 1030 ...(1985); *Thompson v. Lynaugh*, 821 F.2d 1054, 1060 (5th Cir. 1987) ("deliberately" and

"reasonable doubt" need not be defined as their "common meaning is sufficiently clear to allow the jury to decide the special issues on punishment"), *cert. denied,* 483 U.S. 1035 ... (1987); *James* [*v. Collins,* 987 F.2d 1116, 1120 (5th Cir. 1993)] (not necessary to define "deliberately," "probability," "criminal acts of violence," or "continuing threat to society"); [*Nethery,* 993 F.2d at 1162] (not necessary to define "deliberately," "probability," or "society"). *See also* [*Pulley,* 465 U.S. at 50 n.10] (Texas punishment issues are not impermissibly vague as they have "a common sense core of meaning").

*Woods,* 75 F.3d at 1033–34.

Given this established federal precedent, Carpenter cannot demonstrate that the state court's adjudication of this claim was either contrary to, or involved an unreasonable application of, clearly established federal law.[75] Thus, under AEDPA, relief must be denied and this court should dismiss this claim.

## X.   A Capital Sentencing Jury Is Not Entitled To Be Informed Of A Defendant's Parole Ineligibility. (Claims X(A) and X(B)).

In Claims X(A) and X(B), Carpenter claims that the trial court's refusal to inform the jury of the consequences of a life sentence, specifically that he would be ineligible for parole for fifteen years, resulted in cruel and unusual punishment because: it deprived Carpenter of his right to due process by preventing him from rebutting any evidence of future dangerousness; and because it impermissibly diminished the reliability of the jury's ultimate

---

[75]   Further, because the relief requested here by Carpenter would create a new rule of federal constitutional law, *Teague*'s non retroactivity principles foreclose this claim. 489 U.S. at 310.

determination that death was the appropriate punishment by failing to inform the jury on the meaning of "life" a legal term of art. In support, Carpenter relies upon *Simmons v. South Carolina*, 512 U.S. 154 (1994) he argues that *Simmons* holds that a jury must be informed regarding the true meaning of a life sentence under Texas law. However, as discussed below, Carpenter's reliance upon *Simmons* is misplaced. Further, Carpenter raised these issues on state habeas and the state courts concluded that his claims were without merit. SHCR-01 488–492. Therefore, Carpenter must demonstrate that the state courts unreasonably denied his claim to obtain relief under AEDPA.

Carpenter argues that under *Simmons*, the trial court's refusal to inform the jury of Carpenter's parole ineligibility for fifteen years constitutes a denial of his Eighth Amendment rights. Specifically, he claims that it negated his ability to rebut the State's argument of future dangerousness. 3d Am. Pet. 256–67. However, Carpenter's interpretation of *Simmons* is mistaken. While the Supreme Court in *Simmons* did, in fact, find that the actual duration of a capital defendant's prison term is "indisputably relevant" in assessing future dangerousness, it also reaffirmed that states are generally free to decide whether a capital sentencing jury should be informed of the possibility of a defendant's early release. 512 U.S. at 163, 168. Only where life without parole is the sole alternative to a death sentence, *and* future dangerousness is an

194

issue, does due process actually require the jury to be informed of the defendant's parole eligibility. *Id.* at 153 (O'Connor and Kennedy, JJ., concurring) (emphasis added).

The rule set out in *Simmons* does not, therefore, apply to states such as Texas where life without parole was not a sentencing option in capital cases at the time of Carpenter's trial. *See id.* at 167–68 & nn.7–8 (noting that, while Texas traditionally has prohibited informing juries about a capital defendant's parole eligibility, life without parole is not a sentencing alternative in Texas). The *Simmons* Court stated that,

> In a State in which parole is available, how the jury's knowledge of parole eligibility will affect the decision whether or not to impose the death penalty is speculative, and we shall not lightly second-guess a decision whether or not to inform the jury of information regarding parole.

*Id.* at 168. Thus, the language of *Simmons* makes clear that the case did not invalidate Texas's prohibition against informing juries about the parole implication of a life sentence in capital cases. Moreover, the Supreme Court has confirmed in two subsequent opinions that the *Simmons* holding applies only where life without parole is the only available alternative to the death penalty. *See Ramdass v. Angelone*, 530 U.S. 156, 165 (2000); *Shafer v. South Carolina*, 532 U.S. 36, 48-52 (2001). Although the Texas Legislature has since Carpenter's

trial made life without parole a sentencing option in capital cases, it was not a possibility at the time of Carpenter's trial.

Federal habeas relief on this claim is further precluded under circuit precedent that has repeatedly rejected the merits of this claim. *See Hughes v. Johnson*, 191 F.3d 607, 617 (5th Cir. 1999); *Muniz*, 132 F.3d at 224; *Montoya v. Scott*, 35 F.3d 405, 417 (5th Cir. 1995). The Fifth Circuit has held that where Texas did not statutorily provide for parole ineligibility at the time of the petitioner's conviction, due process does not require the sentencing jury to be informed of the number of years a defendant must serve under a life sentence before becoming eligible for parole. *Allridge v. Scott*, 41 F.3d 213, 222 (5th Cir. 1994). In sum, Carpenter had no legal right to have the jury informed of his parole ineligibility for fifteen years. There was no violation of his Eighth Amendment rights and the state courts did not unreasonably apply federal law in denying him relief.

Moreover, the instruction Carpenter seeks would most likely have harmed him more than it could possibly have helped him. Respectfully, Carpenter's suggestion that the jury would find fifteen years to be a significant period of time is preposterous. 3d Am. Pet. 260. It is more likely that his jurors would have thought that such a short period of time was not sufficient. Indeed, most jurors would be surprised and appalled to learn that Carpenter might be

196

released in only fifteen years on a life sentence after committing such a brutal and cold-blooded crime. To the extent Carpenter also asserts that his desired instruction would have helped him refute the prosecution's argument—that Carpenter would constitute a continuing danger to the three principle witnesses against him—his argument also fails. Carpenter asserts that he could have countered the prosecution's assertion with the argument that, in fifteen years, he might not have been able to locate these witnesses. *Id.* But this argument has no merit. The jury's inquiry would have been not whether Carpenter could actually find the three principle witnesses, but rather whether he would look for them. And to the extent the jury answered that question in the affirmative, Carpenter's subsequent actions have proven it correct. Carpenter's correspondence reveals that he is actively looking for eyewitness Tessica Rainey and seeking to intimidate other witnesses. *See* Ex. C 2–3 (letter to Siska Baker, dated Jan. 9, 2007), 10 (letter to Jolee Vanderhaar, dated Oct. 7, 2008). Under these circumstances, it is highly unlikely that this instruction would have had the effect Carpenter argues it would. For all of these reasons, the Court should reject both of Carpenter's claims.

Finally, Carpenter's claim is also barred under *Teague* principles ,which dictate that unless an exception applies, new rules of constitutional criminal

procedure will not apply to cases where the convictions became final before the

new rule was announced. 489 U.S. at 316. The Fifth Circuit has stated that,

> If we were to conclude...that due process entitles a capital
> defendant to introduce evidence of parole ineligibility whenever the
> state argues that the defendant is a future danger, regardless of
> whether the state statutorily provides for parole ineligibility, such
> a conclusion would constitute a "new rule" and, therefore, would be
> barred under *Teague*.

*Allridge*, 41 F.3d at 222, n.11.

## XI. Carpenter's Constitutional Rights Were Not Violated by the Admission of His Letters and Drawings at the Punishment Phase of Trial. (Claims XI(A) and XI(B)).

Carpenter claims he was denied due process when the trial court allowed

the introduction of letters written by Carpenter which contained racist

comments and lewd drawings drafted by Carpenter during the punishment

phase. 3d Am. Pet. 272–80. Specifically, he argues that because such evidence

was not directly relevant to the crime of which he was convicted, the admission

of such evidence violated his First Amendment rights. *Id.* at 273–77. Carpenter

raised these claims in his state writ application, and because both the trial

court and the CCA correctly denied relief, this was an adjudication on the

merits. *Singleton*, 178 F.3d at 384; SHCR-01 525–28, 532–36. Therefore, this

court cannot grant habeas corpus relief unless it determines that the state

court's determination was unreasonable based upon clearly established federal

law or the facts contained in the record.

Moreover, "a federal court may grant habeas relief based on an erroneous state court evidentiary ruling only if the ruling also violates a specific constitutional right or renders the petitioner's trial fundamentally unfair." *Gochicoa v. Johnson*, 118 F.3d 440, 446 (5th Cir. 1997); *see also Trussell,* 699 F.2d at 259 (citing *Nelson,* 642 F.2d 903); *Cupit,* 28 F.3d at 536. An erroneous admission of evidence renders a trial fundamentally unfair if relates to evidence that is "crucial, critical and highly significant." *See Pemberton v. Collins*, 991 F.2d 1218, 1227 (5th Cir. 1993) (citing *Mullen v. Blackburn*, 808 F.2d 1143, 1145 (5th Cir. 1987)). Therefore, to obtain federal habeas relief on these claims, Carpenter must demonstrate not only that the evidence was wrongly admitted but either that the admission violated a specific constitutional right or that it rendered his entire trial fundamentally unfair, *and* that the state courts were unreasonable in their determination that it did not.

Carpenter argues that because this was not a racially or sexually motivated crime, the trial court violated his First Amendment rights by admitting his letters and drawings which were otherwise irrelevant.[76] 3d Am. Pet. 273–77. To support his argument that the admission of this evidence violated his First Amendment rights, Carpenter cites to *Dawson v. Delaware*,

---

[76]     To the extent Carpenter wants this Court to declare that all relevant evidence must automatically be excluded when a defendant asserts a First Amendment violation, then relief is barred under *Teague.*

503 U.S. 159 (1992). However, Carpenter's reliance upon *Dawson* is misplaced. In *Dawson*, the Supreme Court held that although the First Amendment protects an individual's right to join groups and associate with others, the Constitution *does not erect* a *per se* barrier to the admission of evidence concerning beliefs and associations at sentencing. 503 U.S. at 161 (emphasis added). The Court ruled that the admission of evidence of the defendant's membership in the Aryan Brotherhood prison gang violated the First Amendment because the prosecution offered no evidence of the gang's violent tendencies relevant to sentencing. *Id.* at 166. The Fifth Circuit followed this reasoning in affirming a capital murder conviction in *Fuller v. Johnson*, 114 F.3d 491 (5th Cir. 1997). There, the court approved the introduction of Fuller's membership in the Aryan Brotherhood because the State had also introduced evidence that the gang had committed unlawful acts including homicides, drug dealing, and aggravated assaults. *Id.* at 498. The court stated, "[a] reasonable juror could conclude that membership in such a gang is relevant to future dangerousness ... [t]he fact that Fuller was within his rights in joining the gang does not bar the use of relevant evidence at trial." *Id.* Thus, relevant evidence normally protected by the First Amendment is still admissible.

Carpenter cannot show that the state courts's determination to deny him relief was unreasonable, therefore, he is not entitled to federal relief on this

claim. First, Carpenter complains about the admission of State's Exhibits 149, 178–181, and 183.[77] These are all letters written by Carpenter to McBay. All the letters contain racial epithets, and Exhibits 181 and 183 contain either accounts or threats of violence. SHCR-01 534 (para. 325). Under Texas law, the trial court is authorized to admit any evidence deemed relevant to sentencing. Tex. Code Crim. Proc. art. 37.0711, § 3 (Vernon 1991).Even Carpenter admits that "[i]f the State has evidence of specific desires and stated intents to engage in violence toward minorities, such evidence would be admissible for future dangerousness." 3d Am. Pet 276–77. Because these exhibits contain threats and accounts of violence, they are undoubtedly relevant to the future dangerousness issue. As such, Carpenter has failed to show that these exhibits were improperly admitted much less a violation of his constitutional rights. Thus, at most Carpenter has stated a basis for the exclusion of Exhibit 180. However, he has not shown and cannot show that the admission of this one particular exhibit rendered his entire trial fundamentally unfair or that it violated his First Amendment rights in light of the proper admission of the other exhibits and testimony reflecting his hatred and violent tendencies toward African-

---

[77]     Exhibits149, 178 and 179 were admitted for record purposes only and are full copies of the letters, represented by Exhibits181, 183 and 180, respectively.

Americans. 28 RR 33, 47 (testimony that Carpenter went "nigger-hunting").

Thus, the state courts did not unreasonably deny Carpenter relief on this claim.

Second, Carpenter complains about the admission of Exhibits 204–209.

Exhibit 204 is a picture of a "skull wearing sunglasses and what appears to be

a confederate bandana," with the phrase "Lawless Rebels" encircling the skull.

SHCR-01 527 (para. 282). Exhibits 205–209 "depict female genitalia and nude

women engaged in various sexual acts. SHCR-01 527 (para. 283). On state

habeas, the trial court found that "the skull drawing has a violent undertone

and suggests a racial bias," and "the sexual drawings evince applicants's

objectification of women, if not a disrespect for them as well." SHCR-01 527

(para. 286–87). As discussed in the paragraph above, evidence of Carpenter's

violent tendencies as indicated by the skull drawing is relevant to the issue of

future dangerousness. Therefore, to the extent Carpenter complains about the

admission of Exhibit 204, he has failed to show that it was improperly admitted.

As for Exhibits 205–209, although Carpenter contends that this was not a

sexually-based crime, he does not deny the victim's gender. Given the additional

testimony concerning Carpenter's disregard for women, specifically, threats to

kill his female cousin and grandmother, 28 RR 45–49; stalking his cousin's

daughter, 29 RR 94–100; his sexual relationships with and solicitation of

underage girls, 28 RR 27, 29; 29 RR 235; his physical and sexual assaults of

McBay, 28 RR 30–32, 40–42; and testimony evincing that he threatened to kill Evrin Smith and received a "rush" from killing Henin, 27 RR 31, the trial court did not err in concluding such evidence was relevant to the punishment phase. One of the State's arguments for the death penalty was that Carpenter would seek revenge against the women who testified against him. 30 RR 76. As such, Carpenter has not made the necessary showing that this evidence was improperly admitted.

Further, even if the admission of this evidence was a close call, under AEDPA, Carpenter must demonstrate that the state courts were unreasonable in their decision to deny relief. A federal habeas court's inquiry into unreasonableness should be objective rather than subjective, and a court should not issue the writ simply because that court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly. *Williams*, 529 U.S. at 409–11; *Tucker v. Johnson*, 242 F.3d 617, 620-21 (5th Cir. 2001). Therefore, since the Fifth Circuit has held that federal courts should "not consider the correctness of the evidentiary rulings of the Texas courts," and Carpenter has not demonstrated a clear violation of his First Amendment rights or that the admission of this evidence rendered his trial fundamentally unfair, this Court is not free to grant relief. *Trussell,* 699 F.2d at 259.

Further, Carpenter has not cited any controlling authority that demonstrates the state courts's decision was unreasonable. Although he argues that the state court findings that the drawings were relevant to his character represent a misapplication of federal law, 3d Am. Pet. 279, Carpenter fails to account for the fact that the Fifth Circuit has held that it is the state court's "ultimate decision" that is to be tested for unreasonableness, "not every jot of its reasoning." *Santellan*, 271 F.3d at 193; *Neal*, 286 F.3d at 246; *Catalan*, 315 F.3d at 493. Moreover, because this evidence was admitted exclusively at the punishment phase, all his arguments of harm pertaining to the guilt-innocence phase are disingenuous. *See* 3d Am. Pet. 277–78. Although Carpenter argues that the evidence of his future dangerousness was minimal, making the introduction of this evidence more damaging, the record, related above, proves that Carpenter is a violent man with little or no regard for human life. Therefore, this Court should deny relief on these claims.