# Attachment A



# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

### NO. 73,127

## BRITTANY MARLOWE HOLBERG,
## a/k/a BRITTANY MARLOWE JOHNSON, Appellant

### v.

### THE STATE OF TEXAS

## DIRECT APPEAL FROM THE
## 251st DISTRICT COURT OF RANDALL COUNTY

*MANSFIELD, J., delivered the opinion of the Court, in which McCORMICK, P.J., and HOLLAND and KEASLER, JJ., joined. MEYERS, J., did not participate in the decision of the case. KELLER, J., joined the opinion of the Court, except with respect to its discussion of point of error number 40, and joined the judgment of the Court. PRICE, J., joined only the judgment of the Court. WOMACK, J., joined the opinion of the Court, except with respect to its discussion of point of error number sixteen, and joined the judgment of the Court. JOHNSON, J., joined the opinion of the Court, except with respect to its disposition of point of error number 40, to which she dissented.*

## O P I N I O N

Appellant, Brittany Marlowe Holberg, was found guilty of capital murder and sentenced to

death.  On appeal to this Court, she brings fifty points of error,[1] which we have re-ordered and

grouped to facilitate a more orderly discussion.  We will affirm the judgment of the trial court.[2]

*Points of Error Relating to the*
*Sufficiency of the Evidence*

In points of error numbers eighteen and nineteen, appellant argues that the evidence adduced

at her trial was legally insufficient, under the Fourteenth Amendment to the United States

Constitution, to support her conviction.  The record reflects that appellant was charged with, and

found guilty of, intentionally committing murder in the course of attempting to commit and

committing robbery and burglary.  See Tex. Pen. Code §§ 19.03(a)(2), 29.02(a)(1), and 30.02(a)(1)

& (3).  The State presented 21 witnesses (law enforcement personnel, friends and relatives of both

the victim and appellant, the county medical examiner, etc.) and numerous exhibits (including

appellant's incriminating written statement[3]) at the guilt/innocence stage in an attempt to prove its

case, and appellant presented eleven witnesses (including herself) and numerous exhibits in her

defense.  Viewed in the light most favorable to the State, the evidence and reasonable inferences

therefrom established the following:

At approximately 4:30 p.m., November 13, 1996, in Randall County, 80-year-old A. B.

---

[1]  Appellant's brief contains an un-numbered point of error between points 46 and 47.
We have designated that point as point of error number 46-A.

[2]  Pursuant to Texas Rule of Appellate Procedure 77.2, a majority of this Court has
determined that the only parts of this opinion to be published are the introductory paragraph, the
paragraphs discussing points of error numbers ten and eleven, and the concluding paragraph.

[3]  In her written statement, given to police shortly after her arrest, appellant admitted
killing the victim but claimed she did so in self-defense.

Towery, Sr., purchased groceries at an Albertson's store and then walked back to his apartment. As he neared his home, Towery was approached by appellant – a 23-year-old prostitute and drug addict – who asked to use his telephone. Towery consented, and the two proceeded into his apartment. Once inside, appellant asked Towery for money, but he refused. Appellant then tried to take Towery's money by force, and the two struggled. In the course of the struggle, appellant grabbed several objects (a cast iron skillet, a steam iron, a hammer, a paring knife, a butcher knife, and two forks) and used them to beat and stab Towery, fatally injuring him.[4] After Towery fell to the floor, dying, appellant shoved the base of a lamp five inches down his throat, choking him and hastening his death. Appellant then searched Towery's pants pockets, found his wallet, and took $1,400 in cash. After showering and changing into some of Towery's clothes, appellant left. She spent the evening using Towery's money to buy cocaine, which she snorted with a friend.

Consistent with the Fourteenth Amendment's guarantee of due process, no criminal defendant may be convicted and punished except upon proof sufficient to persuade a rational fact-finder of the defendant's guilt beyond a reasonable doubt. *Tibbs v. Florida*, 457 U.S. 31, 45, 102 S.Ct. 2211, 2220 (1982). In assessing the legal sufficiency of the evidence, under the Fourteenth Amendment, to support a conviction, we consider all of the record evidence, whether admitted properly or improperly, in the light most favorable to the State and determine whether, based on that evidence and reasonable inferences therefrom, a rational jury could have found the defendant guilty of all of the elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789 (1979); *Miles v. State*, 918 S.W.2d 511, 512 (Tex.Crim.App. 1996). Furthermore, when we undertake to review the sufficiency of the evidence and, as was the case here,

---

[4] Towery sustained 58 stab wounds and numerous blunt force injuries.

the trial court's charge authorized the jury to convict on alternative theories, the verdict of guilt will be upheld if the evidence was sufficient on any one of the theories. *Rabbani v. State*, 847 S.W.2d 555, 558-559 (Tex.Crim.App. 1992), *cert. denied*, 509 U.S. 926, 113 S.Ct. 3047 (1993). If, given all of the evidence, a rational jury would have necessarily entertained a reasonable doubt as to the defendant's guilt, we must reverse and render a judgment of acquittal. *Narvaiz v. State*, 840 S.W.2d 415, 423 (Tex.Crim.App. 1992), *cert. denied*, 507 U.S. 975, 113 S.Ct. 1422 (1993).

Applying these principles to the case at bar, we conclude that the evidence was legally sufficient to support appellant's conviction. Viewed in the light most favorable to the State, the evidence at trial established that, on November 13, 1996, in Randall County, appellant intentionally killed Towery in order to obtain his money to support her drug habit. In other words, based on the evidence at trial, a rational jury could have concluded beyond a reasonable doubt that, at the time and place in question, appellant intentionally committed murder in the course of committing robbery, *i.e.*, that appellant intentionally caused the death of an individual while in the course of appropriating his property without his effective consent and with the intent of depriving him of that property. We overrule points of error numbers eighteen and nineteen.

In point of error number fifteen, appellant argues that the evidence adduced at her trial was legally insufficient to support the jury's affirmative answer to the first punishment issue, concerning her future dangerousness. Under the first punishment issue, the jury was asked to determine "whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society." Article 37.071, § 2(b)(1).[5] The State presented seven witnesses at the punishment stage in an attempt to prove that the correct answer to the first punish-

---

[5] All references to articles are to those in the Texas Code of Criminal Procedure.

ment issue was "yes," and appellant presented twelve witnesses in rebuttal. Viewed in the light most favorable to the State, the evidence adduced at the punishment stage, and reasonable inferences therefrom, established that (1) sometime prior to November 6, 1995, appellant struck the head of her elderly "sugar daddy," E. R. Williams, with a cane, rendering him unconscious, because he would not give her money for illicit drugs; (2) while awaiting trial in the instant case, appellant repeatedly solicited a cell-mate to kill Vickie Marie Kirkpatrick, a key prosecution witness; and (3) appellant was once convicted of theft. In addition, Dr. Richard E. Coons, a psychiatrist, testified that, based on appellant's record, there was a "significant probability that [she] would commit criminal acts of violence in the future."

The State had the burden of proving the first punishment issue beyond a reasonable doubt. Article 37.071, § 2(c). "Thus, the State had the burden of proving beyond a reasonable doubt that there is a probability that appellant, if allowed to live, would commit criminal acts of violence in the future, so as to constitute a continuing threat, whether in or out of prison." *Ladd v. State*, 3 S.W.3d 547, 557 (Tex.Crim.App. 1999), *cert. denied*, ___U.S.___, 120 S.Ct. 1680 (2000). In its determination of the issue, the jury was entitled to consider all of the evidence presented at both the guilt/innocence and punishment stages of trial. *Ibid.* As an appellate court reviewing the sufficiency of the evidence to support the jury's affirmative finding, we consider all of the record evidence, whether admitted properly or improperly, in the light most favorable to the State and determine whether, based on that evidence and reasonable inferences therefrom, a rational jury could have found beyond a reasonable doubt that the correct answer to the first punishment issue was "yes." *Miles v. State*, 918 S.W.2d at 512; *Harris v. State*, 738 S.W.2d 207, 225-226 (Tex.Crim.App. 1986), *cert. denied*, 484 U.S. 872, 108 S.Ct. 207 (1987). If, given all of the evidence, a rational jury would

have necessarily entertained a reasonable doubt as to the probability of appellant's future dangerousness, we must reform the trial court's judgment to reflect a sentence of imprisonment for life. Article 44.251(a).

Applying these principles to the case at bar, we conclude that the evidence was legally sufficient to support the jury's affirmative answer to the first punishment issue. Viewed in the light most favorable to the State, the evidence at trial established, among other things, that (1) appellant was both a prostitute and a drug addict; (2) she brutally murdered an elderly gentleman in order to obtain money to support her drug habit; (3) on a previous occasion, she attacked another elderly gentleman in order to obtain money to support her drug habit; (4) while in jail awaiting trial, she solicited a cell-mate to kill a prosecution witness; and (5) she had a prior conviction for theft. In addition, there was psychiatric evidence that appellant would probably commit criminal acts of violence in the future. In short, based on the totality of the evidence presented at trial, a rational jury could have concluded beyond a reasonable doubt that appellant exhibited a dangerous aberration of character and was essentially incorrigible, and that the correct answer to the first punishment issue was "yes." We overrule point of error number fifteen.

In point of error number sixteen, appellant argues that the evidence adduced at trial was factually insufficient to support the jury's affirmative answer to the first punishment issue. See *Johnson v. State*, 23 S.W.3d 1, 9-11 (Tex.Crim.App. 2000); *Clewis v. State*, 922 S.W.2d 126, 129 (Tex.Crim.App. 1996). We have held, however, that it is not possible for an appellate court to assess the factual sufficiency of the evidence to support a jury's affirmative answer to the first punishment issue. *McGinn v. State*, 961 S.W.2d 161, 169 (Tex.Crim.App.), *cert. denied*, ___U.S.___, 119 S.Ct. 414 (1998). We overrule point of error number sixteen.

In point of error number twenty, appellant argues that the "evidence of [her] eligibility for the death sentence [was] legally insufficient because the State failed to prove lack of provocation" on the part of the victim. By their plain terms, however, neither Penal Code § 19.03 nor Article 37.071 requires the State to prove lack of provocation on the part of the victim. Compare Article 37.0711, § 3(b)(3) (applicable to capital offenses committed before September 1, 1991). We overrule point of error number twenty.

### Points of Error Relating to the Constitutionality
### of Penal Code § 19.03 and Article 37.071

In point of error number ten, appellant, citing *Lemon v. Kurtzman*, 403 U.S. 602, 91 S.Ct. 2105 (1971), and *Edwards v. Aguillard*, 482 U.S. 578, 107 S.Ct. 2573 (1987), argues that Penal Code § 19.03 and Article 37.071, the bases of her conviction and punishment, violate the Establishment Clause of the First Amendment.[6,7] More specifically, appellant argues that the statutes violate the Establishment Clause because (1) "the sponsors of the House Bill creating those statutes could not articulate a reasonable, secular purpose for their enactment but did articulate, at length, the religious purpose for the punishment, while siding, in fact, with the viewpoint of a particular and identifiable religious sect," and (2) "the effect of [the statutes is] to advance the beliefs of

---

[6] The Establishment Clause of the First Amendment provides that "Congress shall make no law respecting an establishment of religion." This guarantee of government neutrality with respect to religion was made applicable to the states by the Due Process Clause of the Fourteenth Amendment. *Cantwell v. Connecticut*, 310 U.S. 296, 303-304, 60 S.Ct. 900, 903 (1940).

[7] Although appellant made no such objection in the trial court, we have held that "[q]uestions involving the constitutionality of a statute upon which a defendant's conviction is based should be addressed by appellate courts, even when such issues are raised for the first time on appeal." *Rabb v. State*, 730 S.W.2d 751, 752 (Tex.Crim.App. 1987). See G. Dix & R. Dawson, *Texas Criminal Practice and Procedure* § 42.122 (1995 & Supp. 2000).

fundamentalist Protestants over those of other branches of American Christianity and other sects and religions that oppose the death penalty on contrasting religious grounds."

House Bill 200, enacted into law in 1973, brought Penal Code § 19.03 and Article 37.071 into being. See H.B. 200, 63rd Leg., R.S., ch. 426, 1973 Tex. Gen. Laws 1122-1129. According to appellant, the legislative history of H.B. 200 reveals the following relevant facts: At a public hearing on the bill before the House Committee on Criminal Jurisprudence on February 6, 1973, three district attorneys testified that they believed the death penalty was, generally, a deterrent to murder. One of the district attorneys also observed that the death penalty ensured that the person executed would never murder again, whether in or out of prison. During the House floor debate on the bill on May 8, 1973, the bill's chief sponsor, Representative Cobb, stated that the bill should be enacted into law because the people of Texas wanted the death penalty. Finally, at the close of the House floor debate on May 10, 1973, Representative Washington, who opposed the bill, argued that no evidence existed that the death penalty deterred crime. Representative Leland, also opposed to the bill, commented next that state executions violated the Ten Commandments' prohibition on killing. In response to Leland's argument, the co-sponsors of the bill – Representatives Cobb, Williamson, and Hollowell – cited biblical passages that, in their view, supported the death penalty.

A statute violates the Establishment Clause if the Legislature's actual purpose in enacting the statute was to advance or inhibit religion, or if the statute's primary effect is to advance or inhibit religion.[8] *Lemon v. Kurtzman*, 403 U.S. at 612-613, 91 S.Ct. at 2111. However, a court may not hold a statute invalid on Establishment Clause grounds unless the statute's invalidity definitely

---

[8] The Court in *Lemon v. Kurtzman* also held that a statute violates the Establishment Clause if the statute fosters an excessive entanglement of government with religion, but appellant does not argue that prong of *Lemon*.

appears. *Ex parte Granviel*, 561 S.W.2d 503, 511 (Tex.Crim.App. 1978); *Ex parte Halsted*, 182 S.W.2d 479, 482 (Tex.Crim.App. 1944). Furthermore, in assessing the legislative purpose, a court cannot assume that the selected statements of a few legislators, even the sponsors of the legislation, reflected the motivation of the entire Legislature. See *State v. Carpenter*, 541 N.W.2d 105, 112 n. 11 (Wis. 1995), *cert. denied*, 521 U.S. 1118, 117 S.Ct. 2507 (1997).[9]

The legislative history cited by appellant does not persuade us that the Legislature's actual purpose in enacting Penal Code § 19.03 and Article 37.071 was to advance or inhibit religion. In our view, it is at least as likely that the Legislature's actual purpose in enacting the statutes was the secular one of establishing the appropriate penalty for certain heinous crimes, and that the legislators acted as they did because they held one or more of the following reasonable, secular beliefs: (1) the death penalty is the only proportional punishment for certain crimes; (2) the death penalty ensures, at a minimum, that the offender will never harm anyone again; (3) the death penalty may deter some persons (professional criminals and those already imprisoned for life), and possibly others, from committing murder; and (4) life imprisonment without parole is not a viable alternative to the death penalty because (a) capital offenders are a danger to others in the prison environment, (b) persons imprisoned literally for life have little incentive to behave properly, and (c) it is undesirable, costly, and possibly inhumane to keep persons in prison until they actually die from old age or disease. See generally *Gregg v. Georgia*, 428 U.S. 153, 183-186, 96 S.Ct. 2909, 2930-2931 (1976) (plurality).

Appellant's reliance upon *Edwards v. Aguillard*, 482 U.S. 578, 107 S.Ct. 2573, is misplaced. In that case, the Supreme Court held invalid, on Establishment Clause grounds, the Louisiana

---

[9] While the decision in *State v. Carpenter*, 541 N.W.2d 105, is not binding on this Court, we find its reasoning persuasive.

"Creationism Act," which forbade the teaching of the theory of evolution in public schools unless accompanied by instruction in "creation science." The Supreme Court held the statute invalid because the Court could not conceive of a purpose that the Louisiana Legislature might have had for the statute other than the religious one of advancing the Christian belief in divine creation. Thus, *Edwards v. Aguillard* is easily distinguishable from the case at bar.

We are also unpersuaded that the primary effect of the statutes is to advances Protestant beliefs over those of other faiths. The primary effect of the statutes is penal in nature, not religious, and the mere fact that the statutes are consistent with the tenets of a particular faith does not render the statutes in violation of the Establishment Clause. *Hernandez v. C. I. R.*, 490 U.S. 680, 696, 109 S.Ct. 2136, 2147 (1989). We overrule point of error number ten.

In point of error number eleven, appellant argues that Penal Code § 19.03 and Article 37.071 violate the Cruel and Unusual Punishments Clause of the Eighth Amendment[10] because the statutes "advance" the "particular [Protestant] religious belief in 'blood atonement.'" Again, we are unpersuaded. The Eighth Amendment's prohibition on cruel and unusual punishments has three aspects: (1) it limits the methods which may be used to inflict punishment; (2) it limits the amount of punishment which may be prescribed for various offenses; and (3) it bars any punishment in certain situations. See 1 W. LaFave & A. Scott, *Substantive Criminal Law* § 2.14(f) at 249 (1986 & Supp. 2001). As we discussed previously, the Legislature, when it enacted the statutes in question, may have been motivated by reasonable, secular beliefs. The fact that the statutes may be consistent with the tenets of the Protestant faith does not, in our view, implicate any of the three

---

[10] The Eighth Amendment's ban on the infliction of "cruel and unusual punishments" was made applicable to the states by the Due Process Clause of the Fourteenth Amendment. *Louisiana v. Resweber*, 329 U.S. 459, 463, 67 S.Ct. 374, 376 (1947).

aspects of the Eighth Amendment prohibition on cruel and unusual punishment. We overrule point of error number eleven.

In point of error number seventeen, appellant argues that,

as applied in Appellant's case, wherein the jury could have found post-murder theft, the facially constitutional statutory aggravating circumstance of "robbery" [in Penal Code § 19.03(a)(2)] was unconstitutionally vague and overbroad [in violation of the Eighth and Fourteenth Amendments] because, without further instruction on post-murder theft, it rendered the lesser included offense of Murder unavailable to Appellant's jury as a sentencing [sic] option. The statutory charge also left the jury without sufficient guidance for determining the presence or absence of the "in the course of committing or attempting to commit robbery" factor, because it gave the jury no guidance on the distinction between Capital Murder (with the robbery aggravator) and post-murder theft.

(Citations omitted.)

The record reflects that the trial court instructed the jury accurately on the pertinent statutory elements of capital murder, murder, manslaughter, robbery, burglary, and theft. The trial court also instructed the jury accurately on the pertinent statutory definitions of "attempt to commit," "bodily injury," "appropriate," "unlawfully appropriate," "owner," "possession," "effective consent," "enter," and "habitation." Finally, the trial court instructed the jury accurately that "[t]he term 'in the course of committing' an offense means conduct that occurs in an attempt to commit, during the commission, or in immediate flight after the attempt or commission of the offense." See *Riles v. State*, 595 S.W.2d 858, 862 (Tex.Crim.App. 1980).

We see no merit to appellant's argument. The trial court's charge, which accurately tracked the relevant statutes, gave the jury clear guidance on the distinction between murder in the course of robbery (a capital offense), murder in the course of burglary (a capital offense), and the lesser included offense of murder (a non-capital offense), and the charge gave the jury the option of finding

appellant guilty of any, or none, of those offenses.  Therefore, if the jury believed that appellant

murdered Towery and only afterward decided to commit theft, then the jury, as it was charged, could

have found appellant guilty of the lesser included offense of murder.  See *Anderson v. Collins*, 18

F.3d 1208, 1221-1223 (5th Cir. 1994).  We overrule point of error seventeen.

In point of error number 27, appellant argues that Article 37.071, § 2(a), applied at her trial,

violates the Eighth Amendment's ban on cruel and unusual punishment because the statute prohibits

informing jurors of the consequences of their failure to agree unanimously on the punishment issues.

The United States Supreme Court has held, however, that the Eighth Amendment does not require

that juries be informed as to the effect of a failure to reach unanimous agreement on punishment

issues.  *Jones v. United States*, ___U.S.___, ___, 119 S.Ct. 2090, 2098 (1999).  We overrule point

of error number 27.

In point of error number 29, appellant argues that Article 37.071 violates the Eighth

Amendment's ban on cruel and unusual punishment because the statute "prevented [the] jury from

being able to ... consider and give effect to mitigating evidence of provocation" on the part of the

victim.  We disagree.  Evidence that the defendant acted in part because of provocation tends to

show that the defendant is not usually a dangerous person.  Provocation on the part of the victim can

also be considered an extenuating circumstance.  Therefore, appellant's jury could consider and give

effect to any evidence of provocation when it answered the first punishment issue, concerning

appellant's future dangerousness, *and* when it answered the second punishment issue, concerning

mitigation.  See Article 37.071, § 2(e)(1).  We overrule point of error number 29.

In point of error number 30, appellant argues that, "[i]n view of the different capital [murder

sentencing] schemes that have been in operation in Texas since 1989, the ... death penalty was

arbitrarily imposed" upon her in violation of the Eighth Amendment's ban on cruel and unusual

punishment, the Fourteenth Amendment's guarantees of equal protection and due process, and Texas

Constitution article I, § 13's ban on cruel or unusual punishment. We have rejected such arguments

before, however. *Morris v. State*, 940 S.W.2d 610, 616 (Tex.Crim.App. 1996), *cert. denied*, 520

U.S. 1278, 117 S.Ct. 2461 (1997). We overrule point of error number 30.

     In point of error number 31, appellant argues that our state's "statutory capital sentencing

scheme," applied at her trial, violates the Eighth Amendment's ban on cruel and unusual punishment

and the Fourteenth Amendment's guarantee of due process because "it does not permit meaningful

appellate review" of the jury's answers to the punishment issues. We have rejected such arguments

before, however. *Ladd v. State*, 3 S.W.3d at 573. We overrule point of error number 31.

     In point of error number 32, appellant argues that the punishment issue concerning

mitigation, mandated by Article 37.071, § 2(e)(1), violates the Eighth Amendment's ban on cruel

and unusual punishment and the Fourteenth Amendment's guarantee of due process "because it

permits the very type of open-ended discretion condemned by the United States Supreme Court" in

*Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726 (1972). We have rejected such arguments before,

however. *Ladd v. State*, 3 S.W.3d at 574. We overrule point of error number 32.

     In point of error number 33, appellant argues that the definition of "mitigating evidence"

mandated by Article 37.071, § 2(f)(4), and utilized by her jury in answering the punishment issue

concerning mitigation, violates the Eighth Amendment's ban on cruel and unusual punishment and

the Fourteenth Amendment's guarantee of due process. More specifically, appellant complains that

the definition "prevented the jury from reaching [her] very substantial evidence of potential for

rehabilitation, which was the focus of the mitigating evidence the defense produced at the

punishment phase."

We reject appellant's argument for two reasons. First, we have previously upheld the constitutionality of the statutory definition in question. *Ladd v. State*, 3 S.W.3d at 574. Second, appellant's jury could consider and give effect to any evidence of "potential for rehabilitation" when it answered the first punishment issue, concerning her future dangerousness, and when it answered the second punishment issue, concerning mitigation. We overrule point of error number 33.

In points of error numbers 35 and 36, appellant argues that "[t]he death penalty as administered in Texas is cruel and unusual punishment," in violation of the Eighth Amendment and Texas Constitution article I, § 13. In support of her argument, appellant cites Justice Blackmun's dissent in *Callins v. Collins*, 510 U.S. 1141, 114 S.Ct. 1127 (1994). We have rejected such arguments before, however. *Ladd v. State*, 3 S.W.3d at 575. We overrule points of error numbers 35 and 36.

*Points of Error Relating Only to Jury Selection*

In point of error number six, appellant complains that Juror Carpenter "was excludable for cause ... because his voir dire testimony clearly show[ed] he would follow his religious views and automatically vote for the death penalty upon finding a defendant guilty of capital murder." The record reflects, however, that appellant did not object in the trial court to the seating of Juror Carpenter. Therefore, appellant forfeited the right to complain on appeal. Tex. R. App. Proc. 33.1(a). We overrule point of error number six.

In point of error number eight, appellant argues that the trial court erred in not allowing her to question Venireman Fritzmeyer regarding the parole law. We discern no error, however. At the

time of appellant's trial in March 1998, the parole law was not a proper subject for voir dire questioning. *Collier v. State*, 959 S.W.2d 621, 623 (Tex.Crim.App. 1997), *cert. denied*, ___ U.S. ___, 119 S.Ct. 335 (1998).  We overrule point of error number eight.

In point of error number nine, appellant argues that the trial court violated her Sixth Amendment right to an impartial jury[11] when the court granted the State's challenge of Venireman Balderas for cause under Article 35.16(b)(1).  Appellant argues that, under *Wainwright v. Witt*, 469 U.S. 412, 105 S.Ct. 844 (1985), Balderas was not excludable for cause because she "clearly indicated, once she understood the two [punishment] [i]ssues, that she would follow the law and abide by her oath if obliged to sentence appellant, despite her strongly held religious view that the death penalty was wrong."

The record reflects that, in her juror questionnaire, Balderas, a Catholic, indicated that she agreed with the statement, "I cannot vote to assess the death penalty under any circumstances." Later, during voir dire, Balderas repeatedly vacillated as to whether her religious views would allow her to answer the punishment issues strictly in accordance with the evidence.

Consistent with the Sixth Amendment guarantee of an impartial jury, a venireman is challengeable for cause, under Article 35.16(b)(1), because of her views concerning the death penalty, only if those views would prevent or substantially impair the performance of her duties as a juror in accordance with her instructions and her oath. *Wainwright v. Witt*, 469 U.S. at 424, 105 S.Ct. at 852.  The trial court has discretion in making this determination, and its ruling will not be upset on appeal absent an abuse of discretion. *Ladd v. State*, 3 S.W.2d at 559.  An appellate court

---

[11] The Sixth Amendment right to an impartial jury was made applicable to the states by the Due Process Clause of the Fourteenth Amendment. *Parker v. Gladden*, 385 U.S. 363, 364, 87 S.Ct. 468, 470 (1966).

must examine the record as a whole to determine whether there is support for the trial court's ruling, and, in doing so, the appellate court must give deference to the trial court, which was in a position to see and hear the venireman. *Ibid.* If the venireman vacillated with respect to her ability to follow the law, the appellate court must defer to the trial court's judgment. *Ibid.*

We discern no abuse of discretion on the part of the trial court. On this record, the trial court could have reasonably concluded that Balderas' views concerning the death penalty would have prevented or substantially impaired the performance of her duties as a juror in accordance with her instructions and her oath. We overrule point of error number nine.

In point of error number 24, appellant argues that the trial court, when it denied her request to question the venire regarding the parole law, violated her Sixth Amendment right to counsel,[12] her Eighth Amendment right to be free from cruel and unusual punishment, and her Fourteenth Amendment right to due process. We discern no error, however. As we noted previously, at the time of appellant's trial, the parole law was not a proper subject for voir dire questioning. *Collier v. State*, 959 S.W.2d at 623. We overrule point of error number 24.

### Various Points of Error Relating to the Guilt/Innocence and Punishment Stages of Trial

In points of error numbers one and two, appellant argues that the State violated her Sixth Amendment right to an impartial jury, her Eighth Amendment right to be free from cruel and unusual punishment, and her Fourteenth Amendment right to due process, because "the State consciously

---

[12] The Sixth Amendment right to counsel was made applicable to state felony prosecutions by the Due Process Clause of the Fourteenth Amendment. *Gideon v. Wainwright*, 372 U.S. 335, 342, 83 S.Ct. 792, 797 (1963).

sought to organize [and did organize] a [fundamentalist Protestant] jury designed to convict her and

assess the death sentence." More specifically, appellant argues:

> The State exercised its cause and peremptory challenges in Appellant's case to create
> a tribunal organized to return a verdict of death. The prosecutors successfully carried
> out a voir dire strategy of constructing a jury that generally believed the death penalty
> was divinely sanctioned and that the State's deprivation of Appellant's life would be
> ameliorated by the benefit of an afterlife, should Appellant earnestly seek God. As
> the record unequivocally reflects, the State sought and obtained such a theologically
> biased jury in order to prevent serious consideration of rehabilitation as a mitigating
> punishment factor in punishment. While pursuing this strategy, the State cloaked
> itself with spiritual authority by adopting, in front of prospective jurors, the biased
> religious views it was seeking to locate in the jurors. During the punishment phase
> of Appellant's trial, the State elicited improper and egregiously prejudicial testimony,
> and delivered an equally improper closing argument to solidify its hold on the jurors'
> biases.

(Citation omitted.)

As we understand these two points of error, appellant is complaining of (1) all of the State's

questioning during voir dire, (2) all of the State's peremptory challenges and challenges for cause

during voir dire, (3) a portion of the State's questioning of defense witnesses Ella Gibbs and Pat

Karnes during the punishment stage, and (4) all of the State's closing argument at the punishment

stage. Appellant concedes that she failed to make *any* relevant objections concerning these matters

in the trial court, but, citing *Marin v. State*, 851 S.W.2d 275 (Tex.Crim.App. 1993), she argues that

we should excuse her failure to abide by the contemporaneous objection rule because her "right to

an impartial decision-maker is an absolute requirement that cannot be voluntarily waived or forfeited

at trial."

We held in *Marin v. State*, 851 S.W.2d 275, that certain extraordinary claims of error may

be raised for the first time on appeal despite the powerful justifications underlying the contemporane-

ous objection rule.[13] Appellant has provided no argument or authority, however, as to why the *Marin* holding should apply to her claim, and we will not make her argument for her. We hold, therefore, that appellant's failure to object in the trial court forfeited her right to complain on appeal. Tex. R. App. Proc. 33.1. In any event, we have read the record, and it contains nothing that reasonably supports appellant's claim of prosecutorial misconduct. The record does reflect that, during voir dire, both the State and the defense questioned several veniremen with respect to whether their religious beliefs would adversely affect their ability to serve as impartial jurors, but the record reflects no improper questioning. The record also reflects, as will be discussed *infra*, that, at the punishment stage, the State referred to the Christian faith during its cross-examination of defense witnesses Gibbs and Karnes, but the import of those religious references is uncertain, and appellant lodged no objection to the references. We overrule points of error numbers one and two.

In point of error number three, appellant argues that the trial court "abused its discretion by failing to intervene *ex mero motu* ['without prompting'] to prevent the prosecutor's manipulation of evidence and improper argument at the punishment stage from biasing appellant's jury." We discern no error, however. As we noted previously, the record does not support appellant's claim of prosecutorial misconduct. Therefore, the trial court could not have "abused its discretion by failing to ... prevent" that "misconduct." We overrule point of error number three.

In point of error number twelve, appellant argues that, when the trial court admitted evidence at the punishment stage regarding extraneous offenses on her part, the trial court violated her Eighth Amendment right to be free from cruel and unusual punishment and her Fourteenth Amendment

---

[13] See G. Dix & R. Dawson, *Texas Criminal Practice and Procedure* § 42.21 (1995); 5 W. LaFave, *et al.*, *Criminal Procedure* § 27.5(c) at 923-926 (2nd ed. 1999).

rights to equal protection and due process. We have rejected such arguments before, however. *Jackson v. State*, 992 S.W.2d 469, 479 (Tex.Crim.App. 1999). We overrule point of error number twelve.

In point of error number fourteen, appellant argues that the trial court abused its discretion at the punishment stage "by allowing the testimony of [State's witnesses] Corena Norrell and Mary Burnett, because disclosure of those punishment witnesses was not timely, in violation of the trial court's [pre-trial] order." Our examination of the record, however, reveals that appellant made no such objection in the trial court. By not objecting below, appellant forfeited her right to complain on appeal. Tex. R. App. Proc. 33.1. We overrule point of error number fourteen.

In point of error number 28, appellant argues that the trial court erred, at the punishment stage, in excluding evidence regarding the impact her execution would have on her family and friends. We have rejected such arguments before, however. *McFarland v. State*, 928 S.W.2d 482, 522 (Tex.Crim.App. 1996), *cert. denied*, 519 U.S. 1119, 117 S.Ct. 966 (1997); *Fuller v. State*, 827 S.W.2d 919, 935-936 (Tex.Crim.App. 1992), *cert. denied*, 509 U.S. 922, 113 S.Ct. 3035 (1993). We overrule point of error number 28.

In point of error number 21, appellant argues that "[t]he trial court abused its discretion [at the guilt/innocence stage] by sending the trial jury a supplemental charge that failed to answer their two critical questions about the law." More specifically, appellant argues that "[t]he Supplemental Charge was so flawed as to lead the jury to believe that concerns critical to the State's basis for the case and the Appellant's defensive theories were not so important as to require an answer from the court." Appellant concedes that she failed to object to the trial court's "supplemental charge," but she insists that, under our holding in *Almanza v. State*, 686 S.W.2d 157 (Tex.Crim.App. 1984), she

is entitled to a reversal anyway because the "supplemental charge" caused her egregious harm.

The record reflects that, during the jury's deliberations at the guilt/innocence stage, the jury sent the trial court two questions: "Judge, can you commit robbery after you murder someone or is it theft?" and "Judge, on the definition of burglary, does the portion of the definition after the 1st comma (without the effective consent of the owner) apply to both phrases or does it belong with only the 1st one (the phrase immediately following)?" The trial court promptly sent the jury the following answer: "In response to your two (2) inquiries: I regret that the Court is unable to provide you any additional instructions at this time. Please refer to the instructions of the Court as contained in the original Charge of the Court."

The trial court's answer to the jury, which simply referred the jury to the charge it had already been given, did not itself constitute a "charge," supplemental or otherwise. *Earnhart v. State*, 582 S.W.2d 444, 449-450 (Tex.Crim.App. 1979). Therefore, the holding in *Almanza v. State*, 686 S.W.2d 157, relating to errors in jury charges, is inapplicable, and appellant's failure to object in the trial court forfeited her right to complain on appeal. Tex. R. App. Proc. 33.1. We overrule point of error number 21.

In point of error number 25, appellant argues that the trial court's charge to the jury at the punishment stage was "unconstitutionally vague" in its discussion of the parole law. Appellant concedes that she failed to object on this basis in the trial court, but she argues that the "error" caused her egregious harm, necessitating reversal under *Almanza v. State*, 686 S.W.2d 157.

The record reflects that the trial court instructed the jury accurately on the parole law in capital cases but then told the jury that it was "not to consider the manner in which the parole law may be applied to this particular defendant." Since parole was not an issue applicable to appellant's

case, *Collier v. State*, 959 S.W.2d at 623, there is no possibility that the parole instruction caused her egregious harm.   We overrule point of error number 25.

In point of error number 26, appellant argues that the trial court erred, during final argument at the punishment stage, in preventing defense counsel from applying the parole law to the facts of appellant's case.   We discern no error, however, because the parole law was not an issue applicable to appellant's case.   *Ibid.*   We overrule point of error number 26.

In point of error number 38, appellant argues that the trial court erred, at the punishment stage, in failing to define the term "society" as it was used in the first punishment issue, concerning her future dangerousness.   We have rejected such arguments before, however.   *Ladd v. State*, 3 S.W.3d at 572-573.   We overrule point of error number 38.

### Points of Error Relating to the Sixth Amendment Right to Counsel

In point of error number five, appellant argues that she was denied her Sixth Amendment right to the reasonably effective assistance of counsel because her two trial counsel[14] "fail[ed] to object to the prosecutor's voir dire."   More specifically, appellant argues that

the State [erroneously] encouraged [veniremen] through questioning to think of Appellant's prospective 'rehabilitation' only in terms of her chance of converting to fundamentalist Christianity. Thus, the prosecution deftly attempted to cut off jurors' awareness of the relevance of prospects for rehabilitation to the future dangerousness Special Issue.

The Sixth Amendment guarantees the right to the reasonably effective assistance of counsel in state felony prosecutions.   *McMann v. Richardson*, 397 U.S. 759, 771, 90 S.Ct. 1441, 1449

---

[14] Appellant has different counsel on appeal.

(1970). Generally speaking, to obtain a reversal on grounds of ineffective assistance, an appellant must establish that (1) counsel's performance fell below an objective standard of reasonableness and (2) there is a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different. *Strickland v. Washington*, 466 U.S. 668, 687-695, 104 S.Ct. 2052, 2064-2068 (1984). A "reasonable probability" is a probability sufficient to undermine confidence in the outcome of the proceeding. *Ibid.* Appellate scrutiny of trial counsel's performance must be highly deferential and must avoid the deleterious effects of hindsight. *Ibid.* Finally, an appellant's failure to satisfy one prong of the *Strickland* test negates a court's need to consider the other prong. *Id.*, 466 U.S. at 697, 104 S.Ct. at 2069.[15]

We have examined the record of the voir dire of all the jurors who served on appellant's jury, and that record contains nothing that reasonably supports appellant's claim of prosecutorial misconduct. More importantly, appellant has made no effort to prove the prejudice prong of *Strickland*, and that failure precludes any relief. *Ladd v. State*, 3 S.W.3d at 570. We overrule point of error number five.

In point of error number 39, appellant argues that her "[t]rial counsel were ineffective for failing to object ... when the State improperly committed [the venire] to a particular definition of 'criminal acts of violence' that fit evidence to be introduced" later, at the punishment stage. But, again, appellant has made no effort to prove the prejudice prong of *Strickland*, and that failure precludes any relief. *Ladd v. State*, 3 S.W.3d at 570. We overrule point of error number 39.

In point of error number seven, appellant argues that her trial counse rendered ineffective

---

[15] In the discussion that follows, we sometimes assume *arguendo* that appellant has demonstrated the first prong of *Strickland*. In doing so, we do not mean to imply that appellant has *actually* demonstrated the first prong.

assistance, during voir dire, in failing to challenge Juror Carpenter for cause. More specifically, she argues that Carpenter was challengeable for cause because of his "clear rejection of rehabilitation as a sentencing criterion for capital defendants [and] his adherence to a 'blood atonement' retribution theory based upon his religious beliefs."

The record reflects that Carpenter said nothing during the voir dire questioning that indicated he rejected rehabilitation as a factor to consider when answering the punishment issues. He also said nothing that indicated his adherence to a "blood atonement" theory of retribution. In other words, the record does not show the basis on which appellant claims trial counsel should have challenged Carpenter for cause. Therefore, appellant has failed to show that trial counsel's failure to challenge Carpenter for cause constituted deficient performance. We overrule point of error number seven.

In point of error number 22, appellant argues that her trial counsel rendered ineffective assistance, at the guilt/innocence stage, "by failing to object to the trial court's Supplemental Charge[16] and to suggest a more suitable charge." Appellant argues further that the record shows that the jury, in its deliberations, was confused about the law of capital murder and that a proper supplemental charge was necessary to dispel that confusion. Finally, appellant argues that "[t]here is a reasonable likelihood that, properly instructed, the jury would not have convicted [her] of Capital Murder."

As we noted in our discussion of point of error number seventeen, the trial court's original, and only, charge to the jury at the guilt/innocence stage gave guidance to the jury regarding the distinction between capital murder and the lesser included offense of murder. Thus, the record shows no basis on which trial counsel should have sought supplemental jury instructions. Therefore,

---

[16] See the discussion of point of error number 21, *supra.*

appellant has failed to show that her trial counsel's failure to object to the trial court's "supplemental charge" and failure to request another charge constituted deficient performance. We overrule point of error number 22.

In point of error number 23, appellant argues that her trial counsel rendered ineffective assistance in "failing to instruct the jury at voir dire [and] during closing argument [on] the legal distinction between robbery/murder and post-homicide theft." It is apparent from the record that trial counsel's strategy at the guilt/innocence stage was to persuade the jury to believe appellant's testimony that she killed Towery in self-defense and that she did not steal his money. In hindsight, the result of appellant's trial might have been more favorable to her if trial counsel, in their voir dire questioning and in final argument, had focused on the legal distinction between murder in the course of robbery and murder followed by theft. But, on this record, we cannot say that trial counsel's performance actually fell below an objective standard of reasonableness. We overrule point of error number 23.

In point of error number 37, appellant argues that her trial counsel rendered ineffective assistance, at the guilt/innocence stage, in not seeking the suppression of oral statements she made to police after her arrest. Appellant claims the statements were inadmissible under Article 38.22, § 3(a).

Article 38.22, § 3(a), applies only to oral statements made during custodial interrogation. The only relevant evidence in the trial court (the testimony of two police officers) was that appellant made the oral statements in question voluntarily and spontaneously. In other words, the record shows no basis on which trial counsel might have sought suppression of the oral statements. Therefore, appellant has failed to show that her trial counsel's decision not to seek suppression

constituted deficient performance. We overrule point of error number 37.

In point of error number 41, appellant argues that her trial counsel rendered ineffective assistance when they failed to object under Texas Rule of Evidence 608(b) to the State's use of prior arrests to impeach three defense witnesses. More specifically, appellant argues that counsel were ineffective in failing to object to the State's use of prior arrests to impeach defense witnesses Connie Baker and Diana Wheeler at the guilt/innocence stage and defense witness Teresa Cobb at the punishment stage. Appellant argues further that the State's impeachment caused "very serious harm" to Baker's and Wheeler's credibility before the jury, but appellant argues nothing with respect to how the State's impeachment of Cobb might have affected her credibility or the outcome of the trial.

Baker testified on direct examination that from the late 1980's to 1997, she was a prostitute and abuser of illicit drugs in Amarillo. She also testified that on one occasion in the summer of 1996, Towery offered her money for sex. On cross-examination, Baker admitted that she had an Ohio conviction for auto theft and numerous Potter County convictions for prostitution. She also admitted that, on November 15, 1996, two days after Towery's murder, she was arrested in Amarillo for prostitution.

Wheeler testified on direct examination that in late 1994 and 1995, she, too, was a prostitute in Amarillo, living on the streets, and that she visited Towery more than once for the purpose of prostitution. She also testified that there were "a lot of drugs" in her life. On cross-examination, Wheeler admitted that she was arrested once for prostitution, twice for criminal trespass, once for "failure to serve [a] weekend sentence," and once for giving a false identification to a police officer.

With respect to trial counsel's failure to object to the State's impeachment of Baker and Wheeler with prior arrests, appellant has failed to prove the prejudice prong of *Strickland.* Given

what the jury already knew about Baker and Wheeler from their testimony on direct – that they were professional prostitutes and drug abusers – their prior arrests were relatively insignificant. Furthermore, Baker's and Wheeler's testimony, even if believed, did not rebut the principal thrust of the State's case, which was that appellant murdered Towery while in the course of robbing him. In short, there is no reasonable probability that, but for trial counsel's failure to object, the result of the guilt/innocence stage would have been different.

With respect to trial counsel's failure to object to the State's impeachment of Cobb with a prior arrest, appellant has made no effort to prove the prejudice prong of *Strickland*, and that failure precludes any relief. *Ladd v. State*, 3 S.W.3d at 570. We overrule point of error number 41.

In point of error number 42, appellant argues that her trial counsel rendered ineffective assistance, at the guilt/innocence stage, when, on direct examination, they elicited from her admissions that would have been inadmissible under Texas Rule of Evidence 608(b) if offered by the State. Appellant's admissions, sometimes in self-serving form, regarded the following unadjudicated misconduct: (1) in April 1993, she took a gun, which she believed was her mother's, from her step-father without his permission and gave it to her mother; (2) during the summer of 1993, she intentionally passed $1,300 in "hot" checks; (3) also during the summer of 1993, she applied for several department store credit cards using a false name; (4) in late 1993, she began a routine of lying to dentists in order to get prescription pain medication; (5) in 1994 she was charged in Hale County with "possession of a controlled substance, possession of paraphernalia, and public intoxication"; (6) in early 1995, she forged her uncle's signature on checks passed by her cousin; (7) in May 1995, her mother filed complaints against her in Randall County for auto theft and forgery; and (8) in August 1995, she stole the wallet of one of her "tricks." Appellant concedes that her two

trial counsel "might have been looking ahead, anticipating a conviction, and reason[ing] that they did not want to put [her] on the stand again at the punishment stage to counter or explain these unadjudicated offenses when the State offered them there."

We agree with appellant that her trial counsel may have had the strategic reason she cited for eliciting from her the admissions in question, and we cannot say in hindsight that no reasonable trial counsel would have acted as they did. The State's case against appellant was strong, and it would have been reasonable for counsel to anticipate her conviction. We overrule point of error number 42.

In point of error number four, appellant argues that her trial counsel rendered ineffective assistance, at the punishment stage, in failing to object to parts of the State's cross-examination of defense witnesses Ella Gibbs and Pat Karnes. Appellant argues further that her counsel's "failure to object and move for mistrial when the prosecutor introduced damning, 'irrelevant' testimony from [her] own witnesses ... was unprofessional conduct."

The record reflects that, on direct examination, Gibbs testified that she had a "jail ministry" at the Randall County Jail, and that she met appellant in the course of that ministry. The purpose of the ministry, Gibbs related, was "to give the [female inmates] a concept of the Bible and how to live their life [sic] according to biblical instructions." Gibbs also testified that appellant played an active role in the ministry, and was excited and enthusiastic about it. On cross-examination by the State, however, the following exchange occurred:

Q: Have you ever talked with Brittany about when Jesus Christ was hanging on the cross?

A: Yes, we have,

Q: For all of us.

A: Yes, we have.

Q: Have you ever talked with her about the two thieves that were on each side of him?

A: We have been talking – yes, I have.

Q: Okay. Have you ever talked with her about the fact that one of the thieves, in fact, admitted he was there because he deserved to be there?

A: Uh-huh.

Q: And Jesus Christ forgave him, didn't he?

A: (Nods head up and down.)

Q: But he didn't take him down off the cross, did he?

A: No, he didn't.

Karnes testified on direct examination that she was a longtime friend of appellant and that she visited appellant in the Randall County Jail while appellant was awaiting trial in this case. In the course of the direct examination, the following transpired:

Q: What types of things would you [and appellant] discuss?

A: I wanted to reassure Brittany that she is a valuable person, that her life has great potential, and that this is the mortal portion of an eternal life. Brittany is an eternal being and through the many prayers from my [prayer] group [in Lubbock,] I have been led to come back into this child's life to support her here, to encourage her, to find her courage from the Holy Spirit within her, and to let her know that there is a human being mortal person who will stand beside her and see the good in her and support whatever God plans for the rest of your [sic] life.

On cross-examination by the State, the following exchange occurred:

Q: You mentioned that this is the mortal portion of the Defendant Brittany Holberg's life, and that's true of all of us, isn't it?

A: (Nods head up and down.)

Q: Would you agree with me that our relationship with God and how God is going to deal with us is one issue, and whatever obligations we have to mankind on this earth is another issue?  I mean, just because man doesn't forgive us doesn't necessarily mean God doesn't?

A: Absolutely.

Appellant has failed to prove either prong of *Strickland*.  First, it is difficult, even in hindsight, to be certain of the import of the cross-examination in question, and we cannot say that a reasonable defense attorney, even one well-versed in the Christian faith, would have necessarily objected.  Second, even if a reasonable defense attorney would have objected, we see no reasonable probability that, but for trial counsel's failure to object, the result of the punishment stage would have been different.  The State's case with respect to punishment, discussed previously, was strong, and the cross-examination in question occupied but a minute portion of a lengthy punishment stage. We overrule point of error number four.

In point of error number thirteen, appellant argues that her trial counsel rendered ineffective assistance, at the punishment stage, in "failing to hold the State to its burden [of] show[ing] 'clear proof' of [her] unadjudicated extraneous offenses." The record reflects that, at the punishment stage, four prosecution witnesses related the details of unadjudicated misconduct that appellant voluntarily admitted to them.

Before a trial court may admit evidence of uncharged misconduct (also known as "extraneous offenses" or "extraneous misconduct"), the State must "clearly prove" that the misconduct occurred and that the defendant was the perpetrator.  *Chamberlain v. State*, 998 S.W.2d 230, 235 (Tex.Crim.App. 1999), *cert. denied*, ___U.S.___, 120 S.Ct. 805 (2000).  We hold that appellant's

out-of-court admissions that she committed acts of misconduct constituted such "clear proof." Thus,

the record shows no basis for concluding that trial counsel's failure to object to the State's proof

constituted deficient performance. We overrule point of error number thirteen.

In point of error number 34, appellant argues that her trial counsel rendered ineffective

assistance, at the punishment stage, when they argued the following:

> DEFENSE COUNSEL: We discussed, I believe, in voir dire that mitigation could
> be many things. And it's not limited. But, basically, it's any aspect that deals with
> Brittany's character, her background, her record, her emotional instability, her
> intelligence, or circumstances of the crime that you believe would make a death
> sentence inappropriate in this case. Basically, some circumstance that reduces
> Brittany's moral blameworthiness.

Reporter's Record, vol. 25, p. 208. More specifically, appellant argues that, "[a]s a result of

counsel's waiver [sic], the trial court charged [her] jury in such a way that it was obliged to return

a mandatory death penalty and ignore [her] evidence of potential for rehabilitation in an

institutionalized setting."

Appellant appears to be arguing that trial counsel's jury argument constituted deficient

performance because it "permitted" the trial court to erroneously instruct the jury that the definition

of "mitigating evidence" was the one mandated by Article 37.071, § 2(f)(4). However, as we noted

previously, in our discussion of point of error number 33, the definition of "mitigating evidence"

mandated by Article 37.071, § 2(f)(4), was not erroneous. Moreover, appellant's jury could consider

and give effect to any evidence of "potential for rehabilitation" when it answered the first

punishment issue, concerning her future dangerousness. In short, the record shows no basis for

concluding that trial counsel's jury argument was outside the range of professionally competent

assistance. We overrule point of error number 34.

In point of error number 40, appellant argues that her trial counsel rendered ineffective

assistance, at the punishment stage, when they failed to object to 28 different instances of improper

prosecutorial argument. We will first review the law of prosecutorial argument in general and then

address each of the 28 instances in particular.

We have identified four areas of permissible prosecutorial argument: (1) summation of the

evidence; (2) reasonable deduction from the evidence; (3) answer to argument of opposing counsel;

and (4) plea for law enforcement. *Alejandro v. State*, 493 S.W.2d 230, 231 (Tex.Crim.App. 1973).

"The fourth [area] – plea for law enforcement – simply denotes an argument that is otherwise

unobjectionable. It is merely a label given to an argument that is determined to be proper and is not

an independent ground for assessing the propriety of an argument." G. Dix & R. Dawson, Texas

Criminal Practice and Procedure § 37.21 at 575 (1995). Thus, prosecutors have wide latitude in the

language and manner of arguing their side of the case consistent with the evidence. See *Montelongo*

*v. State*, 644 S.W.2d 710, 716 (Tex.Crim.App. 1980); J. Stein, *Closing Argument: The Art and the*

*Law* § 12 (1990); 23A C.J.S. *Criminal Law* § 1261 (1989).

*The First Instance.* Appellant argues that her trial counsel erred in failing to object to the

prosecutor's statement that "human beings differ in value, and there are values that are higher than

just human life." Reporter's Record, vol. 25, p. 176-177. Appellant argues that the prosecutor's

statement "[d]iminished the value of [her] life in favor of higher values," in violation of "the rule

of *Woodson* [*v. North Carolina*, 428 U.S. 280, 96 S.Ct. 2978,] that capital sentencing must be

individualized." Appellant argues further that the prosecutor's statement "tempt[ed] the jury ... to

use a 'higher authority' than the evidence" when answering the punishment issues.

The statement in question was part of the prosecutor's lengthy, somewhat rambling

exhortation to the jurors to remember their duty to answer the punishment issues according to the evidence and not according to their sympathy for appellant. See Reporter's Record, vol. 25, pp. 176-181. The prosecutor's phrase, "values that are higher than just human life," understood in context, referred to "duty, honor, and promises," not to religion. See Reporter's Record, vol. 25, p. 177. A reasonable person, hearing the prosecutor's argument in context, could not have interpreted it as appellant now claims. Thus, trial counsel did not err in failing to object.

*The Second, Third, and Fourth Instances.* Appellant, citing volume 25, page 177, of the Reporter's Record, argues that trial counsel erred in failing to object when the prosecutor, in effect, argued to the jury that "[t]he context in which killing occurs may make it honorable if it is a matter of following 'duty, honor, and promises.'" Appellant contends that the prosecutor's argument, which referred in part to his father, "[i]ntroduc[ed] irrelevant matter not in evidence" and put improper "pressure" on the jury to do its "duty."

The argument in question was part of the prosecutor's exhortation to the jury, mentioned previously, to do its duty to answer the punishment issues according to the evidence and not mere sympathy. See Reporter's Record, vol. 25, pp. 176-181. The prosecutor cited his father, an airman who flew bombing missions in the Second World War, as an example of someone who did his duty even though it meant that someone would die. A reasonable juror, hearing the prosecutor's argument in context, could not have felt unduly pressured to answer the punishment issues in the way the State requested. Furthermore, we see no reason why the prosecutor's reference to his father was error. As we noted previously, a prosecutor has wide latitude in the language and manner of arguing his side of the case consistent with the evidence. Thus, trial counsel did not err in failing to object.

*The Fifth Instance.* Appellant argues that trial counsel erred in failing to object when the

prosecutor made "a negative comparison between his father, Mother Theresa, Florence Nightingale, and Mary Burnett[17] ... on the one hand and Appellant, on the other, as someone who, unlike the others, 'did not honor ... promises [and] didn't honor [her] duty.'"  Appellant argues that the prosecutor "urged the jury to accept [Burnett's] testimony as true by suggesting Burnett had a character as trustworthy and dutiful as ... Mother Theresa."

The argument in question was as follows:

PROSECUTOR:  What makes people different?  What made my father different from people who did not honor their promises, who didn't honor their duty?  What makes Mother Theresa different than Karla Faye Tucker?  What makes Florence Nightingale different than Diane Zamora?  What makes Mary Burnett different than Brittany Holberg?
Duty, honor, promises, promises made, promises kept.  Choices.  Choices based on duty and honor.  We're all responsible for the choices that we make.  The same thing is what makes us different as a people.  Duty, honor, promises, promises made, promises kept.

Reporter's Record, vol. 25, pp. 177-178.

Assuming *arguendo* that trial counsel erred in not objecting, appellant still has not shown a reasonable probability that, but for trial counsel's failure to object, the result of the punishment stage would have been different.  The State's case with respect to punishment, discussed previously, was strong, and it is very unlikely that the argument in question had a substantial impact on the jurors' deliberations.

*The Sixth and Seventh Instances.*  Appellant argues that trial counsel erred in failing to object when the prosecutor "[b]olstered the jury's appreciation of itself," "prais[ed] the jury for returning a guilty verdict," and "flatter[ed] and fraterniz[ed] with ... the jury."  Appellant complains that "[t]he State's closing arguments ... ha[d] the effect of sanctifying the State and demonizing the defense

---

[17] Mary Burnett was a prosecution witness at the punishment stage.

counsel (and through them, Appellant)."

The argument in question was as follows:

> PROSECUTOR: You made promises at the start of this trial, and you are people of honor. You promised that if we proved this case beyond a reasonable doubt, you would return a verdict of guilty as charged in the indictment. You listened to the evidence, you gave it a fair consideration, and you did your duty, you returned a verdict of guilty as charged in the indictment.
>
> *   *   *
>
> You, the people that I know, are people of duty and honor. You made some promises concerning the punishment phase of this trial. And you promised us that you would listen to all the evidence and if you believe the evidence answers this question, dictates an answer of "yes," you would return a verdict of "yes."
>
> You told us that if the second question, if the evidence supports a verdict of "no," you would return a verdict of "no."

Reporter's Record, vol. 25, pp. 178-180.

Assuming *arguendo* that trial counsel erred in failing to object, appellant still has shown no reasonable probability that, but for trial counsel's failure to object, the result of the punishment stage would have been different. As noted previously, the State's case with respect to punishment was strong, and it is very unlikely that the "bolstering," etc., in question had a substantial impact on the jury's deliberations.

*The Eighth Instance.* Appellant argues that trial counsel erred in failing to object when the prosecutor "[i]mpl[ied] that the jurors' oaths require[d] them to answer the first Issue 'yes,' and the second Issue 'no.'" The argument in question was the same as that discussed immediately above.

Trial counsel did not err in failing to object. In the argument in question, the prosecutor was implying nothing more than that the jury should answer the punishment issues according to the evidence. That was a permissible plea for law enforcement.

*The Ninth Instance.* Appellant argues that trial counsel erred in failing to object when the

prosecutor "[r]eveal[ed] a prejudicial matter not in evidence, letting the jurors know that they were all death-prone by stating that they each had stated on their jury questionnaires that they believed 'capital punishment is just and necessary in an appropriate case.'"

The argument in question was as follows:

PROSECUTOR: I looked at the questionnaires that you filled out earlier, and lots of you answered some of the questions one way and some of the questions another way. But there were two questions that every one of you answered exactly the same, not just each one of you, all twelve of you.  Each one of you answered these questions the same way: capital punishment is just and necessary in an appropriate case.
     And number two, "My decision as to whether to assess the death penalty will depend or would depend on the facts and circumstances of the case." Those promises included some implied promises just as surely as if you said them or wrote them down on that piece of paper. Those promises implied that though you may loathe the thought of a 25-year-old young woman being sentenced to death, sympathy for the defendant would not change your answers.  If the circumstances and the evidence dictate that answer, duty and honor will demand that you answer it truthfully.
     Sympathy for the defendant would not change that.  You promised.

Reporter's Record, vol. 25, pp. 180-181.

Assuming *arguendo* that trial counsel erred in failing to object to the prosecutor's reference to the jury questionnaires, appellant still has shown no reasonable probability that, but for trial counsel's failure to object, the result of the punishment stage would have been different.  As noted previously, the State's case with respect to punishment was strong, and it is very unlikely that the reference to the questionnaires had a substantial impact on the jury's deliberations.

*The Tenth and Eleventh Instances.*  Appellant argues that trial counsel erred in failing to object when the prosecutor "ma[de] an anti-sympathy argument against appellant." The argument in question was the same as that discussed immediately above.

The prosecutor's anti-sympathy argument was a permissible plea for law enforcement.  See

*Tong v. State*, 25 S.W.3d 707, 710-711 (Tex.Crim.App. 2000). Therefore, trial counsel did not err in failing to object.

*The Twelfth Instance.* Appellant argues that trial counsel erred in failing to object when the prosecutor "alleg[ed] a matter not in evidence[:] that Appellant 'hired other people to murder other witnesses.'" The statement in question was part of a larger context:

> PROSECUTOR: Now, what about the mitigating – where is the mitigating evidence? Is it [appellant's] home life? I don't think Brittany Holberg had the perfect home life; neither did I. She had everything handed to her on a silver platter, by her own words.
>
> She had everything she ever wanted except more attention and love from her parents. And if that's true, then that's sad. But it's true in a lot of homes, and those folks don't grow up to murder people. They don't grow up to stab people 58 times and beat them with hammers and beat them with canes and break their noses, hire other people to murder other witnesses.

Reporter's Record, vol. 25, p.187.

The record reflects that, at the punishment stage, prosecution witness Katina Dixon testified that she was appellant's cell-mate while appellant awaited trial in this case, and that appellant repeatedly solicited her to kill Vickie Marie Kirkpatrick, another prosecution witness. Thus, the prosecutor's argument was a permissible, although indirect, summation of the evidence, and could not have been reasonably interpreted as alleging a matter not in evidence. Therefore, trial counsel did not err in failing to object.

*The Thirteenth Instance.* Appellant argues that trial counsel erred in failing to object when the prosecutor argued, "Every time someone dies, we've all lost something, but duty and honor and promises have even more value. And that's what makes us different as a people: duty, honor, and promises." See Reporter's Record, vol. 25, p. 189. Appellant argues again that the prosecutor's argument "[d]iminish[ed] the value of [her] life in light of higher values."

The argument in question was part of the prosecutor's exhortation to the jurors to remember their duty to answer the punishment issues according to the evidence and not according to their sympathy for appellant. A reasonable person, hearing the prosecutor's argument in context, could not have interpreted it as appellant now claims. Thus, trial counsel did not err in failing to object.

*The Fourteenth and Fifteenth Instances.* Appellant argues that trial counsel erred in failing to object to the following argument:

> PROSECUTOR: The defense is asking you to roll the dice [when answering the punishment issues]; they're asking you to gamble on whether or not somebody else will die at her hands. And, if you decide to answer these questions in such a way that a life sentence rather than death is imposed and if she kills again, then you have bet the wrong way, and your decision has resulted in the death of another human being.

Reporter's Record, vol. 25, p. 189. Appellant contends that the prosecutor's argument was an "unfair and improper attack" on opposing counsel, and that it "appeal[ed] to [the] passions, fears, [and] vulnerabilities of the jury."

The prosecutor's argument was a permissible plea for law enforcement. Thus, trial counsel did not err in failing to object.

*The Sixteenth, Seventeenth, and Eighteenth Instances.* Appellant, citing *Cortez v. State*, 683 S.W.2d 419 (Tex.Crim.App. 1983), argues that trial counsel erred in failing to object when the prosecutor "[a]ppeal[ed] to [the] jurors to be [the] conscience of the community and to crack down on crime." The argument in question was as follows:

> PROSECUTOR: I want to talk about what maybe you've asked yourself sometimes at the coffee table, at the breakfast table over coffee as you're looking at the paper. Have you ever said to your spouse or friends, "When are they going to do something about crime? When are they going to do something about it? It's everywhere. Why don't they crack down on this stuff? Why don't the legislators do something about this? Why don't the policemen do something about this? I'm sick of this stuff. Why don't the courts and the prosecutors do something about this crime in our lives and

in our society?"

Well now, they are you, and you are they. And the question becomes: What are you going to do? You see, the difference is now you're being asked to do something that's very difficult, requires a great deal of courage. It requires a look at duty, honor, promises, promises made, promises kept.

So, the question is: What are you going to do about crime? Don't pick up a newspaper or turn on a television set or radio five years from now, ten years from now, forty years from now and hear her name and say to yourself, "Oh, my God, what have I done? I had a chance to do something about it then, and I didn't."

\* \* \*

When you're back there deliberating, individually, collectively, ask yourselves, "If I answer these questions in such a way that a life sentence is imposed, can I go out and tell Rocky Towery and Deanna Towery and Rusty and Linda Hagan why, that that's the correct thing to do?"

If you can't, then maybe that's not the right thing to do. Maybe the right thing to do is answer those things – questions in a way that the death penalty is imposed.

Reporter's Record, vol. 25, pp. 190-191, 233.

The argument in question was a permissible plea for law enforcement, and trial counsel did not err in failing to object. See *Whittington v. State*, 580 S.W.2d 845, 847 (Tex.Crim.App. 1979); *Williams v. State*, 575 S.W.2d 30, 33-34 (Tex.Crim.App. 1979); J. Stein, *Closing Argument: The Art and the Law* § 83 (1990). Appellant's reliance upon *Cortez v. State*, 683 S.W.2d 419, is misplaced. In that case, we held that it was improper for a prosecutor to argue that the jury must return a particular verdict because the community expected it. But that was not what the prosecutor here argued.

*The Nineteenth Instance.* Appellant, citing generally to volume 25, page 191, of the Reporter's Record, argues that trial counsel erred in failing to object when the prosecutor implied "that the jurors' oaths require[d] them to answer the Special Issues as desired by the State [and] the victim's family."

The argument in question was as follows:

PROSECUTOR: The real reason the answer to these [punishment] questions, No. 1 should be "yes" and No. 2 should be "no" is because the evidence supports those answers. Everything indicates – there's nothing to indicate there's going to be anything but violence.

\* \* \*

And I believe that you, the people of honor, made some promises to us, to the State of Texas, to the people and to the family of A.B. Towery. And I believe as much as my father loathed what he had to do in World War II, as much as I hated what I had to participate in [in] Vietnam, duty, honor, and promises were more important than running away or hiding from my duty.

I believe you'll keep your promises. I believe you will return an answer of "yes" to Question No. 1 and "no" to Question No. 2, in spite of the bows in [appellant's] hair and sobs in the air.

Reporter's Record, vol. 25, pp. 191-192.

In the argument in question, the prosecutor merely reminded the jury once again of its duty to answer the punishment issues according to the evidence. Such argument was a proper plea for law enforcement, and trial counsel did not err in failing to object to it.

*The Twentieth Instance.* Appellant argues that trial counsel erred in failing to object when the prosecutor "[held] himself up as an example of faithfulness to 'duty, honor, and promises.'" The argument in question, the same as that discussed immediately above, was a permissible plea for law enforcement. Trial counsel did not err in failing to object.

*The 21st Instance.* Appellant argues that trial counsel erred in failing to object when the prosecutor "[f]orcefully assert[ed] his own personal belief that the jurors should vote in such a way as to give appellant the death penalty."

The record reflects that, at one point in his argument, the prosecutor stated, "I believe the right thing to do is to answer [the punishment] questions "yes," No. 1, and "no" for No. 2, because that's the right thing to do, because that's what Ms. Holberg deserves in this case." Reporter's Record, vol. 25, p. 219. The record also reflects, however, that immediately afterward, the

prosecutor summarized for the jury virtually all of the State's evidence with respect to punishment

and, in doing so, repeatedly argued that, in light of that evidence, the "right thing to do" was to

answer the punishment issues in such a way that the death penalty would be assessed.

The prosecutor's statement – that the "right thing to do" was to answer the punishment issues

in such a way that the death penalty would be assessed – understood in context, was an analysis of

the evidence and a reasonable deduction therefrom. "Such argument did not subvert the rule against

the injection into the argument of the purely personal opinion of the prosecutor aside from a

discussion of the testimony." *Sikes v. State*, 500 S.W.2d 650, 652 (Tex.Crim.App. 1973.). See J.

Stein, *Closing Argument: The Art and the Law* § 70 (1990). Thus, trial counsel did not err in failing

to object.

*The 22nd, 23rd, and 24th Instances.* Appellant argues that trial counsel erred in failing to object

when the prosecutor "[e]ncourag[ed] the jury to follow egregiously erroneous legal advice [and]

ignore any mitigating evidence introduced [at the punishment] phase."

The prosecutorial argument in question was as follows:

PROSECUTOR: Under our law, you can take into consideration and ignore every
piece of evidence you heard during the punishment phase of the trial. You can make
your decision, make your answers to those [punishment] questions based totally on
what you heard during the guilt/innocence phase of the trial about what kind of crime
this was.
    The person who committed that crime, are they likely to commit criminal acts
of violence in the future? Yes. You can decide that.
    Is there any mitigating evidence that would overcome that crime? You can
make that decision solely based on the evidence during guilt/innocence. And the
answer to that is "no."
    Someone who commits that crime, there's no amount of mitigating evidence.
I don't care whether it's a bad childhood, the drug use, if she was assaulted by other
people when she was young, there are other people in those situations who don't go
out and commit these crimes.

*       *       *

Our law says you can base your decision to these two questions solely on the guilt/innocence testimony. You know what that was. I'm not going to go through it all again. But we didn't stop there.

Reporter's Record, vol. 25, pp. 221-223. Immediately thereafter, the prosecutor went on to summarize the State's evidence adduced at the punishment stage.

In its punishment charge, the trial court instructed the jurors as follows:

In arriving at the answers to the Special Issues submitted, you shall consider all the evidence submitted to you in this trial, which includes that phase of the trial wherein you were called upon to determine the guilt or innocence of the Defendant, as well as the phase of the trial, the punishment phase, wherein you are now called upon to determine the answers to the Special Issues submitted to you by the Court.

Reasonable jurors, hearing the prosecutor's argument, could have understood him to mean that they could completely ignore the punishment stage evidence when they answered the punishment issues. However, in general, the prosecutor's closing argument was not tied in substantial part to that misstatement of the law. Moreover, the trial court explicitly instructed the jurors that they "shall consider all the evidence submitted to [them] in this trial" when answering the punishment issues, and, in the absence of evidence to the contrary, we must presume the jurors followed their instructions. *Hutch v. State*, 922 S.W.2d 166, 170 (Tex.Crim.App. 1996). Thus, appellant has shown no reasonable probability that, but for trial counsel's failure to object, the result of the punishment stage would have been different.

*The 25th Instance.* Appellant argues that trial counsel erred in failing to object when the prosecutor "ma[de] the first of repeated allegations that defense counsel intentionally misled the jury." The argument in question was as follows:

PROSECUTOR: She [*i.e.*, appellant] came from a nice family, and I want you to understand that prior to coming here in trial, prior to coming here in trial, she told Kristi Samperi and she told Richard Bernal, "I had a good childhood."

Prior to committing this capital murder, she had a good childhood. Her
mother was her best friend because she was supportive and she told Brittany she was
worth something. Prior to having to create mitigating evidence for you, they had a
good – she had a good childhood, she had a good relationship with her mother.

Reporter's Record, vol. 25, p. 223.

The record reflects that, at the guilt/innocence stage, appellant testified that her childhood

was difficult. At age five, she was sexually assaulted by her baby-sitter. At age twelve, her aunt was

murdered, after which her home life "fell apart." Her parents ignored her, drank heavily, and

smoked marihuana in her presence. Her parents also "stopped working [and] just let everything go."

Then, at age thirteen, appellant was assaulted by two men in an alley behind her home. At the

punishment stage, however, Randall County Probation Officer Richard Bernal testified that, on

August 18, 1995, in the course of his employment, he interviewed appellant and she told him that

her childhood was good, that she "had everything that she ever wanted," and that when she was a

child, her mother was her best friend. Finally, Kristi Samperi testified at the punishment stage that

she knew appellant and that she once received a letter from appellant in which she described her

family as "loving."

A reasonable person hearing the prosecutor's argument would probably have understood it

to be an indirect assertion that appellant, in her testimony, lied about her childhood, which would

certainly have been a reasonable deduction from the evidence. Thus, trial counsel did not err in

failing to object.

*The 26th Instance.* Appellant, citing generally to volume 25, page 224, of the Reporter's

Record, argues that trial counsel erred in failing to object when the prosecutor "[s]peculat[ed] that

appellant lied to Dr. [Dhiren] Patel, the defense forensic psychiatrist." Appellant does not explain,

however, any of the relevant facts underlying her argument, apparently believing (incorrectly) that

we will scour the record and her three briefs and fill in the gaps in her argument. Furthermore, even

assuming *arguendo* that trial counsel erred in failing to object, appellant does not even attempt to

show that there is a reasonable probability that, but for trial counsel's failure to object, the result of

the punishment stage would have been different. That failure precludes any relief. *Ladd v. State*,

3 S.W.3d at 570.

*The 27th Instance.* Appellant argues that trial counsel erred in failing to press their objection

to the point of an adverse ruling[18] when the prosecutor "ma[de] another major allegation that defense

counsel intentionally misled the jury." Appellant argues further that "[t]he [prosecutor's] comment

was part of a pattern of argument designed to condemn [her] to death by demonizing [her] and her

counsel in comparison to the State's and jury's righteousness."

The argument in question, and trial counsel's response to it, was as follows:

PROSECUTOR: Why – if that information [regarding appellant's disciplinary problems while in the Randall County Jail awaiting trial in this case] was in the defense's possession, why didn't they tell [Dr. Patel] about it? Because he said he wasn't aware of it, that means someone on that side of the table didn't tell him. Either the defendant or the defense attorneys.

Why didn't they tell him? Why didn't they tell him? Because they don't want you to hear all the truth; they just want you to hear what helps them. Their job is to represent their client as best they can. They don't have an obligation to bring everything to your attention.

DEFENSE COUNSEL: Your Honor, I'm going to object.

COURT: On what basis?

---

[18] Generally, to preserve error in prosecutorial argument, a defendant must object and obtain an adverse ruling. If the objection is sustained, the defendant must request an instruction to disregard, and, if that is granted, move for a mistrial. *Fuller v. State*, 827 S.W.2d 919, 926 (Tex.Crim.App. 1992), *cert. denied*, 509 U.S. 922, 113 S.Ct. 3035 (1993).

DEFENSE COUNSEL: That we do not have an obligation.

(Whereupon an off-the-record conference was had at the Bench, presumably out of the hearing of the jury, after which the prosecutor resumed his argument.)

Reporter's Record, vol. 25, p. 226.

Assuming *arguendo* that trial counsel erred in failing to press their objection to the point of obtaining an adverse ruling, appellant still has shown no reasonable probability that, but for trial counsel's error, the result of the punishment stage would have been different. As we have noted, the State's case with respect to punishment was strong, and it is unlikely that the argument in question had a substantial impact on the jury's deliberations. Although appellant argues that the argument "was part of a pattern of argument designed to ... demonize [her] and her counsel," the record does not support that assertion.

*The 28ᵗʰ Instance.* Finally, appellant argues that trial counsel erred in failing to object when the prosecutor "ma[de] prejudicial, speculative argument" that "improperly encourage[d] the jury to speculate on facts not in the record." The argument in question was as follows:

PROSECUTOR: You heard evidence about crimes committed by women in prison. How do we – did we hear how many of those crimes were committed by murderers or capital murderers, the people that are going to be in the same position that she is? No.

I don't know what the numbers are. Maybe every one of those assaultive offenses were committed by people who were in the position of Brittany Holberg. She has committed an act of violence. That's what Mr. – Dr. Coons based his opinion on, that there was a probability she would commit future acts of criminal violence.

Reporter's Record, vol. 25, p. 227.

Again, assuming *arguendo* that trial counsel erred in failing to object, appellant still has shown no reasonable probability that, but for trial counsel's error, the result of the punishment stage

would have been different. Indeed, appellant fails even to attempt to demonstrate the second prong of *Strickland*. That failure precludes any relief. *Ladd v. State*, 3 S.W.3d at 570. We overrule point of error number 40.

In points of error numbers 48 and 49, appellant argues that "[t]he cumulative errors of trial counsel" during jury selection, the guilt/innocence stage, and the punishment stage "constitute ineffective assistance." These "cumulative error" points present nothing for our review, however. *Chamberlain v. State*, 998 S.W.2d at 238. We overrule points of error numbers 48 and 49.

### Miscellaneous Points of Error

In point of error number 43, appellant argues that the trial court violated her Eighth Amendment right to be free from cruel and unusual punishment when it denied her pretrial motion to set aside the indictment. According to appellant, "[i]n moving to set aside her indictment, [she] presented evidence that capital jurors do not understand their sentencing phase instructions." Appellant does not explain the nature of the "evidence" she is relying upon, however, or why jurors are unable to understand their punishment stage instructions, or even how the jurors' lack of understanding violates the Eighth Amendment. Therefore, we deem this point of error inadequately briefed. *Tong v. State*, 25 S.W.3d at 710; *Robinson v. State*, 851 S.W.2d 216, 222 n. 9 (Tex.Crim.-App. 1991), *cert. denied*, 512 U.S. 1246, 114 S.Ct. 2765 (1994); Tex. R. App. Proc. 38.1(h) & 71.3. We overrule point of error number 43.

In points of error numbers 44, 45, 46, and 46-A, appellant argues that, "if she becomes rehabilitated," the Eighth Amendment ban on cruel and unusual punishment would, for various reasons, bar her execution. Since appellant's arguments are based upon a contingency – the

possibility of her rehabilitation, however that might be shown – they are not ripe for our consideration. *Colburn v. State*, 966 S.W.2d 511, 513 (Tex.Crim.App. 1998). We overrule points of error numbers 44, 45, 46, and 46-A.

Finally, in point of error number 47, appellant argues that "[t]he literal absence of meaningful clemency ... review in Texas [death penalty cases] violates [Article 6, §§ 1 and 4, of] the International Covenant on Civil and Political Rights." See International Covenant on Civil and Political Rights, U.N. General Assembly Res. 2200, Dec. 16, 1966, 6 I.L.M. 368 (ratified by the United States on Sept. 8, 1992). However, since appellant's execution is not imminent and she has not yet applied for clemency, this point of error is not ripe for our consideration. *Colburn v. State*, 966 S.W.2d at 513. We overrule point of error number 47.

Appellant has shown no reversible error. Therefore, we affirm the judgment of the trial court.

DELIVERED NOVEMBER 29, 2000

PUBLISHED IN PART.

Note to the publisher: The only parts of this opinion to be published are the introductory paragraph on pages 1-2, the paragraphs discussing points of error numbers ten and eleven on pages 7-11, and the concluding paragraph on page 46.